IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT CARDIOVASCULAR | ) | |
| SYSTEMS, INC., and EVALVE, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 19-149-MN |
| v. | ) | |
| | ) | |
| EDWARDS LIFESCIENCES CORP., and | ) | |
| EDWARDS LIFESCIENCES LLC, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO EDWARDS'
MOTIONS TO EXCLUDE AND STRIKE EXPERT TESTIMONY**

OF COUNSEL:
James F. Hurst
Amanda J. Hollis
Gregory B. Sanford
Rebecca Fitzpatrick
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Benjamin A. Lasky
Aaron D. Resetarits
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
(212) 446-4800

Erin C. Johnston
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Dated: March 6, 2020

Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
dfry@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................... 1

III.   STATEMENT OF FACTS ............................................................................................ 2

    A.     Background ....................................................................................................... 2

    B.     Ms. Stamm's Lost Profits And Reasonable Royalty Opinions. ........................... 4

    B.     Abbott's Clinician Experts' Opinions On Demand For MitraClip Features. ......... 6

    C.     Mr. Spar's Opinions Addressing Edwards' PTA Invalidity Analysis. .................. 7

IV.    ARGUMENT ............................................................................................................... 7

    A.     Ms. Stamm's Lost Profits Analysis Is Reliable And Should Not Be
        Excluded ............................................................................................................ 8

    B.     Ms. Stamm's Reasonable Royalty Analysis Should Not Be Excluded ............... 12

        1.     Ms. Stamm's Analysis Of Abbott's Minimum Willingness To
            Accept Is Reliable And Should Not Be Excluded .................................... 12

        2.     Ms. Stamm's Analysis Of Edwards' Maximum Willingness To
            Pay Is Reliable And Should Not Be Excluded ......................................... 15

    C.     Abbott's Clinician Experts' Opinions Regarding Demand For The
        Patented Features Are Reliable And Should Not Be Excluded .......................... 16

    D.     To The Extent Not Mooted On Summary Judgment, Mr. Spar's PTA
        Opinions Will Assist The Court, And Should Not Be Excluded ......................... 19

V.     CONCLUSION ......................................................................................................... 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AstraZeneca UK Ltd. v. Watson Labs., Inc.*,
  C.A. No. 10–915-LPS, 2012 WL 6043266 (D. Del. Nov. 14, 2012) ......................................20

*Boston Sci. v. Cordis*,
  838 F. Supp. 2d 259 (D. Del. 2012)......................................................................................11

*Brigham & Women's Hospital Inc. v. Teva Pharms. USA, Inc.*,
  C.A. No. 08–464, 2010 WL 3907490 (D. Del. Sept. 21, 2010) ............................................20

*Broadcom Corp. v. Emulex Corp.*,
  C.A. No. 09-1058-JVS, 2011 WL 11025895 (C.D. Cal. Dec. 13, 2011) ...............................13

*Corelogic Information Sols., Inc. v. Fiserv, Inc.*,
  C.A. No. 10-132-RSP, 2012 WL 12904000 (E.D. Tex. Sept. 20, 2012)................................19

*EMC Corp. v. Pure Storage, Inc.*,
  154 F. Supp. 3d 81 (D. Del. 2016)..................................................................................11, 12

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Corp.*,
  C.A. No. 10-187, 2018 WL 4976559 (D. Neb. Oct. 12, 2018) ........................................13, 16

*IGT v. All. Gaming Corp.*,
  C.A. No. 04-1676, 2008 WL 7084605 (D. Nev. Oct. 21, 2008) ............................................19

*King Instrument Corp. v. Otari Corp.*,
  767 F.2d 853 (Fed. Cir. 1985).............................................................................................11

*McDaniel v. Kidde Residential & Commercial*,
  No. 2:12-CV-1439, 2015 WL 5883724 (W.D. Pa. Oct. 8, 2015) ...........................................13

*Micro Chem, Inc. v. Lextron, Inc.*,
  317 F.3d 1387 (Fed. Cir. 2003)..............................................................................................8

*Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*,
  809 F.3d 610 (Fed. Cir. 2015)..............................................................................................10

*Par Pharm., Inc. v. Hospira, Inc.*,
  C.A. No. 17–944–JFB–SRF, 2019 WL 2396748 (D. Del. June 6, 2019)...............................20

*Rite-Hite Corp. v. Kelley Co., Inc.*,
  56 F.3d 1538 (Fed. Cir. 1995)..............................................................................................11

*Stecyk v. Bell Helicopter*,
   295 F.3d 408 (3d Cir. 2002)........................................................................................8

*In re Sullivan*,
   362 F.3d at 1326 ....................................................................................................20

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
   C.A. No. 11–515-LPS-CJB, 2015 WL 12815314 (D. Del. Nov. 20, 2015) ...........................20

## TABLE OF CITED EXHIBITS

| No. | Name |
|---|---|
| Ex. 1 | ███████████████████████████ |
| Ex. 2 | ███████████████████████████████ |
| Ex. 3 | Transcript, Videotaped Deposition of Tsuyoshi Kaneko, M.D. (Jan. 19, 2020) |
| Ex. 4 | Transcript, Videotaped Deposition of Robert Kipperman, M.D. (Jan. 19, 2020) |
| Ex. 5 | *Evalve v. Edwards Lifesciences* U.K. Trial Transcript (Day 11) |
| Ex. 6 | The Gray Sheet, Edwards' Pursuit of Transcatheter Mitral Valve Repair Options Continues, CEO Says (July 2, 2012) (ABT0000421) |
| Ex. 7 | Rebuttal Expert Report of Robert T. Chang |
| Ex. 8 | █████████████████████████ |
| Ex. 9 | Transcript, Canaccord Genuity Growth Conference (Aug. 9, 2017) (ABT0000874–80) |
| Ex. 10 | Transcript, Edwards 2018 Investor Conference (Dec. 5, 2018) (ABT0000657) |
| Ex. 11 | Expert Report of Moody Makar, M.D. |
| Ex. 12 | Transcript, Videotaped Deposition of Rodolfo Estay (Nov. 1, 2019) |
| Ex. 13 | ███████████████████████ |
| Ex. 14 | ████████████████████ |
| Ex. 15 | ████████████████ |
| Ex. 16 | Expert Report of Laura B. Stamm |
| Ex. 17 | Expert Report of Matthew Grennan, Ph.D. |
| Ex. 18 | Rebuttal Report of Ryan Sullivan, Ph.D. |
| Ex. 19 | Reply Expert Report of Laura B. Stamm |
| Ex. 20 | Reply Expert Report of Matthew Grennan, Ph.D. |

| Ex. 21 | Expert Report of Paul Sorajja, M.D. |
|--------|-------------------------------------|
| Ex. 22 | Expert Report of Stephen H. Little, M.D. |
| Ex. 23 | Expert Report of Dr. Robert Kipperman, M.D. |
| Ex. 24 | Expert Report of Dr. Ehrin Armstrong, M.D. M.Sc. M.A.S. |
| Ex. 25 | Transcript, Videotaped Deposition of Ehrin Armstrong, M.D. (Jan. 9, 2020) |
| Ex. 26 | Expert Report of Dr. Ted Feldman, MD MSCAI FACC FESC |
| Ex. 27 | Expert Report of Robert Spar |
| Ex. 28 | Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23) |
| Ex. 29 | Transcript, Videotaped Deposition of Laura B. Stamm (Jan. 10, 2020) |
| Ex. 30 | Transcript, Videotaped Deposition of Lakshmi P. Dasi, Ph.D. (Jan. 24, 2020) |
| Ex. 31 | Appendix B (Materials Considered) to Expert Report of Paul Sorajja, M.D. |
| Ex. 32 | Appendix B (Materials Considered) to Expert Report of Stephen H. Little, M.D. |
| Ex. 33 | Exhibit B (Materials Considered) to Expert Report of Moody Makar, M.D. |
| Ex. 34 | Expert Report of Dr. Lakshmi P. Dasi |
| Ex. 35 | Letter from D. Hinton, Chief Scientist, FDA, to S. Philbin, Goodwin Proctor LLP, re Citizen Petition (July 12, 2018) (EDW-ABT00733440) |
| Ex. 36 | Reply Expert Report of Morten Olgaard Jensen, Ph.D., Dr. Med. |
| Ex. 37 | Reply Expert Report of Ryan Sullivan, Ph.D. |

## I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT[1]

Edwards' brief reads more like a cross-examination outline than a *Daubert* motion.  When a multi-billion dollar heart valve company like Edwards, with endless relationships and resources, launches an infringing product to ██████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ MitraClip will obviously lose sales and profits.  That is exactly what the evidence will establish at trial.  Edwards' motion is an unjustified attempt to prevent the jury from hearing it.

If the evidence "contradicts" anything, it is Edwards' claims that PASCAL is treating patients MitraClip can't treat and causing Abbott no lost profits.  Edwards continues to make this claim even though its own clinician experts conceded that "*we don't currently have the data* to say that PASCAL will, in fact, be able to treat patients better than MitraClip" (Ex. 3 at 213:3–7), ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ And even though ***Edwards' own counsel*** conceded the same thing to another court (Ex. 5 at 1506:22–1507:5):

> [T]here has been ***no definitive data*** as to the performance of PASCAL in complex anatomies to date. Indeed, we reference in our closing that there is a head-to-head trial with MitraClip going on, but even that is in patients with standard anatomies. ***That is why we have not been able to put our case on the basis, and we do not put our case on the basis that, <u>objectively, it can be said that PASCAL is superior to [MitraClip]</u>.***

There's nothing "unreliable" about Ms. Stamm's not accepting "facts" Edwards' own experts and lawyers concede do not exist.  And Edwards' claim she did "nothing" to determine whether PASCAL was expanding the market by treating patients MitraClip can't treat is simply not true.  In fact, Ms. Stamm reviewed all the evidence and theories Edwards says she did not consider, and concluded they did not show that expansion.  Not surprising.  Merely ***saying***

---

[1] All emphasis added unless otherwise stated; all internal citations omitted unless otherwise stated.

PASCAL is priced at a "premium" to MitraClip, for example, does not make it so, and would not show market expansion anyway.  Among other things, Ms. Stamm also consulted another Abbott expert, Dr. Grennan, who did an entire economic analysis of the issue, and found "reliable evidence that PASCAL has taken substantial sales from MitraClip, and no reliable evidence that PASCAL expands the market."  Edwards musters no reliability challenge to any part of Dr. Grennan's work.

Edwards' other arguments against Ms. Stamm's and the clinicians' opinions are just its own interpretations of the facts—interpretations that Abbott hotly contests, that Edwards' own experts and counsel already conceded away, and that will need to be resolved at trial.

As for Mr. Spar, the fact that legal opinions are often excluded does not mean Mr. Spar's should be.  In evaluating PTA, the Court must ordinarily accept the PTO's interpretation of its regulations.  As former director of the PTO branch that promulgated them, Mr. Spar's testimony is the type of helpful testimony about "PTO practices and procedures" this District allows.  Further, Edwards concedes that its PTA challenge raises "pure legal issues" for the Court to decide. (D.I. 360 at 3.)  Thus, if Edwards' PTA challenge survives pre-trial briefing, it should be heard by the Court, not the jury, and the Court can decide which of Mr. Spar's opinions to accept or reject.

## III.    STATEMENT OF FACTS

### A.    Background

After failing multiple times to "break into" the "minimally invasive transcatheter route for mitral valve repair" another way,[2] Edwards developed PASCAL, a product so similar to MitraClip

---

[2]    *See* Ex. 6 at -422 (EDW's CEO acknowledging that "[t]he minimally invasive transcatheter route for mitral valve repair 'has been a tough one' for the company to break into").  Edwards had several failures, including its "Monarc" coronary sinus annuloplasty device, and its own independently-developed edge-to-edge leaflet repair device, "Mobius," which was abandoned due to "poor . . . results," after failures in more than half of tested patients. (Ex. 7 (Chang) ¶ 92.) ████████████████████████████████████████████████████

Edwards carried out its plan.  It boasted to investors that PASCAL would have just "one competitor," "MitraClip" (Ex. 9 at -879–80), and that MitraClip's clinical trial results, including those of its enormously successful "COAPT" trial, would be a "tailwind" for PASCAL sales. (Ex. 10 at -690.)  It sought and obtained regulatory approval for the same indications as MitraClip (Ex. 11, ¶ 8.2), and then systematically targeted MitraClip sales and customers.

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

Despite this, Edwards now argues PASCAL has taken no MitraClip sales, and no MitraClip profits are being lost to PASCAL, so Abbott is entitled to no "lost profits." Abbott disagrees. Both sides retained experts to address these disputes. Abbott's include damages experts Laura Stamm and Dr. Matthew Grennan, and clinicians Drs. Paul Sorraja, Stephen Little and Moody Makar.

### B.       Ms. Stamm's Lost Profits And Reasonable Royalty Opinions.

Ms. Stamm is a C.P.A. with an M.S. in Management and Finance from M.I.T., and has extensive experience assessing patent infringement damages. (Ex. 16, ¶¶ 4–5.)

In her opening report—spanning 60 pages with over 350 footnotes citing almost 200 documents—Ms. Stamm analyzed each of the *Panduit* factors and concluded Abbott is entitled to lost profits. (*Id.*, ¶¶ 61–133.) In reaching her opinion, Ms. Stamm specifically addressed market expansion. She analyzed the evidence cited in Edwards' interrogatory response to determine whether it showed PASCAL had expanded the market, including the purported "evidence" that "physicians, including key opinion leaders (KOLs), view PASCAL as positively differentiated from MitraClip, including as being able to treat at least some MR patients better, more easily, or at all." (*Id.*, ¶¶ 71). And she considered other relevant evidence, ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ She also consulted Abbott's clinician experts to assess Edwards' assertion that PASCAL is able to treat patients MitraClip cannot. (*Id.*, ¶¶ 73–77.) And she consulted the unchallenged opinions of Dr. Matthew Grennan, an industrial organization economist and Professor of Health Care Management at the Wharton School at U. Penn., who

concluded "PASCAL and MitraClip are close economic substitutes and compete in a two-player market for leaflet repair devices." (*Id.*, ¶ 85; Ex. 17, § VI.A.)  She ultimately concluded there was no evidence showing "PASCAL has caused the leaflet repair TMVr market to expand" or "PASCAL is treating any patients that MitraClip cannot." (Ex. 16, ¶ 107.)

In rebuttal, Edwards' damages expert, Dr. Sullivan, opined that a PASCAL sale is not necessarily a lost MitraClip sale, so no lost profits award is appropriate. (Ex. 18, ¶¶ 124–225.)  He concluded damages should instead be a reasonable royalty. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████      ████████████████ To confirm that analysis, he considered Abbott's minimum willingness to accept and Edwards' maximum willingness to pay. (*Id.*, ¶¶ 278–87.)  He set the minimum at "close to zero," and the maximum at "the profits [Edwards] would not have made in 2019 and 2020 on units of PASCAL manufactured in the United States," then chose the midpoint. (*Id.*)  He found that rate to be consistent with the rate in the ████████. (*Id.*, ¶¶ 275, 287.)

In reply—another 46 pages with 233 footnotes citing almost 90 documents—Ms. Stamm considered the evidence Dr. Sullivan cited, but concluded that "Dr. Sullivan ha[d] cited no clinical evidence or analysis demonstrating PASCAL's purported market expansion." (Ex. 19, ¶ 41; *id.*, ¶¶ 39–68.)  She addressed head-on the "evidence" that had not been identified in Edwards' interrogatory response, including more of the evidence Edwards claims in its motion she ignored,

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████).

She again consulted Abbott's clinician experts, this time also to assess Edwards' argument that physicians might choose treatments other than MitraClip in the "but for" world if PASCAL

was not available. (*Id.*, ¶ 56–60.)  And she again consulted Dr. Grennan, who conducted a "rigorous analysis" of the data relied upon by Dr. Sullivan, and found "reliable evidence that PASCAL has taken substantial sales from MitraClip, and no reliable evidence that PASCAL expands the market." (*Id.*, ¶ 46; Ex. 20, ¶¶ 5, 51–57.)  She ultimately concluded that Dr. Sullivan's claim of PASCAL's "market expansion" was "unsubstantiated and inconsistent with Edwards' own marketing strategy" to "target[] existing MitraClip centers for sales of PASCAL." (Ex. 19, ¶ 40.)

Ms. Stamm then analyzed Dr. Sullivan's reasonable royalty analysis and showed it significantly understated the rate, even under his framework. (*Id.*, ¶¶ 85–116.)  Rather than accepting "close to zero," she concluded "it would be economically unreasonable to expect [Abbott] would accept [a] license … for less than what they agreed to pay for ███████████ (*Id.*, ¶ 113.) ██████████████████████████████████████████████ ███████████████████████████████████████████████. (*Id.*, ¶ 114.)  Ms. Stamm also showed how Dr. Sullivan understated Edwards' maximum willingness to pay by ████████████████████████████████████████████████████████ ██████████████████████. (*Id.*, ¶¶ 106–111.)  Finally, Ms. Stamm noted that the "*Georgia-Pacific* factors support a royalty closer to the upper-bound of the range," but "[c]onservatively" adopted Dr. Sullivan's approach of "assuming a royalty in the mid-point of the range." (*Id.*, ¶ 115.)

## B.    Abbott's Clinician Experts' Opinions On Demand For MitraClip Features.

Drs. Paul Sorajja, Stephen Little and Moody Makar are clinicians with extensive experience making treatment decisions for MR patients, including MitraClip implantation. (Ex. 21, ¶¶ 5–22; Ex. 22, ¶¶ 4–16; Ex. 11, ¶¶ 1.3–1.5.)  Each describes critical features of MitraClip, such as the ability "to grasp the leaflets from both the atrial and ventricular side," the "concave clip arms," and the ability to "move from a fully closed position to an inverted position," and explains their clinical importance (Ex. 21, ¶¶ 93–105; Ex. 22, ¶¶ 85–97; Ex. 11, ¶¶ 11.1–11.10.)

In response, Edwards submitted opinions from three of its own clinicians, one with similar qualifications to Abbott's clinician experts (Kipperman), one who does not implant MitraClip at all (Armstrong), and one who is Edwards' VP of Medical Affairs (Feldman). (Ex. 23, ¶¶ 6–13, 75–76; Ex. 24, ¶ 84; Ex. 25 at 69:9–73:11; Ex. 26, ¶¶ 1, 116.)  Each purports to disagree with Abbott's experts, but they do not identify any alternative demand drivers, or address the evidence Abbott's clinicians are accused of "ignoring." (Ex. 23, ¶¶ 75–76; Ex. 24, ¶ 84; Ex. 26, ¶ 116.)

### C.    Mr. Spar's Opinions Addressing Edwards' PTA Invalidity Analysis.

Robert Spar is the former Director of the PTO's Office of Patent Legal Administration (OPLA), the department that promulgated the PTO's regulations on PTA. (Ex. 27, ¶ 7.)  During discovery, Edwards asserted in an interrogatory response that the PTO incorrectly calculated the '267 patent's PTA under those regulations. (Ex. 28 at 1–8.)  But it has not submitted any expert opinion, or other support for its positions.  Mr. Spar explains the PTO's practices and procedures in calculating PTA, and how they were applied to the '267 patent. (Ex. 27.)  Edwards has agreed the PTA arguments should be addressed by the Court in pre-trial briefing. (D.I. 360 at 3–4.)

## IV.    ARGUMENT

Edwards' motion seeks an extremely broad order excluding Ms. Stamm's *entire* lost profits and reasonable royalty opinions, Drs. Sorajja, Little and Makar's *entire* MitraClip demand opinions, and Ms. Spar's *entire* report.  But for support, it mostly just states its view of the case, and its disagreement with the facts and assumptions in those experts' reports.  Edwards' arguments for exclusion are nothing more than points for cross examination, not a justification for exclusion.

Edwards mainly faults Ms. Stamm for not accepting Edwards' own hotly contested factual assertions, including its claim that doctors do not view "PASCAL and MitraClip as equally preferable alternatives" (EDW Op. Br. at 5), that doctors think—despite the absence of supporting data—PASCAL can "treat at least some MR patients better" than MitraClip (*id.* at 8), and that

"some if not all of PASCAL's sales are likely market expansive" due to PASCAL's allegedly "differentiated" features and "Edwards' reputation and market development activities." (*Id.* at 7.)

These are not grounds for exclusion.  Challenging "facts and assumptions underlying the testimony of an expert witness" is something opposing counsel is supposed to do in "***cross-examination***." *Stecyk v. Bell Helicopter*, 295 F.3d 408, 414 (3d Cir. 2002).

### A.    Ms. Stamm's Lost Profits Analysis Is Reliable And Should Not Be Excluded

Edwards first moves to exclude Ms. Stamm's lost profits opinion, claiming documents and testimony "contradict" her view that PASCAL is not causing market expansion.  But nothing Edwards identifies actually "contradicts" Ms. Stamm's assessment.  And while Edwards might disagree with Ms. Stamm's conclusions, "[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Micro Chem, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

Ms. Stamm's conclusion that PASCAL is not treating patients that MitraClip would not is consistent with the views Edwards' own clinical experts ***and even Edwards itself*** presented to a different court.  This includes the only ***independent*** clinical expert Edwards has relied on consistently throughout this case, Dr. Robert Kipperman, who submitted declarations opposing Abbott's PI and TRO motions. (D.I. 47, 96.)  Edwards' Dr. Sullivan states that he "understand[s] from Dr. Kipperman that 'there are clinical situations that could be addressed with PASCAL that cannot be addressed by MitraClip.'" (Ex. 18, ¶ 467.)  But at his deposition in this case, Dr. Kipperman conceded that there "is ***no clinical data***" supporting that assertion. (Ex. 4 at 225:10–16.)  And in a parallel U.K. proceeding, the court commented that Dr. Kipperman's testimony "presented a slightly different picture of some of the issues than his written evidence" including an "episode" in which "his written evidence implie[d], or seem[ed] to more than imply, that the only thing that could have been done [in one of his treatments] was a PASCAL, and in fact he said

that was not the case in his oral evidence." (Ex. 5 at 1488:20–1489:4.)  After Dr. Kipperman's

about-face at trial, Edwards' U.K. counsel conceded it could no longer "objectively" claim "that

PASCAL is superior to [MitraClip]." (*Id.* at 1506:22–1507:5.)

Dr. Sullivan also relies on Dr. Kaneko as saying "that PASCAL is a differentiated device"

that can treat patients "who might not otherwise be able to be treated with MitraClip, and that

PASCAL can be a better option for patients with certain anatomical differences or different

conditions." (Ex. 18, ¶¶ 135, 467.)  But at his deposition, Dr. Kaneko admitted "***we don't currently***

***have the data*** to say that PASCAL will, in fact, be able to treat patients better than MitraClip."

(Ex. 3 at 213:3–7.)  As explained in Abbott's own *Daubert* motion, the opinions of Edwards' other

clinician experts do not establish that PASCAL can treat patients who cannot be treated with

MitraClip either. (D.I. 417 at 6–18.)  There's nothing "unreliable" about Ms. Stamm not accepting

facts that Edwards' own experts and lawyers readily concede do not exist.

Unsurprisingly then, though it is a cornerstone to its motion, Edwards does not prove its

assertion that "evidence showing that PASCAL is expanding the market" "unquestionably exists."

Edwards points to three things:  (1) some physicians who "view" "PASCAL [a]s … able to treat

at least some MR patients better, more easily or at all," (███████████████████████████████

███████████████████████████████████████████████████████████████████  (EDW

Op. Br. at 8–9.)  But none of these "demonstrate[] that PASCAL is expanding the market." (*Id.*)

Mere "*views*" that PASCAL may be ***able*** to treat patients MitraClip can't, and █████ it ***might***,

do not mean PASCAL ***is*** being used to treat such hypothetical patients or ***has*** expanded the market.

Ms. Stamm did not "ignore" this "evidence," either.  For example, with respect to Dr.

Sullivan's assertions about PASCAL's purportedly "differentiated features," Ms. Stamm pointed

out that much of the evidence Dr. Sullivan cited was "analyst reports offering uncited speculation

about PASCAL's potential benefits" (presumably communicated by Edwards itself) and mere "[a]necdotal examples of physician preferences," which could not prove PASCAL is able to treat patients MitraClip cannot. (Ex. 19, ¶¶ 42–43.)  She also addressed Dr. Sullivan's assertion that the

██████████████████████████████████████████████████████████████

███████████████████  █████████████████████████████████████████

███████████████████████████████████████  (*Id.*, ¶ 50.)  And she considered Dr. Sullivan's assertion, based on Edwards' clinician experts, that physicians might choose medical management rather than MitraClip for patients who would otherwise be treated with PASCAL. (*Id.*, ¶¶ 57–58.)  But she relied on the unchallenged opinions of Abbott's clinician experts that "[o]nce a physician has decided to treat a patient with a leaflet repair device [*i.e.*, MitraClip or PASCAL], he or she would continue with a leaflet repair procedure unless they had no available product in that space." (*Id.*, ¶ 85.) ██████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ [3]

     █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████  █████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████  ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[3] The Court's PI ruling "reject[ing] Plaintiffs' contention that any sale of PASCAL is a lost sale of MitraClip" (EDW Op. Br. at 4) was necessarily preliminary and does not bind the jury. *See Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*, 809 F.3d 610, 619 (Fed. Cir. 2015).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

Thus, Ms. Stamm did far from "nothing" to substantiate her opinion that there is no evidence that PASCAL is treating patients who cannot be treated with MitraClip. (*Contra* EDW Op. Br. at 11.)  Rather, she carefully considered but disputed all of the arguments and supporting "evidence" raised by Dr. Sullivan in support of his contrary opinion.  "[Ms. Stamm's] analysis should not be excluded simply because there is a dispute regarding the facts underlying [her] lost profits methodology." *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 120 (D. Del. 2016).

Edwards also argues that Ms. Stamm needed to "rule out that at least some commercial PASCAL implanting physicians … would choose PASCAL over medical management, but would not so choose MitraClip …." (EDW Op. Br. at 10.)  But a patentee "need not meet the impossible burden of negating ***every possibility*** that a purchaser might not have bought another product," *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 864 (Fed. Cir. 1985), but "need only show that there was a ***reasonable probability*** that the sales would have been made 'but for' the infringement." *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1545 (Fed. Cir. 1995).

Finally, Edwards criticizes Ms. Stamm for not using "surveys of the physicians or heart teams involved in commercial PASCAL implants" (EDW Op. Br. at 9–10), but cites nothing to indicate a survey was required.  Under the law, Ms. Stamm was "not required to present survey evidence" for lost profits. *Boston Sci. v. Cordis*, 838 F. Supp. 2d 259, 274 (D. Del. 2012).  Instead, Ms. Stamm consulted the opinions of economist Dr. Grennan, who concluded "PASCAL and MitraClip are close economic substitutes" and compete in a "two-player market" for leaflet repair

devices, (Ex. 16, ¶ 85; Ex. 17, ¶ 12, Section VI.A.) and, after a "rigorous analysis" of the data relied upon by Dr. Sullivan, found "reliable evidence that PASCAL has taken substantial sales from MitraClip, and no reliable evidence that PASCAL expands the market." (Ex. 19, ¶ 46; Ex. 20, ¶¶ 5, 51–57.)  Edwards has not challenged Dr. Grennan's methodology or conclusions.

At base, Edwards' dispute is over the facts underlying Ms. Stamm's opinion and its remedy is cross-examination and contrary expert testimony, not exclusion. *EMC*, 154 F. Supp. 3d at 92.

### B. Ms. Stamm's Reasonable Royalty Analysis Should Not Be Excluded

Ms. Stamm's reasonable royalty opinions also should not be excluded.  She largely adopted *Dr. Sullivan's* methodology and assumptions, and her material disagreements are well-supported.

#### 1. Ms. Stamm's Analysis Of Abbott's Minimum Willingness To Accept Is Reliable And Should Not Be Excluded

Edwards first criticizes Ms. Stamm's approach to determining Abbott's minimum willingness to accept, *i.e.*, the lower bound for the royalty rate.  Ms. Stamm disagreed with Dr. Sullivan's implausible assumption that Abbott would accept "*close to zero*" as a royalty.  She explained that at a minimum, Abbott would expect at least ███████████████████████████ ███████████████████—according to Dr. Sullivan himself—was technologically comparable to *each* patent-in-suit. (Ex. 19, ¶¶ 113–14.)[4]

*First*, Edwards criticizes Mr. Stamm for not analyzing "technical comparability" between the ████████ and the patents-in-suit, and not citing "any technical expert." (EDW Op. Br. at 13.)  But Ms. Stamm *adopted Dr. Sullivan's assumption* of technological comparability. (Ex. 19, ¶ 86–87; Ex. 18, ¶ 263.) ██████████████████████████████████

---

[4] Ms. Stamm also explained why, even adopting the assumption that the ████████ is "*technically comparable*," ███████████ "is not *economically* comparable … for a number of reasons" including "███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████ Edwards cannot legitimately criticize Ms. Stamm for adopting Dr. Sullivan's assumptions, even if Edwards now believes them to be unsupported. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Corp.*, C.A. No. 10-187, 2018 WL 4976559, *4–5 (D. Neb. Oct. 12, 2018) (rejecting *Daubert* challenge where challenged expert's methodology was "reliable and consistent with much of [the challenger's] expert's analysis"); *cf. McDaniel v. Kidde Residential & Commercial*, No. 2:12-CV-1439, 2015 WL 5883724, at *5 (W.D. Pa. Oct. 8, 2015) (rejecting motion to exclude where "both experts employ essentially the same technique").

*Second*, Edwards criticizes Ms. Stamm for "improperly categoriz[ing] the patents in suit as three separate families whose values are additive." (EDW Op. Br. at 12.)  But its criticisms at most go to the "correctness" of her conclusions, not the reliability of her methodology. *Summit 6*, 802 F.3d at 1296.  Dr. Sullivan asserts that ████████████████████████████████ ██████████████████████████ ████████████ ████████████████ ████████████████████████████ Ex. 18, ¶ 267.)  Ms. Stamm disagrees because the patents-in-suit comprise "three distinct patent families," ████████████████, and, in any event, "the differences between ████████████████ the hypothetical license to the Patents-in-Suit" mean the ████████ rate deserves "numerous upward adjustments." (Ex. 19, ¶¶ 113–14.)

This is a fundamental disagreement between experts for a jury to resolve.  Edwards cites no case precluding an expert from concluding that a royalty rate for one patent family would apply separately to different families where, as here, each has "importance" to the accused product. *See, e.g., Broadcom Corp. v. Emulex Corp.*, C.A. No. 09-1058-JVS, 2011 WL 11025895, *3 (C.D. Cal. Dec. 13, 2011) (rejecting challenge to expert assigning separate, additive royalty rates to patent families).  Nor did Ms. Stamm acknowledge any "absurd logical extension of her analysis." (EDW

Op. Br. at 12–13.) 

That scenario is not at issue here, so it is irrelevant to Edwards' motion.

Edwards' exclusion argument also does not account for the fact that Dr. Sullivan provides no more detail for his view ████████████████ than Ms. Stamm provided for her opposing view.  His entire analysis is this:

(Ex. 18, ¶ 267.)  If Ms. Stamm's opinion were excluded because her "additive value" opinion lacks support, then Dr. Sullivan's reasonable royalty opinion should also be excluded because his "no additive value" opinion has no more support.  Neither should be excluded.

Edwards' remaining arguments also go to the correctness of Ms. Stamm's conclusions, not the reliability of her methodology.  For example, Edwards disagrees that the '813 patent should be considered a separate "family" from the '388, '493 and '267 patents, which are continuations-in-part. (EDW Op. Br. at 12.)  But Ms. Stamm explained her use of the term "patent family" to mean patents that cover different "fundamental technologies." (Ex. 29 at 135:17–136:18.)  Edwards does not even dispute that the '813 patent covers different fundamental technology than the '388/493/267 patents, much less establish that conclusively as a matter of law.

Nor is Ms. Stamm's opinion "contrary to Abbott's own technical experts." (EDW Op. Br. at 13.)  Dr. Dasi and Mr. Chang do not contradict Ms. Stamm's testimony that each patented invention was "foundational to the *MitraClip* device." (Ex. 29 at 144:3–10.)  Dr. Dasi used the term "foundational" in a different sense to refer to how the '097 patent has "changed and impacted views of engineering, medicine" *in general*, and he further testified that the remaining patents-in-

14

suit are "important" and "build over the foundations" and contain "important intellectual ideas." (Ex. 30 at 132:14–22, 260:23–261:16.)  Even if the Court believes the patents-in-suit are not all "foundational," that would merely go to the "correctness" of Ms. Stamm's opinion rather than the reliability of her methodology, and exclusion would still be improper. *Summit 6*, 802 F.3d at 1296.

### 2.    Ms. Stamm's Analysis Of Edwards' Maximum Willingness To Pay Is Reliable And Should Not Be Excluded

Edwards next criticizes Ms. Stamm's analysis of Edwards' maximum willingness to pay, *i.e.*, the upper bound of the royalty rate, but again its criticism does not warrant exclusion.  ***Ms. Stamm applied the same assumption as Edwards' expert Dr. Sullivan***, that Edwards' maximum willingness to pay would be the profits it would lose from being off the market in 2019 and 2020 absent a license. (Ex. 19, ¶ 106; Ex. 18, ¶¶ 279–80.)  She disagreed, however, with Dr. Sullivan over the quantum of those profits, ██████████████████████████████████████████

███████████████████████████████████████████████████  She said that position is "economically untenable" because there would need to be a ████████████████████

██████████████████████████████████████████████████████████████████

██████████████ (Ex. 19, ¶¶ 110–11.) ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Edwards does not allege that Ms. Stamm's conclusion that ███████████████████████

██████████████████████████ nor does it criticize her modeling.  Rather, Edwards argues that "Ms. Stamm did not adjust the maximum royalty rate to apportion the value of the PASCAL procedure sales at issue attributable to the claimed inventions, which are limited only to certain aspects of the implant." (EDW Op. Br. at 15.)  But this argument ignores what Ms. Stamm was doing: she adopted ***Dr. Sullivan's*** metric for maximum willingness to pay. (Ex. 19, ¶ 106; Ex. 18,

¶¶ 279–80.)  Dr. Sullivan did not apportion those profits to the implant any more than Ms. Stamm

in setting the upper bound of his royalty rate. (Ex. 18, ¶¶ 278–84.)  Again, Edwards is improperly

criticizing Ms. Stamm for adopting the same approach as Dr. Sullivan, which cannot provide a

basis for exclusion. *Exmark*, 2018 WL 4976559, at *4–5.

That is not to say that Dr. Sullivan and Ms. Stamm performed no apportionment.  Rather,

to apportion, Dr. Sullivan chose the midpoint between his upper and lower bounds based on his

view that ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████ Ex. 18, ¶¶ 285–87.)  Ms. Stamm "[c]onservatively" did so too, despite her review of

the evidence showing Dr. Sullivan's assumptions understated the value of the patented technology.

(Ex. 19, ¶ 115.)  Notably, Dr. Sullivan did not further ████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████ (Ex. 18, ¶¶ 287,

344–45; *cf.* EDW Op. Br. at 16.)  Edwards cannot legitimately criticize Ms. Stamm for doing the

same. *Exmark*, 2018 WL 4976559, at *4–5.  Edwards' motion to exclude should be denied.

### C.    Abbott's Clinician Experts' Opinions Regarding Demand For The Patented Features Are Reliable And Should Not Be Excluded

Edwards also provides no basis to exclude Abbott's clinician experts' opinions.  Edwards

argues that "the medical experts are just that—medical experts, not experts on consumer surveys

or other such evidence." (EDW Op. Br. at 16.)  But it does not and cannot dispute that the experts

are knowledge leaders in interventional cardiology with extensive experience making treatment

decisions for patients with mitral regurgitation, including MitraClip's use.  As such, they are

qualified to opine on why physicians choose MitraClip.  And, in response, Edwards relies on its

own clinician experts with the same, or even lesser, qualifications, including an interventional cardiologist who has not even treated patients with MitraClip since 2013. (Section III.B, *supra*.)

Abbott's clinician experts do not merely say, as Edwards claims, that "physicians would not use MitraClip if it did not work." (EDW Op. Br. at 17.)  Rather, they opine, based on their extensive experience, that MitraClip would not work successfully (or at all) without the patented features, so clinicians would not use it without those features. (Ex. 21, ¶¶ 93–105; Ex. 22, ¶¶ 85–97; Ex. 11, ¶¶ 11.1–11.10.)  Edwards has no basis to assert (and cites nothing to support) that the clinician experts "created their list of demand-driving features by looking to the patents rather than analyzing the evidence" (EDW Op. Br. at 17).   None even considered the patents-in-suit in reaching their demand opinions, much less relied on them to guide their opinions. (Exs. 31–33.)

Edwards also ignores that its own clinician experts agree with Abbott's experts.   Dr. Kaneko admitted that the ability to capture the leaflets from both sides is "fundamental" to both MitraClip's and PASCAL's success. (Ex. 3 at 247:14–248:13.)  Dr. Armstrong further testified that "if the grasping was conducted on just one side, it would create a malcoaptation and not effectively treat the mitral regurgitation." (Ex. 25 at 270:15–272:5.)  The '097 patent's "clipping system" enables this. (*See, e.g.*, Ex. 22, ¶ 91; Ex. 34, ¶¶ 918–19.)  Dr. Kaneko also admitted that the ability to move to an "inverted position," as the '267 patent claims, is "essential" to MitraClip's operation. (Ex. 3 at 244:19–245:19; *see also* Ex. 34, ¶¶ 934–44.)

Edwards faults Abbott's clinician experts for not seeing "that other features … are the ones that drive demand" (EDW Op. Br. at 17–18), but the evidence Edwards cites is either irrelevant or consistent with Abbott's experts' opinions.   Whether Abbott's marketing materials specifically call out patented features using the patent terminology (*id*. at 17) is irrelevant, because the patented features are the "fundamental" and "essential" features that allow Abbott (and Edwards) to market

17

a "minimally invasive" device at all, where many others have failed. (Ex. 21, ¶¶ 93–105; Ex. 22, ¶¶ 85–97; Ex. 11, ¶¶ 11.1–11.10; Ex. 3 at 244:19–245:19, 247:14–248:13; Ex. 25 at 270:15–272:5.)  In contrast, Edwards' own experts admit that the marketing terms on which it relies—*e.g.*, "multidisciplinary heart team" and "real-time imaging"—are generic terms known long before MitraClip and/or generally available to ***all*** transcatheter mitral repair technologies. (*See, e.g.*, Ex. 25 at 133:8–138:2, 140:22–143:12; Ex. 3 at 257:4–258:25, 259:4–262:22.)  None can explain the success of, and demand for, MitraClip (and now PASCAL) over competing technologies. (*Id.*)

Edwards also ignores that its own PASCAL marketing highlights the same patented features. (*See, e.g.*, Ex. 34, ¶¶ 916–17, 927–29, 941–42 (citing and quoting EDW marketing materials).)  The evidence shows that the PASCAL features Edwards identifies as purportedly ***not*** incorporated into MitraClip, *e.g.*, "wider clips" and "independent grasping," were enabled only by the patented features.  For example, to have a "wider clip," one must have a clip in the first place, which Abbott's patents enabled. ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Thus, Abbott's experts have not "ignored inconvenient evidence" but have weighed relevant evidence over irrelevant information.  Edwards' clinician experts did not even address the very evidence Edwards complains Abbott's experts "ignored." (Ex. 23, ¶¶ 75–76; Ex. 24, ¶ 84; Ex. 26, ¶ 116.)  And with good reason.  Edwards cannot claim demand for MitraClip—which the FDA called a "first-in-class device representing a breakthrough technology and providing a clinically meaningful advantage over existing technology" (Ex. 35 at 7–8) —is due to the generic "heart team" that chooses it, catheter that delivered it, or imaging technology that guided it, rather than the clip's specific, revolutionary features.  Further, to the extent Edwards is suggesting that

the clinicians "should have conducted a survey to establish demand for the patented feature[s]," Edwards' experts do not rely on such a survey, and Edwards has "failed to demonstrate that a survey is necessary to support [the] opinions." *Corelogic Information Sols., Inc. v. Fiserv, Inc.*, C.A. No. 10-132-RSP, 2012 WL 12904000, *2 (E.D. Tex. Sept. 20, 2012).  At most, Edwards' theory that Abbott's experts ignored evidence is fodder for cross-examination, not exclusion.[5]

Edwards complains that the clinicians' characterizations of the demand-driving benefits is "improperly broad because it encompasses plainly non-patented features" (EDW Op. Br at 19) but Edwards mischaracterizes the experts' reports through selective quoting.  Although Abbott's experts opine that "[t]he primary demand for the MitraClip has been driven by the need for a safe and effective, less-invasive treatment for [MR]," and that MitraClip's "unique combination" of features met that need (*id.*), they then explain how *only the patented technology* enabled that "unique combination." (Ex. 21, ¶¶ 93–105; Ex. 22, ¶¶ 85–97; Ex. 11, ¶¶ 11.1–11.10.)  While Edwards disagrees, "*Daubert* does not allow a court to resolve a factual dispute underlying the expert's analysis" where "both parties have essentially highlighted an issue of fact as to what is the essential feature of [the patentee's covered products] that drives their sales and demand." *IGT v. All. Gaming Corp.*, C.A. No. 04-1676, 2008 WL 7084605, at *8 (D. Nev. Oct. 21, 2008).

**D.     To The Extent Not Mooted On Summary Judgment, Mr. Spar's PTA Opinions Will Assist The Court, And Should Not Be Excluded**

As noted in Abbott's February 18, 2020 letter brief, Edwards' PTA invalidity arguments are wrong as a matter of law, and should be summarily rejected. (D.I. 350 at 2–3.)  If they survive to trial, however, the Court should admit Mr. Spar's testimony provide the proper framework for

---

[5] Edwards' experts discussed that "evidence" of "other features" in *reply* reports of its *bioengineering and economics* experts in the context of *objective indicia of non-obviousness*, not demand for the patented features for damages. (*See, e.g.*, Ex. 36, ¶ 524; Ex. 37, ¶¶ 63–68.)

19

the jury. To decide the PTA issue, the Court will need to "accept the [PTO's] interpretation of [PTO] regulations unless that interpretation is plainly erroneous or inconsistent with the regulation." *In re Sullivan*, 362 F.3d at 1326. Having implemented the PTA regulations, Mr. Spar is uniquely placed to supply the proper framework. Edwards does not dispute that Mr. Spar's opinions are reliable or that he is qualified to provide them (*id.*), and it has not presented any contrary expert opinion.

Edwards overstates when it claims that "[t]his Court typically excludes testimony of legal experts 'absent extraordinary circumstances.'" (EDW Op. Br. at 20). This case is unlike Edwards' cited cases,[6] in that the Court must defer to the PTO's interpretations of its regulations. Edwards' cited cases also show that courts in this District ***do*** permit PTO experts to testify on "PTO practices and procedures," and their application. *See, e.g.*, *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, C.A. No. 11–515-LPS-CJB, 2015 WL 12815314, *3–4 (D. Del. Nov. 20, 2015). Since the parties agree this is not a jury question (D.I. 360 at 3–4), there is no risk of jury confusion or prejudice, and the Court can determine what weight to give Mr. Spar's ultimate conclusions. *See Par Pharm., Inc. v. Hospira, Inc.*, C.A. No. 17–944–JFB–SRF, 2019 WL 2396748, *2 (D. Del. June 6, 2019) ("In bench trials, evidence should be admitted and then sifted when the district court makes its findings of fact and conclusions of law."). Mr. Spar's testimony should be admitted to help the Court.

## V.   CONCLUSION

For these reasons, the Court should deny Edwards' Motion.

---

[6] *See AstraZeneca UK Ltd. v. Watson Labs., Inc.*, C.A. No. 10–915-LPS, 2012 WL 6043266, *1 (D. Del. Nov. 14, 2012) (former PTO examiner with no expertise in the patent field not permitted to testify on claim construction from perspective of person skilled in the art); *W.L. Gore*, 2015 WL 12815314, *5 (PTO expert's inequitable conduct opinion excluded, where it required "speculation as to what may have been in another's mind"); *Brigham & Women's Hospital Inc. v. Teva Pharms. USA, Inc.*, C.A. No. 08–464, 2010 WL 3907490, *1–2 (D. Del. Sept. 21, 2010) (similar).

Respectfully submitted,

/s/ David M. Fry
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
dfry@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

OF COUNSEL:
James F. Hurst
Amanda J. Hollis
Gregory B. Sanford
Rebecca Fitzpatrick
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Benjamin A. Lasky
Aaron D. Resetarits
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
(212) 446-4800

Erin C. Johnston
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Dated: March 6, 2020

## CERTIFICATE OF SERVICE

I, David M. Fry, hereby certify that on March 6, 2020, this document was served on the

persons listed below in the manner indicated:

**BY EMAIL**

Kelly E. Farnan
Jeffrey L. Moyer
Christine D. Haynes
RICHARDS LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7705
farnan@rlf.com
moyer@rlf.com
haynes@rlf.com

Catherine Nyarady
Nicholas P. Groombridge
Kira A. Davis
Joshua D. Reich
Ayelet M. Evrony
Allison C. Penfield
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3532
cnyarady@paulweiss.com
ngroombridge@paulweiss.com
kdavis@paulweiss.com
jreich@paulweiss.com
aevrony@paulweiss.com
apenfield@paulweiss.com

*/s/ David M. Fry*
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
dfry@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

# EXHIBIT 1

# REDACTED IN ITS ENTIRETY

# EXHIBIT 2

# REDACTED IN ITS ENTIRETY

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
------------------------------------
                                   )
ABBOTT CARDIOVASCULAR               )
SYSTEMS, INC. AND EVALVE INC.,      )
                                   )
         Plaintiff and             )
         Counterclaim Defendants   )
                                   )
vs.                                 )  C.A. No. 19-149(MN)
                                   )
EDWARDS LIFESCIENCES CORP. and      )
EDWARDS LIFESCIENCES LLC,           )
                                   )
         Defendant and             )
         Counterclaim Plaintiffs   )
                                   )
------------------------------------
```

Videotaped Deposition of TSUYOSHI KANEKO, M.D.

Boston, Massachusetts

Sunday, January 19, 2020 - 8:58 a.m.

Reported by:

Sandra A. Deschaine, CSR, RPR, CLR, RSA

Job No. 26754

Page 2

1
2    VIDEOTAPED DEPOSITION OF TSUYOSHI KANEKO, M.D.
3
4    DATE:       SUNDAY, JANUARY 19, 2020
5
6    TIME:       8:58 A.M. - 3:05 P.M.
7
8    LOCATION:   THE WESTIN COPLEY PLACE
9                10 HUNTINGTON AVENUE
10               BOSTON, MASSACHUSETTS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    APPEARANCES:
2
3    ON BEHALF OF THE PLAINTIFF AND COUNTERCLAIM
4    DEFENDANTS:
5    KIRKLAND & ELLIS, LLP
6      Benjamin Lasky, Esquire
7      601 Lexington Avenue
8      New York, New York 10022
9      212.446.6415
10     blasky@kirkland.com
11
12   ON BEHALF OF DEFENDANT AND COUNTERCLAIM
13   PLAINTIFFS:
14   PAUL, WEISS, RIFKIND, WHARTON &
15   GARRISON, LLP
16     Kira Davis, Esquire
17     1285 Avenue of the Americas
18     New York, New York 10019-6064
19     212.373.3230
20     kdavis@paulweiss.com
21
22   Also Present:  Shawn Budd, videographer
23
24
25

Page 4

1                  INDEX
2    EXAMINATION                    PAGE
3    Tsuyoshi Kaneko, M.D.
4      By Mr. Lasky ......................... 7
5
6               EXHIBITS
7    EXHIBIT   DESCRIPTION            PAGE
8    Exhibit 1  Expert Report of Tsuyoshi      6
9               Kaneko, M.D
10   Exhibit 2  Exhibit A, Curriculum Vitae    6
11               of Tsuyoshi Kaneko, M.D.
12   Exhibit 3  Exhibit B, List of Materials   6
13               Considered
14   Exhibit 4  MitraClip:  Valve repair      22
15               device offers new treatment
16               option for some with severe
17               mitral regurgitation
18   Exhibit 5  Bates Nos. ABT1287811 through  179
19               -7820, Transcatheter Valve
20               Repair for Patients With
21               Mitral Regurgitation, 30-day
22               results of the CLASP study
23
24   (Exhibits continued.)
25

Page 5

1              INDEX (continued.)
2               EXHIBITS
3    EXHIBIT    DESCRIPTION            PAGE
4    Exhibit 6  Bates Nos. ABT1611434 through  182
5               -1468, Contemporary,
6               real-world, clinical outcomes
7               with the next generation
8               MitraClip (NTR/XTR) System,
9               Results fro the 1000+ patient
10              global EXPAND Study
11   Exhibit 7  Bates Nos. ABT1198417 through  215
12              -8421, Mitral regurgitation
13              in heart failure:  Time for a
14              rethink
15   Exhibit 8  Bates Nos. EDW-ABT00611369     216
16              through -1378, Percutaneous
17              Repair or Medical Treatment
18              for Secondary Mitral
19              Regurgitation
20
21
22
23
24
25

TransPerfect Legal Solutions
212-400-8845 – Depo@TransPerfect.com

1        A.  Is there any -- can you repeat        01:13 PM
2   that one more time?
3        Q.  Sure.  Is there any circumstance
4   where you would say that for two devices that
5   have some technical differences, treat the
6   same patient population, that there wouldn't        01:13 PM
7   be a need for both devices?
8        A.  There would not be a need for both
9   devices.
10       Q.  Are there any circumstances where
11  you would reach that conclusion?        01:13 PM
12       I'm trying to think of any
13  scenarios, but not from a clinician
14  standpoint?
15       Q.  Right.  Because from a clinician
16  standpoint, by definition, having more        01:14 PM
17  options is better than having less options,
18  right?
19       A.  That is a fact, yes.
20       Q.  Right.  And that's regardless of
21  whether there's data showing any difference        01:14 PM
22  in the benefits of one over the other, right?
23       A.  Again, I think you're trying to
24  make this into more really black-and white
25  picture here.  Medicine is not black and

1   white.  And, you know, when you have to        01:14 PM
2   choose between the two devices and when we
3   think that -- you know, oftentimes experience
4   really dictates our field.  So if you're
5   familiar with one device over the other, that
6   is one of the advantages of one device,        01:14 PM
7   because you know about it a little more.
8        It really becomes a problem when
9   there is a condition that you know that may
10  be a problem.  And those are the cases where
11  having another option really helps.  And        01:15 PM
12  that's -- those are the cases -- most cases
13  will be treated with a device or technique or
14  medication or -- whatever you think that is
15  appropriate.  It's the other small portion
16  where -- the disease is not just unified.        01:15 PM
17  It's a complex constellation of problems that
18  we see.
19       And even these mitral
20  regurgitations that we sort of gather, it's a
21  constellation of different problems.  Even        01:15 PM
22  that classification of degenerative disease
23  plus Myxomatous -- I mean, plus functional
24  disease, people make that assumption; but
25  oftentimes they have a combination of both.

1   And, you know, those are the cases where we        01:16 PM
2   still struggle, you know, trying to provide
3   the best care for the patients, and one
4   solution may not be just appropriate, and
5   those are the cases where having another
6   option really helps.        01:16 PM
7        So, you know, to clarify your
8   statement, it is a -- to answer your question
9   as yes, but there's more details to that.
10  Almost not -- you don't need it for
11  everybody.  You know, you don't need all the        01:16 PM
12  options for everybody.  I mean, there's a lot
13  of research saying that if we have more than
14  three options, than you actually take more
15  time to decide and there's a higher chance of
16  making errors, right.  So not having a lot of        01:16 PM
17  options is always -- having a lot of options
18  always is not great.
19       But for a certain particular
20  complex case that is extremely difficult,
21  those are the cases that will benefit from        01:16 PM
22  multiple options from our end.
23       Q.  Right.  But they'll benefit only
24  if the alternative device can treat that
25  patient successfully and better than

1   MitraClip, right?        01:17 PM
2        A.  Better than MitraClip, yes.
3        Q.  Okay.  And that's where we don't
4   currently have the data to say that PASCAL
5   will, in fact, be able to treat patients
6   better than MitraClip?        01:17 PM
7        A.  Right.  But that goes back to the
8   original statement where we don't know, but
9   it can be revealed as time goes on.  We
10  didn't know -- I gave you the two examples of
11  cases where we didn't know at the time when        01:17 PM
12  where it was approved, and as times goes, it
13  gets revealed.  And the key factor in those
14  two examples where that one device didn't
15  harm as much as -- or one device was inferior
16  to the others, meaning that harming more        01:17 PM
17  patients, so I think safety is another
18  important thing.  And if the safety profile
19  is good, then I think we have to -- we have
20  to learn.
21       Q.  Right.  And that's what the CLASP        01:18 PM
22  trial -- CLASP II trial is designed to do,
23  right?
24       A.  Yes.  But, you know -- I think you
25  alluded to this.  But, you know, the

Page 214

1   randomized arm won't really -- it will answer   01:18 PM
2   some of the questions that we discussed, but
3   I think it's that single-arm cohort out of
4   the CLASP IID and IIF that will actually give
5   some insight as well.
6       Q.   Okay.  Now, back to page 9, which   01:18 PM
7   I think is what started this statement, the
8   statement from Mitra-FR that "'at least 48
9   patients had residual mitral regurgitation --
10      THE REPORTER:  Would at least?
11      Q.   Sorry.  "'At least 48 patients in   01:18 PM
12  the intervention group had residual mitral
13  regurgation of grade 2+ or higher at 12
14  months.'"
15      Do you know what percentage that
16  was of the total treatment?   01:19 PM
17      A.   144 divided by 48.  That was ITT,
18  intention to treat.
19      Q.   Did you say 144?
20      A.   Yeah.  That number could be lower
21  because 144 was intention to treat.  So, you   01:19 PM
22  know, some of the patients may not have
23  received the treatment itself.
24      Q.   Bear with me a second.
25  (Pause in proceedings.)

Page 215

1       Q.   Apologies.   01:22 PM
2   (Pause in proceedings.)
3   (Exhibit 7, Bates Nos. ABT1198417 through
4   -8421, Mitral regurgitation in heart failure:
5   Time for a rethink, marked for
6   identification.)   01:23 PM
7   BY MR. LASKY:
8       Q.   Dr. Kaneko, I've handed you what's
9   been marked as Exhibit 7 to your deposition.
10  It has the Bates numbers ABT1198417 through
11  -421.  And it's a reference titled "Mitral   01:23 PM
12  regurgitation in heart failure:  Time for a
13  rethink."
14      Have you seen this before?
15      A.   No.
16      Q.   Can you take a look at the data --   01:23 PM
17  well, strike that.
18      Take a look -- this is an article
19  that reviews both the Mitra-FR and COAPT
20  trials and tries to reconcile them.  And
21  you'll see there's some data in Table 1 about   01:23 PM
22  both the Mitra-FR and COAPT trials.
23      A.   Uh-huh.
24      Q.   Is there any way from this
25  reference to confirm what percentage of

Page 216

1   patients in the MitraClip arm had residual MR   01:24 PM
2   less than or equal to 2+ at one year?
3       A.   Again, I don't think this is the
4   right -- this is the right article to quote
5   that number.  This is a viewpoint article
6   with -- these are oftenly done in the   01:24 PM
7   scientific journals where an expert is
8   offered to write their viewpoint or opinion
9   about an issue.  And, you know, again, these
10  charts are not reviewed.  So I think you
11  should probably get the New England Journal   01:25 PM
12  of Medicine paper that was published for this
13  topic.
14      Q.   Fair enough.  I just couldn't find
15  it immediately but now I found it.
16  (Exhibit 8, Bates Nos. EDW-ABT00611369   01:25 PM
17  through -1378, Percutaneous Repair or Medical
18  Treatment for Secondary Mitral Regurgitation,
19  marked for identification.)
20  BY MR. LASKY:
21      Q.   I've handed you what's been marked   01:25 PM
22  as Exhibit 8.  It has the Bates
23  EDW-ABT00611369 through -378.  And this is
24  the New England Journal of Medicine article
25  for Mitra-FR that you were referring to?

Page 217

1       A.   Yes, it is, yes.   01:25 PM
2       Q.   Okay.  So can you find then where
3   it's states what percentage of MitraClip
4   patients had MR less than 2+ after one year?
5       A.   So in the other outcomes in page 6
6   of this article, on the left lower corner.   01:26 PM
7       Q.   Uh-huh.
8       A.   However, at least 48 patients in
9   their national group and who technical
10  success was achieved were confirmed to have
11  mitral regurgitation, grade 2+ or higher at   01:26 PM
12  one year.
13      Q.   Okay.  And do you know how that
14  compares to PASCAL's clinical experience?
15      A.   Well, PASCAL has -- again, I don't
16  think you can compare that directly because   01:27 PM
17  these are two different patients.  And I
18  don't know if -- we can calculate the
19  percentage, I think that's what you
20  originally asked.
21      Q.   Uh-huh.   01:27 PM
22      A.   But I think you have to calculate
23  the ones that had technical success.  So
24  I'm -- if you look at Table 2 in page 7, it
25  mentions that the device implantation failure

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 242

1    don't know when the last time we did the        02:24 PM
2    off-label MitraClip.
3        Q.  Okay.  Do you know if -- you know
4    that the MitraClip label has certain warnings
5    about anatomies?
6        A.  Yes.                                     02:24 PM
7        Q.  Are you permitted to include
8    someone in the randomized arm if they have
9    one of those anatomies?
10       A.  Most of those are exclusion
11   criteria for the CLASP IID or IIF trial.        02:24 PM
12       Q.  Okay.  But, in fact, just because
13   someone is within that exclusion criteria,
14   that doesn't mean that the patient would be
15   unsuitable for MitraClip, right?
16       A.  Repeat that question again for me.       02:24 PM
17       Q.  Yeah.  There are patients who are
18   suitable for MitraClip who might also fall
19   into those exclusion criteria, right?
20       A.  Yes.
21       Q.  And those patients, within the          02:24 PM
22   context of the CLASP II trial, would only be
23   treated in the single-arm cohort even though
24   they might be suitable for MitraClip, right?
25       A.  Yes, but there is a reason for

Page 243

1    that.  And the reason is that -- you know,       02:25 PM
2    the reason why these anatomies are chosen are
3    because these are anatomies that have had bad
4    outcome or worse outcomes.  And that does
5    not mean that all of them failed.  You know,
6    with -- one in particular, leaflet             02:25 PM
7    calcification at the tip, we've had success
8    with clipping both sides of the
9    calcification, and we've actually reduced
10   the -- reduced the leakage in those cases.
11       But what was different in that,             02:25 PM
12   was that that patient had a very, very thick
13   posterior leaflet that allowed the posterior
14   leaflet to completely coapt with the
15   calcified interior leaflet.  So that feature
16   is not always seen.  Posterior leaflets are    02:25 PM
17   usually short in these functional pathology.
18   So, you know, you sort of have to have a
19   specific anatomy in order for these to work.
20   And I think that is what we're trying to nail
21   down, which anatomy is suitable for certain    02:26 PM
22   devices.
23       Q.  But a patient who is suitable for
24   MitraClip but falls within the exclusion
25   criteria, for example, they might have a

Page 244

1    small mitral valve area but still be suitable   02:26 PM
2    for MitroClip, those patients exist, right?
3        A.  Those patients exist, but we know
4    that those patients are -- it's all about the
5    percentages, and we know that the chances of
6    failure in those patients are high.  That's     02:26 PM
7    why they're excluded.
8        But what I'm saying is, just
9    because the patient is in the registry arm,
10   does not mean they have to be unsuitable for
11   MitraClip, they might just fall within an       02:26 PM
12   exclusion criteria?
13       A.  There are some certain populations
14   that may fall into the category or they may
15   be able to do the MitraClip, yes.
16       Q.  And yet they would still be within      02:26 PM
17   the single arm?
18       A.  They can be, yes.
19       Q.  Now, again, I may have asked you
20   this before.  But how many times in your use
21   of MitraClip have you had to invert the         02:27 PM
22   device to avoid entanglement?
23       A.  To avoid entanglement.  That is
24   quite a few.  I just can't tell you in
25   numbers.  And, you know, sometimes we do

Page 245

1    three or four times per clip with the           02:27 PM
2    location of it.  So I cannot even give you a
3    ballpark on this, but --
4        Q.  It's frequent?
5        A.  It's frequent, yes.
6        Q.  Okay.  And without that feature,        02:27 PM
7    do you think you would have been able to
8    untangle the device?
9        A.  You mean the everting?
10       Q.  Yes.
11       A.  Yeah, if you didn't have evert,         02:28 PM
12   you would have just caught that leaflet.  So,
13   you know, you can't take it out of the left
14   ventricle.
15       Q.  I see.  So, in other words, in
16   order to take it out of the left ventricle,     02:28 PM
17   that everting or inverting feature is an
18   important feature, right?
19       A.  It's an essential feature.
20       Q.  Are there any examples where you
21   weren't able to untangle the device by using    02:28 PM
22   that inversion feature?
23       A.  Yes, we have.
24       Q.  How many?
25       A.  I can at least think of two cases.

62  (Pages 242 to 245)

Page 246

```
 1        Q.  It's two out of around 70, right?    02:28 PM
 2        A.  Yes.
 3        Q.  And what did you do in that
 4   circumstance?
 5        A.  In that case -- we had, actually,
 6   one recently, which I think the -- this is a    02:28 PM
 7   hypothesis, we don't know this yet -- we
 8   don't know this for sure.  But when we were
 9   rotating it, probably captured a chord and
10   when we spun, I think it rotated around the
11   clip.  So the location was not great.  We    02:29 PM
12   were trying to pull and the clip did not come
13   out.
14             And when we made a decision to
15   deploy that clip, because we couldn't get it
16   out, we were able to get the leaflets, but I    02:29 PM
17   think by entangling the chords, it gathered
18   up more tissue and created stenosis in the
19   valve.  So we were able to deploy it, but had
20   a stenosis.  The patient became -- the mean
21   gradient was 7 when we left the operating    02:29 PM
22   room -- when we left the cath lab; and,
23   subsequently, this patient required to go to
24   the OR because she was so symptomatic from
25   the mitral stenosis.
```

Page 247

```
 1        Q.  Similarly, is it your opinion that    02:29 PM
 2   the elongated position is important to the
 3   PASCAL device?
 4        A.  Yes.
 5        Q.  And also to avoid this
 6   entanglement, right?                            02:30 PM
 7        A.  Yes.
 8        Q.  Okay.  Do you think it's important
 9   to the MitraClip device, based on your
10   understanding of how it works, that it be
11   able to grab the leaflets from both the    02:30 PM
12   ventricle and atrial side?
13        A.  Repeat that question again.
14        Q.  Based on what you know about how
15   the MitraClip works --
16        A.  Uh-huh.                               02:30 PM
17        Q.  -- do you think it's important
18   that it be able to grab the leaflets from
19   both the ventricle and the atrial side?
20        A.  You mean with the arm from the
21   ventricular side and then the grippers from    02:30 PM
22   the atrial side?
23        Q.  Yes.
24        A.  Yes.
25        Q.  And why is that important?
```

Page 248

```
 1        A.  You have to sandwich the leaflets    02:30 PM
 2   in order to gather them in the center.
 3        Q.  And would you say that's
 4   fundamental to the operation of the
 5   MitraClip?
 6        A.  Yes.                                  02:30 PM
 7        Q.  And is the same true for PASCAL?
 8        A.  PASCAL, yes, you have to get the
 9   leaflets, you know, for it to mobilize
10   towards the spacer.
11        Q.  You need to get them between the    02:31 PM
12   paddle and the clasp; right?
13        A.  That is correct.
14        Q.  Now, if PASCAL did not have the
15   clasps, it only had the paddles and the
16   spacer, do you have any view as to whether    02:31 PM
17   that would be able to adequately hold the
18   leaflets?
19        MS. DAVIS:  Objection.
20        A.  I don't know the answer to that.
21   BY MR. LASKY:                                 02:31 PM
22        Q.  Now, do you know that the
23   MitraClip arms have kind of a concave shape?
24        A.  MitraClip has a concave --
25   MitraClip or --
```

Page 249

```
 1        Q.  The MitraClip arms.                  02:31 PM
 2        A.  Yes.
 3        Q.  Now, is that -- does that have any
 4   importance to you in the way that you operate
 5   the device?
 6        A.  Not really, no.  I mean, it's --    02:31 PM
 7   we -- you know, we've been shown with the
 8   device, that's what we have, but, you know, I
 9   don't think that really changes anything from
10   our perspective.
11        Q.  Do you have a view one way or the    02:32 PM
12   other whether you think it would be work as
13   well if the arm was just flat rather than
14   concave?
15        A.  With the concave?  Well, you're
16   trying to capture that leaflet in that arm,    02:32 PM
17   so it does make sense to have more concave
18   shape than just flat.
19        Q.  Why does it make more sense?
20        A.  Because you can actually retain it
21   in that cavity.                               02:32 PM
22        Q.  Now, is the same true again for
23   PASCAL, that that has -- well, strike that.
24             PASCAL's paddles also are concave,
25   right?
```

63  (Pages 246 to 249)

Page 250

```
 1        A.  I don't know.              02:32 PM
 2        Q.  Okay.  You know that the paddles
 3   wrap around the spacer, right?
 4        A.  Yes, they do, yeah.
 5        Q.  And so in that sense they're
 6   concave, right?                     02:32 PM
 7        A.  Well, I mean, again, I'm not an
 8   engineer.  So I don't know if a straight
 9   shape, you know, sort of takes that
10   configuration.  I just don't know.
11        Q.  Sure.  Okay.  That's fair.  02:32 PM
12        MR. LASKY:  Take a quick break.
13        MS. DAVIS:  Sure.
14        THE VIDEOGRAPHER:  The time is
15   2:32.  We're off the record.
16   (Recess taken at 2:32 p.m. to 2:41 p.m.)  02:40 PM
17        THE VIDEOGRAPHER:  Okay.  We're
18   back on the record.  The time is 2:40.
19   BY MR. LASKY:
20        Q.  Considering mitral regurgitation,
21   have you ever treated a patient with   02:41 PM
22   MitraClip that you didn't think would benefit
23   from it?
24        A.  Would not benefit from a
25   MitraClip.  The answer to that is no.
```

Page 251

```
 1   Because, you know, even in cases where we   02:41 PM
 2   thought -- you know, we don't like to use the
 3   word too much, but when we thought we're
 4   doing a Hail Mary in these patients, there's
 5   some part of us that makes us think that
 6   doing the MitraClip will have an effect.   02:41 PM
 7        So I think to answer your
 8   question, I don't think we've had any
 9   patients that underwent MitraClip who we did
10   not think that was going to have any benefit.
11        Q.  And do you -- based on what you   02:41 PM
12   know of the industry as a whole, would you
13   say that's the approach generally taken in
14   the field?
15        A.  Yes.
16        Q.  Are you aware of any evidence that   02:42 PM
17   physicians are treating patients with
18   MitraClip who will not benefit from them just
19   because of Abbott's marketing, for example?
20        A.  That is a very difficult question.
21   I don't know if it's because of Abbott's   02:42 PM
22   marketing, but I think we sort of spoke about
23   this, touched on this several times.  But my
24   view on the functional MR performing
25   MitraClips, is still somewhat skeptical in
```

Page 252

```
 1   that -- you know, in a well-selected   02:42 PM
 2   patients, the COAPT trial proved that it has
 3   an excellent outcomes.  It actually improves
 4   patients survival and the number needed to
 5   treat in that study was less than six people.
 6   So if you select the right person, then one   02:43 PM
 7   in six will have a survival benefit, which is
 8   astonishing, right, which is a great result.
 9        But, on the other hand, you sort
10   of have to understand that patient came one
11   six months in a high-volume institution that   02:43 PM
12   we are trying to enroll these patients.  And
13   you know, right now, even at our institution,
14   who we consider, since we are on the COAPT
15   trial, and we have very thoughtful
16   physicians, excellent physicians with very   02:43 PM
17   thoughtful cardiologists, I don't know if
18   we're really following that COAPT criteria
19   and are we treating patients that are falling
20   into the Mitra-FR category?  We try not to.
21   But you know, sometimes there's no other   02:43 PM
22   option, and, you know, we don't know whether
23   those are going to work.
24        We certainly have expectations
25   that they'll work, but even at our
```

Page 253

```
 1   institution, which is, you know, probably one   02:44 PM
 2   of the institutions that has world-renowned
 3   cardiologists and are very, very thoughtful
 4   physicians, I think we are still overusing
 5   it.
 6        And if you take this to a world   02:44 PM
 7   where, you know, the heart failure physicians
 8   are barely involved in the care of these
 9   mitral regurgitations and if the physicians
10   that are treating this has a very superficial
11   understanding of what those trials meant, I   02:44 PM
12   am pretty sure that those patients were
13   overtreated, in my view.
14        Again, is that because of the
15   Abbott marketing?  I don't know.  I mean, to
16   me, I think part of it is physicians' lack of   02:44 PM
17   knowledge or lack of understanding of
18   clinical data.  But I do believe that there
19   are some patients that are definitely being
20   treated in the population that it's not
21   really supposed to, based on the clinical   02:45 PM
22   trial data that we have.
23        Q.  Do you think the physicians who
24   are doing that are doing it despite knowing
25   that it's not going to be effective?
```

64  (Pages 250 to 253)

Page 254

```
 1       A.  You know, that's a difficult      02:45 PM
 2   question to answer for me.  Some are, and
 3   some may know it; but, you know, again, these
 4   patients are not, like, oh, this is a COAPT
 5   patient, this is Mitra-FR patient, right?
 6   There's a little bit of gray zone there.     02:45 PM
 7           And, you know, if the gray is a
 8   little lighter, are you going to treat them?
 9   Is it a little darker?  Are going to treat it
10   with medical management?  I think it really
11   depends on that individual physician's      02:45 PM
12   thought process.  And some people may be a
13   little more aggressive, right, but can you
14   blame them for treating patients that are
15   dark gray.  I don't know the answer to that.
16       Q.  And is part of that because these   02:45 PM
17   patients don't have any other options so it's
18   like a Hail Mary, as you've used that term?
19       A.  Some patients, some patients.
20       Q.  But you have no evidence that
21   physicians are overtreating with MitraClip   02:46 PM
22   based on Abbott's influence, right?
23       A.  Abbott's influence, I don't think
24   we can say that it's the corporate
25   advertisement that is doing this.  It may
```

Page 255

```
 1   have an effect.  I mean, you know, I'll be    02:46 PM
 2   honest with you.  I mean, Abbott has been
 3   very vocal about this being approved for
 4   secondary MR and rightfully so.  I mean, it
 5   is approved by the FDA.  But are they
 6   marketing aggressively to sell that?  I don't  02:46 PM
 7   know.
 8       Q.  Now, have you ever used a
 9   MitraClip in a patient you did not think
10   would benefit from it based on influence by,
11   for example, an Abbott sales representative?   02:47 PM
12       A.  No.
13       Q.  Are you aware of that ever
14   happening in the field?
15       A.  I haven't spoken to all the
16   proceduralists, but, you know, at least in    02:47 PM
17   our institution, no.
18       Q.  Now, are you familiar with the
19   concept of a heart team?
20       A.  Yes, I'm very aware of it.
21       Q.  And you're part of the heart team   02:47 PM
22   at Brigham & Women's; is that right?
23       A.  Yes.
24       Q.  Who is part of the heart team?
25       A.  So the heart team concept really
```

Page 256

```
 1   grew over time.  So initially it was        02:47 PM
 2   interventional cardiologists and the surgeons
 3   and the valve coordinator.  That was what our
 4   basic heart team consisted of.  Now we have
 5   numerous physicians that are involved.
 6           So we have a cardiac              02:47 PM
 7   anesthesiologist, whom happens to be the echo
 8   cardiographers.  Ours are excellent.  So, you
 9   know, we rely on their images during the
10   procedure.  We have cardiology imaging
11   specialists, echo specialists, CT            02:48 PM
12   specialists.  We also have a senior
13   noninterventional cardiologists that are on
14   the team.
15           So, you know, these cardiologists
16   provide expert opinions on the valvular      02:48 PM
17   disease.  Our cardiologists happens to be the
18   former ACC president and, you know, senior
19   author for guidelines for valvular disease.
20   So he gives us a lot of insights in these
21   patients.  So those are the physician side.   02:48 PM
22           And then we have physician
23   extenders, numerous PAs.  We also have a
24   research coordinator, valve coordinator,
25   research subcoordinators.  We have a
```

Page 257

```
 1   scheduler that's also involved.  So our team   02:48 PM
 2   member -- I counted the other day -- we have
 3   over 14 people involved.
 4       Q.  The heart team concept, that
 5   predated the MitraClip; is that right?
 6       A.  The first EVEREST trial.  The       02:49 PM
 7   heart team concept really came to light at
 8   the time of TAVR approval, which happened in
 9   December of 2011.  So that was when the FDA
10   mandated a heart team assessment for these
11   patients.  So that's when the heart team      02:49 PM
12   concept really blossomed.
13       Q.  In the treatment of mitral
14   regurgitation, though, was the heart team
15   concept in existence before MitraClip was
16   available?                                   02:49 PM
17       A.  In our institutions, yes.  In our
18   institution, we had a surgeon that was
19   interventional trained.  So he was heavily
20   involved in the disease process.  So we had
21   that concept at our institution.  I don't     02:49 PM
22   know if that is true for all the other
23   places.
24       Q.  Okay.  And would you agree that
25   the heart team, in terms of its effectiveness
```

65  (Pages 254 to 257)

Page 258

1    of treating a disease, it's only as effective    02:50 PM
2    as the options that are available to it?
3         A.   That's a difficult one to answer.
4    The options will be a limitation to the
5    things that the patient -- things that we can
6    provide but the discussion that we have    02:50 PM
7    within that sort of goes beyond of just the
8    options.
9         Q.   I guess what I meant is, so before
10   MitraClip was available --
11        A.   Yeah.    02:50 PM
12        Q.   -- the only options were medical
13   management --
14        A.   Or surgery.
15        Q.   -- and surgery --
16        A.   Yes.    02:50 PM
17        Q.   -- and there was a need for some
18   patients who could not be adequately treated
19   with both, right?
20        A.   Yes, that is correct.
21        Q.   But having a heart team itself did    02:50 PM
22   not solve that need, right, you needed a
23   device for the heart team to be able to
24   recommend?
25        A.   A treatment optionw-wise, yes.

Page 259

1         Q.   Was?    02:51 PM
2         A.   The treatment option-wise.
3         Q.   Oh, treatment option-wise.
4              And imaging is an important aspect
5    of the MitraClip procedure; is that right?
6         A.   Yes.    02:51 PM
7         Q.   It's important for both
8    diagnostics and guidance; is that right?
9         A.   Yes.
10        Q.   The imaging doesn't treat the
11   disease, though, right?    02:51 PM
12        A.   Imaging does not treat the
13   disease, but it is an eye of a procedure.
14        Q.   Right.  It's the clip that
15   actually treats the mitral regurgitation,
16   right?    02:51 PM
17        A.   Right.  But I think that's
18   oversimplification in my mind.  So, you know,
19   if you had a clip without an echo, can you do
20   the procedure?  No.  I think that states it
21   all.  So they are complementary and they're    02:51 PM
22   both -- they were both equally important to
23   the success of the procedure itself.
24        Q.   With the echo, it's not specific
25   to MitraClip, right, the echo procedures?

Page 260

1         A.   Echo procedure is not specific to    02:52 PM
2    MitraClip.
3         Q.   And it's equally available for
4    other transcatheter therapies, right?
5         A.   Yes.
6         Q.   So to the extent that MitraClip is    02:52 PM
7    more success than another transcatheter
8    therapy, it can't be due to the availability
9    of echo, right?
10        A.   Again, the reason for MitraClip
11   success is because they were one of the first    02:52 PM
12   devices that really has been tried.  Right
13   now I think there are some other some devices
14   in the transcatheter valve replacement
15   devices that are being tried, but those are
16   two different animals.  I don't think you    02:52 PM
17   should be comparing repair devices and the
18   impairment devices -- replacement devices,
19   because the complications are different, the
20   device sizes are different.  They're two
21   different animals.    02:53 PM
22             And, you know, the other MitraClip
23   repair devices will all require
24   echocardiogram, right, that -- yes, your
25   statement is correct.  But, on the other

Page 261

1    hand, none of these devices can be done    02:53 PM
2    without echocardiogram, so echocardiogram is
3    an essential part of procedure.  You just
4    can't do it without it.
5              So if -- say, for instance, if in
6    the MitraClip room we intubate the patient,    02:53 PM
7    and then if we find that the echo is broken,
8    there's no echo that they can't spare, they
9    can't bring from upstairs, then we will have
10   to cancel the procedure.  We will not proceed
11   with just the device.  But --    02:53 PM
12        Q.   Sorry.
13        A.   -- on the other hand, if you have
14   a functioning echo, but if you didn't have
15   MitraClip, you can't treat the patient, so...
16        Q.   Right.  But I guess you alluded to    02:53 PM
17   it before.  Other transcatheter mitral repair
18   devices will equally depend on echo, right?
19        A.   Yes.
20        Q.   And so if we're comparing the
21   relative success of two such devices, its not    02:54 PM
22   going to be due to echo that one is more
23   successful than the other?
24        A.   You're comparing echo as the
25   reason for the success for the mitral

66  (Pages 258 to 261)

Page 262

1    regurgitation repair?                02:54 PM
2         Q.  Well, what I'm saying is -- let's
3    be more concrete.
4         A.  Yes.
5         Q.  So, for example, cardioband --
6         A.  Yeah.                       02:54 PM
7         Q.  -- you understand is available in
8    Europe?
9         A.  Yes.
10        Q.  Do you know what the relative
11   sales figures of cardioband are compared to   02:54 PM
12   MitraClip?
13        A.  Extremely low, my understanding.
14   I don't know the exact numbers, but...
15        Q.  Right.  And echo is equally
16   important to both of those procedures, right?   02:54 PM
17        A.  Uh-huh.  Yes.
18        Q.  And so the success of MitraClip
19   compared to cardioband cannot be attributed
20   to the availability of echo, right?
21        A.  That has more to do with the        02:54 PM
22   device itself.
23        Q.  Let's see.
24            Now, obviously, this whole opinion
25   relates to whether there are patients who can

Page 263

1    be treated with PASCAL who cannot be treated   02:55 PM
2    with MitraClip or whether there are patients
3    who can be treated with PASCAL better than
4    MitraClip.
5            Do you have any estimate as to the
6    percentages of patients that are treatable    02:55 PM
7    with edge-to-edge that can only be treated
8    with PASCAL?
9         A.  I cannot answer that question,
10   because, you know, this is all going to be a
11   guess, right?  And I don't even know how many   02:56 PM
12   patients that will have a commissural
13   prolapse within the whole entire population
14   of mitral disease that we're going to be
15   treating.  I don't know what the percentages
16   will be with the leaflet -- with a           02:56 PM
17   significant cleft, that is not available
18   to -- that is a difficult case to do the
19   MitraClips.
20            And, you know, Leaflet
21   calcification, that will not allow you to do,   02:56 PM
22   you know, difficult case for MitraClip but
23   severe bileaflet prolapse, this is very hard
24   to estimate, in my opinion.
25        Q.  Would it be 1 percent of the total

Page 264

1    treatable population?               02:56 PM
2         A.  I can say that it will definitely
3    be less than 10 percent.  That's probably the
4    best number that I can give you.
5         Q.  Okay.
6         A.  Anything that will -- anything     02:57 PM
7    beyond that will just be a guess.
8         Q.  Okay.  It's possible it could be 1
9    percent; is that right?
10        A.  Oh, anything is possible, because
11   we're estimating here.               02:57 PM
12        Q.  Okay.  And now thinking about the
13   patients who are treatable with MitraClip who
14   will be, in your view, treatable better
15   within PASCAL, what percentage of patients
16   does that cover?                     02:57 PM
17        A.  Again, I couldn't give you a
18   number before, so this is the number that I
19   just cannot give you.  It's just going to be
20   an estimate too, and it's going to be a wild
21   guess, right?                        02:57 PM
22            And, again, we just lack the data
23   on saying that, you know, what are the
24   popular -- what are the percentages of these
25   patients, so it's going to be hard for me to

Page 265

1    even give you the numbers; and, you know, if   02:58 PM
2    it's -- it's not going to be more than 10
3    percent, that I can tell you.  It's going to
4    be definitely less than that.  Is it going to
5    be less than 1 percent?  I don't know.  I
6    don't think so.  I think that it's going to   02:58 PM
7    be higher than that.
8            But, again, this is just my guess.
9    But even if it was 1 percent, there are 7,000
10   MitraClips being performed right now and that
11   number is climbing because of all the        02:58 PM
12   indication expansion, and, you know, all the
13   technological advance that you are guys are
14   putting into.  So that number will keep on
15   going up.  And even if it's 1 percent that's
16   70 patients.  That's important for me.        02:58 PM
17        Q.  Right.  So your opinion that
18   PASCAL is important, really it would be the
19   case whether it's one patient or a thousand
20   patients, right, your view is that PASCAL
21   would be important in that circumstance,      02:59 PM
22   right?
23        A.  And, again, I am a clinician, so
24   to me, that is a difference, right?  So my
25   interest is to treat that "n" that is on the

                           67  (Pages 262 to 265)

Page 266

1    table at that time, so that will be my          02:59 PM
2    interest.  There's going to be some
3    economical calculations that will be beyond
4    my understanding, public health or finances,
5    right, that will justify all this.  So that
6    is completely beyond my knowledge.  So I          02:59 PM
7    can't comment on that.
8            But for me, as a clinician, it is
9    important to have an option if I have a
10   patient on the table.
11       Q.  Now, for the anatomies that you          03:00 PM
12   say are unsuitable or challenging for
13   MitraClip, if PASCAL ultimately isn't
14   approved, let's say the FDA doesn't approve
15   it or for whatever reason, would you keep
16   trying MitraClip in those patients?          03:00 PM
17       A.  If there's no other option.  You
18   know, I think if the chances are limited, but
19   if there is a chance to maybe help, we may
20   push the line a little bit forward.  But I
21   think we're learning more and more that, you          03:00 PM
22   know, in certain anatomies they don't work,
23   right?
24          Because I think when the MitraClip
25   was first introduced, you know, we were just

Page 267

1    treating with DMRs -- degenerative disease,          03:00 PM
2    DMR means degenerative disease -- and in
3    those patients we sort of learned over time,
4    but we sort of lack experience on the
5    functional patients.  And after the COAPT
6    trial and the recent approval, I think we're          03:01 PM
7    learning more and more about functional cases
8    where, you know, these MitraClips work and
9    where MitraClips do not.
10          And we are gaining more experience
11   in that, and we are learning that in certain          03:01 PM
12   cases it just doesn't work.  And if it was
13   obvious that it was not going to work, you
14   know, the anatomy looks like it was
15   completely unsuitable for MitraClip, then I
16   would not in those cases.          03:01 PM
17       I mean, MitraClip, although it's a
18   very safe procedure, it does have mortality
19   risks, it does have some complication risks.
20   And, you know, if you're exposing patients to
21   that with almost zero benefit that you're          03:01 PM
22   thinking, then I don't think I will do that.
23       Q.  Before you ultimately make that
24   decision, you will have to take into account
25   what benefits of any come from the newer

Page 268

1    generations of MitraClip, like G4, correct?          03:02 PM
2        A.  That has to be put in
3    consideration.
4        Q.  And that's not something you're
5    yet qualified to put into consideration,
6    right?          03:02 PM
7        A.  No, I do not have experience with
8    the G4, and I do not have any data on that
9    for sure.
10       Q.  In footnote -- well, strike that.
11          You know what, I think I'm done.          03:03 PM
12   Thank you very much.
13          THE WITNESS:  Thank you very much.
14          MS. DAVIS:  No questions.
15          THE VIDEOGRAPHER:  The time is
16   3:02.  We're off the record.          03:03 PM
17   (Recess taken at 3:02 p.m. to 3:03 p.m.)
18          MR. LASKY:  I do need to go back
19   on the record just to close out the issue on
20   the commercial cases.
21          THE VIDEOGRAPHER:  One second.          03:03 PM
22   We're on the record.  The time is 3:03.
23          MR. LASKY:  Before we end, I
24   did -- we did discuss earlier whether or not
25   I could put some commercial data to you.

Page 269

1    There were two documents that I had asked          03:03 PM
2    about, and I'll just read the Bates numbers.
3    It's not going to give you any confidential
4    information.  They were EDW-ABT00741413 and
5    EDW-ABT00651435.  I had asked whether I could
6    put those to Dr. Kaneko.  I was told during a          03:04 PM
7    break that Edwards had decided to decline my
8    request to do that.
9          MS. DAVIS:  I believe my specific
10   comment to you was that Edwards is unwilling
11   to make an exception on an expedited basis.          03:04 PM
12   Today is a Sunday, and we're in the middle of
13   a deposition.  The answer is no.  But the
14   comment I made to you is that we are
15   unwilling to make a decision on an expedited
16   basis.          03:04 PM
17          MR. LASKY:  Again, I'm not sure
18   this is an exception because this is your
19   witness and you have the ability to, you
20   know, put anything you want of your own
21   expert, but I understand your position.          03:04 PM
22          MS. DAVIS:  We can go off the
23   record now?
24          MR. LASKY:  Yes.
25          THE VIDEOGRAPHER:  The time is

68  (Pages 266 to 269)

# EXHIBIT 4

# REDACTED IN ITS ENTIRETY

# EXHIBIT 5

EVALVE v EDWARDS LIFESCIENCES        21 JANUARY 2020                PROCEEDINGS - DAY 11

---

IN THE HIGH COURT OF JUSTICE        Claim No  HP-2019-000003
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
INTELLECTUAL PROPERTY LIST (ChD)
PATENTS COURT
                    The Rolls Building
                    7 Rolls Buildings
                    Fetter Lane
                    London EC4A 1NL

                    Tuesday, 21st January 2020

                    Before:
                    MR  JUSTICE BIRSS
                    ---------------
BETWEEN:

                    (1) EVALVE INC
         (2) ABBOTT CARDIOVASCULAR SYSTEMS INC
            (3) ABBOTT MEDICAL UK LIMITED
                        Claimants

                    - and -

            EDWARDS LIFESCIENCES LIMITED
                        Defendant
                    ---------------
(Computer-aided transcript of the Stenograph Notes of
Marten Walsh Cherer Ltd , 2nd Floor, Quality House,
6-9 Quality Court, Chancery Lane, London WC2A 1HP
Telephone No: 020 7067 2900  Fax No: 020 7831 6864
e-mail: info@martenwalshcherer com)
                    ---------------
MR  RICHARD MEADE QC, MR  JAMES ABRAHAMS QC, MR  MICHAEL CONWAY
and MS  JENNIFER DIXON (instructed by Taylor Wessing LLP)
appeared for Abbott
MS  KATHRYN PICKARD and  MS  TESS WALDRON  (instructed by Powell
Gilbert LLP) appeared for the Defendant

                    ---------------
                    PROCEEDINGS
                    DAY 11
                    ---------------

---

[Page 1458]

                    KATHRYN PICKARD

 1
 2   MR. JUSTICE BIRSS:  Yes, Ms. Pickard?
 3   MS. PICKARD:  Good morning, my Lord.  My Lord, I think you have
 4       heard that unfortunately we have lost Mr. Acland for today, so
 5       I will be presenting our closing submissions, and I am going
 6       to be assisted by Ms. Waldron, who is a solicitor advocate, so
 7       she will be sitting beside me.
 8   MR. JUSTICE BIRSS:  I am very sorry to hear about Mr. Acland,
 9       I hope he is all right, please give him my best wishes, and
10       I am very grateful to you, if I may say so, Ms. Pickard, for
11       picking up the brief and making the speech, because that is
12       obviously going to be much the expeditious way of dealing with
13       this case.  Thank you.
14   MS. PICKARD:  Hopefully I will be of some assistance.
15   MR. JUSTICE BIRSS:  I think so.  Dare I say you might end up being
16       of more assistance than Mr. Acland, who knows!  I am sure that
17       will not happen.
18   MS. PICKARD:  I am sure not.  I appreciate our closing submissions
19       did go in relatively late in the day yesterday, and
20       I appreciate also that they are quite long, so your Lordship
21       will not have had much time really to look through them.  As
22       with my learned friend's submissions, these are based on our
23       opening submissions, and some of it may well be familiar.
24       What I was intending ----
25   MR. JUSTICE BIRSS:  I have read them, both of them.

---

[Page 1459]

                    KATHRYN PICKARD

 1
 2   MS. PICKARD:  I am grateful.  What I was intending to do was to
 3       use them as the structure for my submissions today, to assist
 4       your Lordship, and I was going to deal with a couple of points
 5       that were raised during the opening submissions, when your
 6       Lordship made a couple of points about the form of carve-out
 7       and the procedure that has been adopted in this case.  I was
 8       then intending to turn to the witnesses, and then set out, in
 9       broad detail, our case, our substantive case.  And then pick
10       up some points which I think are general points which permeate
11       through all the evidence about the approach that has been
12       taken on both sides to the question of the test of the
13       reasonable clinician's judgment, and also the way in which
14       data is relevant or not relevant to the issues before your
15       Lordship.  I will then turn to deal with the law, and then we
16       can get into the technical details.
17           There is a day each for closing.  Obviously we will see
18       where we get to, I am not necessarily intending to take the
19       whole day, and it may be that once we get into the technical
20       details, because they are set out in quite a lot of detail, it
21       will not be necessary to go through those in huge amounts.
22   MR. JUSTICE BIRSS:  Thank you, that is very clear and helpful.
23       One thing I need to tell you all, and then the other thing is
24       a reaction to what you have said.  The thing I need to tell
25       you all is that unfortunately we are going to have a late

---

[Page 1460]

                    KATHRYN PICKARD

 1
 2       start tomorrow, because I need to visit Edmonton County Court.
 3       Very exciting!  Edmonton is in London, but it is not so near
 4       Central London to make it easy to get from a meeting that
 5       finishes at 10 o'clock for a 10.30 start, so I would imagine
 6       we will start at 11.00 and I hope that does not inconvenience
 7       us too much.  I must say I agree, I think two days, having got
 8       where we have got to, I really would be very surprised if we
 9       need the full two days to close this case, which is one reason
10       why I do not think the Edmonton thing is going to be a big
11       problem, but, Ms. Pickard, you take the time you want to take,
12       I am not going to try to hurry you up or anything, but I do
13       think you are right.
14           On the technical detail, as you have said, and I am very
15       grateful to both sides, you have gone into it in some depth,
16       and I obviously read that through carefully.  At the moment
17       I do not have any questions about any of the technical detail,
18       I feel as if I have a pretty clear picture in my mind about
19       what is going on and what the different parties say, so do not
20       feel you need to go into that -- obviously I am not trying to
21       stop you.  If there are points you want to make, particularly
22       in response to anything your opponents have said, that applies
23       as much to Mr. Meade as it does to you, but I do not think it
24       will be necessary to go through the technical detail in a lot
25       of detail orally, because you have done it fully and

---

[1]  (Pages 0 to 1460)

MARTEN WALSH CHERER LTD    2ND FLOOR, 6-9 QUALITY COURT, CHANCERY LANE        LONDON, WC2A1HP
TEL: (020) 7067 2900           E-MAIL: info@martenwalshcherer.com         FAX: (020) 7831 6864

[Page 1485]

KATHRYN PICKARD

1
2    to be clear, unless I misunderstood it, you are not saying
3    that part of your, as it were, package, is being put to the
4    court as to what should happen, either no injunction or a
5    carve-out injunction; you are not saying that also part of
6    that package is that the decision should be that it is going
7    to be a reasonable royalty?
8    MS. PICKARD: No.
9    MR. JUSTICE BIRSS: You are not saying that.
10   MS. PICKARD: We are not asking for that at this stage, no.
11   MR. JUSTICE BIRSS: Thank you.
12   MS. PICKARD: Just to make clear, my Lord, I have mentioned it at
13   paragraph 15 of our written submissions, but Edwards is
14   prepared to make interim payments in the meantime.
15   MR. JUSTICE BIRSS: Yes.
16   MS. PICKARD: And a royalty rate of 5% on each PASCAL unit has
17   been suggested. Again, that was the royalty rate awarded in
18   the Boston v Edwards litigation. Again, we have had nothing
19   back on that, so that is what we have offered.
20   MR. JUSTICE BIRSS: Am I deciding that in this judgment or am I
21   deciding that on another judgment?
22   MS. PICKARD: I think that would be decided now. If your Lordship
23   were to say no injunction or a carve-out, your Lordship can
24   take into account the fact we have offered and order it, that
25   if no injunction or carve-out applies that it should be on the

[Page 1486]

KATHRYN PICKARD

1
2    basis of an interim royalty rate of 5%.
3    MR. JUSTICE BIRSS: How do I assess that 5% as being a reasonable
4    offer on the information I have? Do I know the profitability
5    of this product at all? I am not conscious that I have any of
6    the information that you would normally have to decide whether
7    I was prepared to accept 5%, say.
8    MS. PICKARD: No.
9    MR. JUSTICE BIRSS: The old trick used to do with licences of
10   right is do a third, a third, a third, and assume that the
11   profit was -- I cannot remember what the thirds were now,
12   I will remember it by the time I write the judgment --
13   manufacturing, but these products, also, the sale price will
14   be no doubt much higher than the cost of goods, because of all
15   the back-up that is required, and because of amortising the
16   costs of R&D and all the other things. I can no doubt assume
17   your profit margin is more than 5%, but I do not have any
18   evidence for that, do I?
19   MS. PICKARD: No, my Lord, we do not have any evidence. Doing the
20   best we can, there is a problem that we also do not know where
21   we are in terms of which claims we may be infringing, and how
22   that will feed into what profits are attributable to the
23   infringement in the first place, which obviously is something
24   that would be taken into account in determining what the
25   royalty rate would be. However, what we can go on is that we

[Page 1487]

KATHRYN PICKARD

1
2    know these devices are in a similar class to the devices that
3    were in issue in Edwards v Boston, in other words they are
4    structural heart products, and we know that in Edwards v
5    Boston, in that case, I think Boston was contending for 50%
6    and Edwards was contending for 2% and Arnold J came up with a
7    5% figure
8    MR JUSTICE BIRSS: That was when it was common ground that there
9    would be no injunction
10   MS PICKARD: Only on part of it There was a dispute
11   MR JUSTICE BIRSS: There was a dispute about the carve-out
12   MS PICKARD: Yes, but there was also a dispute as to whether
13   there should be -- the dispute related to whether -- I am
14   going to come on to deal with that case, actually, so it may
15   be best to deal with it then, but there were disputes
16   However, it does give an indication, but the other point is
17   obviously interim payments under the CPR, which is that the
18   court is trying to do the best in the situation at an interim
19   stage, so we have offered this, but we have heard nothing back
20   from the other side, nothing to suggest to think they it is
21   far too low, not that they are going to say it is far too
22   high, but it just shows we are willing to pay In the absence
23   of anything from the other side, I think this would have to be
24   accepted
25   MR JUSTICE BIRSS: Okay

[Page 1488]

KATHRYN PICKARD

1
2    MS. PICKARD: My Lord, with those two preliminary points out of
3    the way, the next subject in our written closing is the
4    witnesses. As always, your Lordship will have formed his own
5    view.
6    MR. JUSTICE BIRSS: Yes.
7    MS. PICKARD: So what we have done here is set out some points
8    that we take about all of them. Dr. Kipperman, we say was a
9    very fair expert witness, he did his best to assist the court.
10   We say that his evidence should be given weight, obviously he
11   had great expertise in this area. He had been involved in the
12   development of the therapy from the beginning and been the
13   primary operator in a large number of procedures. He also was
14   very clear he was a big fan of MitraClip. There was quite a
15   lot of cross-examination to him about how good the MitraClip
16   was, but he did not dispute that, in fact he said he was known
17   as Clipperman because he performed so many MitraClip
18   procedures, so there was no suggestion that he was aligning
19   himself with one side or the other.
20   MR. JUSTICE BIRSS: What do I make of his report? His oral
21   evidence, if I may say so, struck me as being very open and
22   frank, but it also struck me as presenting a slightly
23   different picture of some of the issues than his written
24   evidence. For example, the one that springs to mind is the
25   episode in which -- there was one where his written evidence

MARTEN WALSH CHERER LTD     2ND FLOOR, 6-9 QUALITY COURT, CHANCERY LANE        LONDON, WC2A1HP
TEL: (020) 7067 2900           E-MAIL: info@martenwalshcherer.com        FAX: (020) 7831 6864

[Page 1489]

KATHRYN PICKARD

1  implies, or seems to more than imply, that the only thing that
2  could have been done was a PASCAL, and in fact he said that
3  was not the case in his oral evidence.
4  MS. PICKARD:  I do not know if your Lordship has in mind the
5    evidence he gave about the patient he treated with the small
6    mitral area with the PASCAL.
7  MR. JUSTICE BIRSS:  It could be.
8  MS. PICKARD:  That was the one he dealt with in some detail in his
9    third report, and it might be worth turning up at D4, tab 3.
10   That is at page 7.  This is the patient he referred to when
11   talking about the mitral stenosis, and I do not he know if
12   your Lordship will recall this was a patient who presented
13   with a valve area of less than 3cm squared.  He said that his
14   experience of the MitraClip had been it could be an issue
15   where the valve area was smaller than 4cm squared, because of
16   the high mitral valve gradient, and so for this particular
17   patient he made a decision to implant a PASCAL.  It was
18   successful, but at paragraph 28 he was very clear, he said,
19   "To be clear, it is not my opinion that the use of a MitraClip
20   in this patient would necessarily have resulted in stenosis."
21   In his written evidence he was very clear.  I think he
22   confirmed that in cross-examination, that that was not
23   something that he was seeking to hide from the court.
24        I think the other area on which there was criticism put

[Page 1490]

KATHRYN PICKARD

1  in cross-examination, in relation to the patient who died, who
2  he deals with in his second report behind tab 2, and that was
3  the patient he discusses at paragraph 20.  He says that,
4  having considered the anatomy of that patient, and indeed
5  having tried to use the MitraClip device and saying that he
6  was not able to grasp both valve leaflets successfully, his
7  view was that he would have been able to treat this patient if
8  he had had the PASCAL which allows for independent leaflet
9  grasping.  Obviously the, G4, which is at a very early stage
10  in terms of being used in a few centres in the US, also has
11  independent leaflet grasping, so he set out in that paragraph
12  that he sought to source a G4 when he could not get a PASCAL,
13  but it was not made available.
14       There was a lot of evidence put to him, and questions
15  put to him, about the ups and downs of exactly what Abbott
16  did, but in the context of an expert who is giving evidence
17  about technical matters, the fact is the G4 was not made
18  available to him, Abbott told him that the patient could be
19  sent to a different hospital instead, and Dr. Kipperman quite
20  fairly expressed concerns, because he had experience of using
21  that feature, whereas he understood the clinician at that
22  other hospital did not.  So we would say that any criticism
23  along those lines would be unfair as well.
24  MR. JUSTICE BIRSS:  Okay.  I do not know the reasons, do I, why

[Page 1491]

KATHRYN PICKARD

1  Edwards decided not to allow a PASCAL device to be used in
2    that case?
3  MS. PICKARD:  I think he gave some evidence in cross-examination
4    that it was a resource issue, but we do not know what actually
5    transpired.
6  MR. JUSTICE BIRSS:  We were only told it was a resource issue.
7  MS. PICKARD:  Yes, that is what he thought.  We do not have any
8    evidence from Edwards as to ----
9  MR. JUSTICE BIRSS:  No.
10 MS. PICKARD:  Again he is quite fair in that paragraph, he says,
11   "I tried to get a PASCAL device, I could not; I tried to get a
12   G4 device, I could not".  In the context of an expert giving
13   technical evidence, he was not trying to cast any aspersions
14   on Abbott there, it was simply a matter of fact that that
15   patient died because neither a PASCAL or a G4 was available to
16   that patient.
17 MR. JUSTICE BIRSS:  Obviously very sad.
18 MS. PICKARD:  We say Dr. Kipperman is an expert in which your
19   Lordship can have confidence.  Mr. Estay was Edwards'
20   commercial witness.  The cross-examination of him was on the
21   basis that when he had said that he had got positive feedback
22   about PASCAL, and there had been successful implantations, the
23   suggestion is, well, because of what happened with Dr. Smith,
24   essentially, we cannot believe any of that, and when you say

[Page 1492]

KATHRYN PICKARD

1  "success", it might not actually be success.
2       I think, as we have set out in our written submissions,
3  that, again, would be unfair, given that Dr. Smith's own
4  report at the time was that there had been success in the
5  procedures, and certainly contemporaneous documents suggest
6  that.  Importantly, even on Tuesday, when Dr. Smith sent his
7  e-mail, he confirmed that he cast no aspersions relating to
8  the performance of the PASCAL, and said that the case was a
9  challenging one, and also there was no serious adverse event
10  and this is an outcome we can see, despite our very best
11  efforts.
12       Just for your Lordship's note, Dr. Smith treated two
13  patients with PASCAL.  One was the one on which the
14  cross-examination focused, but the second one he stated that
15  he felt they did extremely well, and in his e-mail of last
16  week, which is at C8, tab 15, he said he was very happy with
17  the first.  We do not know whether Abbott tried to talk to
18  Professor MacCarthy as well, who also did a procedure, nobody
19  inferred that they did, and they obviously did not get
20  anywhere there.  We say that would be unfair to draw those
21  inferences.
22       Professor Windecker, my Lord, I do not know whether this
23  is a convenient moment to deal with the objection taken to his
24  evidence?

EVALVE v EDWARDS LIFESCIENCES          21 JANUARY 2020                PROCEEDINGS - DAY 11

[Page 1505]

KATHRYN PICKARD

1
2   are also other examples in the evidence indicating that there
3   are patients for whom PASCAL will be a real option. The
4   suggestion made by Abbott that MitraClip is always an answer
5   is not borne out by the evidence.
6       At paragraph 51 we try to meet the assertion that is
7   made against us that our case is one of mere preference. What
8   we say is that this is not a case of mere preference. It has
9   always been the case that the reasonable opinion of clinicians
10  as to whether, in a particular patient, MitraClip or PASCAL
11  would give you the better treatment option, or the only
12  treatment option, is based on the objective differences
13  between the devices. So this is not a case where a clinician
14  is merely saying, "I prefer to use PASCAL because I like the
15  Edwards' sales person", so it is all about mere preference.
16  There is an objective reason for that preference being formed.
17  That is why, at paragraph 52, we have set out our case in the
18  way in which it has always been. The three things are, are
19  there objective differences? Is it reasonable for clinicians
20  to form the opinion that those objective differences are
21  clinically significant, and if so, (c), the crux of the
22  matter, is that enough to establish the public interest as a
23  legal matter?
24  MR. JUSTICE BIRSS: What strikes me about (a), (b) and (c), which
25  is a helpful way of setting out your case, is what is not

[Page 1506]

KATHRYN PICKARD

1
2   here. You are relying on (a), certain objective facts in (a),
3   but you are not relying on any objective facts about the
4   effect of the design and functionality of PASCAL?
5   MS. PICKARD: No.
6   MR. JUSTICE BIRSS: Those are objective facts which a reasonable
7   clinician, if she or he had them, would take into account.
8   MS. PICKARD: Yes. This is the data point, yes. It may be that
9   I can deal with this now. The point that is made against us
10  is that it is said there is no data. "You have no evidence
11  that, in fact, these objective features make a difference or
12  allow ...". I think there are a number of answers to that.
13  One of them is that PASCAL is at a very early stage. It has
14  only been on the market for a very short period of time. Data
15  is being collected, and some of that data has been made
16  publicly available. So, for example, we have The Lancet
17  article with the 23 compassionate use patients. We have the
18  Lim publication which is at D5, tab 17. Actually, maybe
19  I will just read out the list. We have the Kriechbaum paper
20  at D6, tab 8. We have the discussions from Khan, Hausleiter
21  and von Bardeleben at Ng which are at CXX 2, DXX-MM6 and
22  DXX-MM8. However, we do not shy away from the fact that there
23  has been no definitive data as to the performance of PASCAL in
24  complex anatomies to date. Indeed, we reference in our
25  closing that there is a head-to-head trial with MitraClip

[Page 1507]

KATHRYN PICKARD

1
2   going on, but even that is in patients with standard
3   anatomies. That is why we have not been able to put our case
4   on the basis, and we do not put our case on the basis that,
5   objectively, it can be said that PASCAL is superior to Abbott.
6   Your Lordship cannot form a view .... Sorry, I have some more
7   references as well as to data that is in the case, but perhaps
8   I will come back and give it to you. It was the CLASP six
9   month and 12 month studies, but they are all in the closing.
10      However, in terms of the data point, we do accept that
11  there is no data but, obviously, data in the medical field, to
12  be useful, has to be properly collated, and you have to
13  understand what the data means. So, for example, I think the
14  criticism made against us, to put it bluntly, is that we
15  should have disclosed the full details of the commercial
16  PASCAL registry data. We have obviously given the headline
17  figures in Mr. Estay's report, but the fact is that is
18  not publicly available data.
19  MR. JUSTICE BIRSS: Sure.
20  MS. PICKARD: So it is not data, and it is no part of my case that
21  the reasonable clinician would have that data to hand. That
22  is not data that is in the public domain and, therefore, it is
23  not data upon which we rely.
24  MR. JUSTICE BIRSS: I understand. Your case is (a), (b), (c).
25  MS. PICKARD: Yes.

[Page 1508]

KATHRYN PICKARD

1
2   MR. JUSTICE BIRSS: Notable by its absence -- this, as you say,
3   is nothing to be embarrassed about, given the state of the
4   timing of the way this issue was arising -- is that you are
5   not relying on evidence which purports to show what the effect
6   of the design or functionality of the PASCAL is in patients?
7   (Pause)
8   MS. PICKARD: That is correct, my Lord. In fact, even when the
9   head-to-head trials are completed, that clinical trial data is
10  not going to be broken down to say, "Well, this particular
11  feature was particularly good for this anatomy anyway".
12  Again, that comes back to the bigger point, that when we talk
13  about data, what are we talking about? Any clinical trial,
14  even a randomised clinical trial, can be criticised because
15  the patient selection was wrong or the statistical exercise on
16  the data was done wrongly or the outcomes were measured
17  wrongly, or whatever it may be. In fact, we have a good
18  example in this case where we can see that the COAPT data and
19  the Mitra FR data, both of which were randomised control
20  trials, came to different results on the question of whether
21  MitraClip was better than medical management when it came to
22  secondary MR. So we do not shy away from the fact that we
23  have no data.
24      I think the other point to make is this, that the
25  question of what data is needs to be unpacked because it is

MARTEN WALSH CHERER LTD    2ND FLOOR, 6-9 QUALITY COURT, CHANCERY LANE      LONDON, WC2A1HP
TEL: (020) 7067 2900          E-MAIL: info@martenwalshcherer.com        FAX: (020) 7831 6864

EVALVE v EDWARDS LIFESCIENCES        21 JANUARY 2020        PROCEEDINGS - DAY 11

[Page 1509]

KATHRYN PICKARD

1  something that Abbott comes back to again and again in their
2  skeleton argument, and they say, "There is no data".  However,
3  the question is, what do we mean by "data" in this context?
4  It is information, at the end of the day, about implantations
5  of medical devices into real life patients, patients who, on
6  the whole, are over 75 years old, so people's grandparents,
7  their great aunts and uncles.
8  MR. JUSTICE BIRSS:  Parents as well, Ms. Pickard!
9  MS. PICKARD:  Yes.  I will get in trouble if I say that, but
10  nearly!  Clearly, clinicians act ethically.  No clinician is
11  going to put a medical device into a patient for the first
12  time without forming a reasonable judgment that that device is
13  going to be safe and is going to have benefits.  I think that
14  is where we say that Abbott's case just has a fundamental flaw
15  in it, or their defence to our case, I should say, has a
16  fundamental flaw.  They say there is no data, but what data
17  are they talking about?  At some point someone has to start
18  generating that data, and that data can only be generated by
19  somebody putting the device into a patient, which requires,
20  unless that clinician is going to be acting unethically, for
21  the clinician to form a reasonable view that there are
22  benefits to putting that device into that patient.
23  MR. JUSTICE BIRSS:  Right, but is there not an exception for
24  patent infringement for clinical trials?  You are not being

[Page 1510]

KATHRYN PICKARD

1  stopped from finding out things?
2  MS. PICKARD:  Well, I mean, in this case the other side have
3  sought a preliminary injunction to stop us carrying out
4  individual implantations.  At the moment I think the position
5  -- I will be told the right number -- is that we are allowed
6  to do a certain number.
7  MR. JUSTICE BIRSS:  But they are not clinical trials, are they?
8  That is not what they are because you have authorisation?
9  MS. PICKARD:  We have approval, so obviously we have been able to
10  do a clinical trial to show that it is safe and efficacious.
11  It would be difficult to see how you could do a clinical trial
12  to .... Our case is that there are difficult anatomies for
13  which there is a public interest in having this device
14  available to treat.  It is quite difficult to see how,
15  certainly in the light of the way that Abbott has pursued this
16  litigation, we could actually get that up and running in a way
17  that would work in the UK.
18  MR. JUSTICE BIRSS:  Okay.
19  MS. PICKARD:  The exclusions for clinical trials are also quite
20  limited as well, so I think certainly from the way in which
21  Abbott has approached this to date I am not sure we would have
22  avoided litigation by saying, "Well, this is part of a
23  clinical trial", as opposed to allowing a device ----
24  MR. JUSTICE BIRSS:  Well, it depends whether it is or is not.

[Page 1511]

KATHRYN PICKARD

1  That is part of the answer.  I think we had better give the
2  shorthand writer a break so we will just rise for a few
3  minutes.
4  (A short break)
5  MR. JUSTICE BIRSS:  Yes?
6  MS. PICKARD:  My Lord, just coming back to the point on their
7  clinical trials, we would say that if your Lordship finds that
8  it is, on our (a), (b), (c), reasonable for clinicians to form
9  the view that PASCAL could treat patients either better than
10  MitraClip or it could be used where MitraClip could not be
11  used, it would be wrong to say that we could somehow funnel
12  those patients into a clinical trial and, therefore, take the
13  advantage of the exception under the Patents Act.  Obviously,
14  a clinical trial would have to be subject to all kinds of
15  conclusion, exclusion criteria, randomisation and so on and so
16  forth, and it is very difficult to see, at this stage, how
17  that could be done in this case.  Even if it could, the fact
18  is that it would be wrong, if this court finds there is a
19  public interest in treating those patients, to prevent
20  clinicians treating those patients simply because they were
21  not enrolled on a clinical trial.  Indeed, that perhaps sort
22  of shows why, if there is a public interest here, it should be
23  dealt with by no injunction or a carve-out rather than
24  essentially trying to achieve the same effect by arbitrarily

[Page 1512]

KATHRYN PICKARD

1  going down the exceptions to patentability route.
2  There is another point we would make on the data because
3  it is something that was put to our witnesses in
4  cross-examination.  We say it is inconsistent with the
5  approach Dr. Makar took and also shows why the data point does
6  not work and why we have not relied upon it.  To try and draw
7  conclusions about whether one device is better than the other
8  you need to have a proper randomised control trial, so it is
9  not possible to simply say, "Well, here is some data from a
10  registry, and here is some more data from another registry,
11  and although we do not have details of the patients and the
12  reasons why they were treated or so on and so forth, you can
13  somehow draw conclusions about the headline figures".  We say
14  that that is just not something you can do.  We say that, in
15  this case, if Edwards had disclosed full details of that
16  registry data, no doubt it would have been said against us,
17  "You cannot draw any conclusions from that because it is an
18  all-comers trial.  We do not know enough information about
19  whether any of those data are significant or not.  Some of the
20  patients do not have the complex anatomical features that you
21  say they do".  So, we are in a little bit of a lose/lose
22  situation.  We are being criticised for not relying upon the
23  data but, undoubtedly, if we had sought to rely upon the data
24  we would have been criticised because it would have been said

[14]  (Pages 1509 to 1512)

# EXHIBIT 6

# EXHIBIT 18

ABT0000421

# Edwards' Pursuit Of Transcatheter Mitral Valve Repair Options Continues, CEO Says

The Gray Sheet

July 2, 2012

Copyright 8 2012 Elsevier, Inc.

**Section:** Vol. 12; No. 70

**Length:** 579 words

## Body

**Edwards Lifesciences Corp.** remains interested in developing transcatheter mitral valve repair technology to build on its success in the transcatheter aortic valve space, the company says.

In addition to ongoing internal development efforts, acquisitions remain a possibility in the transcatheter mitral valve space, CEO Michael Mussallem suggested June 20 at the Wilson Sonsini Goodrich & Rosati Medical Device Conference in San Francisco.

While Edwards announced in 2010 that it was discontinuing its *Monarc* transcatheter mitral valve program due to slow trial enrollment, "We've got lots of stuff going on inside the company that we haven't talked about because it's not ready for prime time yet," Mussallem told fellow device company execs, venture capitalists and researchers at the meeting.

The comments were made in an interview at the conference with David Cassak, VP-content and managing director-medical devices at Elsevier Business Intelligence, publisher of "The Gray Sheet."

Edwards has seen more success with its *Sapien* transcatheter aortic heart valve. The device was approved by FDA last fall for patients deemed inoperable with conventional valve surgery. And on June 13, the agency's Circulatory System Devices Panel supported expanded labeling for the valve to include patients at high risk with conventional open heart valve surgery. (See "emSapienem Heart Valve Gets FDA Panel Nod For HighRisk Surgical Patients" "The Gray Sheet" Jun. 18, 2012.)

Beyond Sapien for transcatheter aortic valve replacement, Edwards offers its line of surgical *Perimount* pericardial tissue heart valve replacements for both aortic and mitral procedures. The firm also markets multiple surgical valve repair devices.

The minimally invasive transcatheter route for mitral valve repair "has been a tough one" for the company to break into, Mussallem said.

Edwards CEO Michael Mussallem sat down for an interview with David Cassak, VP-content and managing director-medical devices at Elsevier Business Intelligence, publisher of "The Gray Sheet," during the Wilson Sonsini Goodrich &amp; Rosati Medical Device Conference in San Francisco on June 20.

Nevertheless, the exec hinted that his firm's positive experience with transcatheter aortic valve implants may help provide momentum for Edwards to boost its transcatheter mitral valve program, possibly through an outside acquisition.

ABT0000422

Edwards' Pursuit Of Transcatheter Mitral Valve Repair Options Continues, CEO Says

"One of the things we've just learned from experience is that when you have your own development program, you're so much brighter about how to analyze the space and the size of what you might do," he said. "And so it helps give you some confidence if you do think about acquiring ": because you know what the issues are."

"We don't think aortic stenosis is the only valve disease that we can treat with some kind of minimally invasive technology," he added. "We're pretty optimistic about what can happen."

Abbott's *MitraClip* is the first mitral valve repair product available that can be delivered via catheter rather than with open surgery; it is marketed in Europe but PMA-pending in the U.S. St. Jude Medical and privately-held Mitralign also are working on percutaneous mitral valve repair devices. Other transcatheter mitral valve technology developers include privately held Cardiac Dimensions and Valtech Cardio.

Besides Edwards, developers of transcatheter aortic valves include Medtronic ( *CoreValve* ) and St. Jude ( *Portico* ).

By Zach Miners

**Load-Date:** July 2, 2012

---

End of Document

ABT0000423

# EXHIBIT 7

# REDACTED IN ITS ENTIRETY

# EXHIBIT 8

# REDACTED IN ITS ENTIRETY

# EXHIBIT 9

# EXHIBIT 39

ABT0000874

| | | |
|---|---|---|
| Company Name: Edwards Life Corp | Market Cap: 24,099.47 | Bloomberg Estimates - EPS |
| Company Ticker: EW US | Current PX: 114.13 | Current Quarter: 0.864 |
| Date: 2017-08-09 | YTD Change($): +20.43 | Current Year: 3.785 |
| Event Description: Canaccord Genuity Growth | YTD Change(%): +21.804 | Bloomberg Estimates - Sales |
| Conference | | Current Quarter: 832.588 |
| | | Current Year: 3394.500 |

# Canaccord Genuity Growth Conference

## Company Participants

- Scott B. Ullem

## Other Participants

- Jason Richard Mills

# MANAGEMENT DISCUSSION SECTION

## Jason Richard Mills

Okay, great. Good afternoon everyone. Welcome to the Canaccord Genuity Global Growth Conference. My name is Jason Mills. I am the senior medical devices' analyst for Canaccord. And thank you again for coming. This is the first of my sessions from my coverage list and really can't say of a better company to start out with than Edwards Lifesciences. And we're fortunate to have both the Chief Financial Officer, Scott Ullem here today as well, the Head of Investor Relations and many other things at the company I am sure, David Erickson. Both of them will be going through a fireside chat. I don't think we have any slides. I think we're just going to chat.

Before we move on to that, there are obviously disclosures in your book, so take a look at those. And if you would like, grab me or the management team after for any questions.

# Q&A

**<Q - Jason Richard Mills>**: What I thought I would do today is try – I had three topics I wanted to get to and questions within those topics really taking a different approach than asking the same questions. Really trying to get at what the philosophies of the company, first, and then maybe drilling down into structural heart, into transcatheter valves where they've been clearly the leader for several years. I will try to stop about maybe 20 minutes and leave 5 minutes, so think about questions maybe that you how that I don't ask because I'd like to engage with the audience as much as possible. So, Scott and Dave thanks for coming.

**<A - Scott B. Ullem>**: Pleasure. Thanks very much.

**<Q - Jason Richard Mills>**: And you just reported just another terrific quarter. So, let me give you a chance to put a level set us before I dive into questions, about sort of where the business is today. And then I think I'm going dive in just to give you a heads up of where we're going, maybe a little on the philosophy of the company, how your philosophy on growth, margins, but we'll get to that. But just maybe level-set us where the company is today and maybe remind folks what your guidance is and how you're thinking about the business for the second half of the year?

**<A - Scott B. Ullem>**: Sure. So, the company is in a very stable spot today and we had an unusual quarter in a sense that all three of our business units; Transcatheter Heart Valves, Surgical Heart Valve Therapy and Critical Care performed better than expected, showed growth in all of our regions, so U.S., Europe, Japan and the rest of world. Transcatheter Heart Valves, the business performed well. We saw a less of a competitive impact than we expected in the second quarter. And as a result, we exceeded our expectations in Transcatheter Heart Valves.

In Surgical Heart Valves we've got one new product that's rolling out, another one to follow in the form of INTUITY Elite and INSPIRIS. And in Critical Care monitoring, we've got a really successful rollout strategy this year for our

Bloomberg

ABT0000875

| | |
|---|---|
| Company Name: Edwards Life Corp | Market Cap: 24,099.47 |
| Company Ticker: EW US | Current PX: 114.13 |
| Date: 2017-08-09 | YTD Change($): +20.43 |
| Event Description: Canaccord Genuity Growth Conference | YTD Change(%): +21.804 |

**Bloomberg Estimates - EPS**
Current Quarter: 0.864
Current Year: 3.786

**Bloomberg Estimates - Sales**
Current Quarter: 832.588
Current Year: 3394.500

new HemoSphere monitoring platform as well as disposables that go along with it and our EV1000 monitoring platform.

Beyond that we've made a lot of progress in our new therapies and specifically therapies around transcatheter tricuspid repair and transcatheter mitral repair and replacement. And we feel like we're on track to achieve success in years ahead as a result of that aggressive investment in research and development. And maybe I'll pause there.

**<Q - Jason Richard Mills>:** That's perfect. It's good a set up. So, the first question is about your focus. First, you have two foci, Structural Heart and Critical Care monitoring, but really the former is I'd say a bigger focus for the company. So, as you think about your dogged focus on Structural Heart more specifically, as opposed to a strategy of leveraging your call points, whether be the interventionist cardiologist in structural heart or cardiac surgeon perhaps in critical care monitoring. With acquisitions of synergistic products, I know investors would ask you about all the time, how can you leverage this call point? Lot of times you talk about what we're really focused. Maybe you could give us a little bit more insight into why you believe that focus is the right focus for to augment the long-term growth and margin expansion and earnings growth for the company?

**<A - Scott B. Ullem>:** You're right, Jason. We have a different strategy than a lot of our public medical device peers. We are intentionally not diversifying beyond structural heart and critical care Monitoring. We're intentionally laser-focused around structural heart therapies that can really change the way medicine is practiced. And by that I mean, developing and rolling out therapies that are novel that offer very different tools to physicians and very different paths and recoveries in qualities of life to patients.

And it's a riskier strategy in a sense that we don't have more diversification to depend upon. You will not see Edwards out purchasing orthopedics or specialty pharma companies to fold into a portfolio rather we're going to stay laser-focused in what we're doing today. The reason is not philosophical. The reason is from a competency standpoint and from an economic standpoint. We think we're really good at structural heart innovation. We've had a long track record of success. We have deep relationships with physicians and hospitals, regulators, payors, and we are confident that there is tremendous growth in those areas. If there were not growth, then we'd have to resort to thinking about broader strategic alternatives, but we just feel like growth for a long, long period of time, many years into the future is substantially higher than growth in other sectors of medical devices and that's the reason why we're really staying focused in our specialty earnings.

**<Q - Jason Richard Mills>:** Okay. Dig into structural heart and TAVR, maybe in a little bit, but sticking on sort of the theme of philosophy. Talking about the P&L. Talking about your philosophy and how you balance, what has been for the majority of the last several quarters upside to your TAVR expectations in the Street? It seems like that carries with it – upside in TAVR carries with it really great margins. We can see that flow through. At the same time, this time last year you were engaging in a further build out of your sales force in manufacturing. So you had to make a decision to spend some of that gross profitability that came to you and that continues to come to you. So, what's your philosophy on letting margins go up vis-à-vis the strong growth that you're seeing in structural heart? And spending on mitral and some of these other things that may not bring top-line materiality in the nearer term, but you feel good about longer term. How do you think about trying to manage that operating margin line?

**<A - Scott B. Ullem>:** Yeah. So, the way we think about the P&L starts with investing aggressively for long-term top-line organic growth. And so, some companies focus on the expense lines in order to cut down and drive bottom-line growth. We focus on the expense lines to invest in them to drive top-line growth, and as a result get the bottom-line growth. So for example, in the second quarter, earnings per share grew 42%, but it's really stemming from the investments we've made over many, many years in novel therapies that are growing quickly on the top-line and fueling ultimate bottom-line growth and cash flow.

In the second quarter, you just put some numbers behind it, we grew 23% in TAVR, 28% in TAVR in the U.S. We grew substantially in Surgical Heart Valve Therapies and Critical Care and it yielded overall a 15% consolidated underlying growth rate on the top-line, so, again, excluding FX and acquisitions.

Bloomberg

ABT0000876

| Company Name: Edwards Life Corp | Market Cap: 24,099.47 | Bloomberg Estimates - EPS |
| Company Ticker: EW US | Current PX: 114.13 | Current Quarter: 0.864 |
| Date: 2017-08-09 | YTD Change($): +20.43 | Current Year: 3.785 |
| Event Description: Canaccord Genuity Growth Conference | YTD Change(%): +21.804 | Bloomberg Estimates - Sales |
| | | Current Quarter: 832.588 |
| | | Current Year: 3394.500 |

Over the long term, we do expect that we'll be able to get some leverage out of our gross profit line. And recently, we've been investing significantly and increasing our manufacturing capacity, and that has provided a headwind to gross margin expansion. And in the second quarter, for the first time in a while, we saw the mix improvement coming from TAVR, which is a relatively high gross margin product inside of Edwards. Not being offset by operational investment and so we saw almost 150 basis point expansion in gross margin just as a result of that mix shift.

Over time we're going to continue to invest in operations, and so there will be some natural resistance or headwinds to getting that same kind of mix improvement period-over-period. And in addition, as we rollout new products, oftentimes new products come at a lower gross margin until we get to sufficient scale [ph] when we start getting rid of (08:53) operating efficiencies.

But over time, we'd expect to get some lift in gross margins. When you get down to the expense lines, SG&A and R&D, as I mentioned, our real focus is on investing to drive top line growth. And while we are disciplined, especially in selling, general and administrative expense growth, we're also making sure that we've put in place the right kinds of technologies in the R&D pipeline, as well as the right level of field support as we continue to rollout TAVR and rollout in the future our new transcatheter, tricuspid and mitral innovations.

**<Q - Jason Richard Mills>:** That's helpful. Going to TAVR for a second and sticking with the theme of philosophy. The market has been competitive in Europe, increasingly competitive in Europe for several years. So you've had an opportunity to compete in Europe differently than you've had an opportunity to compete in the U.S., competitive market with one other player. Well, we've got another one that we know is planning to come to the U.S. market.

So, again, on philosophy, talk about your philosophy as it relates to driving the top-line growth in a competitive market, TAVR specifically juxtaposed to maintaining the pricing power that you've had. Of course in some ways that pricing is responsive to reimbursement, which has been quite good. But in lieu of any changes in reimbursement, one might think competition may breed a bit more price competition. You talked about gross margins as you see long term uplift perhaps in that over the long term. Talk about your philosophy in competing in TAVR, maintaining your price, not giving in perhaps to anything you might see on the price competitive front.

**<A - Scott B. Ullem>:** So there are lots of elements to that question. Let me try to pick it apart and take them one by one. First, in terms of our competitive philosophy, we are competing against the disease, first and foremost, more so than competing to other competitors. And in this – at this early stage in the adoption of this important new therapy, we think that expansion in the overall treatment of these patients is worth a lot more than expansion of our market share. We've seen in Europe, actually there has been a lot of competitors in Europe. For a numbers of years, we had about seven different competing product lines, two of which represented about 85% of the total procedural volume. Edwards has maintained a leading position in Europe as well as in the other regions.

Our pricing strategy has been fairly consistent which is that we price our products in line with what we think the value is that they provide. And I think generally Edwards has been trading at a price premium in Europe sometimes in the neighborhood of 20% depending upon the country. So, I think having the leading position as well as having a substantial price premium reflects the fact that our real strategy stems from having products that are differentiated based upon scientific results in clinical trials. And we're going to continue to invest in new technologies, new products and clinical trials to support that differentiation.

In terms of price realization, in Europe we've seen consistently over the years low-single digit percentage price declines – average selling price declines as different hospitals achieve higher thresholds for receiving rebates and incentives. In the U.S., in terms of pricing, the average selling price has been pretty constant since we've been commercialized and overall globally, that's the case as well.

The reason in the U.S. is because as new centers come online, typically those new centers purchase products at the full prices as centers that are more experienced, have been implanting these valves longer are reaching higher volumes and achieving those same volume thresholds and tie them to incentives and rebates as has been the case in Europe. And so, globally average selling prices have been stable in transcatheter heart valves and we expect to maintain discipline and make sure that we're getting fair value for the investments that we're making in this important therapy.

Bloomberg

ABT0000877

| | |
|---|---|
| Company Name: Edwards Life Corp | Market Cap: 24,099.47 |
| Company Ticker: EW US | Current PX: 114.13 |
| Date: 2017-08-09 | YTD Change($): +20.43 |
| Event Description: Canaccord Genuity Growth Conference | YTD Change(%): +21.804 |

**Bloomberg Estimates - EPS**
Current Quarter: 0.864
Current Year: 3.785
**Bloomberg Estimates - Sales**
Current Quarter: 832.588
Current Year: 3394.500

**<Q - Jason Richard Mills>**: That makes sense. On TAVR in the U.S., working our way down a little bit into more specific questions, but staying somewhat 10,000 feet with respect to the patient population, you mentioned the disease as you are competitor at this point. Maybe talk about the updated target addressable market that you updated at your last Investor Meeting increased it as a matter of fact, quite significantly and the components of that where we are in the penetration cycle.

And I guess the second part of that question is how you go after that market relative to the way the FDA allows you to in terms of making you get approvals for various risk profile as investors know you've got high and intermediate risk, and anything above that, anything more risky than that and you're waiting on investing in a trial for a low risk. I'll get to more specific question on low-risk later, but talk about the market and how much you're able to target today and what I guess ultimately low risk may mean for you and the way you attack the market differently once you have it.

**<A - Scott B. Ullem>**: Sure. So, right now the patients that are eligible for receiving TAVR are patients who have severe aortic stenosis with symptoms. And within that population of patients with severe symptomatic AS we are eligible to offer this therapy to patients who are at high risk and intermediate risk of undergoing traditional open heart surgery. As you mentioned, Jason, we've got a trial underway, a PARTNER III trial which is studying this valve in patients who are at low risk of undergoing traditional open heart surgery.

We expect that that trial will be fully enrolled around the end of this year and will lead to ultimate approval for this therapy for all patients regardless of risk of undergoing traditional open heart surgery somewhere in the 2019 timeframe. At that point we believe that's going to lead to a market size for TAVR by 2021 of $5-plus billion and growing. So, that's a milestone along the way to a market that we believe is...

**<Q - Jason Richard Mills>**: Relative to half of that today.

**<A - Scott B. Ullem>**: Relative to half of that today in 2016, 2017 run rate. Now keep in mind, that's just for patients who have severe symptomatic AS. There is an additional population of patients that is not included in that $5-plus **billion number which is patients who have severe aortic stenosis that are not demonstrating symptoms.** And we are just in the early stages of undertaking a trial to study that patient population. The name of that trial is EARLY-TAVR.

And the patients who have severe AS will be evaluated for symptoms and patients who continue not to demonstrate symptoms will be randomized either to receive TAVR or to be watched and to receive medical management during that time period, and we'll see which patient population performs better. There will be some patients who under that trial, who undergo a stress test, who then do demonstrate symptoms, they will not be eligible for the trial and instead will be referred to get treated commercially with TAVR. So maybe I'll pause there and see if that addressed where you were going.

**<Q - Jason Richard Mills>**: It did. Couple of things there to tackle, low risk and then asymptomatic, very different markets. With respect to low risk, I think what investors grapple with obviously, all of us do, because there is a really good literature that tells, okay, that 25% of the market is high-risk or 10% high-risk and 40% is intermediate. So, we're all grappling with that. What part of the market do you have access to, and you get that question a lot. I guess my question isn't that, it's what does low-risk approval do, assuming the data shows good results relative to the primary endpoint? What does it do in terms of your development of the market, the care pathway channel, how does it change? How your customers, the physicians interact with the population whether it be through marketing or billboards or outreach. Is it a potential massive catalyst to market development?

**<A - Scott B. Ullem>**: We think it is a catalyst to market development and let's just take it back in time a little bit. Historically, this is a therapy that's been offered to a very small segment of the population. Those patients who were not eligible for surgery who are either inoperable or at high risk of undergoing surgery and did not have another option.

Now as of last August, patients who were at intermediate risk of surgery also have the option of getting TAVR therapy, but there is still a large segment of the population that does not have this therapy available to them. As we've experienced different events over the last several years, what we've seen is that label expansion approach from high risk to intermediate risk, [ph] openly intermediate (18:43) risk to low risk has a meaningful influence on the total population patients who end up getting treated. But there are other endpoints as well and it's tough to isolate the impact of those

ABT0000878

| | |
|---|---|
| Company Name: Edwards Life Corp | Market Cap: 24,099.47 |
| Company Ticker: EW US | Current PX: 114.13 |
| Date: 2017-08-09 | YTD Change($): +20.43 |
| Event Description: Canaccord Genuity Growth Conference | YTD Change(%): +21.804 |

Bloomberg Estimates - EPS
  Current Quarter: 0.864
  Current Year: 3.786
Bloomberg Estimates - Sales
  Current Quarter: 832.588
  Current Year: 3394.500

label expansions from new technologies, new clinical trial results, new competitor technologies and trial results, and so all of those are influencing growth in this market and we continue to believe that they will influence the growth in the years ahead as well.

In addition to this label expansion that we expect for the low-risk trial, we also intend to continue rolling out innovations. And so for example, we're going to be introducing our [ph] ultra (19:22) delivery system in Europe later this year, in the U.S. next year. We're also introducing new products and late this year we expect to introduce our CENTERA self-expanding valve in Europe and we're enthusiastic about the prospects it has for continuing to grow Edward sales.

**<Q - Jason Richard Mills>**: That's helpful. Last one on low-risk. There have been – it hasn't enrolled as expeditiously as some of the other trials. It hasn't been slow but I think some investors asked the question, why didn't it just enroll faster than anything else? Is there seemingly more patients in the low-risk population? How would you address that? And what would you say to an investor, who says, well, does that imply anything about what the market growth maybe in low-risk population once you are commercial there?

**<A - Scott B. Ullem>**: Right. So, we don't think it has any implications for what the ultimate adoption curve looks like once TAVR is available to all risk category patients. Rather, often times when new trials start, it takes a while for them to get to really start to ramp, especially in the case of a randomized trial. So, keep in mind, this is low-risk trial studies, patients who get TAVR as compared to patients who are randomized to get traditional surgical aortic valve replacement, and so randomized trial sometimes take longer to enroll than in a registry trial for example which is what some of the past trials have looked like.

And so, we're still very enthusiastic and optimistic about the prospects of getting this low-risk indication. We believe that this trial will be enrolled around the end of this year. Remember, this is a trial with a one-year endpoint, and so once the last patient enrolls around the end of this year, add 12-months to that, and then when that one year follow-up period is concluded, we will assemble the data and prepare to submit it to FDA for approval.

**<Q - Jason Richard Mills>**: Early 2019 or somewhere in that range?

**<A - Scott B. Ullem>**: Sometime during the course of 2019. It's tough to predict what the pipeline is going to be like or what the timeline may look like, but 2019 is a good modeling assumption.

**<Q - Jason Richard Mills>**: Okay. Of course there is never enough time, but let me be remised, if I didn't touch on the transcatheter efforts you have in mitral and tricuspid. Let me ask in a more provocative way, if I were to think in – frankly in my model out at least a couple of years and frankly as I think about what I would model over the next five years, it wouldn't have transcatheter mitral or tricuspid wouldn't be material in my model. Why would that be wrong? Or maybe within the context of that question, talk about the differences in developing the mitral market versus the transcatheter aortic?

**<A - Scott B. Ullem>**: Sure. So, we do think there will be meaningful revenue opportunities over time, although you're right, over the next couple of years we're still early on in clinical trials and in getting approvals and starting to launch these therapies. But let's just maybe us tick through some of the different programs that we have underway.

In the tricuspid space, we just recently concluded the enrollment of our CE Mark trial for Cardioband tricuspid and we've also been trialing our FORMA spacer device for tricuspid repair in patients. So, between the two we've treated over a 100 patients and we're optimistic about developing a strategy for introducing a tricuspid repair therapy in 2018.

In the mitral space, we already have commercial approval for Cardioband mitral in Europe and we're pleased with the initial results that we've seen. We have approval for an IDE in the U.S. for Cardioband mitral. And while our start in Europe for Cardioband mitral is slower than we expected, we are forecasting $2 million to $3 million in sales by the fourth quarter and continuing to grow beyond that.

In addition, we've got our PASCAL mitral valve repair device and we're pleased with the reception that PASCAL has gotten from clinicians who have had an opportunity to trial that device. And we're optimistic that it's going to be a very valuable therapeutic alternative for a market that already is $400 million plus in size with one other competitor or only

Bloomberg

ABT0000879

| | | |
|---|---|---|
| Company Name: Edwards Life Corp | Market Cap: 24,099.47 | Bloomberg Estimates - EPS |
| Company Ticker: EW US | Current PX: 114.13 | Current Quarter: 0.864 |
| Date: 2017-08-09 | YTD Change($): +20.43 | Current Year: 3.785 |
| Event Description: Canaccord Genuity Growth | YTD Change(%): +21.804 | Bloomberg Estimates - Sales |
| Conference | | Current Quarter: 832.588 |
| | | Current Year: 3394.500 |

one competitor participating in that market.

In terms of mitral valve replacement, we've started treating patients again with our transseptal approach CardiAQ device. And we're focused very carefully on this less invasive approach than a transapical implant patient. And so, while the road ahead is going to be long, we expect that we could get approval for a transcatheter mitral replacement device in the 2019 timeframe.

So overall, we've got a very robust portfolio. We're in this unusual position where we have a lot of different programs that are being offered to patients today. And we also have some tough decisions to make. It may be the case that not all of these programs get commercialized and that we may combine programs or take programs in a different direction, but we've got a really good problem to manage over the next couple of years.

## Jason Richard Mills

And I've got to get better doing this job up here moderating, because I didn't leave any time for audience questions. So you'll have to catch Scott and David on the way out. Although, I'm sure you are running to another meeting. Your schedule is pretty good. So, please join me in thanking Scott and David for their time.

*This transcript may not be 100 percent accurate and may contain misspellings and other inaccuracies. This transcript is provided "as is", without express or implied warranties of any kind. Bloomberg retains all rights to this transcript and provides it solely for your personal, non-commercial use. Bloomberg, its suppliers and third-party agents shall have no liability for errors in this transcript or for lost profits, losses, or direct, indirect, incidental, consequential, special or punitive damages in connection with the furnishing, performance or use of such transcript. Neither the information nor any opinion expressed in this transcript constitutes a solicitation of the purchase or sale of securities or commodities. Any opinion expressed in the transcript does not necessarily reflect the views of Bloomberg LP.*

*© COPYRIGHT 2017, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.*

ABT0000880

# EXHIBIT 10

# EXHIBIT 24

ABT0000657

**S&P Global**
Market Intelligence

# Edwards Lifesciences Corporation
# NYSE:EW
# Analyst/Investor Day
## Wednesday, December 05, 2018 4:00 PM GMT

COPYRIGHT © 2018 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

1

ABT0000658

**Contents**

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ............................................................................. | 3 |
| Presentation | ............................................................................. | 4 |
| Question and Answer | ............................................................................. | 25 |

COPYRIGHT © 2018 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

ABT0000659

EDWARDS LIFESCIENCES CORPORATION ANALYST/INVESTOR DAY | DEC 05, 2018

# Call Participants

## EXECUTIVES

**Bernard J. Zovighian**
*Corporate Vice President of Transcatheter Mitral & Tricuspid Therapies*

**Catherine M. Szyman**
*Corporate Vice President of Critical Care*

**Daveen Chopra**
*Corporate Vice President of Surgical Heart Valve Therapies*

**David K. Erickson**
*Vice President of Investor Relations*

**Larry L. Wood**
*Corporate Vice President of Transcatheter Heart Valve*

**Michael A. Mussallem**
*Chairman & CEO*

**Scott B. Ullem**
*Corporate VP & CFO*

**Unknown Executive**

## ANALYSTS

**Bruce M. Nudell**
*SunTrust Robinson Humphrey, Inc., Research Division*

**Christopher Thomas Pasquale**
*Guggenheim Securities, LLC, Research Division*

**Frederick Allen Wise**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

**Jason Richard Mills**
*Canaccord Genuity Limited, Research Division*

**Joanne Karen Wuensch**
*BMO Capital Markets Equity Research*

**Joshua Thomas Jennings**
*Cowen and Company, LLC, Research Division*

**Kristen Marie Stewart**
*Barclays Bank PLC, Research Division*

**Lawrence H. Biegelsen**
*Wells Fargo Securities, LLC, Research Division*

**Matthew Charles Taylor**
*UBS Investment Bank, Research Division*

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

**Unknown Analyst**

**Vijay Muniyappa Kumar**
*Evercore ISI Institutional Equities, Research Division*

## ATTENDEES

**Jeffrey Popma**
*Steward Health Care System, LLC*

**Randolph Martin**

**Unknown Attendee**

Copyright © 2018 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

ABT0000660

EDWARDS LIFESCIENCES CORPORATION ANALYST/INVESTOR DAY | DEC 05, 2018

# Presentation

**David K. Erickson**
*Vice President of Investor Relations*

Good morning, everyone. I am David Erickson, Vice President of Investor Relations here at Edwards Lifesciences, and I'd like to welcome you to our 2018 Investor Conference.

Before we get started, a few housekeeping items to go over. This morning, we issued a press release that summarizes the information that we'll be discussing today. A copy of this release is included with your handouts and is also available on our website. Today's conference is being webcast live and a replay of this event and copies of management slides will be available on our website as soon as possible after the conclusion.

During the question-and-answer times, so at everyone in the room can hear as well as for the benefit of those persons on the webcast, if you have a question, please raise your hand to be acknowledged and then use the microphones that are built into the tables in front of you by pressing the button. If you're sitting on the sides of the room and not at one of the tables, please raise your hand, we'll get a hand-held mic to you for the questions. Please identify yourself before asking your question and please limit your questions, so that we can get to as many people as possible during the Q&A times.

During the conference today, Edwards' management will be making a number of forward-looking statements. These statements speak only as of today, and we do not undertake any obligation to update them after today. More information about the risks associated with these forward-looking statements can be found in the forward-looking statement included at the bottom of today's press release and in documents filed with the SEC that are available on our website.

Today's presentations includes some figures identified as underlying and adjusted. When we use these items, we're referring to non-GAAP measures. Otherwise, we're referring to GAAP figures. And a reconciliation of non-GAAP measures is included in your handouts and is also available on our website.

Finally, in the interest of full disclosure, these are the relationships and financial arrangements pertaining to the clinicians that you will hear from today.

And with that, I will turn it over to Mike Mussallem, our Chairman and CEO. Mike?

**Michael A. Mussallem**
*Chairman & CEO*

Thank you, David. Thanks all for joining us today. It's our pleasure that we get a chance to talk you about Edwards Lifesciences, and we appreciate your interest. So let me jump right into it. Globally, cardiovascular disease is the #1 cause of death. It's projected to remain that way. There are around -- overall, there's over 18 million people around the world that died of cardiovascular disease last year. That's about 30% of the global population, what you may not know is that approximately 3 quarters of those are in low-to-mid income countries.

In the U.S. in fact, we've had cardiovascular disease on the run. It's been reducing year-after-year. That event -- that trend reversed a couple of years ago as a result of obesity, diabetes, et cetera. And now it's on the rise again. Let's talk about why this is important. As we look ahead, our world is getting wealthier, healthier and they're living longer.

There was an article, The Lancet, that predicted 59 countries, including China, will have a life expectancy that's over 80 by 2040. Why does that matter? As you know, cardiovascular disease is a progressive disease. It gets worse as you get older. If you are 24 years old, your chance of cardiovascular disease, the odds are something like 20%. They go up to nearly twice of that or about 40% by the time you're 45. Once you're over 80, the estimate is that about 90% of people over 80 have some form of cardiovascular disease. So you can see why this is particularly relevant and it's very costly. This disease means that

Copyright © 2018 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

ABT0000661

EDWARDS LIFESCIENCES CORPORATION ANALYST/INVESTOR DAY | DEC 05, 2018

and primary PCI for acute myocardial infarction has a number of needed to treat of about 100, so 1% difference in the mortality. This says you treat 6 patients, not 100 patients, and you save a life. So this changed everything. And it changed everything from our perspective, because when you have mortality reductions, as this is the primary endpoint, it changes the way we think, which I think is really where we stand right now.

And of course, what we also learned was that not all the patients in this study were prohibitive risk. Some of them weren't prohibitive risk and these forest plots show that whether you were not high risk or high risk, you still had the same beneficial outcome in the treatment of functional mitral regurgitation. Now there is going to be a lot of controversy and there will be a lot of controversy about comparison for these 2 different trials. But they're not the same trials in my opinion, they're not the same trials. MITRA-FR, wonderful investigators, didn't probably see a heart failure specialist until they got enrolled in the trial versus having seen a heart failure specialist for months on the COAPT side. That the mitral regurgitation was a little bit less severe in MITRA-FR, a little bit more severe in COAPT. The ventricles were a little bit worse in MITRA-FR than they were with COAPT. As a result of that, the ventricles were a little sicker with less MR, not on optimum medical therapy. It's not really the same population as what the COAPT investigators demonstrated, incredibly important.

So what this mean? We'll talk about how we get to guideline-directed medical therapy, but we have to get there as background therapy. Severe MR and its non-end stage ventricle is probably going to be preferred, and that's certainly where they intervened in this particular area. I think that similar to surgery that we need to think earlier about intervening earlier in patients with functional mitral regurgitation. We learn that with surgery, it's been learning with other things as well. And it's always important to have optimal patient selection. You don't want patients too sick, you don't want patients too healthy. You need to be able to have these patients suffer with mitral regurgitation in order to show a benefit, and that's what COAPT did. And for the first time I think that we see that mitral valve therapy altered the course of FMR. In those patients who were treated, their ventricle stayed the same in size and their quality of life stayed the same. In those patients who were not treated, the ventricles got bigger, the function got worse and their quality of life was worse. So we intervened, incredibly important piece going forward. And as we think about our trial portfolio, which Bernard will share with you in just a second, it's really going to be the functional indices of a benefit that we're going to use to supplement along the way.

So what about clinical trial considerations? Well, we won't have the time -- Bernard is going to talk about some of the trials that are coming forward. We didn't touch both on tricuspid as complex as mitral is, take them an order of magnitude greater and take it to tricuspid disease, maybe we can take that up in the Q&A session, incredibly difficult paradigm to treat.

So what are take-home message is? Well, we got to get better. I got to get better at what I do. I have to pick up different procedural skills that are more advanced, education, promulgation of that -- education of the community is going to be incredibly important. COAPT showed that we can alter the natural history of mitral regurgitation and we can reduce mortality by intervening, incredibly important. But as I hope I've been able to convince you, the heterogenous nature of the mitral valve compared to the aortic valve really necessities that we do take a toolbox approach to pathology and use the right technology to match with the pathology that we see. And obviously, we're going to have to as we think about the world of COAPT is now going to be a world where everyone is going to try to replicate COAPT results. And we need to think about innovative trial designs, providing more insights into the functional improvements of patients undergoing these therapies. Thanks for your attention.

**Bernard J. Zovighian**
*Corporate Vice President of Transcatheter Mitral & Tricuspid Therapies*

Good morning, everyone. It is now my pleasure to talk about our newly formed division, TMTT. I'm sure you all know what TMTT stands for, transcatheter mitral and tricuspid therapy. And we have a very exciting plan for next year. I'd like to start with a recap of our strategy. And you heard from Dr. Popma, he did an amazing job of highlighting the fact, these 2 diseases, mitral and tricuspid are very complex. The patients are prevalent, and they are not the same. There is a large diversity of patients. And therefore, like in surgery, we probably need a toolbox to treat these patients. And we are very pleased with the meaningful

Copyright © 2018 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights Reserved.
**spglobal.com/marketintelligence**

ABT0000687

EDWARDS LIFESCIENCES CORPORATION ANALYST/INVESTOR DAY | DEC 05, 2018

toolbox we put together, highly differentiated. As you have seen from Edwards on the aortic side, we are not only committed to bring innovative therapies, but also world-class evidence and education, which is going to be key to success.

So over the years to come, what you can expect from us is a cadence of meaningful innovation, starting with having 3 commercial products in Europe next year. Given the emerging evidence, COAPT, and our increased confidence in our portfolio, we now believe that in 2024, this TMTT opportunity globally is going to be around $3 billion, which is going to be achieved 1 year earlier than what we said last year.

I feel very fortunate of leading this new division, TMTT. We are uniquely positioned. We have 60 years of experience on the surgical mitral side. About more than 15 years of experience on the transcatheter mitral side. Not all of the transcatheter project were successful, but all of them provided great learner, positioning us for success today. And today, with our boarder set of portfolio and highly differentiated portfolio, all of these therapy are in a clinical evaluation today, adding a lot of learning to our experience.

Really quickly now because Dr. Popma went in great detail. So we believe the opportunity is 3x bigger on the aortic side and patient are few who are operated, very complex, serious complication, high mortality rate, basically, very few options. And this is just to recap how diverse are the patients. Diverse within mitral, diverse within tricuspid. So for sure, we need a portfolio. I'm pleased about, very excited about the portfolio we built, 7 platform across tricuspid and mitral. We are making progress on all of them, and we are looking at ways to further innovate the next generation internally. But we're also looking externally to make sure that we are going to be the leader in this space and also in the patient care.

What I'm going to do right now is go one by one for each platform. PASCAL is mimicking a well-known surgical technique [indiscernible]. So this technology has 4 very important elements. The first one is a very innovative delivery system, TAVR, which is making the procedure reproducible. And then we have 3 things around the implant: Specifically designed paddle to reduce the stress on the leaflet, clasp who can be activated independently or together to optimize the MR reduction, and finally, the spacer to fill the spacing between the leaflets. So this 4 things together, the delivery system, the paddle, the clasp and the spacer, it is what is making this device highly differentiated compared to what existed in the marketplace. We have some evidence, early evidence, but we have strong evidence. We are very pleased about what we have seen. And we have very aggressive plan for next year.

First, clinically, given the evidence existing for the FMR patient population and DMR patient population, we are going to be focusing on 2 pivotal study in the U.S. So the first one, CLASP IID, is for the DMR patient population. This one is approved already by FDA and CMS, and we are currently activating this study in the U.S. CLASP IIF for FMR patient population, we are planning to initiate this study by the end of year next year. And then on the tricuspid side, we want to get some more learning, and we are going to start in the U.S. an early feasibility study.

So a lot of clinical activity on the PASCAL front. Commercially, we expect to get CE Mark and to launch the device by midyear next year. We are right now building the plant, a dedicated field team to make sure we can execute at very high level.

Quick one on the CLASP IID study, so which is a 2:1 randomized against MitraClip, which is noninferiority study. We have selected highly experienced people in the field to lead the study. And what you see also on right is a very unique registry, because we believe we can get some learning by looking at patient that might not be eligible to a MitraClip, but can be treated with, a PASCAL. So for sure, more learning coming here.

Now let me move to a second product, Cardioband. Cardioband also mimic a surgical procedure. We are placing a band around the annulus -- above the annulus, and then we are deploying anchors. And at the end of the procedure, we deploy tension to reduce the annulus dimension. The beauty is that we can do that in a beating heart. So the cardiologist and the team can look at the MR reduction or the TR reduction and decide if the reduction is enough or not.

And we have some evidence, very strong evidence. We have 2 CE Mark study, for the MR side and the TR side, showing durability and effectiveness of the device. But having said that, and you all know that, we

Copyright © 2018 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

ABT0000688

EDWARDS LIFESCIENCES CORPORATION ANALYST/INVESTOR DAY | DEC 05, 2018

know that we need to improve a couple of things. The first one is even though there is great excitement in the marketplace, and clinicians want to use this device for their patients because it is making a big impact, the procedure is too long. So we are dedicating some effort to make the procedure shorter, one. Two is the supply. We had some supply limitation this year, and Mike talked about it in a different -- earning call during the year. As you know, we are transferring production from Israel to our Edwards plant, the plant is underway, looking good. And we are going to progressively improve supply throughout 2019.

On the clinical front, we had a pivotal study active for the MR patient population. Given COAPT, we are going to assess the learning from COAPT and look at if we need to change the design or not of ACTIVE. So for now, the study is paused until we know better.

Because the tricuspid patient population has very few options, and we believe that most of the tricuspid patient have a functional disease, and Cardioband is truly could be first-line therapy for these patients. We are also expecting to start a pivotal study by the end of year next year with the TR patient population.

So I talked about 2 repair technology, PASCAL and Cardioband. Now let's move into our replacement options. You remember that long time ago, we made the decision to go transseptal -- transfemoral only. It is the most patient-centric. For sure, it is much more difficult to design, but we love, in this company, to do -- to take on this kind of technological challenge, and we love to solve that. I'm very pleased to say that this is the perfect example of our Edwards strategy in action. We leverage our leading position on the surgical side. We leverage our proven SAPIEN M3 device using the mitral position, more than 3,000 procedures done since the beginning. We leverage also the learning from our internal transcatheter mitral program, FORTIS.

Together with the acquisition we made, CardiAQ, a couple of years ago to develop what I believe is the 2 best transseptal (sic) [ transfemoral ] platform today, EVOQUE and M3. Let met talk a little bit about each one of them.

EVOQUE has been specifically designed as a valve for the mitral anatomy. We have a unique delivery system, very stable, reproducible, low profile, and 2 valve sizes to be able to treat a large spectrum of patients, and we are just beginning. We have done a few patients, we just started an EFS in the U.S., and what we plan to do here, we are very encouraged by the early result, we plan to expand on this clinical experience in '19.

M3. M3 is using the SAPIEN 3 platform, which has been slightly modified, and we have specifically designed a very low profile, easy-to-use delivery system and the docking system, basically to offering a landing zone to the valve. We have -- here we have had a little bit more experience, more than 30 patient. Dr. Raj Makkar at TCT this year presented 15 patient and showing 0 mortality at 30 days and great technical success rate. So we are very encouraged about the fact that we have more experience, one. Two is using our proven device, SAPIEN M3. So in '19, we are going to expand on our EFS learning together with expecting to start a pivotal by the end of the year next year.

FORMA. FORMA is our latest platform in the portfolio. A very simple device, easy to use, the clinical community love it, short procedure time. So basically, what it is? It is a spacer placed in between the leaflets and let you anchor in the right ventricular wall of the patient. What we have done in '18 is we have modified and redesigned and improved the device, and we are about to restart an early feasibility study with this improved device, and we plan to do that in '19.

If you look at this portfolio and you see -- I believe it is one of the most -- the broadest portfolio, highest-differentiated portfolio I have ever seen in the medical device industry. And to complement this portfolio, we are very serious about bringing the evidence. So look at this very ambitious clinical plan. 5 early feasibility study across 5 technologies. So here the objective is, what, to get some learning. So by year of '19, to Mike's point early on, we are going to be much more knowledgeable on the disease, on the therapy, on the product, on the type of patients from what technology. At the same time, we expect to start 4 pivotal studies to support our U.S. approval. And in Europe, we are going to continue doing our 3 postmarket approval studies, which is going to be very important to complement our clinical data with real-world evidence. I'm very excited about [indiscernible] of the portfolio and the kind of evidence we're going to generate next year.

Copyright © 2018 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

ABT0000689

**EDWARDS LIFESCIENCES CORPORATION ANALYST/INVESTOR DAY | DEC 05, 2018**

In summary, we are the only company having this kind of experience, 60 years in the surgical side, 16 years in the transcatheter mitral and tricuspid side. We have a momentum for not only next year, we are going to add 12 studies, EFS and pivotal study and postmarket study, but also already this year, we are having a ton of studies running. And we have an unmatched commitment, 7 products in the portfolio, and we have about 600 people fully dedicated to TMTT. So this is all what we do, TMTT. And we have dedicated team across function in clinical, in R&D, and we are building a dedicated team in Europe to be able to support, commercialize, educate our partner physician in Europe.

With this plan, we are -- we will deliver $40 million in revenue next year. And for sure, we are going to face headwinds like there's many clinical studies happening right now, so for sure there will be some competition here. For sure, we feel good about our supply plan, which is going to progressively improve. It could be an headwind, but tailwind, COAPT is validated to the space. But I feel very well prepared to navigate this deliver this $40 million in sales. And more importantly, advance our portfolio from the clinical standpoint and from the innovation standpoint.

In closing, so these patients are prevalent, complex, very different to one to another. We need multiple therapy. I do believe we have the best toolbox in the marketplace today, and we are committed to further innovate. And finally, you have -- clinician partner have a commitment that not only we are going to bring the best innovation, world-class dividends, but also education to treat better these patients, lead the space and transform patient care. Thank you so much.

### Unknown Executive

So we'll open the Q&A session at this point. We'll ask Dr. Popma and Bernard to join me. Bernard, please grab a seat, and we'll begin.

### Joanne Karen Wuensch
*BMO Capital Markets Equity Research*

Joanne Wuensch from BMO Capital Markets. Two questions. One for Dr. Popma. How do you see mitral valve -- minimally invasive mitral valve adoption? And having lived through the TAVR adoption rate, should we think of it as maybe the same, steeper or worse?

### Jeffrey Popma
*Steward Health Care System, LLC*

Well, I know what worse means. It's similar. So I think that this is going to be incremental. I think that the bolus was the enthusiasm in MitraClip for FMR. We've not got an approval yet. So we're going to have to wait for the approval by the FDA of COAPT in -- or MitraClip inpatients for FMR before we can really move forward from a perspective of advocating this to the size the patient. So we still are very selective about where we go. But when that happens, I think, there will be a bolus of patients into the mitral arena. But more importantly, there's an awareness now that we have alternative therapies available to us -- for our heart failure specialists. I can't emphasize that enough is that the awareness of these patients have been, they -- some of them have gotten from the primary care physician, the cardiologist and they're very well managed in the heart failure clinical practices. But that's going to be, I think, a big referral base for us. So we need to expand out the tools in order to expand out the base, and certainly, we're working on that. DMR is certainly going forward with Class IIb. But on the FMR side, I think, we have to wait for approval. At least in this country, we have to wait for approval, but then, I think, it's going to be an incremental top up.

### Joanne Karen Wuensch
*BMO Capital Markets Equity Research*

And then for Bernard, we started 2018 looking for $50 million in TMTT revenues clawed back closer to $2 million and you just put out $40 million for next year. How do we bridge from Q2 $40 million and what -- which products are the drivers for that?

### Bernard J. Zovighian
*Corporate Vice President of Transcatheter Mitral & Tricuspid Therapies*

Copyright © 2018 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

ABT0000690

# EXHIBITS 11-20

# REDACTED IN ENTIRETY

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT CARDIOVASCULAR SYSTEMS, INC. and EVALVE, INC. | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:19-cv-00149-MN |
| v. | ) ) | |
| EDWARDS LIFESCIENCES CORP. and EDWARDS LIFESCIENCES LLC, | ) ) ) | |
| Defendants. | ) ) ) ) ) | |

**EXPERT REPORT OF PAUL SORAJJA, M.D.**

I, Paul Sorajja, M.D., state as follows:

1.     I have been retained by the Plaintiffs Evalve, Inc. and Abbott Cardiovascular Systems, Inc. as an expert witness to discuss treatments for the cardiovascular disorder mitral regurgitation ("MR") and its treatment, including with Abbott's MitraClip device.

2.     I am being compensated at my standard hourly consulting rate of $750/hour.   My compensation is not dependent on the content of this report or the outcome of this case.   A copy of my curriculum vitae is attached as Appendix A, and the materials I have relied upon, in addition to my experience and expertise as an interventional cardiologist, are listed in Appendix B.

3.     In the last four years, I have not testified as an expert at deposition or trial.

## I.      BACKGROUND & EXPERIENCE

5.      I am presently a Senior Consulting Cardiologist at the Minneapolis Heart Institute (MHI) at Abbott Northwestern Hospital, the Director of the Center for Valve and Structural Heart Disease at MHI, and the Roger L. and Lynn C. Headrick Family Chair at the MHI Valve Science Center.

6.      In those roles, I treat patients, performing an average of approximately 250 interventional cardiology procedures per year.  I also conduct research, have published over 150 scientific articles and 50 book chapters, and teach internal medicine residents, cardiovascular fellows, and my fellow physicians.

7.      I went to college at Southwestern University in Georgetown, Texas, and received a Bachelor of Science, *magna cum laude*.

8.      I went to medical school at the Mayo Medical School in Rochester, Minnesota.  It was here that my passion for cardiology has its genesis: in my very first cardiology class, the professor showed an echocardiogram of a beating heart, and I knew from then on that the heart is where my career would lie. My experience during my medical school taught me that I wanted to provide continuity of heart care to patients—not just surgery, but care from the time of a patient's first visit through to their last.

9.      After medical school, I performed my Residency in Internal Medicine and then a Fellowship in Cardiovascular Diseases, both at the Mayo Clinic College of Medicine.

10.     I performed a Clinical and Research Fellowship in Cardiological Sciences at St. George's Hospital Medical School in London.

11.     After my fellowships, I took up a position at the Mayo Clinic and Mayo Foundation, eventually becoming a Professor of Medicine at the Mayo Clinic College of Medicine, Co-

Director for Education at the Mayo Clinic's Cardiac Catheterization Laboratory, and Program Director for the Interventional Cardiology Fellowship.

12. Throughout my fellowships and early years on the staff at Mayo, I learned more about exactly what sort of cardiologist I wanted to be. As I did procedures, and gained confidence and skill, I realized that I wanted to continue to focus on the interventional side of cardiology, and especially on catheter-based procedures. To that end, in my early years at Mayo, I was fortunate enough to have opportunities to work with various cardiac medical device companies on early feasibility studies for catheter based devices. It was exciting to be at the forefront of emerging technologies and helping to advance the field, and it has driven me ever since.

13. While I was at Mayo, we were approached to participate in the pre-approval MitraClip feasibility studies for the treatment of MR. However, there was skepticism of the device and the feasibility of transcatheter mitral valve repair in general, and so we declined the offer to participate.

14. During my years at Mayo, I felt that I professionally needed to move elsewhere for the early technology experience I so desired, which is what prompted my move to MHI, where I have now been for over five years.

15. In my first several months at MHI, in August of 2013, I participated in my first MitraClip procedure (pre-approval, as part of the ongoing REALISM study). Given the ease of use of the device and its ingenious design, the results I achieved with the MitraClip even on my first try were exceptional, and I recognized immediately the profound impact the device would have on treatment of this debilitating disorder.

16.    When MitraClip was approved by the FDA later that year, in October 2013, our team hit the ground running, and in the first full post-approval year, we performed the second-highest number of commercial MitraClip procedures in the United States.

17.    I have continued to implant MitraClip ever since, approximately 60 per year at this point, for a total of >200 MitraClip procedures to date.  I have also published a number of articles and book chapters discussing MitraClip, and have worked to make MHI a MitraClip Center of Excellence, training physicians from all over the country and the world in how to use the device.

18.    In this regard, the FDA requires physicians to undertake a course, known as "MitraClip 101" before implanting a MitraClip.  To date, I have taught that course approximately 15-20 times.  Whether held at Abbott's facilities or elsewhere, I spend a day and a half, in conjunction with one or two other instructors, training up to 30 physicians at a time in the mitral anatomy, appropriate patient selection, clinical outcomes, and the MitraClip procedure, including extensive teaching on troubleshooting.  We review echocardiograms (used to visualize the device in use in the body) from various patients, conduct demonstrations (including my own live cases if the course is held at MHI) and simulations, and end by ensuring the patient and his/her team is ready for various scenarios when performing the procedure.

19.    In addition to this introductory course, I have also taught a more advanced course, known as "MitraClip 202" eight or nine times.  This is a purely voluntary course for practicing physicians who have performed 10-15 cases, but want to get beyond the basics.  8-12 physicians attend and I walk through the most complex cases and topics on day one, and

then conduct interactive live cases on day two, where I engage the practicing physicians in conversations about technique.

20. With regard to Edwards' PASCAL, my hospital was originally enrolled as a center for Edwards' PASCAL Clasp IID trial.  After I agreed to give expert evidence on behalf of Abbott in these proceedings, my hospital was subsequently barred from taking part in Edwards' PASCAL Clasp IID trial.

21. Returning to my non-MitraClip work, I have been involved at the forefront of research for a number of emerging valvular technologies, including the feasibility studies for three devices being investigated for transcatheter mitral valve replacement:  TENDYNE (Abbott), INTREPID (Medtronic), and CAISSON (LivaNova).  I also serve as the national Principal Investigator for TRILUMINATE II, a pivotal study of transcatheter therapy for tricuspid regurgitation.  We are an enrolling site for ACCUCINCH studies (Ancora Heart), studies on transcatheter aortic valve replacement (Medtronic, Boston Scientific, Abbott Vascular, and Edwards Lifesciences), and the TriCinch device for tricuspid repair (4Tech).

22. I have also held leadership roles in the cardiology professional societies and journals, including as Course Director for various symposia, chair and co-chair for various society committees, Editorial Consultant for the *Journal of the American College of Cardiology* and Editorial Board member for the *Catheterization Cardiovascular Interventions* journal, member of the Writing Committee for the 2014 American College of Cardiology Foundation/American Heart Association's Valvular Heart Disease Practice Guidelines Update, and President of the Cardiovascular Innovations Foundation.  Finally, I am board certified in Internal Medicine, Cardiovascular Diseases, and Interventional Cardiology.

### H.     The Key To MitraClip's Success

93.     MitraClip has been used in over 100,000 patients thus far, and it has been widely praised.[52]

94.     Deservedly so.  Most fundamentally, MitraClip is the only non-surgical MR treatment that recreates the natural joining of the leaflets.  It acts directly on the leaflets, directly targets the leak, and reduces the size of the hole with the clip.

95.     In addition, MitraClip actually has what may be an improvement over traditional surgery in that the coaptation of leaflets is permanent.  The leaflets come together and cannot come apart again.  After surgical repair, patients can get scarring that distorts the leaflets, their shape, and their coaptation, leading to recurrence of MR.  That does not occur with MitraClip which is a permanent fixation of the leaflet edges and coaptation.

96.     Specific features of the MitraClip are critical to its success as well:

97.     First, the MitraClip is able to grasp the leaflets from both the atrial and the ventricular side.  Because of the dynamic movement of the leaflets, this is vital.  As one closes the arms, if the leaflets are not being held from both sides, the leaflets will just fall out of the arms.  In fact, it is grasping from both sides that recreates the hands-in-prayer movement of natural coaptation.

98.     Second, the concave clip arms keep the grippers recessed within them while the device is closed, reducing its profile in the heart.  The concave shape of the arms also increases their surface area, enabling a more secure grasp, and allows the cardiologist to cup the leaflets

---

[52] "*Abbott Builds Structural Heart Portfolio*," Business Monitor Online (Aug. 4, 2015) (ABT0000446).
 Perlowski and Feldman,The EVEREST trial results, PERCUTANEOUS MITRAL LEAFLET REPAIR, Ch. 8, pp. 45-53 at 52 (2012) (ABT0000449 at 516).
 Gössl et al., "Current Status of Catheter-Based Treatment of Mitral Valve Regurgitation," *Curr. Cardiol. Rep.* Vol. 19 No. 5, p. 38 (2017) (ABT0000648).
 "Tiny Device is a 'Huge Advance' for Treatment of Severe Heart Failure," The New York Times (Sept. 23, 2018) (ABT0000396).

gently while pulling back, reducing the risk (as on a flat surface) that the leaflets will fall out.

99.     Third, the elongated loop or petal shaped clip arms of the MitraClip protrude outwards radially from the device shaft, which is important because it (a) enables the device to be lined up perpendicular to the leaflet coaptation plane, thereby avoiding certain problems that can be otherwise caused, such as "pin-wheel" effects on the leaflets; (b) provides the reach needed to grasp the leaflets and achieve effective coaptation; and (c) allows for an atraumatic leaflet grasp.

100.    Fourth, each MitraClip gripper has small "frictional elements" along their length.  These catch the leaflets—without them the leaflets would easily slip out—while not also damaging them or restricting reversibility.

101.    Fifth, the MitraClip can move from a fully closed position to an inverted position.  As discussed above, this allows for maximum maneuverability in clip delivery, placement, assessment, and repositioning.  Indeed, the ability for the MitraClip to invert is critical, because it allows the interventionalist to withdraw the device safely back into the left atrium to realign the device.  In my experience, this is needed in most procedures, given the need to precisely align the MitraClip perpendicular to the line of coaptation of the leaflets which, given the shape of the leaflets, is not a straight line.  Thus, the device needs to be aligned differently depending on where along the valve it is to be placed.  Given that this is being done on a beating heart, it can create difficulties even for the most skilled implanter.

102.    If the device were realigned in the ventricle, there would be a risk that the arms or grippers could snag on the chords and become twisted around the device like a piece of spaghetti

28

on a fork.  And if the arms were left in an open or even closed position when being withdrawn from the ventricle into the atrium, there also would be a serious risk of the arms and/or the grippers getting entangled with and damaging the chordae.

103. These unique features of the MitraClip thus transform the challenge of working in a beating heart into an advantage.  In surgery, the heart is stopped, so the cardiologist has to predict how the dynamic heart will react to what he or she has done.  With MitraClip, its reversibility and repositionability—enabled by inversion—allow the cardiologist to simply observe and adjust as needed.  Other transcatheter devices allow for adjustment, but the clip is the only one where that is possible while also creating coaptation of the leaflets.

104. Finally, the MitraClip's covering permits tissue ingrowth, which integrates the clip into the valve and helps ensure the long term stability and strength of the repair.

105. Demand for MitraClip is driven by the need for a safe and effective, less-invasive treatment for mitral regurgitation, one that avoids the significant risks and disadvantages of surgery in primary MR patients and improves upon the surgical outcomes in secondary MR patients, and these features are fundamental to making the MitraClip what it is.  Based on my own experience implanting the MitraClip, as well as my knowledge gained from my colleagues, it is my view that the demand is met by the unique combination of MitraClip's features that I have described.  Without these features, there would be no MitraClip.

Executed this 11th of November at Minneapolis, Minnesota.

_____

Paul Sorajja, M.D.

Date: November 11, 2019

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ABBOT CARDIOVASCULAR SYSTEMS, INC. and EVALVE, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| | ) Case No. 1:19-cv-00149-MN |
| v. | ) ) |
| EDWARDS LIFESCIENCES CORP. and EDWARDS LIFESCIENCES LLC, | ) ) ) |
| Defendants. | ) ) ) ) |

**EXPERT REPORT OF STEPHEN H. LITTLE, M.D.**

1.      I, Stephen H. Little, M.D., have been retained by Plaintiffs Evalve Inc. and Abbott

Cardiovascular Systems, Inc. (collectively, "Abbott") as an expert witness to provide a tutorial

regarding the anatomy of the heart, mitral regurgitation (MR) and history of its treatment, and the

impact of Abbott's MitraClip product on the treatment of MR.

2.      I am being compensated at my standard hourly rate of $600/hour.  My compensation is not

dependent on the content of this Expert Report nor the outcome of this case.  A copy of my

curriculum vitae is provided as Appendix A.  The materials I have relied upon, in addition to my

experience and expertise as a cardiologist, in providing the tutorial in this Expert Report are listed

in Appendix B.

3.      In the last four years, I have testified as an expert by deposition or at trial in the following

case(s): *Mae Chambers v. Damian Chaupin*, Case No. 15-005819 CA 01 (Florida); *Carlos Thillet

v. Gebreab MD*, Case No. 2009 CA 0132780 (Florida); *T. Gambarella v. U. of Connecticut*, Case

No. FVT CV-13-6039122 S (Connecticut); *CardiAQ Valve Techs., Inc. v. NeoVasc Inc.*, Case No.

14-CV-12405-ADB (D. Mass.).

## I.      QUALIFICATIONS

4.      I am a cardiologist with the Houston Methodist DeBakey Heart & Vascular Center.  I serve as the Director of Structural Heart Services for the Houston Methodist Hospital System and director of the Valve Clinic at Houston Methodist Hospital, a multidisciplinary medical clinic focused on the assessment and treatment of complex valvular heart disease.  I also serve as Director of the Cardiovascular Hemodynamics Imaging Laboratory (CHIL).

### A.      Education

5.      I received a Bachelor of Science degree in Biology and Biochemistry, with honors, from York University in Toronto.  I hold a medical degree from McMaster University in Hamilton, Canada, and I did fellowship training in Internal Medicine and in Cardiovascular Diseases at the University of Western Ontario.  I completed an additional year of subspecialty training in Echocardiography at the University of Ottawa Heart Institute.  While there I also performed research in the area of valve disease.  I then moved to Houston, Texas, and completed a postdoctoral research fellowship at Baylor College of Medicine, primarily focusing on heart valve disease imaging and the development of new three-dimensional echocardiography tools and methods to quantify mitral valve dysfunction.  I am board certified in cardiovascular disease by both the Royal College of Physicians & Surgeons of Canada and the American Board of Internal Medicine.

### B.      Clinical Practice

6.      I have been a practicing cardiologist since 2003.  My clinical practice includes an outpatient general cardiology clinic; an outpatient specialty clinic focused solely on heart valve disorders (The Valve Clinic); and hospital-based care of patients with heart valve disorders.

7.      I am also an echocardiographer, performing an average of over 3,000 echocardiogram interpretations per year.  Echocardiography is a specific form of cardiac imaging that uses the

"echoes" from ultrasonic waves to identify and understand cardiac anatomy, evaluate cardiac function, and quantify cardiac dysfunction. Echocardiography is used before, during, and after cardiac procedures.

8.     Echocardiography comes in both two-dimensional and three-dimensional forms, and I use both. The use of 3-D imaging is particularly important during any assessment of the interaction between cardiac structures and any prosthetic device. From a single imaging perspective it is not possible to accurately describe the position of a device in all aspects. For example, a prosthetic device may appear to be in contact with a specific cardiac structure when viewed from above (an en-face view), but from a side view the device may be several millimeters above the target structure. In my role as an interventional echocardiographer, I rely on multiple imaging views to accurately describe the spatial relationship between any device (e.g. MitraClip) and the cardiac tissue being targeted.

9.     I have personally performed approximately 20,000 transthoracic echocardiograms (TTEs) and approximately 6,000 transesophageal echocardiograms (TEEs), which is the approach that is particularly useful for evaluating the mitral valve. I have performed interventional echocardiography during more than 500 structural heart interventional procedures, including, but not limited to, procedures involving Abbott's MitraClip, transcatheter aortic valve replacements (TAVR) with the CoreValve, Sapien valves, and Lotus valves, and other paravalvular repair procedures. Regarding MitraClip specifically, I have participated in implanting approximately 300 clips in approximately 200 patients.

### C.     Research, Teaching & Other Professional Activity

10.     My recent research activities and peer-reviewed publications have focused on novel use of 3-D echocardiography for the quantification of native and prosthetic valve dysfunction as well as imaging guidance for percutaneous structural heart interventions. My research team has created a

3

robust *in vitro* flow system for multimodality functional valve imaging using tailored hemodynamic conditions.  In collaboration with research scientists and mathematicians, my research group creates complex heart valve constructs using 3-D printing techniques to improve our understanding of heart valve dysfunction.  We employ multimodality clinical imaging tools to better characterize and quantify these complex intra-cardiac flow conditions.  I have researched and published regarding MitraClip itself—case reports of novel and challenging uses,[1] discussions of emerging trends for mitral repair including MitraClip,[2] and reviews of the MitraClip experience and best practices.[3]

11.      I have given more than 210 invited lectures nationally and internationally, and have published more than 130 manuscripts and book chapters.  My research activities have been funded through grants from the National Sciences Foundation, the American Heart Association, and industry partnerships.

12.      In addition, I hold an academic appointment (associate professor) at Weill Cornell Medical College and am an adjunct associate professor at Rice University, Department of Bioengineering.

13.      Within my hospital institution, I also run bi-weekly multi-disciplinary heart valve case conference meetings, and I was the program director for our annual Southwest Valve Summit, which was a 2½-day continuing medical education event that includes lectures, case presentations,

---

[1]Avenatti et al., "Tricuspid Regurgitation Repair with a MitraClip Device: The Pivotal Role of 3D Transoesophageal Echocardiography," Eur. Heart J., Vol. 18, No. 3, p. 380 (2017) (ABT0001164).

Avenatti et al., "3D Vena Contracta Area for the Quantification of Residual Mitral Regurgitation after MitraClip Procedure," JACC Interven., Vol. 71, No. 11, p. A1254 (2018) (ABT0002490).

Avenatti et al., "Percutanous Repair for Recurrent Mitral Regurgitation after Surgical Repair: A MitraClip Experience," Structural Heart, Vol. 2, No. 2, pp. 147-154 (2018) (ABT0001170).

[2]Kheradvar et al., "Emerging Trends in Heart Valve Engineering: Part III. Novel Technologies for Mitral Valve Repair and Replacement," Annals Biomed. Engineering, Vol. 43, No. 4, pp. 833-843 (2014) (ABT0001185).

[3]Nyman et al., "Transcatheter Mitral Valve Repair Using the Edge-to-Edge Clip," J. Am. Soc. Echocard., Vol. 31, No. 4, pp. 434-453 (2018) (ABT0001199)

Avenatti et al., "3D Vena Contracta Area for the Quantification of Residual Mitral Regurgitation after MitraClip Procedure," JACC Interven., Vol. 71, No. 11, p. A1254 (2018) (ABT0002490).

live cases, heart dissections, and catheter-based structural heart demonstrations. That conference has been merged with our Multimodality Imaging Symposia (10th annual), which I also co-direct.

14.    I also have several roles within national cardiology societies.  For the American Society of Echocardiography (ASE), I chair the committee on guidelines and standards; chair the task force on structural heart disease; participated in the writing of a guideline for the quantification of residual regurgitation following catheter-based intervention; lecture at multiple ASE-sponsored symposia annually; and recently served on the ASE board of directors (2015-2018).  I lecture at the ASE's annual State-of-the-Art Echo course as well.  For the American College of Cardiology (ACC), I have been both the co-chair (2013) and chair (2014) for the heart valve-learning pathway of the Annual Scientific Sessions; been an invited lecturer for multiple consecutive scientific sessions; and have served as associate editor for the ACC echocardiographic self-assessment program (ACC-EchoSAP, 8.0), which focused on the echocardiographic evaluation of all types of valvular heart disease.

15.    I have become increasingly involved in activities for the Cardiovascular Research Foundation.  I have lectured at the Foundation's annual Transcatheter Cardiovascular Therapeutics Conference (TCT) for several years; in 2018 and 2019, I co-organized a symposium at TCT; I was an associate editor for the Foundation's journal, *Structural Heart*: Journal of the Heart Team (2018/2019).

16.    Finally, I am a fellow of the Royal College of Physicians & Surgeons of Canada, the American College of Cardiology, and the American Society of Echocardiography.

the difference arises from the larger size of the COAPT trial, the greater MitraClip experience of the COAPT study implantation teams, and differences in patient selection—the COAPT patients had more severe functional MR at baseline, and were already at maximally tolerated doses of heart failure medications.[133]  It appears that the MITRA-FR first author may agree with at least some of these distinctions, as he told an industry publication:  "There is absolutely no contradiction between their results … Thanks to these two studies we know with MITRA-FR what should be avoided and with COAPT what should be the ideal target for the heart team when we discuss an indication for the MitraClip."[134]  In addition, in the second year of follow-up the MITRA-FR patients have shown clinical benefits.[135]

### F.   MitraClip's Success

85.   Since approval, MitraClip has been rapidly and widely adopted, with 100,000 patients treated so far.  This number is particularly significant because many of those are patients who previously would have had no good therapeutic options.  It has been widely praised:

- Physicians have called the MitraClip device a "first-in-class [mitral valve repair] device" and stated that "[i]t is clear that the MitraClip offers significant clinical and quality-of-life benefit to patients, with an excellent safety profile compared with surgical intervention."[136]

- MitraClip has become has "significantly advanced the field of transcatheter therapy for mitral valve regurgitation," and "has by far become the most widely adopted TMVr approach worldwide."[137]

---

[133]Stone et al., "COAPT: Mitraclip Reduces Hospitalization, Mortality in HF, Mitral Regurgitation," COAPT TCT Conference News (Sept. 23, 2018), https://www.tctmd.com/news/coapt-mitraclip-reduces-repeat-hospitalizations-mortality-functional-mr-patients-severe-hf (ABT0000407)

[134]*Id.*

[135]Iung et al., "Percutaneous repair or medical treatment for secondary mitral regurgitation: Outcomes at 2 years," Euro J of Heart Failure (in press) (2019).

[136]Business Monitor Online, "Abbott Builds Structural Heart Portfolio," (Aug. 4, 2015) (ABT0000446)
  Perlowski et al., "The EVEREST Trial Results," in Percutaneous Mitral Leaflet Repair, Feldman & St. Goar, (eds.) (2012) (ABT0000449)

[137]Gössl et al., "Current Status of Catheter-Based Treatment of Mitral Valve Regurgitation," Curr. Cardiol. Rep., Vol. 19, No. 5, p. 38 (2017) (ABT0000648)

- After seeing the results of the COAPT study, physicians have called the MitraClip device a "game changer" and "a huge advance" that "will change how we treat these patients."[138] The importance of MitraClips' results in the COAPT study in particular was immediately apparent. I attended the presentation of the COAPT results at TCT, so I was there for the room's spontaneous applause, and I had never seen that reaction before.[139]

86.     The praise is well-deserved.  MitraClip is the only commercially available alternative to mitral valve regurgitation surgery in the United States, and the only alternative to mitral valve regurgitation that acts directly on the leaflets anywhere in the world.  MitraClip directly targets the fundamental issue in MR—it goes after the leaky hole, and reduces the size of the hole with the clip.  The clip recreates the anatomical coaptation—what nature is trying to do with leaflets.  No other technology does this.

87.     In short, naturally, the leaflets come together in a V-shape, like the gates of locks on a canal.  The "V" points into the high-water, or high-pressure side, here the left ventricle, and the pressure within the left ventricle acts to press the leaflets together and keep them closed.  MitraClip replicates this form of coaptation.

88.     Other transcatheter devices, like Carillon and CardioBand, which are currently approved in Europe but not in the United States, are fundamentally different and do not replicate the natural coaptation, as they are not leaflet solutions, but target other parts of the valve anatomy.  This means, for example, that they cannot be used with severe leaflet flail or prolapse.[140]

89.     The primary demand for the MitraClip has been driven by the need for a safe and effective, less-invasive  treatment  for  mitral  regurgitation,  one  that  avoids  the  significant  risks  and

---

[138]Kolata, "Tiny Device is a 'Huge Advance' for Treatment of Severe Heart Failure," N.Y. Times (Sept. 23, 2018) (ABT0000396).

[139]Wood, "TCT 2018, Day 2: COAPT Prompts Round of Applause, Plus New Valve Insight," TCT Website (Sept. 23, 2018), https://www.tctmd.com/news/tct-2018-day-two-coapt-prompts-round-applause-plus-new-valve-insights (ABT0005052)

 Suh (@willsuh76), Twitter Video, https://twitter.com/willsuh76/status/1044827546670518273 (ABT0003667)

[140]Gössl et al., "Current Status of Catheter-Based Treatment of Mitral Valve Regurgitation," Curr. Cardiol. Rep., Vol. 19, No. 5, p. 38 (2017) (ABT0000648)

disadvantages of surgery, including the ineligibility of certain patients for treatment.  With the newly expanded indication to secondary MR patients, demand for MitraClip is also driven by the need to provide clinical benefits over and above medical therapy to secondary MR patients, who typically do not demonstrate a survival benefit from surgery.

90.     Based on my own experience implanting the MitraClip as a member of a team, together with an interventional cardiologist, as well as my knowledge gained from attendance at conferences, reading literature, and speaking with colleagues, it is my view that these demands are met by the unique combination of MitraClip features, including the mechanism of delivery, the range of motion that facilitates leaflet capture, and the structure and shape of the clip arms and grippers that grasp the leaflets,

91.     First, fundamental to the operation of the MitraClip is its ability to engage the valve leaflets from both the atrial and ventricular sides using opposed pairs of clip arms and grippers.  Grasping both sides of each leaflet in this manner provides a complete, balanced grip on the leaflets and therefore leads to effective coaptation.  This is especially important for a beating-heart operation where the flailing leaflets could make it difficult for a device that grasps the leaflets on just one side and pinch them together to obtain a consistently sufficient coaptation of the leaflets.  The MitraClip's ability to secure the leaflets between the clip arms and grippers on both sides before they are brought together prevents the leaflets from flailing away from the device while being brought together, helping to ensure a reproducible, sufficient coaptation.

92.     The structure and shape of the MitraClip arms is another feature that is important to the success of the device.  Specifically, the elongated loop or petal shape of the clip arms protruding from the central shaft allows the MitraClip to grasp sufficient tissue of each leaflet to ensure an effective coaptation, while mitigating the risk of damaging the tissue.  Furthermore the concave

shape of the arms has a number of important advantages. First, it allows for the grippers to be recessed within the arms while in the closed position, which helps to reduce the device profile during delivery to the heart and when implanted. Second, the concave shape of the arms increases the surface area of leaflet capture given the arm width, and therefore provides a stronger grasp, mitigating the risk of the clip detaching from the leaflets.

93.     The structure and shape of the MitraClip grippers also plays a key role in the success of the device. On each gripper are rows of short barbs that provide an increased grip on the leaflets without damaging the leaflets themselves. This balance between requiring sufficient engagement of the barbs to increase the grip while not being so invasive as to damage the leaflets is particularly important given that the MitraClip commonly needs to be repositioned if it is determined that the initial grasp of the leaflets is insufficient. Under those circumstances, the MitraClip grippers need to be disengaged from the leaflet tissue so that the device can be repositioned and re-grasped. In some cases, the leaflets may need to be re-grasped multiple times. If the device were designed to fully puncture the leaflet tissue, the releasing and re-grasping could damage the tissue beyond repair. The barbs on the MitraClip are designed such that they maximize the frictional gripping of the leaflets while ensuring the tissue is not damaged to allow for repositioning and re-grasping of the leaflet as needed.

94.     The MitraClip functionality, including its ability to move from a fully closed position through a full range of open positions to an inverted position, is also very important to the success of the device. This allows for maximum maneuverability in clip delivery, placement, assessment, and repositioning if necessary. For example, the ability to move from a fully closed to an open position is important for the functionality of the device in achieving an effective grasp of the

leaflets when bringing the device up from the ventricular side, and then completing the coaptation through closure.

95.     Also important, is the ability to invert, particularly when it is determined the initial placement of the device is insufficient and it needs to be repositioned.  When this happens, the MitraClip often needs to be brought back up through the mitral valve from the ventricular side to the atrial side.  If the arms were left in an open or even closed position there would be a serious risk of the arms getting entangled with and damaging sub-valvular structures such as the chordae. This situation is somewhat like that of an arrowhead needing to be removed from tissue.  The shape of the arrowhead would likely cause additional tissue damage if it were simply pulled back out, whereas if it were possible to invert the shape of the arrowhead, it would be much easier to simply pull it out.  This is precisely what the MitraClip arms can do.  They can be inverted prior to being brought back to the atrial side, significantly decreasing the risk of damage to the sub-valvular structures.

96.     Finally, the ability of the MitraClip to integrate into the valve assembly through a covering that permits tissue ingrowth is beneficial since the resulting tissue bridge—between the leaflets and across the device—helps to ensure the long term stability and strength of the repair.

97.     The effects of these features have made the MitraClip what it is—a device that is able to treat people who could not otherwise be treated, and extremely valuable to cardiologists and patients alike because of that.  Without these features taken together, there is no reason to think the device would be so effective and desirable.

Executed this 11th of November, 2019 at Houston, Texas.

_____

Stephen H. Little, M.D.


Date: November 11, 2019

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT CARDIOVASCULAR SYSTEMS, INC. and EVALVE, INC., | ) ) ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) ) | C.A. No. 19-149 (MN) |
| v. | ) ) | |
| EDWARDS LIFESCIENCES CORP. and EDWARDS LIFESCIENCES LLC, | ) ) ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) ) ) | |

**Expert Report of Dr. Robert Kipperman, M.D.**

# TABLE OF CONTENTS

I.     QUALIFICATIONS, COMPENSATION, AND PRIOR TESTIMONY ...................2

II.    THE HEART ...........................................................................................................4

   A.  Anatomy of the Heart................................................................................4

   B.  The Mitral Valve .......................................................................................8

   C.  Mitral Regurgitation................................................................................11

III.   TREATMENT OF MITRAL REGURGITATION ...............................................14

   A.  Medical Management ...............................................................................14

   B.  Surgical Treatment ..................................................................................14

   C.  Minimally Invasive Treatment ................................................................15

      (a) Transcatheter Mitral Valve Repair.......................................................15

      (b) Transcatheter Mitral Valve Replacement.............................................16

   D.  Assessing the Treatment of MR ..............................................................16

IV.    MITRACLIP ........................................................................................................17

   A.  Background ..............................................................................................17

   B.  Operation and Efficacy of MitraClip ......................................................20

   C.  MitraClip Characteristics ........................................................................23

      (a) Clip arms ..............................................................................................23

      (b) Leaflet grasping....................................................................................25

      (c) Frictional elements and repositioning ..................................................25

      (d) MitraClip materials ..............................................................................27

      (e) Delivery system....................................................................................30

   D.  Features Driving Demand ........................................................................30

V.     PASCAL ..............................................................................................................31

   A.  Background ..............................................................................................31

   B.  PASCAL characteristics ..........................................................................33

      (a) Paddles .................................................................................................33

      (b) Leaflet grasping....................................................................................34

      (c) Protrusions and repositioning................................................................35

      (d) PASCAL materials................................................................................38

      (e) PASCAL spacer ...................................................................................39

   C.  Delivery system.......................................................................................40

i

VI.   TREATMENT USING MITRACLIP AND PASCAL...............................................41

    A.   Anatomical Features Treated ............................................................41

        (a)  Wide coaptation gap.............................................................43

        (b)  Short posterior leaflet...........................................................46

        (c)  Leaflet prolapse/flail ...........................................................47

        (d)  Flimsy, fragile, tethered or calcified leaflets........................48

        (e)  Disrupted sub-valvular apparatus.........................................49

        (f)  Leaflet clefts........................................................................51

        (g)  Perforated leaflets.................................................................52

        (h)  Prolapse in the commissures ................................................52

        (i)  Severe annular dilation.........................................................52

    B.   Leaflet Detachment .........................................................................53

    C.   Clinical experience with PASCAL and MitraClip............................56

VII.  SUMMARY .................................................................................................59

I, Robert Kipperman, M.D., declare as follows:

1.      I am an interventional cardiologist at Morristown Medical Center in Morristown, New Jersey, and the Co-Director of Morristown Medical Center's Structural Heart Disease Program.  As I explain below, I have extensive experience treating patients suffering from severe mitral regurgitation with the Abbott MitraClip system and, through clinical trials, also have significant experience with the Edwards PASCAL system.

2.      I have been asked by Defendants Edwards Lifesciences Corp. and Edwards Lifesciences LLC ("Edwards") to provide my expert opinions regarding my experience using PASCAL to treat patients, and how PASCAL compares to MitraClip in terms of the treatment of patients.  In my opinion, and based on my personal experience using both devices to treat patients, PASCAL will be a better device for some patients, and I believe that is in the interests of patients that physicians be permitted to use PASCAL.

3.      I have also been asked by Edwards to respond to the statements made in the expert reports of Dr. Makar, Dr. Sorajja, and Dr. Little.  Where I do not address any statements made in these documents it should not be taken that I agree with them.

4.      The opinions in my report are my own.  In formulating these opinions I have relied on my experience as an interventional cardiologist and have reviewed certain materials.  The materials I relied on in formulating my opinion are discussed in my report and identified in Exhibit A, attached to this report.

5.      I reserve the right to supplement, change, clarify, or modify my opinions should additional information and/or documentation become available to me.  I also

reserve the right to create graphics for use in connection with any hearing or trial testimony.

## I.     QUALIFICATIONS, COMPENSATION, AND PRIOR TESTIMONY

6.      I am an interventional cardiologist at Morristown Medical Center in Morristown, New Jersey, and the Co-Director of Morristown Medical Center's Structural Heart Disease Program.  As I discuss in more detail below, I have extensive experience treating patients suffering from severe mitral regurgitation ("MR") with the Abbott MitraClip system and, through clinical trials, also have significant experience with the Edwards PASCAL system.

7.      In 1977, I received a B.A. in Philosophy and Biophysics from the University of California at Berkeley.  I received my medical degree in 1981 from Ross University Medical School.  After medical school, I did my internship and residency in internal medicine at Kings County Hospital Center in New York, where I was later a cardiology fellow.  I am board certified in Internal Medicine and in Cardiovascular Disease.

8.      At Morristown Medical Center, I treat patients for a variety of heart conditions, including MR.  As an interventional cardiologist, I focus on transcatheter procedures, including catheter-based mitral valve repair procedures and transcatheter aortic valve replacement.

9.      I am an active member of professional societies.  I am a fellow of the American College of Cardiology, and member of the American College of Physicians.  I am also active on advisory boards.  I have held leadership positions in the Oklahoma

Cardiovascular Research Group and the Oklahoma Foundation for Cardiovascular Research.

10.     I have served as a principal investigator in several important clinical trials and studies, including for both MitraClip and PASCAL.  With respect to PASCAL, I have served as a principal investigator on both the CLASP study (Edwards PASCAL TrAnScatheter Mitral Valve RePair System Study), intended to assess the safety, performance and clinical outcomes of PASCAL, and the CLASP IID Pivotal Trial, intended to establish the safety and effectiveness of PASCAL in patients with degenerative mitral regurgitation and who have been determined to be at prohibitive risk for mitral valve surgery.  With respect to MitraClip, I have served as a principal investigator on the COAPT trial (Cardiovascular Outcomes Assessment of the MitraClip Percutaneous Therapy for heart failure patients with functional mitral regurgitation).  I also participated in the MitraClip Endovascular Valve Edge-to-Edge Repair (EVEREST) II High Risk Study (HRS).

11.     In connection with the above trials, my institution has received research support from both Abbott and Edwards for enrolling patients in those trials.  I have also served as a proctor for Abbott.  I have also served as an investigator and/or as a proctor for other medical device companies, including Medtronic and Keystone Heart.  I have also served as a consultant for Cardiokinetix.

12.     In addition to the clinical trials described above, I also use MitraClip with patients who are not enrolled in any clinical trial or study.  My hospital is one of the heart valve centers currently providing MitraClip therapy in the United States.  I have performed approximately 300 MitraClip procedures.

13.     To date, I have also performed approximately 30 procedures using PASCAL.  Because PASCAL is an investigational device in the United States, all of these procedures were conducted as a part of a clinical trial.

14.     In the last four years, I have not testified as an expert by deposition or at trial in any case.

15.     I am being compensated at my customary rate of $350/hour for consulting work in this case, up to $2,500 per day.  My compensation does not depend on the content of my opinions or the outcome of the case.

16.     Although I do not believe that this has had any effect on my opinions, I wish to disclose that my son is currently employed by a contractor that works for Edwards on clinical development of PASCAL, and my son is currently working on that project.

17.     A copy of my *curriculum vitae* is attached as Exhibit B.

## II.    THE HEART

### A.    Anatomy of the Heart

18.     The heart consists of four chambers: the right and left ventricles, and the right and left atria.[1]  The primary function of the heart is to pump deoxygenated blood from the body to the lungs, and subsequently pump oxygenated blood from the lungs back to the body.

---

[1]     The right and left designations of the ventricle and atrium are given by reference to the subject's left and right sides, and therefore appear mirror opposite in most diagrams (as shown in Figures 1 and 2).

**(e) Delivery system**

74.     The MitraClip delivery system is designed to fit through a 24 French sheath (which has an external diameter of 8 mm).  Although there are differences between the MitraClip and PASCAL delivery systems (see further paragraph 103 below), I consider that use of both becomes largely intuitive after about 20 or 30 cases.

**D.     Features Driving Demand**

75.     Drs. Makar, Sorajja, and Little each discuss features of MitraClip that they opine are important or as driving demand.[42]  I do not agree with these opinions.  I have been treating patients with MitraClip since the first generation MitraClip was available.  In my experience using MitraClip and in discussions with my colleagues about MitraClip, I have never heard anyone express the view that the "concave shape of the arms,"[43] or its "loop or petal shaped arms [that] protrude radially from the device shaft" are important features of the device.[44]  I also do not use, and am not aware of anyone that uses, MitraClip because it has an inverted position.[45]  Although I understand that the inverted position is the way that MitraClip seeks to reduce the risk of entanglement during repositioning, as a physician, I am not seeking a device with an inverted position.  Instead, I want a device that will not damage the chordae in the first place.

76.     Additionally, I do not use MitraClip because it grasps each leaflets from both sides, because it has a fabric covering, or because the grippers have frictional

---

[42]   Makar Report ¶¶ 11.2–11.10; Little Report ¶¶ 86–97; Sorajja Report ¶¶ 95–105.

[43]   Makar Report ¶ 11.4.

[44]   Makar Report ¶ 11.5.

[45]   Makar Report ¶ 11.7.

elements.[46]  If, for example, I were deciding between two treatments for a particular patient, these features would not lead me to choose MitraClip over Cardioband for that patient.

## V.     PASCAL

### A.     Background

77.     As I set out above, the first implantations of Edwards' PASCAL device (for compassionate use) took place between September 2016 and March 2017, and were reported in Praz 2017.  PASCAL received a CE mark in Europe in February 2019.  It is not currently approved in the US but is currently undergoing clinical trials.



Figure 12: PASCAL[47]

78.     As discussed above, I was one of the principal investigators in the CLASP study, a multicenter, multinational, prospective, single-arm study of 62 patients who underwent TMVr using a PASCAL device.  The 30-day results of this study were reported

---

[46]   Makar Report ¶¶ 11.3, 11.6, 11.8.

[47]   PASCAL images from https://www.edwards.com/gb/devices/transcatheter-valve-repair/PASCAL (last visited Nov. 26, 2019).

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge.


Dated:  December 6, 2019


Robert Kipperman , M.D.

# EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT CARDIOVASCULAR SYSTEMS, INC. and EVALVE, INC., | ) ) ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) ) | C.A. No. 19-149 (MN) |
| v. | ) ) | |
| EDWARDS LIFESCIENCES CORP. and EDWARDS LIFESCIENCES LLC, | ) ) ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) ) | |

**Expert Report of Dr. Ehrin Armstrong, M.D. M.Sc. M.A.S.**

**TABLE OF CONTENTS**

I.      QUALIFICATIONS, COMPENSATION, AND PRIOR TESTIMONY................... 1

II.     THE HEART.......................................................................................... 5

    A.      Anatomy of the Heart ................................................................ 5

    B.      Mitral Regurgitation ................................................................. 8

III.    TREATMENT OF MITRAL REGURGITATION ................................... 10

    A.      The Process by Which Patients Receive Treatment ........................... 10

    B.      Surgery ................................................................................ 13

    C.      Medical Management ................................................................ 15

    D.      Transcatheter Mitral Valve Repair ............................................... 19

IV.     PATIENTS THAT WOULD BENEFIT FROM PASCAL ....................... 21

V.      ADDITIONAL TREATMENT OPTIONS BENEFIT PATIENTS AND WOULD INCREASE THE NUMBER OF PATIENTS TREATED ....................................... 26

I, Ehrin Armstrong, declare as follows:

1.      I have been retained by counsel for Defendants Edwards Lifesciences Corp. and Edwards Lifesciences LLC (together, "Edwards") as an expert witness to provide my opinions regarding mitral regurgitation ("MR") and its treatments.

2.      The opinions in this report are my own.  In formulating my opinions I have reviewed materials and relied on my own experience as an interventional cardiologist.

3.      The materials I relied on in formulating my opinions are discussed in this report and are identified in the attached Exhibit A.  I reserve the right to supplement, change, clarify, or modify my opinions should additional information and/or documentation become available to me.  I also reserve the right to create graphics for use in connection with any hearing or trial testimony.

## I.      QUALIFICATIONS, COMPENSATION, AND PRIOR TESTIMONY

4.      I am an interventional cardiologist and am currently the Director of Interventional Cardiology and the Director of the Vascular Laboratory at the Rocky Mountain Regional VA Medical Center in Aurora Colorado.  I am also a Professor of Medicine at the University of Colorado School of Medicine.

5.      In 1999 I earned my bachelor of science degree in biological sciences from Stanford University.  I then earned my master of science degree in biotechnology in 2002 from the University of Ulster.

6.      In 2004 I received my M.D. *magna cum laude* from Harvard Medical School.

7.      From 2004 to 2007 I completed my residency in Internal Medicine at Massachusetts General Hospital.

(EDW-ABT00732731 at 734) ("In patients with severe secondary mitral regurgitation, percutaneous repair added to medical treatment did not significantly reduce the risk of death or hospitalization for heart failure at two years compared with medical treatment alone.").

### D.      Transcatheter Mitral Valve Repair

78.      The third option available to the heart team is to recommend that the patient receive transcatheter mitral valve repair.  In the United States today, MitraClip is the only approved transcatheter mitral valve repair system.  In Europe, however, in addition to PASCAL, several other products, including Edwards' Cardioband annular repair device is approved.

79.      In the United States, PASCAL is currently undergoing head-to-head randomized controlled trials for both DMR and FMR.  These trials are known as CLASP IID/IIF.

80.      Patients that can benefit from transcatheter mitral valve repair include certain patients with severe symptomatic DMR for whom the risk of surgery is too high and certain patients with moderate-severe or severe symptomatic FMR with low left ventricular ejection fraction and that have developed moderate-severe or severe MR despite receiving optimized medical therapy.

81.      Within these categories of patients, however, there are patients that cannot receive treatment with MitraClip due to their anatomical characteristics.  As discussed in more detail below, in my opinion at least some of these patients could be treated with PASCAL.

82.     Thus, although MitraClip is effective in certain patients, patients would benefit from the addition of more transcatheter mitral valve repair treatment options, including PASCAL.

83.     To the extent that Drs. Makar, Little and Sorajja opine that PASCAL can or will only be used to treat patients that have anatomical criteria that fall within its IFU, *see, e.g.*, Makar Rep. ¶ 8.4, I disagree.  When making treatment decisions, physicians are not required to adhere to the IFU or prescribing information that accompanies a medical device or pharmaceutical product.  Instead, we are permitted to rely on our training, experience, and clinical judgment to decide what is best for a particular patient.  This is a well-understood and accepted practice in the medical field.  Thus, I and other physicians often treat patients with anatomical characteristics that do not fall within those given in IFUs or prescribing information.  For example, when treating abdominal aortic aneurisms using a particular stent, I estimate that over 50% of the time I treat patients that have a shorter neck length—that is, the distance between the renal artery and the beginning of the aneurism—than the IFU for that product recommends.  I do this because it is what is best for those patients, in my judgment.  Thus, to the extent Abbott's experts suggest that treatment of PASCAL will or must be limited only to anatomies specifically permitted by the IFU, I disagree.

84.     In their reports, Drs. Makar, Little, and Sorajja discuss features of MitraClip that they opine drive demand for MitraClip.  Makar Rep. ¶¶ 11.1–11.10; Little Rep. ¶¶ 90–97; Sorajja Rep. ¶¶ 93–105.  Among the features they opine drive demand are "MitraClip's loop or petal shaped arms [that] protrude radially from the device shaft," Makar Rep. ¶ 11.5, and the "concave clip arms [that] keep the grippers recessed within them while the

20

device is closed."  Sorajja Rep. ¶ 98.  Outside of these expert reports, I have not heard or

seen anyone else express the view that these features are "critical" to MitraClip, as

Abbott's experts opine.  Moreover, I do not use MitraClip because it has an inverted

position, because it grasps the leaflets from the atrial and ventricular side, or because it has

a fabric covering or frictional elements.  These are not features on which I base my

treatment decisions.

## IV.    PATIENTS THAT WOULD BENEFIT FROM PASCAL

85.     As mentioned above, as part of the multi-disciplinary heart team at Rocky

Mountain VA Medical Center, I am responsible for evaluating patient anatomy to

determine whether patients should receive MitraClip.  Making treatment decisions based

on these anatomical characteristics is an important part of my job as an interventional

cardiologist and heart team member.

86.     I am thus familiar with the anatomical characteristics that make patients

suitable for treatment with MitraClip and those that make patients unsuitable for treatment

with MitraClip.

87.     In my opinion, there are patients that would be challenging to treat with the

currently available generations of MitraClip or could not be treated with the currently

available generations of MitraClip that could be treated with PASCAL.

88.     As an initial matter, I note that in characterizing the CLASP IID and IIF

trials, Dr. Makar fails to mention that including a non-inferiority endpoint is a standard

practice in the medical device industry for trials such as these.  Makar Rep. ¶ 5.4.

89.     Additionally, the fact that these trials have not yet been completed and the

fact that there is not yet a completed randomized clinical trial comparing PASCAL to

MitraClip does not mean that there is no evidence that PASCAL provides differentiated

multiple devices also led to greater physician education and patient awareness of treatment options.

115.    Thus, in my opinion, the addition of PASCAL as another treatment option for patients suffering from MR will lead to a greater number of patients being treated for MR.

<div align="center">*       *       *</div>

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated:  December 6, 2019


*Ehrin Armstrong*
—————————————————
Ehrin Armstrong, M.D.

# EXHIBIT 25

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


ABBOTT CARDIOVASCULAR          )
SYSTEMS, INC., and EVALVE,      )
INC.,                           )
                                )
          Plaintiffs,           )
                                )
     vs.                        ) No. 19-149-MN
                                )
EDWARDS LIFESCIENCES CORP., and )
EDWARDS LIFESCIENCES, LLC,       )
                                )
          Defendants.           )
_____ )



VIDEO DEPOSITION OF EHRIN ARMSTRONG, M.D.

January 9, 2020

Aurora, Colorado



Reported by:

Jason T. Meadors

Job no: 26748

Page 2

```
 1
 2          Pursuant to Notice and the Colorado Rules of
 3   Civil Procedure, the video deposition of EHRIN
 4   ARMSTRONG, M.D., taken by Plaintiffs, was held at
 5   16455 East 40th Circle, Aurora, Colorado 80111, on
 6   Thursday, January 9, 2020, at 8:35 a.m., before
 7   Jason T. Meadors, RPR, CRR, CRC, and Notary Public for
 8   the State of Colorado.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES
 2   BENJAMIN LASKY, ESQ.
     KIRKLAND & ELLIS LLP
 3   601 Lexington Avenue
     New York, New York 10022
 4   (212)446-6415
     benjamin.lasky@kirkland.com
 5     For the Plaintiffs
 6   MICHAEL F. MILEA, ESQ.
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 7   1285 Avenue of the Americas
     New York, New York 10019-6064
 8   (212)373-3327
     mmilea@paulweiss.com
 9     For the Defendants
10   Also Present:
       Dennis Clayton, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    TABLE OF CONTENTS
 2
     EXAMINATION                           Page
 3
     BY MR LASKY                    7
 4
 5   REQUESTED PORTIONS OF TESTIMONY            Page
 6   Request for document production       267
 7
     EXHIBITS                        Page
 8
 9   1   Expert Report of Dr Ehrin Armstrong, M D   10
         M Sc  M A S
10   2   Exhibit A List of Materials Considered     11
11   3   Exhibit B Ehrin Johnson Armstrong, MD MSc MAS  13
         Curriculum Vitae
12
     4   MITRA-FR vs  COAPT: lessons from two trials   173
13       with diametrically opposed results
14   5   New Horizons in Mitral Leaflet Repair with the  190
         PASCAL Repair System, Holger Nef, MD
15
16   6   How the PASCAL repair system impacts my daily  196
         clinical practice? Philipp Lurz, MD, PhD
17   7   Mitral valve leaflet repair with the new    206
         PASCAL system: early real-world data from a
18       German multicentre experience
19   8   Compassionate use of the PASCAL transcatheter  215
         mitral valve repair system for patients with
20       severe mitral regurgitation: a multicentre,
         prospective, observational, first-in-man study
21
     9   The Lancet Supplementary appendix       228
22
     10  Transcatheter mitral valve repair       234
23
24   11  Management and prognosis of chronic secondary  237
         mitral regurgitation
25
```

Page 5

```
 1   TABLE OF CONTENTS (Continued)
 2   EXHIBITS (Continued)                  Page
 3   12  Transcatheter Valve Repair for Patients With  242
         Mitral Regurgitation
 4
 5   13  Echocardiographic Predictors of Single versus  250
         Dual MitraClip Device Implantation and
 6       Long-Term Reduction of Mitral Regurgitation
         After Percutaneous Repair
 7   14  Treatment supported by guidelines article  250
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Page 66

1    easily, so I went to Evalve at least once in order to
2    review some of them, specifically on one of their
3    computers.
4        Q   Okay.  Starting with the time period from
5    2008 to 2011 when you were a clinical fellow at the
6    University of California San Francisco, did you have
7    any involvement with actually implanting MitraClips?
8        A   No.  I did not while I was at the University
9    of California San Francisco, because although
10   University of California San Francisco was the core lab
11   for the EVEREST trial, they were not a clinical site
12   for the trial.
13       Q   Okay.  While there, did you observe any
14   MitraClip implantations?
15       A   At the University of California, San
16   Francisco, I don't believe I did.  Again, primarily,
17   because the trial was ongoing or just had completed,
18   and they had not been a implanting site.
19       Q   Okay.  And Elyse Foster, is who you were
20   working under at University of California San
21   Francisco; is that right?
22       A   That's correct.
23       Q   What was her role?
24       A   She was a professor of cardiology and the
25   director of the echocardiography laboratory at

Page 67

1    University of California, San Francisco.  So she was a
2    general cardiologist, but an expert in the evaluation
3    of mitral regurgitation by means of echocardiography.
4        Q   Okay.  Then when you transferred to
5    University of California Davis, you were working with
6    Jason Rogers; is that right?
7        A   Yes.  Jason Rogers is one of the people I
8    worked with at the University of California Davis.
9        Q   Okay.  Is that where you -- well, strike
10   that.
11          In paragraph 20 of your report, you state
12   that between 2011 and 2013, you performed approximately
13   30 MitraClip procedures.  Do you see that?
14       A   Yes.  That is correct.  And it was during
15   that period from 2011 to 2013 that I gained firsthand
16   experience with MitraClip implantation.  That was
17   partially related to the ongoing access registry that
18   existed after the EVEREST trial and prior to commercial
19   approval of the MitraClip device, as well as some
20   commercial cases, once approval was obtained.
21       Q   Okay.  So at the University of California
22   Davis, between 2011 and 2013, you performed
23   approximately 30 MitraClip implantations, right?
24       A   Yes, I would estimate that I performed
25   approximately 30 MitraClip implantations during that

Page 68

1    time.
2        Q   And were you the primary implanter for all of
3    those?
4        A   Well, for any MitraClip procedure, it's a
5    team process.  So that includes the person doing the
6    echocardiographic imaging as well as usually two other
7    interventional cardiologist physicians doing the
8    implant, so it was myself and Jason Rogers doing those
9    procedures together.  He had more experience than me at
10   the time, because he had been part of the trial, but I
11   did gain significant experience in MitraClip
12   implantation in those procedures.
13       Q   So when you mentioned that implant was part
14   of a team, you mentioned echo and two interventional
15   cardiologists.  Your role was as one of the
16   interventional cardiologists; is that right?
17       A   That is correct.
18       Q   And in any of those 30 MitraClip
19   implantations, were you actually the one manipulating
20   the device into the heart?
21       A   Yes.  Absolutely.  I mean, as is true in many
22   of those cases, it's, as I mentioned, a team effort, so
23   both physicians are doing something.  But I absolutely
24   was navigating, manipulating catheters, doing the
25   transseptal puncture, determining the placement of the

Page 69

1    MitraClip, and implanting it.
2        Q   How many of the 30 would you say you did that
3    for?
4        A   Probably at least 20.  I would estimate that
5    the first 10 that I did, because of the learning curve
6    with the device, that I assisted or gained knowledge in
7    doing that procedure, and then took a more primary role
8    subsequently in the MitraClip implantation.
9        Q   Okay.  Then in 2013, you moved to the Denver
10   VA Medical Center, which, other than the name change,
11   is where you are now; is that right?
12       A   That's right.
13       Q   Okay.  And since then, you don't mention
14   having performed any MitraClip implantations.  Is it
15   correct that you haven't performed MitraClip
16   implantations since you moved to the Denver VA Medical
17   Center?
18       A   That's right.  I have not performed MitraClip
19   implantations since I moved to Colorado, that's
20   partly related to the availability of services at the
21   Denver VA and the lack of a MitraClip program at the
22   Denver VA.
23          However, I do actively participate in the
24   heart team at my hospital, and that involves a weekly
25   if not daily determination and discussion of people --

18  (Pages 66 to 69)

Page 70

1    patients, rather, with severe mitral regurgitation who
2    may require medical therapy, surgical therapy, or
3    referral for transcatheter mitral valve repair.
4        Q    Okay.  So at your institution, where you've
5    been since 2013, there is no MitraClip program; is that
6    right?
7        A    At the -- at the VA Medical Center where I
8    perform the majority of my clinical practice, there is
9    no MitraClip program.
10           I am also a professor of medicine at the
11   University of Colorado and at the University of
12   Colorado Hospital, which is down the street from the VA
13   Hospital, there is a MitraClip program.
14       Q    Okay.  Just starting with the Denver VA, when
15   you say there's no MitraClip program, does that mean
16   there's no interventional cardiologists who perform
17   MitraClip procedures at that facility?
18       A    There is no interventional cardiologist who
19   performs MitraClip at the Denver VA, and we're in the
20   process of developing that for technical reasons.  The
21   new VA Hospital, which includes a hybrid OR for
22   performing those procedures, was delayed five years and
23   was almost $2 billion over budget.  So we're in the
24   process of approving a MitraClip program.
25       Q    Okay.  So when you say you are part of a

Page 71

1    heart team, the heart team are physicians who are at
2    the Denver VA; is that right?
3        A    Yes.  I would say that that includes myself.
4    There are two other interventional cardiologists at the
5    Denver VA who work in my group with me.  We have a
6    number of general cardiologists with additional
7    expertise in echocardiography.  We also have cardiac
8    surgeons who will perform surgical mitral valve repair
9    or replacement if necessary.  And of course, the other
10   associated staff.
11           But I would broadly say that constitutes
12   the -- the heart team.  And as part of that, we have at
13   least weekly discussions of patients with complex valve
14   disease and make group decisions with regards to the
15   optimal treatment recommendations for those patients.
16       Q    Okay.  But what you can't do, as part of that
17   heart team, is recommend that a patient get a MitraClip
18   at your facility, right?
19       A    That's correct.  Among those patients who, as
20   part of the heart team, we recommend a transcatheter
21   mitral valve repair.  Currently, those patients are
22   referred subsequently to another facility for the
23   actual implantation.  That could include the University
24   of Colorado Hospital or other surrounding hospitals in
25   the Colorado area.

Page 72

1        Q    Okay.  And you mentioned you are also
2    clinically practicing at the University of Colorado.
3    Right?
4        A    That's correct.  I would say the majority of
5    my clinical practice is at the VA Hospital.  However, I
6    have clinical privileges at the University of Colorado,
7    although because of how busy I am clinically at the VA
8    Hospital, my clinical work at the
9    University Hospital is taking emergency call and
10   treating patients with heart attacks on nights and
11   weekends there.
12       Q    Right.  So it wouldn't include patients who
13   would be getting interventional therapies for mitral
14   regurgitation, right?
15       A    Generally not, because those procedures are
16   done during the day and usually as a planned procedure.
17       Q    Okay.  Now, if -- if you are going to
18   recommend that a patient get MitraClip therapy, do you
19   have particular interventional cardiologists at those
20   other facilities who are involved in that decision?
21       A    Generally, yes.  As part of the heart team,
22   we usually make that determination with regards to what
23   would be the best therapeutic approach for a patient.
24   That includes a detailed, excuse me, examination of the
25   patient's mitral regurgitation and anatomic

Page 73

1    characteristics.
2            Because of my expertise in -- and prior
3    experience with transcatheter mitral valve therapies, I
4    will review those echoes myself.  However, as part of
5    the final discussion, when we refer a patient to
6    another physician, we, of course, send all that
7    information to that physician and make sure that they
8    agree with the concept of transcatheter mitral valve
9    repair, and they will typically see that patient
10   themselves additionally before performing the
11   procedure.
12       Q    Now, if you -- sorry, strike that.
13           So I understand the first step is that you
14   and your heart team will review the anatomical
15   characteristics.  If you decide the patient may be a
16   candidate for transcatheter mitral valve repair, you'll
17   then send that information off to a facility that does
18   perform MitraClip procedures, right?
19       A    Yeah, I think that's a good overall
20   representation of the referral process.
21       Q    And then the interventional cardiologist or
22   the team at that other facility will then review that
23   information to see if they agree with your assessment;
24   is that right?
25       A    Yes.  There is some redundancy, of course, in

19 (Pages 70 to 73)

Page 130

1    A    -- 45?
2    Q    Uh-huh.
3    A    Yes.
4    Q    Okay.  Now, the availability of optimized
5    medical management as a treatment option, again,
6    that's -- that's the default that any patient would
7    get, if it is acceptable to treat their symptoms,
8    right?
9    A    It should be the default.  It's a level 1
10   evidence for treatment of mitral regurgitation and part
11   of all the major practice guidelines.  And the reality
12   is, there's often a gap between what's recommended from
13   a practice guideline perspective and what is actually
14   done in practice.
15       So I would say in general, there is room to
16   improve the overall medical care of patients with
17   mitral regurgitation.
18   Q    All right.  Right.  But if a patient can be
19   successfully treated with medical management, they will
20   be, right?
21   A    They certainly should be.  I -- this is --
22   just to make the point that sometimes patients are not
23   treated optimally by their physicians, but they
24   certainly should be treated with optimal medical
25   management.

Page 131

1    Q    Right.  The patient's not to be given, for
2    example, MitraClip if they can be adequately treated
3    with medical management, right?
4    A    They should not.  I mean, I think,
5    definitely, the guidelines would support that patients
6    should be treated with optimal medical management, and
7    failing that, consideration of other options for
8    treating their mitral regurgitation.
9    Q    And similarly, a patient who can be
10   adequately treated with optimal medical management
11   should not be given the PASCAL device, right?
12   A    Broadly, I would say that that is likely
13   true.  If patients have -- are adequately treated with
14   medical therapy, then there is generally not a strong
15   indication for mitral valve repair.
16       However, that's not always true.  A patient
17   may be treated to the extent that they're having
18   minimal symptoms with medical management.  But there
19   are other secondary findings, including the development
20   of atrial fibrillation, reduction in left ventricular
21   injection fraction, despite medical therapy.
22       And so even if a patient is having minimal
23   symptoms and is getting medical therapy, if they have
24   started to develop some of these other
25   echocardiographic findings, then that may become a

Page 132

1    trigger for some type of mitral valve therapy, be it
2    surgery or percutaneous repair.
3        So I think what I'm trying to say here is
4    that it's both the symptoms plus the other objective
5    findings that lead to the decision-making for mitral
6    valve repair replacement.
7    Q    Right.  And just so we're on the page, when I
8    say adequate treatment with medical management, I'm
9    referring both to symptoms and echocardiographic
10   indications.  And if a patient is adequately treated
11   with medical management, they should not get surgery,
12   PASCAL, or MitraClip, right?
13   A    Sure.  I think that that is the basis of the
14   practice recommendations that form the decision for,
15   you know, additional therapies such as surgery or
16   transcatheter repair.
17   Q    And conversely, if it's when the patient is
18   not being adequately treated with medical management,
19   whether it be their symptoms or the echocardiographic
20   indicators, that's when the heart team will consider
21   other options, right?
22   A    Yes.  I think when -- the current situation
23   with medical therapy, if it's -- if the patient is
24   continuing to have symptoms or develop other signs of
25   heart failure, then that would be when a decision would

Page 133

1    be made to proceed with additional therapies.
2    Q    Right.  And in such circumstances, the heart
3    team can only recommend therapies that are actually
4    available, right?
5    A    I'm not sure I understand your question.  In
6    general, it's only possible to recommend therapies that
7    are available.
8    Q    Right.  So in the world in 2002 that we
9    talked about where surgery was the only other option,
10   the heart team could only viably recommend surgery as
11   an alternative to medical management, right?
12   A    Because surgery was the only other available
13   option in 2002, then yes, that would be the only
14   additional therapy.
15   Q    And were the heart team's being used to make
16   those decisions back then when surgery was the only
17   option other than medical management?
18   A    That's an interesting question.  As I recall,
19   the development of a heart team, that really started to
20   become more of an active process around 2005.  And that
21   was for primarily by development of transcatheter valve
22   replacement and the studies that were performed
23   thereof, where this concept of a heart team was
24   developed in order to further provide multidisciplinary
25   care for patients with severe aortic stenosis and

34 (Pages 130 to 133)

Page 134

1   decide about options with regards to aortic valve
2   replacement or transcatheter aortic valve replacement.
3        And I mean, I think in general, physicians
4   working together are beneficial because then it's
5   possible to reach the best possible decision for
6   patient care.
7        And so the heart team concept, I think, was
8   really born out of the development of TAVR.  It's an
9   extension in many ways of tumor boards for treatment of
10  cancer where people from multiple specialties would get
11  together and try to work together to figure out the
12  best options for patient care.
13  Q    And when was that heart team concept ported
14  over to mitral regurgitation treatment?
15  A    I believe that that happened, the concept of
16  the heart team for mitral regurgitation, was born out
17  partly because of the development of the heart team for
18  TAVR.
19       I mean, in my experience, those discussions
20  of multidisciplinary conversation for patients with
21  severe aortic stenosis naturally led to, for lack of a
22  better phrase, spill-over into treatment of other
23  complex anatomies, including mitral regurgitation.
24  Q    When did that happen?  Specifically for
25  mitral regurgitation.

Page 135

1   A    I can't say that there was a specific date
2   when the concept of a heart team for mitral
3   regurgitation was born, per se.  But in my experience,
4   I would say that that happened shortly after the
5   development of a heart team for transcatheter aortic
6   valve, so probably in the range of 2006, 2007, in that
7   time frame.
8   Q    Right.  At that time, 2006, 2007, when your
9   view is that the heart team ported over from TAVR to
10  mitral regurgitation, the options available to that
11  heart team were still medical management and surgery,
12  right?
13  A    Yeah, given that surgery was the main other
14  option in addition to medical management at that time,
15  that would be correct.  So the heart team's
16  decision-making at that point would have been with
17  regard to optimizing medical care or looking for
18  potential surgical options for treatment of mitral
19  regurgitation.
20  Q    And so the heart team adoption -- sorry,
21  strike that.
22       The adoption of the heart team in the mitral
23  regurgitation field did not solve the unmet need for
24  mitral regurgitation treatment for patients who could
25  not benefit from medical management and were ineligible

Page 136

1   for surgery, right?
2   A    Well, I think that the development of the
3   heart team, it depends on what you mean by solving an
4   unmet need, because I think that there are multiple
5   spill-over benefits of a heart team model.
6        That includes getting input from multiple
7   specialties and, for example, although surgery was
8   perhaps the only available option at the time, getting
9   together in a room with a cardiologist and the
10  surgeons, the surgeon can say, Hey, actually, I can
11  think of an option for treating this patient.  Or a
12  cardiologist could say, Wait a minute.  Maybe surgery's
13  not necessary.  We can optimize the medical therapy.
14       I think both of those things that are born
15  out of discussion between specialties ultimately
16  improve patient care.  So to some extent, that by
17  itself made a difference in the treatment of mitral
18  regurgitation.
19  Q    It made a difference, but there was still an
20  unmet need despite the existence of the heart teams for
21  patients who, in the heart team's expert opinion, could
22  not benefit from medical management and were ineligible
23  for surgery, right?
24  A    I would agree that there was an unmet need
25  that continued despite the development of a heart team,

Page 137

1   and that's based on the availability of therapeutic
2   options for treating a patient.
3   Q    Right.  So again, heart team is only as
4   effective as the options that are available to that
5   heart team, right?
6        MR. MILEA:  Objection.
7   A    I think the whole concept of a heart team is
8   to review all of the options that are available and
9   determine which of those options is best for treating a
10  given patient.
11       There, of course, over time will be new
12  options available that will help further the optimal
13  treatment of those patients.  And as those new devices
14  and therapies become available, then of course, the
15  heart team would evaluate those options as well and
16  integrate them into their treatment algorithm.
17  Q    (By Mr. Lasky)  Right.  But, the fact if a
18  patient cannot be treated by any of the available
19  options, the fact that there's a heart team is
20  considering that patient's treatment is not going to
21  meet the need for that patient, right?
22  A    Well, the -- the -- again, the concept of the
23  heart team is to help evaluate the options that are
24  valuable and recommend which of them is best.  The
25  heart team by itself cannot create new options or new

                                    35 (Pages 134 to 137)

Page 138

1  therapeutics.  That is the role of medical device
2  development or novel pharmaceuticals.
3      Q   Right.  Now, imaging techniques are a
4  critical part of mitral regurgitation treatment; is
5  that right?
6      A   Imaging definitely is very important in the
7  evaluation of mitral regurgitation.  Typically,
8  transthoracic echocardiography is performed to first
9  identify the presence of mitral regurgitation.  And
10  transesophageal echocardiography adds significant
11  detail to both the anatomic characteristics and the
12  quantification of the extent of mitral regurgitation.
13      So there are other techniques that can be
14  used to evaluate and quantify mitral regurgitation, but
15  I would say, largely, those two techniques are the most
16  common and can be used to both identify and help guide
17  treatment of patients with mitral regurgitation.
18      Q   Starting with that use of imaging, which is
19  more of a diagnostic side, the existence of a technique
20  to diagnose a patient does not, in and of itself, help
21  with the actual treatment of that patient.  Right?
22      MR. MILEA:  Objection.
23      Q   (By Mr. Lasky)  Let me -- let me withdraw
24  that question and ask it a different way.
25      Just because one can diagnose a particular

Page 139

1  anatomic condition through imaging doesn't mean that
2  that patient can be actually treated.  Correct?
3      A   Well, broadly, I would say that diagnosing a
4  condition is the first step towards guiding the
5  subsequent treatment.  So by definition, a procedure
6  that is diagnostic is not going to, in and of itself,
7  treat the underlying disease.
8      However, it provides very important
9  information that can help determine the best approach
10  for subsequent treatment.  An example of that would be
11  performing a transthoracic echocardiogram that shows
12  mitral regurgitation, but it's unclear whether there's
13  flail in the anterior or posterior leaflets based on
14  that.
15      So therefore, transesophageal echocardiogram,
16  which is also still a diagnostic procedure, might be
17  performed that could help better identify the exact
18  anatomy and thereby help guide the feasibility of a,
19  for example, surgical treatment or transcatheter
20  treatment.
21      So the level of detail that you get with a
22  diagnostic study can, in many cases, help direct what
23  would be the best subsequent therapy.
24      Q   And for those patients who, again, could not
25  adequately be treated with medical management and were

Page 140

1  ineligible for surgery, the existence of imaging
2  techniques to enable diagnosis of their MR and
3  identification of their anatomical characteristics,
4  that isn't sufficient to meet their need for treatment,
5  right?
6      A   Well, I think those diagnostic techniques,
7  again, are important in identifying the anatomical
8  characteristics and quantifying the extent of the
9  disease.  They cannot by themselves treat the problem,
10  but they can help direct subsequent treatments.  So if
11  we did not have those diagnostic procedures, we
12  wouldn't know how to optimally treat a patient.
13      Q   Right.  And again, when you're talking about
14  optimal treatment of a patient, you're talking about
15  with the options that are available at any given time,
16  right?
17      A   Yes, by definition, the diagnostic treatment
18  can help identify and characterize a disease process.
19  And based on those findings, it is then possible to
20  decide among the available treatments which of them are
21  either feasible or the best option.
22      Q   And imaging is also used actually in the
23  guidance of transcatheter mitral therapies, right?
24      A   Yes, imaging is used in the guidance for
25  transcatheter mitral therapies.  Typically, during the

Page 141

1  procedure, a transesophageal echocardiogram is
2  performed because that provides a high level of detail
3  with regards to the mitral valve anatomy.  It can also
4  help confirm the success of the device placement as
5  well as verify the reduction in mitral regurgitation
6  after device implantation.
7      Q   But the imaging, in and of itself, doesn't
8  treat the disorder, right?
9      A   The imaging does not treat the disorder.  It
10  helps guide the treatment that has been decided on.
11      Q   Right.  So for example, for the MitraClip,
12  it's the clip itself that treats the disorder, not the
13  imaging that guides that clip.  Right?
14      A   The MitraClip is the implant that treats the
15  mitral regurgitation.  I would point out that it's a
16  little more complicated than that, because the imaging,
17  when performed correctly, can help verify that the
18  MitraClip, for example, reduced the mitral
19  regurgitation and might identify the fact that a
20  MitraClip was implanted.
21      But the patient still has significant
22  residual mitral regurgitation and, as a result, would
23  thereby guide the decision to place a second, third, or
24  even fourth MitraClip if there was continued mitral
25  regurgitation.

36  (Pages 138 to 141)

Page 142

1    So the imaging is crucial to the guiding that
2  decision-making of the actual implant.
3    Q   Now, imaging -- those imaging techniques that
4  you mentioned are not specific to the MitraClip, right?
5    A   Those imaging techniques can be used for a
6  number of purposes.  They could be used to image the
7  aortic valve, other aspects of the heart itself,
8  real-time guidance for any other type of cardiovascular
9  procedure.
10   Q   To the extent that MitraClip has been shown
11 to work or be more successful than other prospective
12 transcatheter mitral repair techniques, that is not due
13 to imaging, because imaging is available for all those
14 techniques, right?
15   A   If you could help clarify what specific
16 techniques you're referring to, that would be helpful.
17   Q   So you're aware that over the years, various
18 other transcatheter mitral repair devices have been
19 either tested or even approved in Europe, right?
20   A   There have been other transcatheter devices
21 developed and tested.  To my knowledge, the majority of
22 those other devices were more annuloplasty-type devices
23 such as the Carillon device and others, and those
24 devices rely on some transesophageal echocardiography,
25 but actually rely more often on fluoroscopic items as

Page 143

1  well, so -- which is another type of imaging guidance
2  performed to verify the position of -- of devices.
3    Q   But imaging techniques are equally available
4  for use with those devices as they are for MitraClip,
5  right?
6    A   To the extent that those same imaging
7  techniques such as transesophageal echocardiogram are
8  useful in the real-time guidance of those devices,
9  which I don't have personal experience with, since they
10 were investigational or only used in Europe, certainly,
11 transesophageal echocardiogram could be utilized for
12 those devices as well.
13   Q   Now, in paragraph 56 of your report, you say,
14 To the extent Drs. Makar, Little, and Sorajja opine
15 that the fact that they have treated a particular
16 patient with a given anatomy with MitraClip means that
17 all patients with that anatomy are treatable with
18 MitraClip, I do not agree.  Do you see that?
19   A   I do.
20   Q   And equally true is that the fact that a
21 particular patient with a given anatomy was deemed not
22 treatable with MitraClip, that doesn't mean that all
23 patients with that anatomy are not treatable with
24 MitraClip, right?
25       MR. MILEA:  Objection.

Page 144

1    A   I'm not sure I understand your question.  Are
2  you stating that Drs. Makar, Little, and Sorajja felt
3  they couldn't treat a patient, but they could have
4  been?
5    Q   (By Mr. Lasky)  No, I'm saying to the extent
6  that a given physician, such as yourself, believes that
7  a particular patient with a given anatomy cannot be
8  treated with MitraClip, that doesn't mean that all
9  patients with that anatomy cannot be treated with
10 MitraClip, right?
11   A   Well, I think that the reality is that every
12 patient is different.  There are anatomic
13 characteristics that we speak of when describing the
14 mitral valve, you know, with regards to it being the
15 anterior leaflet, posterior leaflet, the medial and
16 lateral commissures, the location of the chordae,
17 the -- you know, the amount of flail, and these other
18 characteristics.
19       But the mitral valve is a complicated
20 structure.  And every patient is different.  So I think
21 that these examples of a case where a patient couldn't
22 be treated, I think that I would have to review the
23 specific details in a given case.
24   Q   Following up on a question from earlier, you
25 mentioned that you updated the UpToDate article about

Page 145

1  transcatheter mitral valve repair about four months
2  ago.  Is that correct?
3    A   I believe so, yeah.  Somewhere in the range
4  of four to five months ago.
5    Q   And was that before you were contacted by
6  Mr. Milea about this case?
7    A   Yes, that would have been.
8    Q   So that -- the updates in that article were
9  not influenced at all by anything that Edwards or its
10 counsel has discussed with you in this case, right?
11   A   No, that would have been impossible, because
12 I updated it prior to being contacted.
13   Q   Okay.  In paragraph 67 of your report -- this
14 is in the section discussing medical management.  And
15 you're referring to certain AHA/ACC guidelines for the
16 management of patients with valvular heart disease.  Do
17 you see this?
18   A   You're referring to the bottom of page 15
19 here?
20   Q   Bottom of 15 and then over to page 16.
21   A   Okay.
22   Q   Now, those guidelines were last updated in
23 2017.  Do you see that?
24   A   I do.
25   Q   Is that correct, to your knowledge?

37 (Pages 142 to 145)

Page 266

1  anatomy.
2       The specific example you gave of perforation,
3  I would point out the case example I mentioned earlier,
4  where a patient suffered actually a perforation from a
5  MitraClip that had to be treated successfully with a
6  PASCAL device.
7       So each of these cases are helpful, and they
8  help inform the overall landscape of severe and complex
9  mitral valve disease.  They can be treated with the
10 PASCAL device or with other therapies.
11    Q   (By Mr. Lasky)  Well, with the case that you
12 mentioned just then, you don't know that it had to be
13 treated with PASCAL.  For example, you don't know that
14 it couldn't have been treated with one or more
15 MitraClips even after the perforation, right?
16    MR. MILEA:  Objection.
17    A   Actually, as I recall in that case, a
18 perforation occurred due to the XTR device on the
19 anterior leaflet.  Attempts were made to repair that
20 perforation with an additional MitraClip device.  They
21 were unsuccessful, and it was that at that point that
22 the operators utilized the PASCAL device to
23 successfully seal the perforation, treat the mitral
24 regurgitation, and avoid the need for emergency surgery
25 in that case.

Page 267

1     Q   (By Mr. Lasky)  And again, that's not an
2  article that you've cited in your report nor provided
3  to me today, right?
4     MR. MILEA:  Objection.
5     A   That is correct.  That -- that article became
6  available after my report.  I'd be happy to provide it
7  to you.
8     Q   (By Mr. Lasky)  Well, I mean, you haven't,
9  right?
10    MR. MILEA:  Objection.
11    Q   (By Mr. Lasky)  I don't have it, right?
12    A   No, but I would be happy to provide you with
13 it.
14    MR. MILEA:  Objection.  It's a public
15 article.
16    MR. LASKY:  It's one that he hasn't cited in
17 his report or any supplement to that report.
18    MR. MILEA:  As he repeatedly stated, it came
19 out after his report.
20    MR. LASKY:  It's not a record.  I'm not aware
21 of it.  I'm not aware of it being produced.  If you
22 want to point me to a Bates number, I'd be happy to
23 look at it then.
24    MR. MILEA:  We'll take that under advisement.
25    MR. LASKY:  Well, I'm talking about today.

Page 268

1  This is the deposition.  Do you have it?
2     MR. MILEA:  I can look.  Let me see if there's
3  a Bates number.  I don't know off the top of my head.
4     Q   (By Mr. Lasky)  Okay.  Do you know what the
5  Bates number is?
6     A   I have not memorized --
7     MR. MILEA:  Objection.
8     A   -- the Bates numbers.
9     Q   (By Mr. Lasky)  Okay.  Were you aware that
10 patients with flail width greater than 15 millimeters
11 and/or flail gap greater than 10 millimeters was an
12 exclusion from the CLASP trial?
13    A   Yes.  Again, those are exclusion criteria
14 that have been applied to all of these major trials of
15 transcatheter mitral valve repair, and again including
16 the EVEREST trial, the COAPT trial, and others.
17    Q   Right.  And my question is:  Were you aware
18 that it was an exclusion for the CLASP trial?
19    A   Yes, I was aware, because I am familiar with
20 the general anatomic exclusions that have been applied
21 to that trial as well as other trials.
22    Q   Okay.  Were you aware that the CLASP trial
23 excluded patients with a coaptation gap of greater than
24 5 millimeters?
25    A   Yes.  Yes, I was aware of that as well.

Page 269

1     Q   Okay.  Were you aware that the CLASP trial --
2  well, strike that.
3       And so do you agree, then, that the CLASP
4  trial excluded patients with complex mitral anatomies
5  that you have considered to be beneficial for treatment
6  with PASCAL?
7     A   To the extent that those prior exclusion
8  criteria that we discussed reflect the presence of
9  complex anatomy, then those are patients that were not
10 included in the CLASP trial.
11      I have not personally reviewed every case in
12 the CLASP trial.  So I do think it would be difficult
13 and outside the scope of my knowledge of the trial to
14 make a blanket determination regarding whether patients
15 included in that trial have complex disease anatomy.
16    Q   Now, you're aware that the CLASP 2D and
17 CLASP 2F trials also include -- exclude patients with
18 the same complex anatomies, right?
19    A   I am broadly aware of that.  I have reviewed
20 the general inclusion and exclusion criteria available
21 on clinicaltrials.gov.  However, because I am not a
22 part of the actual trial and am not under an NDA with
23 Edwards, I do not have the full details of the trial
24 available.
25    Q   Okay.  And the randomized arms of CLASP 2D

68  (Pages 266 to 269)

Page 270

1  and 2F will not evaluate whether PASCAL can be used to
2  treat patient anatomies that MitraClip cannot, right?
3       A   The design of the CLASP 2D and 2F trial is
4  fundamentally to compare the outcomes of PASCAL and
5  MitraClip.  And so by design, patients will not be
6  enrolled in that trial who could successfully be
7  treated with PASCAL but who could not be treated with
8  MitraClip, because the point of that trial is to
9  randomize between the two devices.
10       So among patients who could be treated with
11 PASCAL but not with MitraClip, they would not be
12 candidates for that study because of the limitations of
13 being able -- of not being able to implant a MitraClip
14 in such anatomic cases.
15      Q   Now, MitraClip works by coapting the leaflets
16 that otherwise would not be fully coapted; is that
17 right?
18      A   Generally, I think that's a fair comparison
19 in the first developments of the device.  People often
20 refer it to as edge-to-edge repair with the MitraClip,
21 because you pull one edge to the other edge in order to
22 reduce the mitral regurgitation.
23      Q   And the way that MitraClip does that is by
24 grasping the leaflets from both atrial and ventricular
25 side and bringing them both together, right?

Page 271

1       MR. MILEA:  Objection.
2       A   Generally, yes, the way the MitraClip works
3  is by grasping the anterior -- a portion of the
4  anterior leaflet and a portion of the posterior
5  leaflet, aligning those edges and bringing those edges
6  together in order to better approximate the coaptation
7  line of the mitral valve and thereby reduce mitral
8  regurgitation.
9       Q   (By Mr. Lasky)  And it's a fundamental
10 requirement for the MitraClip that it be able to grasp
11 the -- each of the leaflets from both the atrial and
12 ventricular sides, right?
13      MR. MILEA:  Objection.
14      Q   (By Mr. Lasky)  Fundamental to the way that
15 MitraClip works.
16      MR. MILEA:  Objection.
17      A   Well, it would be -- I think in order to be
18 successful with the MitraClip implantation, then both
19 the atrial and ventricular aspects of the leaflet need
20 to be grasped, because if the grasping was conducted on
21 just one side, it would create a malcoaptation and not
22 effectively treat the mitral regurgitation.
23      Q   (By Mr. Lasky)  The same is true for PASCAL,
24 right, that it requires grasping of the leaflets from
25 both the atrial and ventricular sides in order to bring

Page 272

1  the leaflets closer together against the spacer, right?
2       A   Generally, yes, that is a reasonable
3  characterization, that the PASCAL device works by
4  bringing the anterior/posterior leaflets closer to one
5  another against the spacer.
6       Q   Right.  But the way it does that is by
7  grasping them with elements on the ventricular side,
8  the paddles, and elements on the atrial side, the
9  clasps, right?
10      A   Yes.  That is a fair characterization of how
11 the PASCAL device works.
12      Q   And again, that's fundamental to the
13 operation of the PASCAL, right?
14      MR. MILEA:  Objection.
15      A   I think there are a number of aspects that
16 are fundamental to the operation of the PASCAL device
17 or to the MitraClip device, and it's the interaction of
18 each of those characteristics that make the device
19 efficacious in treating mitral regurgitation.
20      Q   (By Mr. Lasky)  Now, for the MitraClip, it's
21 important that the arms be concave in order to enable
22 the grippers to recess within them.  Is that right?
23      A   I believe that's true.  Again, I think that
24 it's the interaction of all these different
25 characteristics that make one device effective or not

Page 273

1  effective.  But to the extent that the grippers became
2  recessed within the arms, that is a design
3  characteristic of the MitraClip that -- that is used to
4  perform grasping of the leaflets.
5       Q   And it's important both to increase the
6  surface area of the grasp as well as to lower the
7  profile of the device for delivery, right?
8       MR. MILEA:  Objection.
9       A   I'm not sure to what extent that's important
10 as far as lowering the profile of the device and
11 perform the grasping.  But I do know that that is a
12 mechanism by which the device has been designed and
13 performed.
14      Q   (By Mr. Lasky)  Now, if the MitraClip arms
15 were nearly flat rather than being concave, do you have
16 a view as to whether that would operate as well?
17      MR. MILEA:  Objection.  Calls for
18 speculation.
19      A   I don't have a particular view on that
20 subject.  I can't say that I've thought about that in
21 any detail.
22      Q   (By Mr. Lasky)  Okay.  The -- you're aware
23 that there are certain barbs or frictional features on
24 the grippers of the MitraClip?
25      A   Yes.

69  (Pages 270 to 273)

Page 274

1    MR. MILEA:  Objection.
2    A   I am generally aware that the MitraClip has
3  kind of a friction-type surface.  I'm not sure if
4  "barbs" would be how I characterize it.  But it does
5  have a frictional element to it.
6    Q    (By Mr. Lasky)  And you understand that that
7  feature is important to enable grasping of the
8  device -- strike that.
9      Do you understand that the inclusion of those
10  frictional elements on the grippers are important to
11  grasp the leaflets in a durable way and avoid leaflet
12  embolization?
13    MR. MILEA:  Objection.
14    A   Again, I -- I do not know to what extent that
15  particular element of the MitraClip matters and to what
16  extent that makes a difference within the device
17  itself.
18      I know how the device works overall and how
19  it reduces mitral regurgitation, but I don't have an
20  opinion with regards to some of those specific design
21  elements.
22    Q    (By Mr. Lasky)  Now, you mentioned earlier
23  that you needed to use the inverted position of
24  MitraClip to get out of some chordal entanglement,
25  right?

Page 275

1    A   Yes, when we were referring to some other --
2  some of my other case experience with regards to
3  implanting MitraClip, we did discuss the use of
4  inversion to detach or disentangle the MitraClip from
5  chordal entanglement.
6    Q   And a feature that PASCAL uses for that same
7  purpose for getting out of chordal entanglement is its
8  elongated position, right?
9    MR. MILEA:  Objection.
10    A   The PASCAL device does have an elongated
11  position.  That is part of the design features of that.
12  Having not performed PASCAL devices myself, I am not
13  sure that I'd be qualified to say that the goal or the
14  role of the elongation is to remove from chordal
15  entanglement.
16    Q    (By Mr. Lasky)  Well, are you familiar enough
17  with the design of the two devices to understand that
18  where the MitraClip would be used in the inverted
19  position to avoid chordal entanglement when withdrawing
20  and repositioning the device, the PASCAL, in contrast,
21  uses the elongated position for that same purpose?
22    MR. MILEA:  Objection.
23    A   Generally, I think that each of those design
24  characteristics are specific to the device, and each
25  may be a mechanism for reducing or removing device

Page 276

1  entanglement should it occur.
2    Q    (By Mr. Lasky)  And in order to have a device
3  that can successfully repair leaflets in areas where
4  the chordas are present, so in other words, outside of
5  the A2V2 area, it's important to have a feature that
6  allows you to avoid or get out of the chordal
7  entanglement, right?
8    MR. MILEA:  Objection.
9    A   I'm not sure to what extent one feature
10  matters more than another.  I think it's the overall
11  device itself and how that device performs.  There
12  are -- as with any device, there are many ways to cause
13  a problem and many ways to try to get out of that
14  problem.
15      And so I think the characteristics that each
16  device has, when you look at it as an overall device,
17  may provide some benefit in avoiding or managing
18  certain complications, chordal entanglements being one
19  of them.
20    Q    (By Mr. Lasky)  Well, chordal entanglement is
21  a particularly known concern with valve leaflet
22  approximation techniques, right?
23    MR. MILEA:  Objection.
24    A   I'm not sure what you mean by "valve leaflet
25  approximation techniques," other than the main

Page 277

1  experience I have had personally, and which has been
2  described in literatures with the MitraClip device
3  leading to chordal entanglement.  I'm not aware of any
4  reports of chordal entanglement with the PASCAL device.
5    Q    (By Mr. Lasky)  Have you looked for such
6  reports?
7    A   I have broadly searched the literature as
8  part of my preparation for this and did not come across
9  any cases of chordal entanglements during -- during my
10  search.
11    Q   Okay.  So your search -- so to the extent
12  that there are reports out there of chordal
13  entanglement with PASCAL, your search did not identify
14  them, right?
15    A   I am not aware of any cases of chordal
16  entanglement with the PASCAL device.  However, I am
17  aware of many cases and have also experienced chordal
18  entanglement with the MitraClip device.
19    Q   And to get out of that, it was important to
20  have the inverted position capability, right?
21    MR. MILEA:  Objection.
22    A   Based on my experience, the use of the
23  inverted position was helpful to escape or remove from
24  a chordal entanglement with the MitraClip device.
25    Q    (By Mr. Lasky)  Now, both MitraClip and

70  (Pages 274 to 277)

# EXHIBIT 26

# REDACTED IN ITS ENTIRETY

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT CARDIOVASCULAR SYSTEMS, INC. and EVALVE, INC., | ) ) ) | |
| Plaintiffs, | ) ) | CASE NO: 19-149 (MN) |
| v. | ) ) | |
| EDWARDS LIFESCIENCES CORP. and EDWARDS LIFESCIENCES LLC, | ) ) ) | |
| Defendants. | ) ) ) ) | |

**<u>EXPERT REPORT OF ROBERT SPAR</u>**

1

I, Robert Spar, state as follows:

1.      I have been retained by the Plaintiffs Evalve, Inc. and Abbott Cardiovascular Systems, Inc. (collectively, "Plaintiffs" or "Abbott") to discuss the standards applied by the U.S. Patent and Trademark Office (PTO) for determining the patent term adjustment (PTA), if any, to be granted to a patent under 35 U.S.C. § 154(b) and the associated regulations promulgated by the PTO, including 37 C.F.R. § 1.704.  I also have been asked to assess the arguments presented by Defendants Edwards Lifesciences Corp. and Edwards Lifesciences LLC (collectively, "Edwards") in support of their contention that "[a]ll or part of the extension of the term of [Abbott's U.S. Patent No. 7,563,267 ("the '267 patent")] is invalid under 35 U.S.C. § 282(c) because the term of the '267 patent was improperly extended or adjusted pursuant to 35 U.S.C. § 154." (EDW's 8/28/2019 Response to ABT Interrog. No. 23.)

2.      As explained in detail below, it is my opinion that the PTO's assessment that the '267 patent is entitled to 1,743 days of PTA due to prosecution delays by the PTO was correct and in accordance with the applicable statutory and regulatory provisions.  In contrast, Edwards' arguments in this case rely on misunderstandings or misinterpretations of those provisions.  A list of the materials I considered in reaching the opinions and conclusions set forth in this report in Appendix B.

3.      I reserve the right to amend and/or supplement the opinions set forth in this report should I be made aware of any pertinent information that I was not aware of as of the date of this Report.

1

I.      EDUCATIONAL BACKGROUND AND QUALIFICATIONS

4.      I have nearly 40 years of experience working at the PTO.  During my tenure, I served in a number of capacities in Patents, holding the titles of Patent Examiner, Primary Patent Examiner, Supervisory Patent Examiner (SPE), Special Programs Examiner (SPRE), Legal Advisor and Director of the Office of Patent Legal Administration (OPLA). I also served on details to the Solicitor's Office and the Board of Patent Appeals and Interferences (BPAI), and undertook a one-year Commerce Science and Technology Fellowship for the White House.  I retired in 2007.

5.      While at the PTO, I also taught extensively at Patent Academy, and made many training and information presentations to examiners, technical support staff and top patents management.  I also made a number of presentations on proposed, existing and revised PTO practices and policies to state and city patent bar organizations, at conferences of intellectual property organizations, and for the Practicing Law Institute (PLI).

6.      Under my direction, the Form Paragraph Manual, which became part of the Manual of Patent Examining Procedure (MPEP) was created, and I served as its editor for many years.  The Form Paragraph Manual is a collection of form paragraphs that patent examiners should use in their communications to applicants during the patent examination process in order to ensure consistency and correctness of office policy and thoroughness of accompanying explanations.

7.      For the final 11 years of my service at the PTO, from 1996 to 2007, I was the Director of the OPLA (formerly the Special Programs Law Office, or SPLO), under the Deputy Commissioner for Patent Examination Policy.  OPLA is the office in the PTO that handled the initial rulemaking relating to PTA, and provided, and still provides, guidance

2

for the PTO's determination of PTA both within the PTO and externally to the patent community.  In this position, I played a significant and leading role in developing and implementing many major Office rule makings and policy initiatives involving the patent process, and greatly affecting the patent corps and all patent practitioners.  This included overseeing the promulgation of the regulations for implementing the PTA regime, and establishing an automated process for the calculation of PTA in all patent applications, including consideration of the provisions of 37 C.F.R. § 1.704.  As such, I have an extensive understanding of the purpose behind those regulations, and their implementation by the PTO.

8.      I received a Bachelor of Mechanical Engineering (BME) from Rensselaer Polytechnic Institute in 1962, and a Bachelor of Laws (LLB) from the University of Baltimore in 1969.  I am a member of the Maryland Bar, the American Intellectual Property Law Association (AIPLA) (including a member of the Rules Sub-Committee), and I am admitted to the Court of Appeals for the Federal Circuit (CAFC).

9.      I am presently a consultant, providing advice, consultation and training services to the patent bar about patent practices and PTO procedures, including PTA.  In this role, I have provided specialized consulting services via presentations and training workshops to patent intellectual property organizations, patent departments of major corporations, and leading patent law firms.

10.      In addition, I have served as an expert in patent litigation matters, and provided legal and technical consulting services on reissues, reexamination requests, and patent procedures, practices and issues.

11.      I have attached a copy of my resume as Appendix A.

12.     My standard consulting rate of $450/hour is being applied in this case, which does not depend on my provision of any particular opinion or the outcome of this case.

13.     In the last four years, I have not testified as an expert at deposition or trial.

## II.     PATENT TERM ADJUSTMENT (PTA)

### A.     History

14.     Prior to 1995, the term of a U.S. patent was 17 years from issuance.  *See* Pre-GATT 35 U.S.C. § 154.  Under this provision, delays during prosecution were not a significant concern because the patentee would secure a 17-year term regardless of when the patent issued, and how long it had been in examination.

15.     Effective June 1995, through implementation of the General Agreement on Tariffs and Trade (GATT), the relevant patent statute, 35 U.S.C. § 154, was amended to change the patent term from 17 years from issuance to a term starting on the patent's issue date, and ending 20 years from its effective filing date, in order to harmonize U.S. patent term with the rest of the world.  35 U.S.C. § 154; Uruguay Round Agreements Act, Pub. L. No. 103-465, § 532, 108 Stat. 4809, 4984 (1994).  With the end of the patent term calculated from the date the patent application was filed with the PTO (or the filing date of the first U.S. application to which the instant application claimed priority), PTO and/or applicant delays during examination could have a significant impact on the effective patent term.  That is because, while the expiration date was set to be 20 years from the earliest effective filing date, the patent's issuance date could be negatively impacted by prosecution delays triggered by the PTO and/or by the applicant.  Under the revised patent term statute,

the later the issuance of the patent, the shorter would be the effective patent term between issuance and expiry.

16.     Under this new patent term regime, patent applicants were generally able to control and minimize their own delay, thereby maximizing their effective patent term on issuance.  However, applicants were not able to control the erosion of their effective term due to delays attributable to the PTO.

17.     To address this problem, PTA was introduced through the American Inventors Protection Act of 1999, which added 35 U.S.C. § 154(b) to the Patent Act.  As discussed below, that statutory provision—and the PTA regulations promulgated by the PTO to implement it—sought to balance the desire to restore effective term to patents caused by delays linked to certain PTO inactions during prosecution, while eliminating any incentive for gamesmanship whereby applicants could secure extra term through delays within their control.

**B.     35 U.S.C. § 154(b) (Adjustment of Patent Term)**

18.     35 U.S.C. § 154(b), titled "Adjustment of Patent Term," sets forth certain "Patent [T]erm [G]uarantees" in subsection (1), as circumscribed by certain "Limitations" in subsection (2).  35 U.S.C. § 154(b).

19.     Specifically, 35 U.S.C. § 154(b)(1) provides for three separate patent term guarantees: (A) "Guarantee of prompt Patent and Trademark Office responses"; (B) "Guarantee of no more than 3-year application pendency"; and (C) "Guarantee of adjustments for delays due to derivation proceedings, secrecy orders, and appeals."

20.     Under subsection (b)(1)(A), subject to the limitations in § 154(b)(1)(A), "if the issue of an original patent is delayed due to the failure of the [PTO] to" perform one of

5

four enumerated actions in its specified timeframe, "the term of the patent shall be extended

1 day for each day after the end of the period specified" for performing the action.  The

four specified actions are as follows:

- Providing at least one of the notifications under 35 U.S.C. § 132 (*i.e.*, a Notice of Rejection or Objection), or otherwise a Notice of Allowance, not later than 14 months after the application filing date (or the date of commencement of national stage for an International PCT Application);

- Responding to a Reply under 35 U.S.C. § 132 (*i.e.*, Reply to a Notice of Rejection or Objection), or to a Notice of Appeal to the Patent Trial and Appeal Board (PTAB), within four months;

- Acting on an application within four months after the decision on an appeal to the PTAB or a Federal District Court in which allowable claims remain in the application; or

- Issuing a patent within four months after the issue fee is paid and all outstanding requirements satisfied.

35 U.S.C. § 154(b)(1)(A).

21.     The number of days of delay caused by the PTO's failure to perform one or

more of these four actions within the specified timeframe is referred to as "A-delay" and

is included in the ultimate PTA calculation.

22.     Under subsection (b)(1)(B), subject to the limitations in § 154(b)(2), "if the

issue of an original patent is delayed due to the failure of the [PTO] to issue a patent within

3 years after the actual filing date of the application under section 111(a) in the United

States or, in the case of an international application, the date of commencement of the

national stage under section 371 in the international application, excluding three specified

time periods, "the term of the patent shall be extended 1 day for each day after the end of

that 3-year period until the patent is issued." 35 U.S.C. § 154(b)(1)(B).  The three excluded

time periods are as follows:

- Any time consumed by continued examination of the application requested by the applicant under 35 U.S.C. § 132(b);

- Any time consumed by a derivation proceeding, imposition of a secrecy order, or appellate review by the PTAB or a Federal District Court; or

- Any delay in processing of the application by the PTO requested by the applicant (except where the applicant has made a showing that, in spite of all due care, the applicant was unable to respond within the 3-month period specified, up to 3-month's additional term per request could be reinstated).

*Id.*

23.     The number of days of delay caused by the PTO's failure to issue the patent within 3 years is referred to as "B-delay" and is also included in the ultimate PTA calculation.

24.     Under subsection (b)(1)(C), "the term of the patent shall be extended 1 day for each day of the pendency of" of a derivation proceeding, imposition of a secrecy order, or appellate review by the PTAB or a Federal District. 35 U.S.C. § 154(b)(1)(C).  This is known as "C-delay."

25.     Thus, the maximum possible PTA that could theoretically be granted to a patent can be summarized with the following formula:  max. PTA (USPTO delay) = ([A-delay] + [B-delay] + [C-delay]).

26.     In practice, however, the actual amount of PTA granted to a patent will generally be less than this max. PTA amount.  That is because, as noted, the calculation of PTA is subject to certain "Limitations" set forth in 35 U.S.C. § 154(b)(2).  There are three primary "Limitations":

- To the extent there is any overlap between the periods of A-, B- and C-delay, the PTA shall be reduced by the amount of overlap;

- If a patent is disclaimed (including terminally disclaimed), the PTA cannot extend beyond the expiration date specified in the disclaimer; and

- The PTA "shall be reduced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution of the application."

35 U.S.C. § 154(b)(2).

27.     The PTO does not actually consider any disclaimed expiration date in its calculation of PTA and instead leaves it to the field to account for such disclaimers in identifying the expiration date of an extended patent.  Thus, in practice, the calculation of PTA generally is conducted according to the following formula: PTA = ([A-delay] + [B-delay] + [C-delay]) – ([overlap] + [applicant delay]).

28.     With respect to applicant delay, the statute itself sets forth one category: "an applicant shall be deemed to have failed to engage in reasonable efforts to conclude processing or examination of an application for the cumulative total of any periods of time in excess of 3 months that are taken to respond to a notice from the Office making any rejection, objection, argument, or other request, measuring such 3-month period from the date the notice was given or mailed to the applicant." 35 U.S.C. § 154(b)(2)(C)(ii).

29.     The statute also provides "[t]he Director" (*i.e.*, the PTO) with the authority to "prescribe regulations establishing the circumstances that constitute a failure of an applicant to engage in reasonable efforts to conclude processing or examination of an application."  35 U.S.C. § 154(b)(2)(C)(iii).

**C.     37 C.F.R. § 1.704 (Reduction of period of adjustment of patent term)**

30.     Pursuant to the statutory grant of authority in 35 U.S.C. § 154(b)(2)(C)(iii), the PTO has promulgated regulations setting forth the circumstances in which an applicant

shall be deemed to have "failed to engage in reasonable efforts to conclude prosecution (processing or examination) of the application," *i.e.*, 37 C.F.R. § 1.704.  As Director of the OPLA, I was involved in the original rule-making leading to 37 C.F.R. § 1.704, as well as some subsequent amendments.  This was a collaborative process involving regular meetings with the Director of the PTO, and other top PTO officials.

31.    37 C.F.R. § 1.704(b) repeats the statutory basis as follows:

[A]n applicant shall be deemed to have failed to engage in reasonable efforts to conclude processing or examination of an application for the cumulative total of any periods of time in excess of three months that are taken to reply to any notice or action by the Office making any rejection, objection, argument, or other request, measuring such three-month period from the date the notice or action was mailed or given to the applicant, in which case the period of adjustment set forth in § 1.703 shall be reduced by the number of days, if any, beginning on the day after the date that is three months after the date of mailing or transmission of the Office communication notifying the applicant of the rejection, objection, argument, or other request and ending on the date the reply was filed.

32.    37 C.F.R. § 1.704(c) sets forth 14 additional "[c]ircumstances that constitute a failure of the applicant to engage in reasonable efforts to conclude processing or examination of an application," with the following four subsections being relevant for purposes of Edwards' arguments in this case and my opinions herein:

. . .

(6) Submission of a preliminary amendment or other preliminary paper less than one month before the mailing of an Office action under 35 U.S.C. 132 or notice of allowance under 35 U.S.C. 151 that requires the mailing of a supplemental Office action or notice of allowance . . .;

(7) Submission of a reply having an omission (§ 1.135(c)) . . .;

(8) Submission of a supplemental reply or other paper, other than a supplemental reply or other paper expressly requested by the examiner, after a reply has been filed . . .;

. . .

9

(13) Failure to provide an application in condition for examination as defined in paragraph (f) of this section within eight months from either the date on which the application was filed under 35 U.S.C. 111(a) . . . .

33.     The regulations also provide certain limitations on the circumstances in which an applicant will be found to have delayed prosecution, but they are not relevant for purposes of this report and therefore are not set forth here.

34.     It should be noted that, according to the Manual of Patent Examining Procedure (MPEP), the situations set forth in 37 C.F.R. § 1.704(c) "do not represent an exhaustive list of actions or inactions that interfere with the Office's ability to process or examine an application" and so "[t]he Office may also reduce a period of adjustment provided in 37 CFR 1.703 on the basis of conduct that interferes with the Office's ability to process or examine an application under the authority provided in 35 U.S.C. 154(b)(2)(C)(iii), even if such conduct is not specifically addressed in 37 CFR 1.704(c)." MPEP 2732.   During our rule-making, this provision was inserted to allow for unanticipated circumstances where an applicant might delay prosecution.  However, to my knowledge, the PTO has never relied on it to identify an unstated basis for applicant delay.

35.     It is further noted that, in identifying circumstances that would constitute a failure of the applicant to engage in reasonable efforts to conclude processing or examination of an application, the PTO, during the rule making process, tried to avoid identifying any actions, or any inactions that would not actually result in a delay of the prosecution.  Accordingly, the PTO tried to make sure that applicants were not to be penalized for filing replies or responses that did not actually interfere with, or delay the prosecution.  On the other hand, efforts were made to identify as many common actions that an applicant might do, or not do, that would delay the prosecution process.  As a result,

the circumstances set forth in 37 CFR 1.704(c) are fairly comprehensive in identifying the most likely situations of applicant-triggered delays.

     **D.**    **The '267 Patent PTA**

36.    The application for the '267 patent was initially filed on May 19, 2003 and prosecution continued almost six years until, on February 9, 2009, the Examiner issued a Notice of Allowance. ABT0164676. With the notice of allowance was a "Determination of Patent Term Adjustment under 35 U.S.C. 154(b)," which calculated a PTA of 1,079 days. ABT0164678.

37.    On March 3, 2009, the applicants submitted a Petition requesting reconsideration of the PTA determination, and specifically requesting that the PTA be extended to 1,748 days. ABT0164776.

38.    That Petition was initially held in abeyance while the PTO considered references that had been identified in Information Disclosure Statements (IDSs) that had been submitted during prosecution but not indicated as considered, or initialed, by the examiner. ABT0164858.

39.    After the PTO sent an "Issue Notification" identifying the term of PTA as 1,074 days on July 1, 2009, the applicants renewed their Petition requesting reconsideration of the PTA determination on September 8, 2009. ABT0164875-79.

40.    On May 19, 2010, the Office of Petitions issued a decision on the applicants' petition, granting extension of the PTA to 1,743 days, and indicating it would issue a Notice of Correction reflecting that extension. ABT0164891. The Certificate of Correction was issued on August 24, 2010. ABT0164893.

11

41.     In their second Petition, the applicants claimed that the period of "A-delay" applicable to the '267 patent was 1,159 days, the period of "B-delay" was 1,159 days, the period of "overlapping days" was 472 days and the period of "applicant delay" was 85 days.  ABT0164879.  Thus, according to the applicants, the correct term of PTA would be ([1,159] + [1,159]) – (472 + 85) = 1,761 days.  *Id.*

42.     In its decision granting the Petition, however, the Office of Petitions noted that "Patentee fail[ed] to take into account a period of overlap of 18 days for Office delay in issuing the patent after payment of the issue fee and satisfaction of all outstanding requirements," and so decreased the requested PTA by 18 days, yielding the 1,743 days of PTA ultimately granted to the '267 patent.  ABT0164891.

43.     A copy of the Transaction History of the '267 patent available on the PTO's "PAIR" website is attached as Appendix C.  A copy of the '267 patent PTA calculation history also available on PAIR is attached at Appendix D.

44.     I understand that Edwards does not dispute the amount of "A-delay," "B-delay" or "overlapping days" used in the applicants' and PTO's PTA calculations.  Rather, Edwards disputes only the amount of "applicant delay" that was applied.

45.     As reflected in the applicants' Petition, the PTO applied 85 days of "applicant delay" in calculating the '267 patent PTA.  According to the PTA calculation on the PTO website, these 85 days were attributable to:

- Filing of an Oath and replacement drawings after the due date - 5 days;

- Filing of two IDSs after a Response to a Restriction Requirement - 53 days;

- Filing of an IDS after a Response to a Non-Final Rejection - 4 days

12

- Filing of replacement drawings after the Notice of Allowance was mailed - 23 days.

*See* Appendix C.

## III.  OPINION - THE PTO CORRECTLY APPLIED THE REGULATIONS IN CALCULATING PTA FOR THE '267 PATENT

46.  I have reviewed the file history for the '267 patent, including the worksheet showing the calculation of PTA granted to the '267 patent.  I have also reviewed Edwards' response to Abbott's Interrogatory No. 23, which sets forth the bases on which Edwards contends that the '267 patent PTA was improperly calculated by the PTO.  I have also relied upon my experience with Patent Office practice and procedure, including my experience as Director of OPLA with OPLA's responsibility for rule-making in general, and for the PTA rules, in particular, including the development of the regulations addressing when an applicant is considered to have delayed prosecution, *i.e.*, 37 C.F.R. § 1.704.

47.  For the reasons discussed below, I disagree with Edwards' contention that the PTO should have reduced the PTA granted to the '267 patent based on additional alleged "applicant delay."

### A.  The Applicants' Filing Of Replacement Drawings Did Not Constitute "Applicant Delay"

48.  Two months after the application for the '267 patent was filed, on July 18, 2003, the OIPE issued a "Notice to File Missing Parts of Non-Provisional Application." ABT0162579.  The Notice stated that "Applicant is given TWO MONTHS from the date of this Notice within which to file all required items and pay any fees required below to

13

avoid abandonment." *Id.* The Notice identified two items that needed to be filed to avoid abandonment, in addition to the $65 fee:

- "A properly signed oath or declaration in compliance with 37 C.F.R. 1.63, identifying the application by the above Application Number and Filing Date"; and

- "Replacement drawings in compliance with 37 CFR 1.84 and 37 CFR 1.121."

*Id.*

49. Three months and five days later, on October 23, 2003, the applicants submitted a Response to Notice to File Missing Parts, which included the requested Declaration and replacement drawings, along with a Petition for Extension of Time Under 37 C.F.R. 1.136(a) requesting a one-month extension of the deadline to respond to the Notice to File Missing Parts, and the requisite one month extension of time fee. ABT0162581.

50. According to the Transaction History for the '267 patent on PAIR, having received the declaration and replacement drawings, the OIPE marked the application as "Complete" just over a month later, on November 28, 2003.

| 11-28-2003 | Application Is Now Complete |
| 11-28-2003 | Application Dispatched from OIPE |
| 11-28-2003 | Application Is Now Complete |
| 10-23-2003 | Additional Application Filing Fees |
| 10-23-2003 | A statement by one or more inventors satisfying the requirement under 35 USC 115, Oath of the Applic |
| 10-23-2003 | Applicant has submitted new drawings to correct Corrected Papers problems |
| 07-18-2003 | Notice Mailed--Application Incomplete--Filing Date Assigned |
| 06-03-2003 | IFW Scan & PACR Auto Security Review |
| 05-19-2003 | Initial Exam Team nn |

Appendix C.

51. The case was subsequently docketed to the Examiner on March 19, 2004. *Id*.

14

52.     Edwards argues that the applicants' filing of the replacement drawings on October 23, 2003 constituted "applicant delay" under 37 C.F.R. § 1.704(c)(7).  That subsection states that the applicant is considered to have delayed prosecution through "[s]ubmission of a reply having an omission (§ 1.135(c)), in which case the period of adjustment set forth in § 1.703 shall be reduced by the number of days, if any, beginning on the day after the date the reply having an omission was filed and ending on the date that the reply or other paper correcting the omission was filed."  37 C.F.R. § 1.704(c)(7). According to Edwards, the applicants' October 23, 2003 replacement drawings must have had such an "omission" because the PTO subsequently issued a *new* requirement for correction of drawings with the Notice of Allowability on February 9, 2009.  *See* Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23), at 7.

53.     I disagree with Edwards' contention.  This is because, in my experience, 37 C.F.R. § 1.704(c)(7) is inapplicable under the circumstances presented here for two reasons.

54.     First, for this rule to apply, the submitted reply must have an "omission." 37 C.F.R. § 1.704(c)(7) refers explicitly to "§ 1.135(c)."  According to Rule 1.135(c), "[w]hen reply by the applicant is a *bona fide* attempt to advance the application to final action, and is substantially a complete reply to the non-final office action, but consideration of some matter or compliance with some requirement has been inadvertently omitted, applicant may be given a new time period for reply under § 1.134 to supply the omission." 37 C.F.R. § 1.135(c).  Under this rule, where, as here, the applicant made a *bona fide* attempt to correct the identified deficiency, if the October 23, 2003 filed replacement

15

drawings were in some way deficient, applicant should have been given a new time period for reply.

55.    Here, it appears clear that the applicants did in fact make a *bona fide* attempt to comply with the OIPE request to provide replacement drawings.  In the Notice, the OIPE identified two problems with the drawings that had been filed: (1) certain figures were not "free from alterations, overwriting, interlineations, folds, and copy marks" (identifying Figs. 18, 20, 47, 48, 55, 61C, 65G, 65H, 76); and (2) certain figures had "a line quality that is too light to be reproduced … or text that is illegible" (citing Figs. 50, 52, 74C, 74D, 74E and 74F).  ABT0162579.  An example of these problems can be seen, for example, with Figure 50 as filed:



56.    The applicants provided replacement drawings (on October 23, 2003) for each figure identified in the Notice.  ABT0162581.  Revised Figure 50, which is representative of the efforts made by the applicants to correct the drawings, is as follows:



FIG. 50

57.     That the applicants made a *bona fide* attempt to comply is also indicated by the fact that the replacement drawings satisfied the OIPE.  Indeed, the OIPE did not notify the applicant that the replacement drawings had an "omission," or were otherwise deficient, nor did it give the applicant a Rule 1.135(c) notice providing the applicant with additional time to reply.  To the contrary, the OIPE accepted the applicant's replacement drawings filed on October 23, 2003 as a complete and proper response and indicated that the application was complete a month later, and within eight months of filing.  Appendix C. The application was subsequently docketed to the examiner on March 19, 2004.  *Id.*

58.     While I observe that the examiner issued several office actions during the examination process, the examiner never indicated that the drawings used during prosecution were deficient in any way at all, or resulted in delayed prosecution.  It is further noted that the examiner in the office action mailed on November 29, 2007 indicated that the replacement drawings filed on October 23, 2003 were accepted.  ABT0164009-10.

59.     Thus, in my opinion, there was no delay in the prosecution at all due to the acceptable replacement drawings filed on October 23, 2003 and, therefore, § 1.135(c) was not involved at all.  The Examiner's requirement for correction of the drawings included

17

in the Notice of Allowability mailed February 9, 2009 was an entirely new notice. ABT0164676.  In response to the February 9, 2009 Notice of Allowability, I observe that the applicant promptly submitted corrected drawings.  ABT0164703.  Thus, in my opinion, the October 23, 2003 replacement drawings, which were accepted by both OIPE and the examiner, did not delay the prosecution at all.

60.     Second, but very significantly, I note that the comments to 37 C.F.R. § 1.704 in the PTO's rule making notice in the Federal Register state that delays relating to the correction of "application formalities," including a requirement for "drawings in compliance with § 1.84," are treated under § 1.704(**b**), rather than § 1.704(c)(7). 65 FR 56370 (column 3), 56371 (column 1), and 56384 (column 3).  According to the same comment, under 1.704(b), PTA will be reduced if an applicant "does not correct the informality within three months of the …. notice requiring the missing part or correction of the informality."  *Id.*  Thus, not only is it clear that Edwards' assertion that the replacement drawings filed by applicant on October 23, 2003 had an omission is without merit, but, even if there was some sort of an omission with the replacement drawings that required some further reply by applicant, Edwards' reliance on 37 C.F.R. 1.704(c)(7) is inappropriate and also without merit.

61.     Here, I observe that the OIPE mailed the Notice to File Missing Parts on July 18, 2003 requiring the applicant to submit replacement drawings.  The replacement drawings were filed by the applicant on October 23, 2003, three months and five days after the notice from OIPE, along with a request for a one-month extension of time.  Notably, under 37 CFR 1.704(b), the PTO properly accounted for this five-day delay in determining PTA, reducing the PTA by 5 days. Appendix D.  In my opinion, this confirms that the PTO

18

was aware of the potential that the late submission (*i.e.*, in excess of 3 months under 37 CFR 1.704(b)) of acceptable replacement drawings could constitute "applicant delay," and took that delay of 5 days into account in the PTA determination for the '267 patent.  Based on my experience, no error was committed.

**B.    The Applicants' Filing Of Supplemental IDSs After Responding To The Notice To File Missing Parts Did Not Constitute "Applicant Delay"**

62.    37 C.F.R. § 1.704(c)(8) provides that an applicant delays prosecution through "[s]ubmission of a supplemental reply or other paper, other than a supplemental reply or other paper expressly requested by the examiner, after a reply has been filed, in which case the period of adjustment set forth in § 1.703 shall be reduced by the number of days, if any, beginning on the day after the date the initial reply was filed and ending on the date that the supplemental reply or other such paper was filed." 37 C.F.R. § 1.704(c)(8).

63.    Edwards next argues that "[t]he correct interpretation and application of rule 1.704(c)(8) would have reduced the adjustment by hundreds of days because[,] during prosecution of the '267 patent, the PTO issued a 'Notice to File Missing Parts of Non-Provisional Application' requiring a reply on July 18, 2003.  The applicant filed a reply (*i.e.*, the acceptable replacement drawings) to the Notice on October 23, 2003, but later filed a series of Information Disclosure Statements prior to examination of the claims, including one as late as February 2, 2006.  Edwards thus contends that "[a] proper interpretation and application of rule 1.704(c)(8) requires the adjustment of the term of the '267 patent be eliminated in whole or in part because the Information Disclosure Statements are 'other papers' that were filed at extended periods of time after the reply."

19

*See* Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23), at 7-8.

64.     I disagree with Edwards' contention because, in my experience, 37 C.F.R. § 1.704(c)(8) is inapplicable under the circumstances presented here.

65.     To understand why Edwards' contention is incorrect, it is helpful to understand the purpose of 37 C.F.R. § 1.704(c)(8).  I am familiar with the purpose of this rule as I was involved in the rule-making activities that led to adoption of the rule.

66.     As noted above, when an applicant files a reply to certain papers—specifically Notices of Rejection or Objection under 35 U.S.C. § 132—the Examiner is required to issue the next § 132 Notice, or a Notice of Allowance, within four months.  35 U.S.C. § 154(b)(1)(A).  Any delay beyond that four month deadline is considered to be PTO delay and counts towards an applicant's PTA.  *Id.*

67.     The filing of a supplemental reply or other paper (including an IDS) after an initial reply to a § 132 notice can cause delay while the Examiner considers the supplemental paper before issuing the next § 132 notice.  That in turn could lead to the Examiner missing the four-month deadline.  Thus, without any restriction, an applicant could game the system by continuously filing supplemental papers, thereby preventing the Examiner from meeting the four-month deadline, and accumulating PTA at will.  For that reason, during the rule-making process, the rule-making committee, of which I was a member, discussed adding a provision to remove the incentives for gamesmanship by stating that the delay caused by the filing of supplemental papers will count as a delaying action against the applicant in the PTA calculation.  The result was Rule 1.704(c)(8).

68.     But we also recognized that these same considerations do not necessarily apply before the examiner issues the first § 132 notice, when the four-month deadline does not apply.  Therefore, we added a different Rule, 1.704(c)*(6)* (discussed further below), to address the circumstances where filing of a "preliminary paper" (such as a preliminary amendment or supplemental IDS before the first § 132 notice) delays prosecution.

69.     Here, in particular, the "reply" that Edwards refers to is the applicants' October 23, 2003 reply to the OIPE's Notice to File Missing Parts.  Notably, unlike a § 132 notice, the PTO was not obligated to consider and respond to the reply within four months.

70.     Nevertheless, I observe that the OIPE *did* consider the replacement drawings and marked the application as complete in just over *one month*, on November 28, 2003.  Appendix C.  The first IDS referred to by Edwards was not filed until April 5, 2004, more than four months later.  *Id.*; ABT0162608.  Thus, neither the first filed IDS, nor the supplemental IDSs, delayed the PTO's consideration of the applicants' October 23, 2003 response to the Notice to File Missing Parts.

71.     Notably, I observe that the PTO *did* consider the IDS filed by the applicant on December 29, 2006 as a "supplemental reply" or as an "other paper" under Rule 1.704(c)(8), imposing a 53-day PTA reduction.  Appendix D.  This makes sense and is consistent with my experience and the purpose of § 1.704(c)(8), given that that IDS was filed after an October 6, 2006 reply to a Notice of Restriction Requirement, triggering the four-month deadline for the Examiner's next § 132 notice.  In my opinion and based on my experience this confirms that the PTO was aware of Rule 1.704(c)(8) and its potential application to delays due to the filing of a supplemental IDS, but also the inapplicability of the rule to pre-examination formality notices.

21

72.     That § 1.704(c)(8) is not intended to address supplemental filings before formal examination commences is confirmed by 37 C.F.R. § 1.704(c)*(6)*, which provides that an applicant delays prosecution through "[s]ubmission of a preliminary amendment or other preliminary paper less than one month before the mailing of an Office [A]ction under 35 U.S.C. § 132 . . . ." 37 C.F.R. § 1.704(c)(6).  An IDS submitted before the first § 132 notice would be considered such a "preliminary paper," which would only trigger a reduction in PTA if filed within a month of the first § 132 notice.  The reason for this is that, if the first § 132 notice is issued more than a month after the last "preliminary paper," this indicates that the examiner's action was not delayed, and any examiner delay was not caused, by the preliminary paper as the examiner was not in a position to issue the first § 132 notice.  It is noted that, in general, preparing a § 132 notice by an examiner usually takes days, rather than anywhere near a month.  None of the IDSs Edwards relies on qualified as an applicant delay under 37 C.F.R. § 1.704(c)(6), as the latest was filed on February 2, 2006, which is more than eight months before the Examiner issued the first § 132 Notice on October 6, 2006, a Notice of Restriction.  *See* Appendix C; Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23), at 6.

73.     I note that Edwards itself has benefited from this rule itself.  For example, for Edwards' U.S. Patent No. 8,778,016, directed at "[a] method and apparatus for performing mitral valve chordal repair," Edwards was granted 1,306 days of PTA. A copy of the PTA calculation from PAIR, and the transaction history for the patent, is attached as Appendix E.  On review of the PTA calculation for that patent available on PAIR, 636 days of "A-delay" was attributed to the delay in issuing the first § 132 Notice beyond the 14-month deadline.  *Id.*  Specifically, whereas the 14-month from filing deadline fell in

22

October 2009, the Examiner issued the first § 132 Notice, a Non-Final Rejection, in July 2011. *Id.*

74.     As with the '267 patent, however, the OIPE issued a Notice to File Missing Parts within weeks of the application filing date on August 26, 2008, requiring submission of the inventor oath or declaration. *Id.* Edwards responded with the missing oath three months later on November 26, 2008. *Id.* The application was then marked as "Dispatched from OIPE," meaning it was sent for examination, on December 23, 2008. *Id.*

75.     But as with the applicant on the '267 patent, Edwards submitted a supplemental IDS after its reply to the Notice to File Missing Parts, on May 6, 2010. *Id.* According to Edwards' contentions in this case, Edwards should therefore have been docked 1 day of PTA for each day between the filing of its reply to the Notice to File Missing Parts on August 26, 2008, and the filing of its supplemental IDS on May 6, 2010, *i.e.*, **618** days. It was, however, not. Edwards has not challenged the PTO's grant to it of over two-and-a-half years of what according to its (erroneous) contentions in this case, would be invalid PTA.

76.     Similar unchallenged grants of PTA to Edwards also would have been invalid according to Edwards' contention with respect to U.S. Patent No. 7,094,244 (*see* Appendix F):

- 472 days of PTA total; 466 days of "A-delay" due to delay in issuing first § 132 Notice;

- Four supplemental IDSs filed after a reply to a Notice to File Missing Parts;

- 487 days between filing of reply to Notice to File Missing Parts and final supplemental IDS, would have led to complete elimination of the PTA.

23

77.     This indicated that the PTO in considering the PTA to grant to the '267 patent simply followed its standard practice of not applying 37 C.F.R. § 1.704(c)(8) to pre-examination formalities, consistent with the purpose of the regulation, and the context of the regulations as a whole.

### C.     The Application For The '267 Patent Was In Condition For Examination Within Eight Months Of Filing

78.     37 C.F.R. § 1.704(c)(13) provides that an applicant delays prosecution through "[f]ailure to provide an application in condition for examination . . . within eight months from . . . the date on which the application was filed under 35 U.S.C. 111(a) . . . , in which case the period of adjustment set forth in § 1.703 shall be reduced by the number of days, if any, beginning on the day after the date that is eight months from . . . the date on which the application was filed under 35 U.S.C. 111(a) . . . and ending on the date the application is in condition for examination . . . ."  The requirements for an application to be in condition for examination are set forth in 37 C.F.R. § 1.704(f).

79.     Edwards argues that the applicants for the '267 patent failed to provide an application in condition for examination within eight months of filing because the "[s]ufficient drawings were not filed until March 3, 2009."  *See* Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23), at 8.  I disagree with this position of Edwards'.

80.     Specifically, as explained above, after the OIPE issued a Notice to File Missing Parts on July 18, 2003, the applicants submitted replacement drawings on October 23, 2003, and the OIPE marked the application as "Complete" on November 28, 2003. Appendix C.  Thus, the submitted replacement drawings were acceptable, and the

24

application was then in condition for examination.  This was less than seven months after the application was filed.  And the case was subsequently docketed to the Examiner on March 19, 2004 without any further notice of deficiency in the drawings.  *Id.*

81.     Under these circumstances, and based on my experience, the application for the '267 patent ***was*** clearly in condition for examination within eight months after filing. Any remaining alleged deficiency in the drawings (*i.e.*, something noticed later by the examiner during the examination process), which was indicated in a ***new*** notice to correct drawings that was issued with the Notice of Allowability, obviously did not delay or prevent commencement of the examination by the examiner.  Accordingly, such a later noticed need for a correction to the drawings would clearly not be considered applicant delay under 37 C.F.R. § 1.704(c)(13).

82.     Rather, the 23-day delay from the Notice of Allowance to the submission of the corrected drawings was considered applicant delay under a ***different*** provision, 37 C.F.R. § 1.704(c)(10), which provides that an applicant delays prosecution through "[s]ubmission of an amendment under § 1.312 or other paper, other than a request for continued examination in compliance with § 1.114, after a notice of allowance . . . ."  As a result 23 days was deducted from the total PTA. Appendix D.  Again, this confirms that the PTO was aware that applicant's filing of corrected drawings as a Rule 312 reply to the new notice could constitute "applicant delay," and accounted for it accordingly.

**D.     The PTO Correctly Determined That The Remaining "Actions By The Applicant" Identified By Edwards Did Not Constitute Applicant Delay**

83.     Finally, Edwards identifies three "other actions by the applicant" that it contends should be considered "conduct that interferes with the Office's ability to process

25

or examine an application . . . even if such conduct is not specifically addressed in 37 C.F.R. § 1.704(c)." *See* Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23), at 8–9.  I disagree with Edwards' contention that these "other actions by the applicant, considered alone or in combination, require the adjustment of the term of the '267 patent be eliminated." *Id.*  I do not recall any case where PTA was reduced for any of the three "other actions by the applicant" during my time as the Director of the OPLA.

84.     First, Edwards argues that "the applicant's failure to comply with 37 C.F.R. § 1.98(d) requires the adjustment of the term of the '267 patent be eliminated in whole or in part." *See* Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23), at 9.  Specifically, Edwards asserts that "[d]espite not claiming priority to U.S. Patent Application No. 10/613,443, in the February 2, 2006 Information Disclosure Statement, the applicant attempted to rely on 37 C.F.R. § 1.98(d) to avoid providing copies of prior art that were submitted to or cited in Application No. 10/613,443." *Id.*  According to Edwards "[t]his was improper because 37 C.F.R. § 1.98(d) can only be utilized when the earlier application is relied on for an earlier effective filing date under 35 U.S.C. § 120" and "[t]his submission caused or had the potential to cause a delay in the examination of this application and/or other applications, requiring that the adjustment of the term of the '267 patent be eliminated in whole or in part."  I disagree.

85.     I observe no evidence of any delay associated with the submission to the PTO of foreign references identified on the February 2, 2006 IDS.  Indeed, in the Office action mailed on November 29, 2007, the Examiner marked, as considered, the U.S. patent documents identified on the February 2, 2006 IDS. ABT0164009-12.  The Examiner's

26

indication that some foreign patent documents were not in compliance with Rule 1.98(d) did not delay the prosecution on the merits, or issuance of the Office action at all.

86.     In reply, the applicant promptly submitted copies of the remaining eight foreign patent documents on December 17, 2007.  ABT0164041-43.  Subsequently, the Examiner marked these eight foreign patent references as considered on March 20, 2008. ABT0164582.  None of those eight foreign patent documents led to a subsequent rejection, and this issue did not cause or trigger any delay at all in the examination process.

87.     Moreover, for some of the foreign patent documents, the examiner had already considered the equivalent disclosure in a U.S. publication; for example, WO03105667 and WO2004045378, published as US2004049211 and US2005216039, respectively. ABT0162640.

88.     Edwards next points out that "the terminal disclaimer on February 10, 2006 submitted for 'semiconductor package with conductor impedance selected during assembly' for Texas Instruments is wholly unrelated to the application."  *See* Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23), at 9. According to Edwards, therefore, "[t]he applicant's submission of this terminal disclaimer, or the applicant's failure to take action to correct the submission, caused or could have caused a delay in the examination of this application and/or other applications, requiring that the adjustment of the term of the '267 patent be eliminated in whole or in part."  *Id.* Again, I disagree.

89.     The terminal disclaimer appears to have been filed in error in the subject application by a third party as it was not related to the subject application at all.  I observe

no evidence of any delay in prosecution nor any rationale for why this could have caused a delay.

90.     Moreover, there is no indication that the applicant even knew about this unrelated terminal disclaimer, as no notice would have been provided to the applicant.  That the applicant was unaware is evidenced by the fact that the applicant noted later during prosecution that no terminal disclaimer had been filed. ABT0164778.  Without knowledge that the terminal disclaimer had been filed, the applicant would not have had any opportunity to take corrective action. Further, The PTO should have, *sua sponte*, taken the corrective action, namely to remove the inappropriately filed paper.

91.     Finally, Edwards argues that "the applicant's conduct with regards to the number of claims filed combined with the timing and the number of claims cancelled and added requires the adjustment of the term of the '267 patent be eliminated in whole or in part."  *See* Edwards' Responses and Objections to Plaintiffs' Fourth Set of Interrogatories (No. 23), at 9.  Specifically, Edwards refers to the fact that "[t]he initial application filed on May 19, 2003 contained 175 claims," and that the applicant cancelled and added certain numbers of claims during prosecution, either in a Preliminary Amendment after a Restriction Requirement, or in response to an Office Action.  *Id*.  I disagree that the applicant's conduct in this regard was unusual or warrants a reduction of PTA.

92.     As an initial matter, claim numbers are addressed through the fee system, which requires additional fees to be paid for higher numbers of claims. 37 C.F.R. 1.16(h) and (i). Here, all included claims were properly paid for, and Edwards does not suggest otherwise.  ABT0164883.

93.     Moreover, I observe no evidence that the number of pending claims interfered with the timely examination of the '267 patent, noting that the examiner did not object to the total number of claims, or for the claims being unduly multiplied.

94.     For all the above reasons, it is my opinion that Edwards has not identified any legitimate basis to assert that the PTO improperly calculated the PTA for the '267 patent.

Executed this 6th day of December at Silver Spring, Maryland.

_____   12/6/2019

Robert Spar

# EXHIBIT 28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ABBOTT CARDIOVASCULAR | ) | |
| SYSTEMS, INC. and EVALVE, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 19-149 (MN) |
| v. | ) | |
| | ) | |
| EDWARDS LIFESCIENCES CORP. AND | ) | |
| EDWARDS LIFESCIENCES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## EDWARDS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES (NO. 23)

Pursuant to Federal Rules of Civil Procedure 33, Defendants Edwards Lifesciences Corp. and Edwards Lifesciences, LLC (collectively "Edwards") hereby respond and object to Interrogatory No. 23 propounded by Plaintiffs Abbott Cardiovascular Systems, Inc. ("ACS") and Evalve, Inc. ("Evalve") (collectively, "Abbott" or "Plaintiffs").

## GENERAL OBJECTIONS

Edwards incorporates its General Objections from Edwards' Responses and Objections to Plaintiffs' Third Set of Interrogatories (Nos. 11-22).

## INTERROGATORY NO. 23:

Provide the complete legal and factual basis for Edwards' contention in its Sixth Defense that "[a]ll or part of the extension of the term of the '267 patent is invalid under 35 U.S.C. § 282(c) because the term of the '267 patent was improperly extended or adjusted pursuant to 35 U.S.C. § 154."

## RESPONSE TO INTERROGATORY NO. 23:

Edwards incorporates by reference, as though fully set forth herein, each of its General Objections. Edwards further objects to this Interrogatory to the extent it seeks the identification

of documents, things, or information protected by the attorney-client privilege, the work product doctrine and/or any other applicable privilege or immunity.

Subject to and without waiver of any of its General or Specific objections, Edwards states as follows:

Under 35 U.S.C. § 282(c):

"Invalidity of the extension of a patent term or any portion thereof under section 154(b) or 156 because of the material failure—

(1) by the applicant for the extension, or

(2) by the Director,

to comply with the requirements of such section shall be a defense in any action involving the infringement of a patent during the period of the extension of its term and shall be pleaded."

All or part of the extension of the term of the '267 patent is invalid under this provision because the term of the '267 patent was improperly extended or adjusted pursuant to 35 U.S.C. § 154(b).  The version of 35 U.S.C. § 154(b)(1) in effect during prosecution of the '267 patent states:

A. Guarantee of prompt patent and trademark office responses.—Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the Patent and Trademark Office to—

(i)    provide at least one of the notifications under section 132 or a notice of allowance under section 151 not later than 14 months after—

(I)    the date on which an application was filed under section 111(a); or

(II)    the date of commencement of the national stage under section 371 in an international application;

2

(ii)     respond to a reply under section 132, or to an appeal taken under section

134, within 4 months after the date on which the reply was filed or the

appeal was taken;

(iii)    act on an application within 4 months after the date of a decision by the

Patent Trial and Appeal Board under section 134 or 135 or a decision by a

Federal court under section 141, 145, or 146 in a case in which allowable

claims remain in the application; or

(iv)    issue a patent within 4 months after the date on which the issue fee was

paid under section 151 and all outstanding requirements were satisfied, the

term of the patent shall be extended 1 day for each day after the end of the

period specified in clause (i), (ii), (iii), or (iv), as the case may be, until the

action described in such clause is taken.

B.  Guarantee of no more than 3-year application pendency.—Subject to the limitations

under paragraph (2), if the issue of an original patent is delayed due to the failure

of the United States Patent and Trademark Office to issue a patent within 3 years

after the actual filing date of the application under section 111(a) in the United

States or, in the case of an international application, the date of commencement of

the national stage under section 371 in the international application, not including—

(i)     any time consumed by continued examination of the application requested

by the applicant under section 132(b);

(ii)    any time consumed by a proceeding under section 135(a), any time

consumed by the imposition of an order under section 181, or any time

consumed by appellate review by the Patent Trial and Appeal Board or by a Federal court; or

(iii)    any delay in the processing of the application by the United States Patent and Trademark Office requested by the applicant except as permitted by paragraph (3)(C), the term of the patent shall be extended 1 day for each day after the end of that 3-year period until the patent is issued.

C.  Guarantee of adjustments for delays due to derivation proceedings, secrecy orders, and appeals.—Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to—

(i)    a proceeding under section 135(a);

(ii)    the imposition of an order under section 181; or

(iii)    appellate review by the Patent Trial and Appeal Board or by a Federal court in a case in which the patent was issued under a decision in the review reversing an adverse determination of patentability,

the term of the patent shall be extended 1 day for each day of the pendency of the proceeding, order, or review, as the case may be.

There are also limitations on the above periods of adjustment. 35 U.S.C. § 154(b)(2) states:

A.  In general — To the extent that periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed.

B.  Disclaimed term — No patent the term of which has been disclaimed beyond a specified date may be adjusted under this section beyond the expiration date specified in the disclaimer.

C.   Reduction of period of adjustment.

(i)      The period of adjustment of the term of a patent under paragraph (1) shall be reduced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution of the application.

(ii)     With respect to adjustments to patent term made under the authority of paragraph (1)(B), an applicant shall be deemed to have failed to engage in reasonable efforts to conclude processing or examination of an application for the cumulative total of any periods of time in excess of 3 months that are taken to respond to a notice from the Office making any rejection, objection, argument, or other request, measuring such 3-month period from the date the notice was given or mailed to the applicant.

(iii)    The Director shall prescribe regulations establishing the circumstances that constitute a failure of an applicant to engage in reasonable efforts to conclude processing or examination of an application.

37 C.F.R. § 1.703 implements the provisions of 35 U.S.C. § 154(b)(1), and 37 C.F.R. § 1.704 implements the provisions of 35 U.S.C. 154(b)(2)(C).  The version of 37 C.F.R. § 1.704(a) in effect during prosecution of the '267 patent states: "The period of adjustment of the term of a patent under §§ 1.703(a) through (e) shall be reduced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution (processing or examination) of the application."  37 C.F.R. § 1.704(c) identifies "[c]ircumstances that constitute a failure of the applicant to engage in reasonable efforts to conclude processing or examination of an application."

5

The facts of the prosecution of the '267 patent are known to Abbott, and, on information and belief, Abbott possesses more information regarding the facts documented below than does Edwards, particularly given that Abbott has not yet agreed to produce all relevant documents. Nevertheless, based upon the information available to Edwards as of this date, Edwards identifies at least the following factual bases for Edwards' above contention:

The '267 patent according to the PTO has 1743 days of patent term adjustment ("PTA"). The initial application that became the '267 patent was filed on May 19, 2003 and contained 175 claims. During prosecution of the '267 patent, on July 18, 2003 the PTO issued a "Notice to File Missing Parts of NonProvisional Application," indicating that "[t]he oath or declaration is missing" and "[t]he application is informal" because of unacceptable drawings..  The applicant filed a reply to the Notice on October 23, 2003.  The October 23, 2003 reply included an executed declaration and contained replacement drawings that were not in compliance with 37 C.F.R. § 1.84 and 37 C.F.R. § 1.121.  On October 29, 2003 applicant filed an Information Disclosure Statement. Over five months later on April 5, 2004 the applicant filed another Information Disclosure Statement.  Over one year after that on May 31, 2005 the applicant filed another Information Disclosure Statement.  Almost seven months later on December 21, 2005 the applicant filed another Information Disclosure Statement.  About six weeks later, the applicant filed another Information Disclosure Statement on February 2, 2006.  In the February 2, 2006 Information Disclosure Statement the applicant attempted to rely on 37 C.F.R. § 1.98(d) and did not provide copies of the cited references, indicating instead that copies of the references can be found in Application No. 10/613,443.  A terminal disclaimer was filed in the application on February 10, 2006 by Texas Instruments Incorporated for "semiconductor package with conductor impedance selected during assembly."  On November 6, 2006 the applicant, in a Preliminary Amendment and

Response to Restriction Requirement, cancelled 76 claims and added 39 new claims.   On December 13, 2007, in response to an Office Action, the applicant then proceeded to cancel claims 5 and 32-110 and 176-211, and simultaneously added 6 new claims.   On March 3, 2009, almost one month after the Notice of Allowance, the applicant filed replacement drawings, which were deemed acceptable by the examiner in a communication mailed March 25, 2009.

Under 37 C.F.R. § 1.704(c)(7) the adjustment of the term of the '267 patent must be eliminated in whole or in part.   37 C.F.R. § 1.704(c)(7) requires the PTA be reduced if there is a reply submitted which has an omission by the number of days the applicant takes to correct the omission.   The replacement drawings filed on October 23, 2003 constitute such a reply. The drawings were in response to the Notice to File Missing Parts of NonProvisional Application and did not comply with 37 C.F.R. § 1.84 and 37 C.F.R. § 1.121.   The adjustment of the term of the '267 patent must be eliminated in whole or in part by the time it took to correct the omission, which occurred nearly one month after the Notice of Allowance.

Under 37 C.F.R. § 1.704(c)(8) the adjustment of the term of the '267 patent must be eliminated in whole or in part because the PTO applied an incorrect interpretation of the law under PTO rule 1.704(c)(8).   37 C.F.R. § 1.704(c)(8) requires the time between the filing of unsolicited "other papers" and the filing of an initial reply to be subtracted from the adjustment of the patent term.   The correct interpretation and application of rule 1.704(c)(8) would have reduced the adjustment by hundreds of days because during prosecution of the '267 patent, the PTO issued a "Notice to File Missing Parts of NonProvisional Application" requiring a reply on July 18, 2003. The applicant filed a reply to the Notice on October 23, 2003, but later filed a series of Information Disclosure Statements prior to examination of the claims, including one as late as February 2, 2006.   A proper interpretation and application of rule 1.704(c)(8) requires the adjustment of the

7

term of the '267 patent be eliminated in whole or in part because the Information Disclosure Statements are "other papers" that were filed at extended periods of time after the reply.

Under 37 C.F.R. § 1.704(c)(13) the adjustment of the term of the '267 patent must be eliminated in whole or in part.  37 C.F.R. § 1.704(c)(13) requires that the application be in a condition for examination within eight months of filing.  To be in a condition for examination, the drawings must comply with 37 C.F.R. § 1.84(l).  Sufficient drawings were not filed until March 3, 2009.  This delay eliminates the adjustment of the term of the '267 in whole or in part because the applicant's delay prevented the application from being in a condition for examination within the time period required.

Under 35 U.S.C. § 154(b)(2)(C) and 37 C.F.R. § 1.704(a) the adjustment of the term of the '267 patent must be eliminated in whole or in part.  35 U.S.C. § 154(b)(2)(C) requires that the period of adjustment "shall be reduced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution of the application," and gives the Director authority to "prescribe regulations establishing the circumstances that constitute a failure of an applicant to engage in reasonable efforts to conclude processing or examination of an application."   The circumstances identified in 37 C.F.R. § 1.704(c) do not represent an exhaustive list of circumstances that constitute a failure of the applicant to engage in reasonable efforts to conclude processing or examination of an application, as the PTO recognized in the version of the Manual of Patent Examining Procedure ("MPEP") available in 2009.  The MPEP recognized that "[the] Office may also reduce a period of adjustment . . . on the basis of conduct that interferes with the Office's ability to process or examine an application . . . even if such conduct is not specifically addressed in 37 C.F.R. 1.704(c)."   In addition to the conduct that requires the adjustment be reduced under the three subsections of 37 C.F.R. § 1.704(c) described

above, other actions by the applicant, considered alone or in combination, require the adjustment of the term of the '267 patent be eliminated.

First, the applicant's failure to comply with 37 C.F.R. § 1.98(d) requires the adjustment of the term of the '267 patent be eliminated in whole or in part.  Despite not claiming priority to U.S. Patent Application No. 10/613,443, in the February 2, 2006 Information Disclosure Statement, the applicant attempted to rely on 37 C.F.R. § 1.98(d) to avoid providing copies of prior art that were submitted to or cited in Application No. 10/613,443.  This was improper because 37 C.F.R. § 1.98(d) can only be utilized when the earlier application is relied on for an earlier effective filing date under 35 U.S.C. § 120.  This submission caused or had the potential to cause a delay in the examination of this application and/or other applications, requiring that the adjustment of the term of the '267 patent be eliminated in whole or in part.

Second, the terminal disclaimer on February 10, 2006 submitted for "semiconductor package with conductor impedance selected during assembly" for Texas Instruments is wholly unrelated to the application.  The applicant's submission of this terminal disclaimer, or the applicant's failure to take action to correct the submission, caused or could have caused a delay in the examination of this application and/or other applications, requiring that the adjustment of the term of the '267 patent be eliminated in whole or in part.

Third, the applicant's conduct with regards to the number of claims filed combined with the timing and the number of claims cancelled and added requires the adjustment of the term of the '267 patent be eliminated in whole or in part.  The initial application filed on May 19, 2003 contained 175 claims.  On November 6, 2006 the applicant, in a Preliminary Amendment filed after the examiner already issued a Restriction Requirement, cancelled 76 claims and added 39 new claims.  On December 13, 2007, after the examiner issued an Office Action, the applicant

then proceeded to cancel 116 more claims and simultaneously added 6 new claims.  This conduct

caused or could have caused a delay in the examination of this application and/or other

applications, requiring that the adjustment of the term of the '267 patent be eliminated in whole or

in part.

Fact discovery is ongoing, Abbott has not yet produced all documents that may be relevant

to this defense, and Edwards is still conducting its inquiry into the facts and circumstances at issue

in the present case, and reserves the right to supplement or amend its Response to this Interrogatory

as the case progresses.

|  |  |
|---|---|
|  | */s/ Kelly E. Farnan*_____ |
|  | Jeffrey L. Moyer (#3309) |
|  | Kelly E. Farnan (#4395) |
| OF COUNSEL: | Christine D. Haynes (#4697) |
|  | Richards, Layton & Finger, P.A. |
| Nicholas Groombridge | 920 N. King Street |
| Catherine Nyarady | One Rodney Square |
| Kripa Raman | Wilmington, DE 19801 |
| Kira A. Davis | (302) 651-7700 |
| Michael F. Milea | Moyer@rlf.com |
| Allison C. Penfield | Farnan@rlf.com |
| Ayelet M. Evrony | Haynes@rlf.com |
| Joshua D. Reich |  |
| PAUL, WEISS, RIFKIND, WHARTON | *Attorneys for Defendants Edwards* |
| & GARRISON LLP | *Lifesciences Corp. and Edwards* |
| 1285 Avenue of the Americas | *Lifesciences, LLC* |
| New York, NY 10019 |  |
| (212) 373-3000 |  |

Dated:  August 28, 2019

10

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on August 28, 2019, a true and correct copy of the foregoing was

caused to be served on the following counsel of record as indicated

**<u>BY ELECTRONIC MAIL</u>**
Karen E. Keller
David M. Fry
Nathan R. Hoeschen
Shaw Keller LLP
I.M. PEI Building
1105 North Market Street
12th Floor
Wilmington, DE 19801

**<u>BY ELECTRONIC MAIL</u>**
James F. Hurst
Amanda J. Hollis
Bryan S. Hales
Gregory B. Sanford
Rebecca Fitzpatrick
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

**<u>BY ELECTRONIC MAIL</u>**
Benjamin A. Lasky
Aaron D. Resetarits
Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022

**<u>BY ELECTRONIC MAIL</u>**
Erin C. Johnston
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Farnan@rlf.com

# EXHIBIT 29

# REDACTED IN
# ITS ENTIRETY

# EXHIBIT 30

# REDACTED IN ITS ENTIRETY

# EXHIBIT 31

# APPENDIX B

**APPENDIX B**

**MATERIALS CONSIDERED**

"Abbott Completes Separation of Research-Based Pharmaceuticals Business," Abbott Press Release (Jan. 2, 2013), http://abbott.mediaroom.com/2018-07-12-Abbott-Receives-FDA-Approval-for-Next-Generation-MitraClip-R-Device-to-Treat-People-with-Leaky-Heart-Valves (ABT0002153)

Alfieri et al., "The double-orifice technique in mitral valve repair: A simple solution for complex problems," *J Thorac Cardiovasc Surg*., Vol. 122 No. 4, pp. 674-681 (2001) (ABT0002010)

Attizzani et al., "Extended Use of Percutaneous Edge-to-Edge Mitral Valve Repair Beyond EVEREST (Endovascular Valve Edge-to-Edge Repair) Criteria: 30-Day and 12-Month Clinical and Echocardiographic Outcomes From the GRASP (Getting Reduction of Mitral Insufficiency by Percutaneous Clip Implantation) Registry," *JACC: Cardiovasc Inteven.,* Vol. 8 No. 1, pp. 74-82 (2015) (ABT0002160)

Avenatti et al., "Percutaneous Repair of Severe Eccentric Mitral Regurgitation Due to Medial Commissural Flail: Challenges for Imaging and Intervention," *CASE: Cardiovascular Imaging Case Reports,* Vol. 2 No. 2, pp. 147-154 (2018) (ABT0001180)

Bail and Doebler, "The MitraClip System: A Systematic Review of Indications, Procedural Requirements, and Guidelines," *Thorac Cardiovasc Surg*., Vol. 62 No. 1, pp. 18-25 (2014) (ABT0002026)

Baumgartner et al., "2017 ESC/EACTS Guidelines for the management of valvular heart disease," *Euro Heart J*., Vol. 38 No. 36, pp. 2739-2791 (2017) (ABT0002436)

Business Monitor Online, Abbott Builds Structural Heart Portfolio, Aug. 4, 2015. (ABT0000446)

Capretti, "A complex valve anatomy for Mitraclip: Forme fruste of Barlow's disease with cleft," *Cardiol J*., Vol. 25, No. 3, p. 416 (2018) (ABT1086178)

"COAPT: MitraClip reduces hospitalization, mortality in HF, mitral regurgitation," TCT Meeting News (Sept. 23, 2018), https://www.tctmd.com/news/coapt-mitraclip-reduces-repeat-hospitalizations-mortality-functional-mr-patients-severe-hf (ABT0000407)

Dasi et al., "Fluid Mechanics of Artificial Heart Valves," *Clin Exp Pharmacol Physiol*, Vol. 36 No. 2, pp. 225-237(2009) (ABT0001821)

Estevez-Loureiro et al., "Echocardiographic and Clinical Outcomes of Central Versus Noncentral Percutaneous Edge-to-Edge Repair of Degenerative Mitral Regurgitation," *JACC*, Vol. 61 No. 25, pp. 2370-7 (2013) (ABT1086163).

Fedak et al., "Evolving Concepts and Technologies in Mitral Valve Repair," *Circulation,* Vol. 117, pp. 963-974 (2008) (ABT0001987)

Feldman et al., "Percutaneous Mitral Repair With the MitraClip System: Safety and Midterm Durability in the Initial EVEREST (Endovascular Valve Edge-to-Edge REpair Study) Cohort," *J Am Coll Cardiol*., Vol. 54 No. 8, pp. 686-694 (2009) (ABT0001750)

Feldman et al., "Percutaneous Repair or Surgery for Mitral Regurgitation," *N Engl J Med*., Vol. 364 No. 15, pp. 1395-1406 (2011) (ABT0002129)

Franzen et al., "Acute outcomes of MitraClip therapy for mitral regurgitation in high-surgical-risk-patients: emphasis on adverse valve morphology and severe left ventricular dysfunction," *Euro Heart J*. Vol. 31 No. 11, pp. 1373-1381 (2010) (ABT1086393).

Geis et al., "Percutaneous repair of severe mitral valve regurgitation secondary to chordae rupture in octogenarians using MitraClip," *J Interven Cardiol,* Vol. 31, pp. 76-82 (2018) (ABT0002958).

Goel et al., "Prevalence and Outcomes of Unoperated Patients With Several Symptomatic Mitral Regurgitation and Heart Failure: Comprehensive Analysis to Determine the Potential Role of MitraClip for This Unmet Need," *JACC*. Vol. 62 No. 2, pp. 185-186 (2014) (ABT0005072)

Gössl, M., Farivar, R.S., Bae, R., Sorajja, P. Current status of catheter-based treatment of mitral valve regurgitation, Curr. Cardiol. Rep. 19(5):38, 2017. (ABT0000648)

Iung et al., "Percutaneous repair or medical treatment for secondary mitral regurgitation: Outcomes at 2 years," Euro J of Heart Failure (in press) (2019).

Kalbacher et al., "Long-term outcome, survival and predictors of mortality after MitraClip therapy: Results from the German Transcatheter Mitral Valve Interventions (TRAMI) registry," *Int J Cardiol*. ePub (2018) (ABT0002500).

Kar et al., "Five-year outcomes of transcatheter reduction of significant mitral regurgitation in high-surgical-risk patients," *Heart*. ePub, pp. 1-7, (2018) (ABT0002492).

Kayatta et al., "Mitral valve repair with the MitraClip®," *Interventional Cardiology*, Vol. 6, No. 6, pp. 557-67 (2014). (ABT0000424)

Kheradvar et al, "Emerging Trends in Heart Valve Engineering: Part I. Solutions for Future. *Annals of Biomedical Engineering.* Vol. 43, No. 4, pp. 833-43 (2014) (ABT0001809).

Lamelas et al., "Outcomes of Minimally Invasive Valve Surgery Versus Median Sternotomy in Patients Age 75 Years or Greater," *Annals of Thoracic Surgery*, Vol. 91 No. 1, pp. 79-84 (2011) (ABT0002019).

Lee et al., "Grasping the Pseudo-Cleft in the Case of a Small, Severely Tethered Posterior Mitral Leaflet," *Korean Circ J.,* Vol. 47 No. 4, pp. 536-537 (2017) (ABT1086175).

Lesevic et al., "Long-Term Outcomes After MitraClip Implantation According to the Presence or Absence of EVEREST Inclusion Criteria," Am J Cardiol., Vol. 119 No. 8, pp. 1255-1261 (2017) (ABT0002170).

Maisano et al., "Percutaneous Mitral Valve Interventions in the Real World: Early and 1-Year Results from the ACCESS-EU, A Prospective, Multicenter, Nonrandomized Post-Approval Study of the MitraClip Therapy in Europe," *J Am Coll Cardiol*., Vol. 62 No. 12, pp. 1052-1061 (2013) (ABT0002522).

Mayo Clinic – Mitral Valve Regurgitation, https://www.mayoclinic.org/diseases-conditions/mitral-valve-regurgitation/symptoms-causes/syc-20350178 (ABT0002909)

Mirabel et al., "What are the characteristics of patients with severe, symptomatic mitral regurgitation who are denied surgery?" *Euro Heart J.,* Vol. 28, pp. 1358-1365 (2007) (ABT0000437)

MitraClip CE Label (ABT0003103)

MitraClip Transcatheter Mitral Valve Repair Procedure Animation Video, https://www.abbott.com/corpnewsroom/product-and-innovation/the-mitraclip-story.html

MitraClip U.S. Label (2019)

MitraClip U.S. Label (Oct. 2013) (ABT0002035)

MitraClip® Tutorial with Endoscopic Images from a Beating Swine Heart , https://youtu.be/chzOG32GJhs

Mizote et al., "A Case of Successful MitraClip Implantation in a Patient Having a Large Coaptation Gap under Extracorporeal Membrane Oxygenation (ECMO)," *Catheterization and Cardiovasc Interven.,* Vol. 91, No. 827-830 (2018) (ABT1085771).

Monteagudo Ruiz, J.M., Fernández-Golfín, C., Mesa, D., González-Alujas, T., Sitges, M., Carrasco-Chinchilla, F., Li, C.H., Grande-Trillo, A., Martínez, A., Matabuena, J., Alonso-Rodríguez, D., Aquila, I., Zamorano, J.L. Prevalence of optimal valve morphology for MitraClip in patients with mitral regurgitation. Echocardiography. 34(8):1122-1129, 2017. (ABT0002178)

Ningyan et al., "Killing two birds with one stone – MitraClip for flail P2 and systolic anterior motion of mitral valve: a case report," *Eur Heart J.- Case Reports*,  Vol. 2, pp. 1-5 (2018) (ABT1086180).

Obadia et al., "Percutaneous Repair or Medical Treatment for Secondary Mitral Regurgitation," *New Engl J Med*., ePub, pp. 1-10 (2018) (ABT0001091)Otto and Bonow, Valvular Heart Disease, BRAUNWALD'S HEART DISEASE, 10th Ed. Ch. 64, pp. 1446-1523 (2014) (ABT0001661).

Patzelt, J., et al. First experience with the MitraClip XTR compared to the MitraClip NTR system in a patient with severe mitral regurgitation and complex mitral valve anatomy. Structural Heart. 3(1):79-80 (2019). (ABT1086186).

Perlowski and Feldman,The EVEREST trial results, PERCUTANEOUS MITRAL LEAFLET REPAIR, Ch. 8, pp. 45-53 at 50 (2012) (ABT0000449 at 514).

Schaefer et al., "Simultaneous Double Clipping Delivery Guide Strategy for Treatment of Severe Coaptation Failure in Functional Mitral Regurgitation," *Heart, Lung and Circulation*, Vol. 24, pp. 98-102 (EDW-ABT00328432).

Shah and Jorde, "Percutaneous Mitral Valve Interventions (Repair): Current Indications and Future Perspectives," *Front Cardiovasc Med.,* Vol. 6, Art.88, pp. 1-18 (2019)

Sorajja et al., "Maneuvers for Technical Success with Transcatheter Mitral Valve Repair," *Catheter Cardiovasc Interv*., Vol. 92 No. 3, pp. 617-626 (2017) (ABT0001371)

Sorajja et al., "Transcatheter Therapy for Mitral Regurgitation: Clinical Challenges and Potential Solutions," *Circulation,* Vol. 136, pp. 404-417 (2017) (ABT0005664)

Sorajja, P. et al., Maneuvers for Technical Success with Transcatheter Mitral Valve Repair, Catheterization and Cardiovascular Interventions 92:617-626 (2017).

Sorajja, P., Structural Heart Cases, A Color Atlas of Pearls and Pitfalls, Elsevier, 2019.

Sorajja et al., "Outcomes With Transcatheter Mitral Valve Repair in the United States: An STS/ACC TVT Registry Report," *J Am Coll Cardiol*., Vol. 70 No. 19, pp. 2315-2327 (2017) (ABT0002508).

Stone et al., "Trancatheter Mitral-Valve Repair in Patients with Heart Failure," *N Eng J Med*., ePub, pp. 1-12(2018) (ABT0002533).

TCT 2019 patient video conference and treating doctor presentation.

TCT Website, https://www.tctmd.com/news/tct-2018-day-two-coapt-prompts-round-applause-plus-new-valve-insights (ABT0005052)

Thaden et al., "Mitral Valve Anatomic Predictors of Hemodynamic Success With Transcatheter Mitral Valve Repair," *J Am Heart Assoc.*, Vol. 7, pp. 1-11 (2018) (ABT0095271).

The New York Times, Tiny Device is a 'Huge Advance' for Treatment of Severe Heart Failure, Sept. 23, 2018. (ABT0000396)

van der Bijl et al., "Effect of functional mitral regiurgitation on outcome in patients receiving cardiac resynchronization therapy for heart failure," *Am J Cardiol*., Vol. 123 No. 1, pp. 75-83 (2019). (ABT0005062)

William Suh, MD Twitter Reply Video to Gregg W. Stone MD (Sept. 25, 2018), https://twitter.com/willsuh76/status/1044827546670518273 (ABT0003668).

VideoMitraClip Procedure 3D Animation, https://youtu.be/4-yTP0EaZzg

Whitlow et al., "Acute and 12-Month Results With Catheter-Based Mitral Valve Leaflet Repair: The EVEREST II (Endovascular Valve Edge-to-Edge Repair) High Risk Study," *J Am Coll Cardiol*., Vol. 59 No. 2, pp. 130-139 (2012) (ABT0002142)

# EXHIBIT 32

# APPENDIX B

## Appendix B

## Materials Considered

Abbasi, et al., "Detection and Estimation of the Degree of Mitral Regurgitation by Range-Gated Pulsed Doppler Echocardiography," *Circulation*, Vol. 61, No. 1, pp. 143-147 (1980) (ABT0001980)

Business Monitor Online, "Abbott Builds Structural Heart Portfolio," (Aug. 4, 2015) (ABT0000446)

Abbot Website, "Abbott Receives FDA Approval for Next Generation MitraClip Device to Treat People with Leaky Heart Valves," Abbott Press Release (July 12, 2018), http://abbott.mediaroom.com/2018-07-12-Abbott-Receives-FDA-Approval-for-Next-Generation-MitraClip-R-Device-to-Treat-People-with-Leaky-Heart-Valves (ABT0002157)

Abbott Website, "MitraClip Transcatheter Mitral Valve Repair," https://www.vascular.abbott/us/products/structural-heart/mitraclip-mitral-valve-repair.html (ABT0001743)

ACC CardioSmart Website, "Atrial Fibrillation: Understand Your Condition," https://www.cardiosmart.org/Heart-Conditions/Atrial-Fibrillation/Content/Understanding-AFib (ABT0001232)

ACC CardioSmart Website, "Coronary Artery Disease, Understand Your Condition," https://www.cardiosmart.org/Heart-Conditions/Coronary-Artery-Disease/Understand-Your-Condition (ABT0001241)

ACC CardioSmart Website, "High Blood Pressure: Understand Your Condition," https://www.cardiosmart.org/Heart-Conditions/High-Blood-Pressure/Understand-Your-Condition (ABT0001226)

ACC CardioSmart Website, "How the Heart Works," https://www.cardiosmart.org/Heart-Basics/How-the-Heart-Works (ABT0001220)

ACC CardioSmart Website, "Mitral Valve Regurgitation: Understand Your Condition," https://www.cardiosmart.org/Heart-Conditions/Mitral-Valve-Regurgitation/Understand-Your-Condition. (ABT0001255)

Alfieri, et al., "The Double-Orifice Technique in Mitral Valve Repair: A Simple Solution for Complex Problems," *J. Thorac. Cardiovasc. Surg.*, Vol. 122, No. 4, pp. 674-681 (2001) (ABT0002010)

Armeni et al., "Real-World Cost Effectiveness of MitraClip Combined with Medical Therapy versus Medical Therapy Alone in Patients with Moderate or Severe Mitral Regurgitation," *Int'l. J. Cardiol.*, Vol. 209, pp. 153-160 (2016) (ABT0002546)

Avenatti et al., "3D Vena Contracta Area for the Quantification of Residual Mitral Regurgitation after MitraClip Procedure," *JACC Interven.*, Vol. 71, No. 11, p. A1254 (2018) (ABT0002490)

Avenatti et al., "Percutanous Repair for Recurrent Mitral Regurgitation after Surgical Repair: A MitraClip Experience," *Structural Heart*, Vol. 2, No. 2, pp. 147-154 (2018) (ABT0001170)

Avenatti et al, "Percutaneous Repair of Severe Eccentric Mitral Regurgitation Due to Medial Commissural Flail: Challenges for Imaging and Intervention," *CASE: Cardiovascular Imaging Case Reports*, Vol. 2, No. 2, pp. 147-154 (2018) (ABT0001180)

Avenatti et al., "Tricuspid Regurgitation Repair with a MitraClip Device: The Pivotal Role of 3D Transoesophageal Echocardiography," *Eur. Heart J.*, Vol. 18, No. 3, p. 380 (2017) (ABT0001164)

Attizzani et al. "Extended Use of Percutaneous Edge-to-Edge Mitral Valve Repair Beyond EVEREST (Endovascular Valve Edge-to-Edge Repair) Criteria: 30-Day and 12-Month Clinical and Echocardiographic Outcomes from the GRASP (Getting Reduction of Mitral Insufficiency by Percutaneous Clip Implantation) Registry," *JACC: Cardiovasc Inteven.*, Vol. 8, No. 1, pp. 74-82 (2015) (ABT0002160)

Bail et al., "The MitraClip System: A Systematic Review of Indications, Procedural Requirements, and Guidelines," *J. Thorac Cardiovasc. Surg.*, Vol. 62, No. 1, pp. 18-25 (2014) (ABT0002026)

Baumgartner et al., "2017 ESC/EACTS Guidelines for the Management of Valvular Heart Disease," *Eur. Heart J.*, Vol. 38, No. 36, pp. 2739-2791 (2017) (ABT0002436)

Capretti et al., "A Complex Valve Anatomy for Mitraclip: Forme Fruste of Barlow's Disease with Cleft," *Cardiol J.*, Vol. 25, No. 3, p. 416 (2018) (ABT1086178)

Castillo et al., "Surgical Echocardiography of the Mitral Valve," *Rev. Esp, Cardiol.*, Vol. 64, No. 12, pp. 1169-1181 (2011) (ABT0001330)

Castillo et al., "Degenerative Mitral Valve Disease," *in Hurst's The Heart* (2017) (ABT0001404)

Cohn et al., "Evolution of the Concept and Practice of Mitral Valve Repair," *Annals Cardiothorac. Surg.*, Vol. 4, No. 4, pp. 315-321 (2015) (ABT0001801)

Dasi et al., "Fluid Mechanics of Artificial Heart Valves," *Clin. Exp. Pharmacol. Physiol.*, Vol. 36, No. 2, pp. 225-237 (2009) (ABT0001821)

Estevez-Loureiro et al., "Echocardiographic and Clinical Outcomes of Central versus Noncentral Percutaneous Edge-to-Edge Repair of Degenerative Mitral Regurgitation." *JACC*, Vol. 61, No. 25, pp. 2370-77 (2013) (ABT1086163)

Feldman et al., "Percutaneous Mitral Repair with the MitraClip System: Safety and Midterm Durability in the Initial EVEREST (Endovascular Valve Edge-to-Edge Repair Study) Cohort," *J. Am. Coll. Cardiol.*, Vol. 54, No. 8, pp. 686-694 (2009) (ABT0001750)

Fedak et al., "Evolving Concepts and Technologies in Mitral Valve Repair," Circulation, Vol. 117, pp. 963-974 (2008) (ABT0001987)

Feldman et al., "Percutaneous Mitral Valve Repair Using the Edge to Edge Technique: Six Month Results of the EVEREST Phase 1 Clinical Trial," *J. Am. Coll. Cardiol.*, Vol. 46, No. 11, pp. 2134-2140 (2005) (ABT0002121)

Feldman et al., "Percutaneous Repair or Surgery for Mitral Valve Regurgitation," *N. Eng. J. Med.*, Vol. 364, pp. 1395-1406 (2011) (ABT0002129)

Franzen et al., "Acute Outcomes of MitraClip Therapy for Mitral Regurgitation in High-Surgical-Risk-Patients: Emphasis on Adverse Valve Morphology and Severe Left Ventricular Dysfunction," *Eur. Heart J.*, Vol. 31, No. 11, pp. 1373-81 (2010) (ABT1086393)

Geis et al., "Percutaneous Repair of Severe Mitral Valve Regurgitation Secondary to Chordae Rupture in Octogenarians Using Mitraclip," *J. Interven. Cardiol.*, Vol. 31, pp. 76-82 (2018) (ABT0002958)

Gössl et al., "Current Status of Catheter-Based Treatment of Mitral Valve Regurgitation," *Curr. Cardiol. Rep.*, Vol. 19, No. 5, p. 38 (2017) (ABT0000648)

Harrington et al., "A History of the Cardiac Diseases, and the Development of Cardiovascular Medicine as A Specialty," in *Hurst's The Heart* (2017) (ABT0001760)

Heart.org Website, "Classes of Heart Failure," https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure

Iung et al., "A Prospective Survey of Patients with Valvular Heart Disease in Europe: The Euro Heart Survey on Valvular Heart Disease," *Eur. Heart J.*, Vol. 24, No. 13, pp. 1231-1243 (2003) (ABT0001390)

Iung & Vahanian, "Epidemiology of Valvular Heart Disease in the Adult," *Nature Rev. Cardiology*, Vol. 8, pp. 162-172 (2011) (ABT0001344)

Iung et al., "Percutaneous repair or medical treatment for secondary mitral regurgitation: Outcomes at 2 years," Euro J of Heart Failure (in press) (2019)

Kalbacher et al., "Long-Term Outcome, Survival and Predictors of Mortality after MitraClip Therapy: Results from the German Transcatheter Mitral Valve Interventions (TRAMI) Registry," *Int'l. J. Cardiol.* (2018) (ABT0002500)

Kar et al., "Five-Year Outcomes of Transcatheter Reduction of Significant Mitral Regurgitation in High-Surgical-Risk Patients," *Heart*, pp. 1-7 (2018) (ABT0002492)

Kheradvar et al., "Emerging Trends in Heart Valve Engineering: Part I. Solutions for Future," Annals Biomed. Engineering," Vol. 43, No. 4, pp. 833-843 (2014) (ABT0001809)

Kheradvar et al., "Emerging Trends in Heart Valve Engineering: Part III. Novel Technologies for Mitral Valve Repair and Replacement," *Annals Biomed. Engineering*, Vol. 43, No. 4, pp. 833-843 (2014) (ABT0001185)

Kolata, "Tiny Device is a 'Huge Advance' for Treatment of Severe Heart Failure," N.Y. Times (Sept. 23, 2018) (ABT0000396)

Lamelas et al., "Outcomes of Minimally-Invasive Valve Surgery versus Median Sternotomy in Patients Age 75 Years or Greater," *Annals Thorac. Surg.*, Vol. 91, No. 1, pp. 79-84 (2011) (ABT0002019)

Lee et al., "Grasping the Pseudo-Cleft in the Case of a Small, Severely Tethered Posterior Mitral Leaflet," *Korean Circ. J.*, Vol. 47, No. 4, pp. 536-537 (2017) (ABT1086175)

Lesevic et al., "Long-Term Outcomes after MitraClip Implantation According to the Presence or Absence of EVEREST Inclusion Criteria," *Am. J. Cardiol.*, Vol. 119, No. 8, pp. 1255-1261 (2017) (ABT0002170)

Little et al., "3D Printed Modeling for Patient-Specific Mitral Valve Intervention: Repair with a Clip and a Plug,".*JCC: Cardiovas. Interven.*, Vol. 9, No. 9, pp. 973-975 (2016) (ABT0001166)

Little, "DMR: EVEREST II Was A Decade Ago; Have Mitraclip Techniques and Outcomes Improved?," *TCT Presentation* (Sept. 26, 2019), https://www.tctmd.com/slide/dmr-everest-ii-was-decade-ago-have-mitraclip-techniques-and-outcomes-improved

Maisano et al., "Percutaneous Mitral Valve Interventions in the Real World: Early and 1-Year Results from the ACCESS-EU, A Prospective, Multicenter, Nonrandomized Post-Approval Study of the MitraClip Therapy in Europe," *J. Am. Coll. Cardiol.*, Vol. 62, No. 12, pp. 1052-1061 (2013) (ABT0002522)

Maisano et al., "The Evolution from Surgery to Percutaneous Mitral Valve Interventions," *J. Am. Coll. Cardiol.*, Vol. 58, No. 21, pp. 2174-2182 (2011) (ABT0002000)

Malouf et al., "Functional Anatomy of the Heart," in *Hurst's The Heart* (2017) (ABT0001592)

Marwick et al., "Echocardiography," in *Hurst's The Heart* (2017) (ABT0001843)

Mirabel et al., "What Are the Characteristics of Patients with Severe, Symptomatic, Mitral Regurgitation Who Are Denied Surgery?," *Eur. Heart J.*, Vol. 28, No. 11, pp. 1358-1365 (2007) (ABT0000437)

MitraClip CE Label (ABT0002196)

MitraClip U.S. Label (2019)

MitraClip Website, "About Mitral Regurgitation," http://mitraclip.com/about_mitral_regurgitation (ABT0001249)

Mizote et al., "A Case of Successful MitraClip Implantation in A Patient Having A Large Coaptation Gap Under Extracorporeal Membrane Oxygenation (ECMO)," *Catheterization & Cardiovasc. Interven.*, Vol. 91, pp. 827-830 (2018) (ABT1085771)

Monteagudo et al., "Prevalence of Optimal Valve Morphology for MitraClip in Patients with Mitral Regurgitation," *Echocardiography*, Vol. 34, No. 8, pp. 1122-1129 (2017) (ABT0002178)

Mount Sinai Hospital Website, "Papillary Muscles and the Left Venticle," https://www.mitralvalverepair.org/papillary-muscles-and-left-ventricle (ABT0001657)

Ningyan et al., "Killing Two Birds with One Stone—Mitraclip for Flail P2 and Systolic Anterior Motion of Mitral Valve: A Case Report," *Eur. Heart J.*, Vol. 2, pp. 1-5 (2018) (ABT1086180)

Nishimura et al., "ACC/AHA Guidelines on Valvular Heart Disease," *J. Thorac. Cardiovasc. Surg.*, Vol. 148, No. 1, pp. e1-132 (2014) (ABT0001441)

Nkomo et al., "Burden of Valvular Heart Diseases: A Population Based Study," *Lancet*, Vol. 368, pp. 1005-1011 (2006) (ABT0001382)

Nyman et al., "Transcatheter Mitral Valve Repair Using the Edge-to-Edge Clip," *J. Am. Soc. Echocard.*, Vol. 31, No. 4, pp. 434-453 (2018) (ABT0001199)

Obadia et al., "Percutaneous Repair or Medical Treatment for Secondary Mitral Regurgitation," *N. Eng. J Med.* Vol. 379, pp. 2297-2306 (2018) (ABT0001091)

Perlowski et al., "The EVEREST Trial Results," *in Percutaneous Mitral Leaflet Repair*, Feldman & St. Goar, (eds.) (2012) (ABT0000449)

Otto et al., "Valvular Heart Disease," in *Braunwald's Heart Disease* (2015) (ABT0001661)

O'Gara et al., "The Role of Imaging in Chronic Degenerative Mitral Regurgitation," *JACC: Cardiovasc. Img.*, Vol. 1, No. 2, pp. 221-237 (2008) (ABT0001574)

Patzelt et al., "First Experience with the MitraClip XTR Compared to the MitraClip NTR System in a Patient with Severe Mitral Regurgitation and Complex Mitral Valve Anatomy," *Structural Heart*, Vol. 3, No. 1, pp. 79-80 (2019) (ABT1086186)

Perlowski et al., "The EVEREST Trial Results," in *Percutaneous Mitral Leaflet Repair*, Feldman & St. Goar (eds.) (2012) (ABT0000449)

Schaefer et al., "Simultaneous Double Clipping Delivery Guide Strategy for Treatment of Severe Coaptation Failure in Functional Mitral Regurgitation," *Heart, Lung & Circulation*, Vol. 24, pp. 98-102 (2015) (EDW-ABT00328432)

Shah et al., "Percutaneous Mitral Valve Interventions (Repair): Current Indications and Future Perspectives," *Front Cardiovasc. Med.*," Vol. 6, p. 88 (2019)

Sorajja et al., "Maneuvers for Technical Success with Transcatheter Mitral Valve Repair," *Catheter Cardiovasc. Interven.*, Vol. 92, No. 3, pp. 617-626 (2017) (ABT0001371)

Sorajja et al., "Outcomes with Transcatheter Mitral Valve Repair in the United States: An STS/ACC TVT Registry Report," *JACC*, Vol. 70, No. 19, pp. 2315-2327 (2017) (ABT0002508)

Sorajja, "Structural Heart Cases: A Color Atlas of Pearls and Pitfalls," *Elsevier* (2019) (ABT1085709)

Sorajja et al., "Transcatheter Therapy for Mitral Regurgitation: Clinical Challenges and Potential Solutions," *Circulation*, Vol. 136, No. 4, pp. 404-417 (2017) (ABT0001356)

Stone et al., "Clinical Trial Design Principles and Endpoint Definitions for Transcatheter Mitral Valve Repair and Replacement: Part 1: Clinical Trial Design Principles," *JACC*. Vol. 66, No. 3, pp. 278-307 (2015) (ABT0002090)

Stone et al., "COAPT: Mitraclip Reduces Hospitalization, Mortality in HF, Mitral Regurgitation," COAPT TCT Conference News (Sept. 23, 2018), https://www.tctmd.com/news/coapt-mitraclip-reduces-repeat-hospitalizations-mortality-functional-mr-patients-severe-hf (ABT0000407)

Stone et al., "Transcatheter Mitral-Valve Repair in Patients with Heart Failure," *N. Eng. J Med.*, Vol. 379, pp. 2307-2318 (2018) (ABT0002533)

Suh (@willsuh76), Twitter Video, https://twitter.com/willsuh76/status/1044827546670518273 (ABT0003667)

Thaden et al., "Mitral Valve Anatomic Predictors of Hemodynamic Success with Transcatheter Mitral Valve Repair," *J. Am. Heart Assoc.*, Vol. 7, pp. 1-11 (2018) (ABT0095271)

"Transcatheter Mitral Valve Repair (TMVR)–National Coverage Determination (NCD)," Dept. of Health & Hum. Servs. (Apr. 26, 2015) (ABT0002187)

Whitlow et al., "Acute and 12-Month Results with Catheter-Based Mitral Valve Leaflet Repair: The EVEREST II (Endovascular Valve Edge-to-Edge Repair) High Risk Study," *J. Am. Coll. Cardiol.*, Vol. 59, No. 2, pp. 130-139 (2012) (ABT0002142)

Wood, "TCT 2018, Day 2: COAPT Prompts Round of Applause, Plus New Valve Insight," TCT Website (Sept. 23, 2018), https://www.tctmd.com/news/tct-2018-day-two-coapt-prompts-round-applause-plus-new-valve-insights (ABT0005052)

YouTube Video, "MitraClip Procedural Porcine Demonstration," https://youtu.be/chzOG32GJhs

YouTube Video, "MitraClip Procedure – Nebraska Medicine," https://youtu.be/4-yTP0EaZzg

Zoghbi et al., "ASE Guidelines for Quantification of Native Valve Regurgitation," *J. Am. Soc. Echocard.*, Vol. 30, No. 4, pp. 303-371 (2017) (ABT0001260)

# EXHIBIT 33

# REDACTED IN ITS ENTIRETY

# EXHIBIT 34

# REDACTED IN ITS ENTIRETY

# EXHIBIT 35



July 12, 2018

**By Certified Mail – Return Receipt Requested**

Stephanie Philbin
Goodwin Proctor LLP
901 New York Avenue, N.W.
Washington, DC 20001

**Re: Citizen Petition for Due Diligence Determination of Patent Term Extension for
MITRACLIP CDS; Docket Nos. FDA-2014-E-2358; FDA-2014-E-2359**

Dear Ms. Philbin:

This letter responds to your due diligence petition (hereafter Petition), dated April 20, 2018.
Your Petition requests that the Food and Drug Administration (FDA or the Agency) determine
that Abbott Vascular, Inc. (Abbott or the applicant), the applicant for a patent term extension for
the MITRACLIP Clip Delivery System (MITRACLIP CDS) device, is not entitled to the entire
requested period of patent term extension because Abbott did not act with due diligence during
the regulatory review period.[1]

As the Chief Scientist, I am authorized to perform all delegable functions of the Commissioner
of Food and Drugs.[2] I have reviewed your Petition and the attached exhibits, Abbott's response
to the Petition, and the applicable statutory provisions and regulations. For the reasons set forth
below, I find that the Petition fails to contain information or allegations upon which it may
reasonably be determined that Abbott did not act with due diligence during the regulatory review
period. In addition, the Petition was not filed in accordance with 21 CFR 60.30(d). For these
reasons, I deny the Petition without considering the merits of the Petition.[3]

---

[1] MITRACLIP CDS was initially manufactured by Evalve, Inc. Abbott acquired Evalve, Inc. in September 2009.
(Petition Exh. 4, (FDA Executive Summary prepared for the March 20, 2013 meeting of the Circulatory System
Devices Panel (hereafter FDA Executive Summary) at 8)). This letter refers to Abbott Vascular, Inc.; Abbott
Cardiovascular Systems, Inc.; and Evalve, Inc. collectively as Abbott.
[2] FDA Staff Manual Guide 1410.21 ¶ 1.B.7.
[3] 21 CFR 60.34(b).

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

I.  Background

    A.  MITRACLIP CDS

MITRACLIP CDS:

> is indicated for the percutaneous reduction of significant symptomatic mitral regurgitation (MR ≥ 3+) due to primary abnormality of the mitral apparatus (degenerative MR) in patients who have been determined to be at prohibitive risk for mitral valve surgery by a heart team, which includes a cardiac surgeon experienced in mitral valve surgery and a cardiologist experienced in mitral valve disease, and in whom existing comorbidities would not preclude the expected benefit from reduction of the mitral regurgitation.  * * * [MITRACLIP CDS] consists of three major components: 1) the Delivery Catheter[,] 2) the Steerable Sleeve, and 3) the MitraClip Device ** * [MITRACLIP CDS] is used to advance and manipulate the implantable MitraClip Device for proper positioning and placement on the mitral valve leaflets. . . .[It] grasps and coapts the mitral valve leaflets[,] resulting in fixed approximation of the mitral leaflets throughout the cardiac cycle.[4]

On April 16, 2003, an investigational device exemption (IDE) under section 520(g) of the Federal Food, Drug, and Cosmetic Act (FDCA) for MITRACLIP CDS became effective.[5]  The following clinical studies were conducted in the United States prior to FDA approval of MITRACLIP CDS:

- EVEREST I – a feasibility study that enrolled subjects between 2003 and 2006;
- EVEREST II RCT – a randomized, controlled trial that enrolled subjects between 2005 and 2008 and which was a pivotal study to compare MITRACLIP CDS to the standard of care mitral valve repair or replacement surgery;
- EVEREST II High Risk Registry (HRR) Study – a single arm registry that enrolled subjects between 2007 and 2008;
- REALISM High Risk (HR) – a continued access registry with enrollment between 2009 and 2013; and
- REALISM Non-High Risk – a continued access registry with enrollment between 2009 and 2011.[6]

Abbott submitted the premarket approval application (PMA) for MITRACLIP CDS on March 4, 2010, and FDA approved it on October 24, 2013.[7]

---

[4] Petition Exh. 3 (FDA Summary of Safety and Effectiveness Data (SSED) at 1-2).
[5] 82 Fed. Reg. 49027, 49029 (Oct. 23, 2017).
[6] Petition Exh. 3 (SSED at 14); Petition Exh. 4 (FDA Executive Summary at 8).
[7] 82 Fed. Reg. at 49029.

EDW-ABT00733441

## B. Drug Price Competition and Patent Term Restoration Act of 1984

The Drug Price Competition and Patent Term Restoration Act of 1984 (Public Law 98-417) and the Generic Animal Drug and Patent Term Restoration Act (Public Law 100-670) generally provide that a patent may be extended for a period of up to five years so long as the permission for commercial marketing is the first permitted commercial marketing or use of the product and the patented item (medical device, human drug product, animal drug product, food additive, or color additive) was subject to regulatory review by FDA before the item was marketed. Under 35 U.S.C. 156(c), a product's regulatory review period forms the basis for determining the amount of extension an applicant may receive.

A regulatory review period is the sum of two periods of time: a testing phase and an approval phase. For medical devices for which an IDE is required, the testing phase begins on the effective date of the IDE and ends on the date that an applicant initially submits a PMA.[8] The approval phase, as relevant to this matter, begins on the initial submission date for the PMA and ends upon approval.[9] The United States Patent and Trademark Office (USPTO) applies several statutory limitations in its calculations of the actual period for patent term extension. Among other limitations, the maximum length of a patent term extension is calculated based upon the sum of the length of the approval phase and one-half the length of the testing phase.[10] A maximum of five years can be added to a patent term.[11] In all cases, the total patent life for the product with the patent term extension cannot exceed fourteen years from the product's approval date. If the patent life of the product after approval has fourteen or more years, the product would not be eligible for patent term extension.[12]

## C. MITRACLIP CDS Patent Term Extension History

The USPTO received patent term restoration applications for MITRACLIP CDS on behalf of Abbott (U.S. Patent No. 7,288,097) (the '097 patent) and on behalf of The Trustees of Columbia University in the City of New York (U.S. Patent No. 7,464,712) (the '712 patent).[13] In response to the USPTO's request for FDA's assistance in determining the patent's eligibility for patent term restoration, FDA informed the USPTO that MITRACLIP CDS had undergone a regulatory review period and represented the first permitted commercial marketing or use of the product.[14] In response to the USPTO's request that FDA determine the product's regulatory review period, on October 23, 2017, FDA published a Federal Register notice setting forth the dates on which it based its determination and determined that the regulatory review period for MITRACLIP CDS is 3,846 days.[15] FDA found that, of this time, 2,515 days occurred during the testing phase of the regulatory review period, while 1,331 days occurred during the approval phase. FDA's Federal

---

[8] *See* 35 U.S.C. 156(g)(3)(B)(i); 21 CFR 60.22(c)(1)(i).
[9] *See* 35 U.S.C. 156(g)(3)(B)(ii); 21 CFR 60.22(c)(2)(i).
[10] 35 U.S.C. 156(c)(2).
[11] 35 U.S.C. 156(g)(6).
[12] 35 U.S.C. 156(c)(3).
[13] 82 Fed. Reg. at 49028-29.
[14] *Id.* at 49029.
[15] *Id.*

EDW-ABT00733442

Register notice established the deadline for submitting a due diligence petition as April 23, 2018.[16]

II. Discussion

    A. Legal Requirements for a Due Diligence Petition

A person may file with FDA a due diligence petition claiming that an applicant for patent term extension did not act with due diligence in seeking FDA approval of the product during some part of the regulatory review period. FDA regulations establish the filing, formatting, and content requirements for due diligence petitions. Among other requirements, due diligence petitions must include sufficient facts to merit an investigation by FDA of whether the applicant acted with due diligence during the regulatory review period and a certification that the petitioner provided a true and complete copy of the petition to the applicant by certified or registered mail (return receipt requested) or by personal delivery.[17] If the petition fails to comply with these requirements, FDA may deny the petition without considering the merits.[18] FDA may also deny the petition without considering the merits if the "petition fails to contain information or allegations upon which it may reasonably be determined that the applicant did not act with due diligence during the applicable regulatory review period."[19]

The due diligence standard is "that degree of attention, continuous directed effort, and timeliness as may reasonably be expected from, and are ordinarily exercised by, a person during a regulatory review period."[20] FDA examines the facts and circumstances of the applicant's actions during the regulatory review period to determine whether the applicant acted with due diligence.[21] FDA will consider all relevant factors, such as the amount of time between the approval of an investigational exemption and the commencement of a clinical investigation and the amount of time required to conduct a clinical investigation.[22]

The legislative history of the Drug Price Competition and Patent Term Restoration Act of 1984 notes that the petitioner need not show conclusively that there was a lack of due diligence. Rather, the petitioner need only allege sufficient facts to merit an investigation.[23] As an example, the legislative history notes that it would be sufficient for the petitioner to allege that human clinical trials did not begin for an unreasonably long period of time after FDA granted permission to begin those trials or that the trials took an unreasonably long period of time.[24] In those events, FDA would determine whether the delay was caused by the applicant's lack of due diligence.[25]

---

[16] *Id.* at 49028-29.
[17] 21 CFR 60.30(c)-(d).
[18] 21 CFR 60.34(b)(1), (b)(4).
[19] 21 CFR 60.34(b)(4).
[20] 35 U.S.C. 156(d)(3); 21 CFR 60.36(a).
[21] 21 CFR 60.36(a).
[22] *Id.*
[23] H. Rept. 857, 98th Cong., 2d Sess. Part 1 at 42 (June 21, 1984) (attached as Petition Exh. I).
[24] *Id.*
[25] *Id.*

4

EDW-ABT00733443

Further, "[t]he Committee established a system for review of due diligence that requires the minimal amount of federal agency personnel time."[26] The goal is to ensure that "obvious delays," such as an extended period of time during which clinical trials are not being conducted, are not counted toward patent term extension.[27] Due diligence petitions are not intended to cause a review of every action, but to identify significant periods when the loss of patent term resulted "solely from the applicant's failure to pursue approval."[28] Delays resulting from events that may reasonably be expected to occur, such as the temporary unavailability of testing facilities or a scientific dispute as to the tests required for approval or the interpretation of such tests, would not be the basis for finding a lack of due diligence.[29]

The standard of due diligence as set forth in FDA's regulations incorporates the statutory definition of "that degree of attention, continuous directed effort, and timeliness as may reasonably be expected from, and are ordinarily exercised by, a person during the regulatory review period."[30] The regulations further explain that "FDA will take into consideration all relevant factors, such as the amount of time between the approval of an investigational exemption or research permit and the commencement of a clinical investigation and the amount of time required to conduct a clinical investigation."[31] In the preamble to the proposed rule, FDA noted that, in giving FDA the responsibility for reviewing due diligence petitions, Congress recognized FDA's expertise in approving FDA-regulated products.[32] FDA explained that, for this reason, FDA would examine an applicant's actions in light of FDA's experiences with similar situations and products.[33] FDA set forth a non-exhaustive list of eight factors that may be considered in reviewing due diligence petitions.[34] FDA noted that certain of the factors were consistent with the types of events that the legislative history indicated would not constitute a lack of due diligence.[35]

When FDA issued the final rule, in response to comments, FDA removed the non-exhaustive list of relevant factors and instead codified language to replace the list with general criteria from the legislative history.[36] FDA noted that the proposed list was not intended to be exhaustive but rather was intended to provide potential petitioners with an idea of the types of events FDA would consider in reviewing due diligence petitions.[37] FDA emphasized that the listed events were consistent with the legislative history.[38] FDA replaced the list of relevant factors with "general criteria taken from the legislative history."[39] FDA cited one example from the

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] 21 CFR 60.36(a).
[31] *Id.*
[32] 51 Fed. Reg. 25338, 25342 (July 11, 1986).
[33] *Id.*
[34] *Id.* at 25342-43, 25347.
[35] *Id.* at 25343.
[36] 53 Fed. Reg. 7298, 7304 (Mar. 7, 1988).
[37] *Id.*
[38] *Id.*
[39] *Id.*

5

EDW-ABT00733444

legislative history and revised 21 CFR 60.36(a) to state that "FDA will take into consideration all relevant factors, such as the amount of time between the approval of an investigational exemption or research permit and the commencement of a clinical investigation and the amount of time required to conduct a clinical investigation."[40]  Because the regulatory standard in § 60.36(a) was intended to be consistent with types of events set forth in the legislative history, FDA considers the factors discussed in the legislative history in its review of due diligence petitions.

  B. The Petition

    1. Claims of Alleged Failure to Act with Due Diligence

In your Petition, you cite multiple periods of time during which you allege that Abbott failed to act with due diligence.  You note the period of time from April 2003 until October 2013, during which MITRACLIP CDS was in clinical development and under review by FDA.[41]  You also emphasize that the PMA was under review from March 2010 until October 2013.[42]  You additionally point to the following dates or periods of time when Abbott notified FDA of and investigated events such as field actions: August 31, 2009; April 21, 2011 until October 7, 2011; December 1, 2011 until February 2012; October 5, 2012; and February 2013.[43]

The Petition also raises Abbott's requests for extensions of time during the regulatory review period on the following dates: November 8, 2007; March 13, 2009; April 5, 2012; and July 15, 2013.[44]  The Petition further maintains that Abbott repeatedly requested extensions of time to file annual reports, including on April 14, 2008 and May 15, 2008, on which Abbott requested two 30-day extensions.[45]  You note that Abbott submitted additional requests for extensions of time to file annual reports on March 26, 2009; April 5, 2010; February 20, 2013; and April 22, 2013.[46]

    2. Certification

Your Petition contains a statement that the Petition had been served upon Abbott by Federal Express.[47]  However, the Petition did not include a certification that you provided a true and complete copy of the Petition to the applicant by certified or registered mail (return receipt requested) or by personal delivery, as required by 21 C.F.R. 60.30(d).

---

[40] *Id.* at 7308.
[41] Petition at 3.
[42] *Id.*
[43] *Id.* at 3-5.
[44] *Id.* at 6.
[45] *Id.* at 6-7.
[46] *Id.* at 7.
[47] *Id.* at 9.

EDW-ABT00733445

### C. Analysis

#### 1. Claims of Alleged Failure to Act with Due Diligence

##### a. The Length of the Regulatory Review Period

You note that the entire regulatory review period for the MITRACLIP CDS device was over ten years, from the date the IDE became effective on April 16, 2003 until the date the PMA was approved on October 24, 2013.[48]  In addition, the Petition asserts that period of PMA review, which began on March 4, 2010, and ended October 24, 2013, resulted from Abbott's lack of due diligence in considering FDA's feedback in designing and implementing its clinical trials.[49]  You argue that for a device to be in testing and under regulatory review for such a long period raises the question whether Abbott exercised due diligence.[50]  You also argue that "[f]or a PMA to be pending before FDA for over three years suggests that there were significant issues with the application."[51]

As applicable here, FDA's regulations define the regulatory review period as consisting of the sum of the lengths of the testing phase and the approval phase, with the testing phase for a device beginning on the date on which an IDE is submitted.[52]  FDA's regulation on due diligence petitions states that FDA will examine the facts and circumstances of the applicant's actions "during the regulatory review period."[53]  Nonetheless, as the Petition concedes, days prior to the issuance of the patent are excluded from the amount of patent term extension the USPTO may award.  Any determination regarding due diligence for the time period preceding the issuance of the patent would not change the length of the patent term extension and thus is irrelevant.  For this reason, the Petition focuses on the portion of the regulatory review period that falls after the date of issuance of each patent (October 30, 2007 for the '097 patent and December 16, 2008 for the '712 patent).[54]  Because the timeframe prior to the issuance of the patent is excluded from the amount of patent term extension that the USPTO may award, FDA need not address the overall length of the entire regulatory review period.

Assuming *arguendo* that FDA must consider the full length of the regulatory review period, I find that neither the overall length of the regulatory review period nor the length of the approval phase provide a basis upon which it may reasonably be determined that the applicant did not act with due diligence.  The record for this matter reflects that both of these periods are consistent with the lengths of the regulatory review period and the approval phase for numerous other devices.[55]  Moreover, in considering both the length of the regulatory review period and the length of the approval phase in light of FDA's expertise in reviewing and approving FDA-regulated products, I am mindful that MITRACLIP CDS is a first-in-class device representing a

---

[48] *Id.* at 3.
[49] *Id.* at 5-6.
[50] *Id.*
[51] *Id.* at 3.
[52] 21 CFR 60.22(c).
[53] 21 CFR 60.36(a).
[54] 37 CFR 1.777(d)(1); Petition at 2-3, 7.
[55] Abbott Response at 6-7, fns. 23-24 (citing FDA regulatory review period determinations).

EDW-ABT00733446

breakthrough technology and providing a clinically meaningful advantage over existing technology.[56]  I also note that, during the course of the regulatory review period, Abbott conducted five clinical trials, beginning with the 2003 feasibility study, and worked with FDA on the design, and received conditional approval, of the COAPT trial.[57]  I also consider other activities Abbott undertook during the regulatory review period, as described in more detail in the following sections.  Considering the nature of the device at issue here and the activities of Abbott during the regulatory review period, I conclude that the petition has not made allegations sufficient to warrant an investigation of the entire regulatory review period or the approval phase of the regulatory review period.

I address below the specific allegations of delay that occurred after the issuance of the patent, including the length of the PMA review period.

<center>b.   Field Actions and Modifications to MITRACLIP CDS</center>

Relying on various public sources and several exhibits submitted in support of your petition, you contend that certain field actions and modifications to MITRACLIP CDS may have delayed the review of the PMA and reflect a lack of due diligence in the design of the device.

The Petition cites an August 31, 2009 notification of a device removal and questions whether the removal slowed the clinical trial process.[58]  The Petition further describes a field action that covers the period from April 21, 2011 until October 7, 2011, during which Abbott notified FDA of three incidents of radiopaque ring detachment from the Delivery Catheter system, investigated the incidents, and modified the device.[59]  You maintain that the field action prompted questions from FDA and resulted in Abbott's voluntarily suspending enrollment in the REALISM continued access registry until October 7, 2011 and voluntarily recalling the device.[60]  You question whether the field action and suspension of clinical testing resulted from a lack of due diligence in manufacturing or quality.[61]  You note that there was a period of over five months during which Abbott was not conducting clinical trials and argue that Congress did not intend prolonged periods during which human clinical trials are not being conducted to be counted in the period of patent term extension.[62]

The Petition also cites a December 1, 2011 field action.[63]  Relying on Abbott's own "Urgent Field Safety Notice/Advisory Notice," you note that, in this instance, Abbott issued a field safety notice after two reported incidents related to the inability to remove the gripper line, a

---

[56] Petition Exh. 3 (SSED at 1); Abbott Response to Petition at 7, 11.
[57] Petition Exh. 3 (SSED at 14); Exh. 4 (FDA Executive Summary at 9).
[58] Petition at 5.  Abbott began marketing MITRACLIPS CDS in Europe in 2008.  (Petition Exh. 3 (SSED at 4)).
[59] Petition at 3-4.
[60] *Id*. at 3-4; *see also* Exh. 4 (FDA Executive Summary at 8); Exh. 5 (Abbott, "Urgent Field Safety Notice/Device Recall" (April 2011)); Exh. 6 (Hughes, S. "Mitraclip Recalled Due to Problems With Delivery System," Heartwire (May 9, 2011)).
[61] Petition at 4.
[62] *Id*.
[63] *Id*.

<center>8</center>

component of the Delivery Catheter.[64]  You note that Abbott updated the instructions for use, and in February 2012, Abbott notified FDA of a modification to the gripper.[65]

The Petition points to a February 27, 2013 field safety notice for four reports of the actuator knob of the clip delivery system being incorrectly turned during clip deployment and thus preventing deployment of the clip and require additional medical intervention or conversion to surgery.[66] The petition notes that the field safety notice emphasized the section of the instructions for use stating that the actuator knob should be turned in a counterclockwise direction.[67]  You observe that Abbott added a directional arrow to the actuator knob of newly-manufactured devices but that the field safety notice emphasized that current inventory was safe for use.[68]

Finally, the Petition states that Abbott notified FDA of another field action on October 5, 2012, and of a field safety notice in March 2013 but that the reasons for these field actions are unclear.[69]

You argue, in essence, that the foregoing field actions triggered modifications to the device, raised questions for FDA, and thus delayed the PMA review process. You contend that the field actions suggest that Abbott failed to act with due diligence because modifications to the device were needed to allow continued clinical testing and PMA review.  You maintain that patent term extension should not be granted for such applicant-induced delays.[70]

The allegations and the other information on which you rely, regarding these field actions do not provide a sufficient basis from which it may reasonably be determined that the applicant failed to exercise due diligence during the regulatory review period.  These field actions are the type of events that may reasonably be expected to occur during a regulatory review period.  In addition, information in the Petition and the attached exhibits shows that Abbott responded to the adverse events with that degree of attention, continuous directed effort, and timeliness as may reasonably be expected from, and are ordinarily exercised by, a person during a regulatory review period.

The Petition correctly notes that Congress did not intend prolonged periods during which human clinical trials are not being conducted to be counted in the period of patent term extension.[71]  However, as described above, the legislative history, read as a whole, indicates that the system for review of due diligence petitions was not intended to result in the review of every action, but instead to identify significant periods of time where "the loss of patent term resulted solely from the applicant's failure to pursue approval."[72]  The legislative history provides examples of events that are reasonably expected to occur and that would not be a basis for a finding of a lack of due diligence, such as delays caused by the temporary unavailability of testing facilities or by

---

[64] *Id.*, citing Exh 7 (Abbott, "Urgent Field Safety Notice/Advisory Notice" (Dec. 2, 2011)).
[65] Petition at 4.
[66] *Id.* at 4-5.
[67] *Id.* at 5.
[68] *Id.* at 5, Exh. 8 (Abbott, "Urgent Field Safety Notice/ Physician Advisory" (Feb. 27, 2013)).
[69] Petition at 4-5.
[70] *Id.* at 5.
[71] *Id.* at 4 (quoting H. Rept. 857, 98th Cong., 2d Sess. Part 1 at 42).
[72] H. Rept. 857, 98th Cong., 2d Sess. Part 1 at 42.

9

EDW-ABT00733448

scientific disputes involving the tests needed for approval.[73]  As discussed in detail above, FDA regulations incorporate the definition of due diligence set forth in 35 U.S.C. § 156(d)(3) and included the "general criteria taken from the legislative history."[74]  Thus, in assessing the Petition's allegations, I will consider the facts and circumstances of Abbott's actions, as described in the petition, response to the petition, and accompanying exhibits, during the regulatory review period in a manner consistent with the legislative history, as the Agency intended when 21 CFR 60.36(a) was promulgated.

The standard in 21 CFR 60.36(a) is intended to reflect the intent of Congress that a sponsor should not be found to have failed to exercise "due diligence" based on events reasonably expected to occur during a regulatory review period.  The MITRACLIP CDS field actions cited in the Petition are the types of events that are reasonably expected to occur during the regulatory review period, and thus they cannot form the basis for a finding that Abbott failed to exercise due diligence.  Based upon FDA's expertise in the premarket development and approval of devices, it is not unusual for potential safety issues to arise during the regulatory review period, including during clinical trials, continued access protocols, or, as was the case here, postmarketing experience in another jurisdiction where the device is already approved.  That such events are reasonably expected to occur is evidenced by FDA regulations governing device trials, which anticipate that such issues may arise during an investigation and set forth requirements for such contingencies, including requirements for monitoring and reporting certain adverse events and the suspension of clinical trials.[75]  Although in this instance Abbott's suspension was voluntary, the types of events that occurred here are the types of events that the legislative history makes clear should not provide a basis for a finding of a lack of due diligence.  For these reasons, it may not reasonably be determined from the Petition's allegations that field actions reflect the applicant's failure to act with due diligence.

Likewise, in FDA's experience, it also may reasonably be expected that a device may be redesigned or instructions for use modified during the regulatory review period based upon experience with the device during clinical trials or postmarketing use of the device in other jurisdictions.  Again, FDA regulations and guidance anticipate circumstances when a study sponsor may want or need to make changes to the investigational plan, including clarifying the instructions for use or modifying the device.[76]  Such modifications to the instructions for use and to the design of the device are consistent with the exercise of due diligence and are intended to help to ensure the safety of the device that FDA reviews for approval.

The Petition and the attached exhibits do not suggest that the events leading to the field actions, the changes to the instructions for use, or modifications of the MITRACLIP CDS design were anything other than the types of events that would be reasonably expected to occur during the regulatory review period.  Nor do they reflect a lack of due diligence on Abbott's behalf in designing the device.  In fact, as set forth in the exhibits to the Petition, the Center for Devices

---

[73] *Id.*
[74] 53 Fed. Reg. at 7304.
[75] 21 CFR 812.46; 21 CFR 812.150(b) (addressing unanticipated adverse device effects).
[76] 21 CFR 812.25(d); 21 CFR 812.35(a); Changes or Modifications During the Conduct of a Clinical Investigation; Final Guidance for Industry and CDRH Staff at 2 (2001).

EDW-ABT00733449

and Radiological Health (CDRH) acknowledged that the design of MITRACLIP CDS continually evolved during the EVEREST II RCT, resulting in what CDRH characterized as minor changes to the device.[77] CDRH further noted that Abbott voluntarily suspended enrollment in the REALISM continued access registry due to the ring detachment and modified the device to correct the cause.[78] However, CDRH stated that it had no concerns with the device modifications and concluded that the clinical data collected in the EVEREST II RCT were applicable to the design of the device as proposed in the PMA.[79] For all these reasons, I conclude that the allegations regarding the device redesign and modifications to the instructions for use fail to allege a lack of due diligence on Abbott's part.

The specific allegations regarding the nearly six-month period between April 21, 2011 and October 7, 2011, during which Abbott voluntarily suspended the continued access protocol, likewise do not warrant investigation. In addition to being an event that is reasonably likely to occur, the allegations in the Petition show that Abbott exercised due diligence in responding to the events. The Petition makes clear that Abbott undertook multiple activities during that timeframe, including notifying FDA of the incidents of radiopaque ring detachment from the Delivery Catheter system, investigating the incidents, and modifying the device. The completion of its root cause investigation and redesign of the device in less than six months indicates that, in addressing the issue of the ring detachment, Abbott did exercise that degree of attention, continuous directed effort, and timeliness as may reasonably be expected from, and are ordinarily exercised by, a person during a regulatory review period.

Further, Abbott's actions in reporting and investigating the above incidents and suspending the clinical trial are actions consistent with the "degree of attention, continuous directed effort, and timeliness as may reasonably be expected from, and are ordinarily exercised by, a person during a regulatory review period." It is in the interest of neither the public health nor sound public policy to find that an applicant's responses to safety and design issues such as those that occurred during the regulatory review period for MITRACLIP CDS reflect an applicant's lack of due diligence. It is in the interest of the health and safety of human subjects and patients that any risks or adverse events occurring during the regulatory review period are investigated and addressed in an appropriate manner. It is also in the interest of participants in clinical trials and continued access protocols for a sponsor to suspend the clinical trial or continuing access protocol if such action is warranted. For these reasons, and considering FDA's experience with similar situations, I find that Abbott's actions in response to these incidents are consistent with what would be expected of a sponsor in such circumstances. To read the due diligence regulation to find that such actions constitute a lack of due diligence warranting a reduction in the length of the patent term extension could discourage applicants from taking the necessary time to investigate, report, and resolve the root cause of the events.

In summary, as to the field actions and the modifications to the device's design and instructions for use, the Petition merely alleges events that are reasonably expected to occur and which FDA did not intend to be included among the types of events that would suggest a lack of due

---

[77] Petition Exh. 4 (FDA Executive Summary at 8).
[78] Id.
[79] Id.

11

EDW-ABT00733450

diligence on the part of an applicant.  Additionally, the Petition fails to allege any period in which Abbott failed to pursue approval of MITRACLIP CDS or failed to follow up on the incidents leading to the field actions with due diligence.  For these reasons, I find that the Petition's allegations as to the field actions and device redesign fail to contain sufficient information or allegations upon which it may reasonably be determined that Abbott did not act with due diligence during the regulatory review period.

c.  Clinical Trial Design and Implementation

You argue that the lengthy PMA review may reflect the applicant's lack of due diligence in considering FDA's feedback in designing and implementing the clinical trials.  You assert that the PMA review was extended, likely as a result of issues related to the design and implementation of the clinical trials and the need to change the device's proposed indication.  Specifically, you state that prior to approval of the EVEREST II RCT, CDRH had repeatedly expressed concerns with the trial design.[80]  The Petition further alleges that CDRH pointed out numerous limitations with the EVEREST II HRR and the REALISM HR continued access registry upon which Abbott later relied.[81]  According to your Petition, the record suggests that CDRH twice denied approval of one of the clinical trial protocols.[82]  Finally, you observe that the Circulatory System Devices Panel was unable to conclude that there was a reasonable assurance of the efficacy of MITRACLIP CDS for the indicated patient population.[83]  You note that Abbott narrowed the scope of the indication due to limitations with the clinical trials and after the applicant received a major deficiency letter and that CDRH approved the device based upon a *post hoc* analysis of patients from the EVEREST II RCT, the EVEREST II HRR, and the REALISM HR continued access registry.[84]

An applicant acting with due diligence may disagree with FDA as to the design of clinical trials.  As explained above, FDA intended 21 CFR 60.36(a) to be consistent with the types of events set forth in the legislative history.  The legislative history explains that delays caused by a scientific dispute involving either the types of tests required for approval or the interpretation of the tests required for approval are among the types of delays that are reasonably expected to occur and are not a basis for finding a lack of due diligence.[85]  The Petition's allegations here fall squarely within those two types of delay.  Based upon FDA's experience in providing feedback to sponsors on clinical trial design, there is nothing in the record to show that the disagreement here was anything other than the type of scientific disagreement that ordinarily may occur between FDA and a sponsor.  As a result, these allegations provide no basis from which it may reasonably be determined that the applicant failed to exercise due diligence.

Exhibits to your Petition establish that MITRACLIP CDS is a first-in-class device for which FDA granted priority review because the device "is intended to treat mitral regurgitation and

[80] Petition at 5-6.
[81] *Id.* at 6.
[82] *Id.*
[83] *Id.*
[84] *Id.* at 5-6.
[85] *See* H. Rept. 857, 98th Cong., 2d Sess. Part 1 at 42.

12

EDW-ABT00733451

addresses an unmet clinical need in that it represents a breakthrough technology that provides a clinically meaningful advantage over existing technology by being the first available percutaneous mitral valve repair device."[86] As a first-in-class device, the design of clinical trials to assess the safety and effectiveness of MITRACLIP CDS by comparing the device to an open cardiac procedure raises difficult challenges. Here, Abbott and FDA did not agree on the design of the pivotal EVEREST II RCT, and the submissions to the docket, which are part of the record before me, make clear Abbott's and FDA's conflicting views regarding the proper design of the trial.[87] FDA had concerns as to whether the device could be approved based on the results of the EVEREST II RCT as designed, and the Circulatory System Devices Panel was divided (4 to 5) on the issue of whether the clinical data demonstrated the efficacy of MITRACLIP CDS for the indication Abbott sought.[88] Scientific disagreement, such as that which occurred here, would not be unexpected in designing a trial to support approval of a device such as MITRACLIP CDS. Even if Abbott's decision to move forward with the EVEREST II RCT without making the changes recommended by FDA did cause delays in review of the PMA, such delays do not provide a basis to find a lack of due diligence.

Despite this scientific disagreement between Abbott and FDA, there is nothing in the Petition and exhibits to indicate that Abbott failed to exercise due diligence in initiating and completing the trials, or in attempting to resolve the differences of scientific opinion with CDRH. The exhibits attached to the Petition demonstrate that, following the Circulatory System Devices Panel Meeting, Abbott engaged in significant interaction and discussion with FDA to revise the indication.[89] Ultimately, as the exhibits to your Petition establish, the trials conducted during the regulatory review period supported the approval of MITRACLIP CDS, as data from 127 patients in the EVEREST II RCT, EVEREST II HRR, and REALISM HR continued access registry supported approval of MITRACLIP CDS for the revised indication.[90]

The Petition's allegations regarding the clinical trial design cite to events that are reasonably expected to occur because they stem from scientific disagreement. These allegations also fail to allege any period in which Abbott failed to pursue approval of MITRACLIP CDS. For these reasons, I find that the Petition's allegations regarding the clinical trial design fail to contain sufficient information or allegations upon which it may reasonably be determined that Abbott did not act with due diligence during the regulatory review period.

### d. The Applicant's Requests for Extensions of Time

The Petition notes that the applicant requested multiple extensions of time during the regulatory review period. You maintain that, while the publicly available record for most of the requests for

---

[86] Petition Exh. 3 (SSED at 1); Abbott Response to Petition at 7, 11.

[87] Petition Exh. 4 (FDA Executive Summary at 8); Abbott Response to Petition Exh. 3 (Mauri, L., et al, "The EVEREST II Trial: Design and rationale for a randomized study of the evalve mitraclip system compared with mitral valve surgery for mitral regurgitation," American Heart Journal (July 2010) (setting forth the rationale for the trial design)).

[88] Petition Exh. 4 (FDA Executive Summary at 8); Petition Exh. 9 (Transcript of March 20, 2013 Circulatory System Devices Panel Meeting at 317).

[89] Petition Exh. 3 (SSED at 18).

[90] Id.

EDW-ABT00733452

extension of time does not indicate the amount of additional time sought by Abbott, the information that is available shows that Abbott requested more than 75 days in extensions of time.[91]

The Petition alleges that on November 8, 2007, Abbott requested a 15-day extension to respond to FDA's August 27, 2007 letter. You note that Abbott also requested an extension of time on March 13, 2009 to respond to FDA's January 30, 2009 questions. The Petition points to other extensions of time requested by Abbott on April 5, 2012 and July 15, 2013.[92]

The Petition further alleges a period of delay between April 14, 2008 and October 16, 2008 and that, on April 14 and May 15, 2008, Abbott requested two separate 30-day extensions to submit the IDE annual report.[93] Your Petition discloses that Abbott submitted the annual report on June 27, 2008 and that, on September 15, 2008, Abbott responded to FDA's July 31, 2008 questions on the report.[94] Finally, you note that Abbott requested extensions of time to file its annual reports on March 26, 2009; April 5, 2010; February 20, 2013; and April 22, 2013.[95]

As an initial matter, I note that the need for additional time to provide information to FDA, whether in response to questions from the Agency or to compile information included in an annual report, is an event that may reasonably be expected to occur. As with the other allegations regarding due diligence, CDRH has anticipated that such events may occur and has issued guidance in which CDRH addresses requests for extensions of time, indicating that applicants may sometimes need extensions of time to complete required submissions or respond to questions or requests for additional information from FDA.[96] An applicant's need for additional time to complete tasks such as collecting data or conducting the analysis necessary to respond to FDA's questions, without more, does not suggest the applicant was not acting with due diligence.

As to the request for extension of time on April 5, 2012, the exhibits to the Petition indicate that this extension relates to the COAPT trial.[97] The exhibits indicate that the approval of MITRACLIP CDS was based upon a *post hoc* analysis of results from 127 patients enrolled in the EVEREST II RCT, EVEREST II HRR, and REALISM HR continued access registry and that the COAPT trial was enrolling at the time of the Circulatory System Devices Panel Meeting.[98] Because the PMA approval was based upon the EVEREST II RCT, EVEREST II HRR, and REALISM HR continued access registry, and the Petition does not allege that the approval was based on the COAPT trial, there is no basis to find that this request for additional time slowed the PMA approval.

---

[91] Petition at 7.
[92] *Id*. at 6.
[93] *Id*. at 6-7.
[94] *Id*. at 7.
[95] *Id*.
[96] Guidance on IDE Policies and Procedures at 3-4 (Jan. 20, 1998).
[97] Request for Patent Term Extension for U.S. Patent No. 7,464,712, Exh. E at 19.
[98] Petition Exh. 3 (SSED at 18); Petition Exh. 4 (FDA Executive Summary at 83).

14

EDW-ABT00733453

Finally, the Petition does not explain how extensions of time to file an *IDE* annual report could impact or delay the review of the *PMA*. Further, the exhibits to the Petition make clear that the EVEREST II RCT, the pivotal clinical trial supporting the PMA completed enrollment in 2008. With the exception of the April 2008 request, the other requests for an extension of time to file the IDE annual report occurred only during the continued access registries (in April 2010, February 2013, and April 2013).

For all these reasons, I find that the Petition's assertions regarding the requests for an extension of time fail to raise allegations upon which it may reasonably be determined that the applicant did not act with due diligence during the regulatory review period.

### e. Conclusion

A due diligence petition must include sufficient facts to merit an investigation by FDA of whether the applicant acted with due diligence during the regulatory review period.[99] If the petition fails to contain information or allegations upon which it may reasonably be determined that the applicant did not act with due diligence during the regulatory review period, FDA may deny the petition without considering the merits.[100] As explained above, I have determined that the Petition fails to contain information and allegations upon which it may reasonably be determined that Abbott did not act with due diligence during the regulatory review period. Accordingly, I deny the Petition without considering the merits.

### 2. Certification

Although, as discussed above, sufficient grounds exist to deny the petition based on 21 C.F.R. 60.34(b)(4), the record before me establishes that you failed to comply with the regulatory requirements for filing a Petition as set forth in 21 CFR 60.30. The regulations for due diligence petitions at 21 CFR 60.30(d) require that the petition contain a certification that the petitioner has served a true and complete copy of the petition upon the applicant by certified or registered mail (return receipt requested) or by personal delivery. FDA may deny a due diligence petition without considering the merits if the petition is not filed in accordance with 21 CFR 60.30.[101] Here, the Petitioner certifies that the Petition was served on Abbott via Federal Express.

The regulations are unambiguous: a petitioner must certify that it has served the petition on the applicant by certified or registered mail (return receipt requested) or personal delivery, and the regulations do not provide for service by any other means. I have considered the Petitioner's arguments regarding the adequacy of the service in this case,[102] but 21 CFR 60.30(d) explicitly requires that the petition contain a certification that the petition was served in a particular manner. I thus conclude, under 21 CFR 60.34(b)(1), that the Petitioner's failure to certify that service was accomplished in the required manner--and apparent failure to serve the petition in

---

[99] 21 CFR 60.30(c).
[100] 21 CFR 60.34(b)(4).
[101] 21 CFR 60.34(b)(1).
[102] May 30, 2018 Submission from Goodwin Proctor, LLP to Docket Nos. FDA-2014-E-2358 and FDA-2014-E-2359.

EDW-ABT00733454

such a manner--provides an alternative ground for the Agency to deny the Petition without considering the merits.

Sincerely,

RADM Denise Hinton
Chief Scientist

cc: Erica Battaglia, Divisional Vice President and Associate General Counsel, Abbott

16

EDW-ABT00733455

# EXHIBIT 36

# REDACTED IN ITS ENTIRETY

# EXHIBIT 37

# REDACTED IN ITS ENTIRETY