IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT CARDIOVASCULAR SYSTEMS, INC. and EVALVE, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 19-0149 (MN) |
| EDWARDS LIFESCIENCES CORP. and EDWARDS LIFESCIENCES LLC, | ) ) ) | **REDACTED PUBLIC VERSION** |
| Defendants. | ) ) ) | |

**EDWARDS' OPPOSITION TO ABBOTT'S MOTION TO EXCLUDE EXPERT OPINIONS UNDER *DAUBERT***

OF COUNSEL:

Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Kira A. Davis
Michael Milea
Allison C. Penfield
Ayelet Evrony
Joshua Reich
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

David E. Cole
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

Dated:  March 6, 2020

Jeffrey L. Moyer (#3309)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Moyer@rlf.com
Farnan@rlf.com
Haynes@rlf.com

*Attorneys for Defendants Edwards Lifesciences
Corp. and Edwards Lifesciences, LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ................................................................................................ ii

I.       PRELIMINARY STATEMENT ................................................................ 1

II.      SUMMARY OF ARGUMENT .................................................................. 2

III.     STATEMENT OF FACTS ......................................................................... 3

         A.      The Challenged Physician Opinions ............................................. 3

         B.      Dr. Jensen's Challenged Opinions and Dr. Sullivan's Challenged Criticism.......... 4

IV.      ARGUMENT .............................................................................................. 5

         A.      Testimony from the Challenged Physicians Regarding the Benefits of PASCAL to Patients Is Admissible ............................................ 5

                 1.       The Challenged Physicians Are Qualified ......................... 5

                 2.       The Challenged Opinions Are Reliable .............................. 10

                 3.       The Challenged Opinions Meet the "Fit" Requirement ...... 17

         B.      Edwards' Invalidity Expert Did Not Apply the Wrong Legal Standards ............. 18

         C.      Edwards' Damages Expert Was Permitted To Criticize Abbott's Expert ............. 20

V.       CONCLUSION ........................................................................................... 20

RLF1 23047637v.1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amgen Inc.* v. *Sanofi*,
   872 F.3d 1367 (Fed. Cir. 2017)............................................................................18

*Avanir Pharm., Inc.* v. *Actavis S. Atl. LLC*,
   36 F. Supp. 3d 475 (D. Del. 2014),
   *aff'd*, 612 F. App'x 613 (Fed. Cir. 2015)...........................................................20

*In re ChanBond, LLC Patent Litig.*,
   2019 WL 6910284 (D. Del. Dec. 19, 2019)........................................................19

*Comcast Cable Commc'ns, LLC* v. *Sprint Commc'ns Co.*,
   203 F. Supp. 3d 499 (E.D. Pa. 2016) .............................................................15, 17

*Daubert* v. *Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)............................................................................................10

*Ecolochem, Inc.* v. *S. Cal. Edison Co.*,
   227 F.3d 1361 (Fed. Cir. 2000)...........................................................................20

*Georgia-Pacific Corp.* v. *U.S. Gypsum Co* ...............................................................19

*Inline Connect. Corp.* v. *AOL Time Warner Inc.*,
   2007 WL 275928 (D. Del. Jan. 29, 2007)............................................................19

*Integra Lifesciences Corp.* v. *HyperBranch Med. Tech., Inc.*,
   2018 WL 1785033 (D. Del. Apr. 4, 2018).................................................10, 14, 15

*Kannankeril* v. *Terminix Int'l, Inc.*,
   128 F.3d 802 (3d Cir. 1997)...................................................................................5

*Magna Elecs., Inc.* v. *TRW Auto. Holdings Corp.*,
   2016 WL 4239187 (W.D. Mich. Jan. 8, 2016) .....................................................20

*MorphSys, Inc.* v. *Janssen Biotech, Inc.*,
   358 F. Supp. 3d 354 (D. Del. 2019)......................................................................18

*Noven Pharm., Inc.* v. *Actavis Labs. UT, Inc.*,
   2017 WL 6619330 (D. Del. Dec. 22, 2017)..........................................................20

*Nuvo Pharm. (Ireland) Desig. Activity Co.* v. *Dr. Reddy's Labs., Inc.*,
   923 F.3d 1368 (Fed. Cir. 2019)...........................................................................19

RLF1 23047637v.1

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Oddi* v. *Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)................................................................................15

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)..................................................................5, 9, 15, 16

*Perricone* v. *Medicis Pharm. Corp*,
    267 F. Supp. 2d 229 (D. Conn. 2003),
    *aff'd in part, vacated in part, rev'd in part*,
    432 F.3d 1368 (Fed. Cir. 2005)..........................................................................19

*Perricone* v. *Medicis Pharm. Corp*,
    432 F.3d 1368 (Fed. Cir. 2005)..........................................................................19

*Plant Genetic Sys., NV* v. *DeKalb Genetics Corp.*,
    315 F.3d 1335 (Fed. Cir. 2003)..........................................................................18

*Rivera* v. *ITC*,
    857 F.3d 1315 (Fed. Cir. 2017)..........................................................................18

*Schneider* v. *Fried*,
    320 F.3d 396 (3d Cir. 2003)....................................................................5, 11, 15

*Sport Dimension, Inc.* v. *Coleman Co.*,
    2015 WL 12732710 (C.D. Cal. Jan. 29, 2015),
    *aff'd*, 820 F.3d 1316 (Fed. Cir. 2016) ...............................................................10

*TQ Delta, LLC* v. *ADTRAN, Inc.*,
    2019 WL 5677539 (D. Del. Oct. 31, 2019) .........................................................9

*UGI Sunbury LLC* v. *Permanent Easement for 1.7575 Acres*,
    949 F.3d 825 (3d Cir. 2020)...........................................................................2, 15

*ViiV Healthcare UK Ltd.* v. *Lupin Ltd.*,
    6 F. Supp. 3d 461 (D. Del. 2013),
    *aff'd*, 594 F. App'x 686 (Fed. Cir. 2015) ..........................................................20

**STATUTES**

35 U.S.C. § 112.........................................................................................................4, 18, 19

RLF1 23047637v.1

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**OTHER AUTHORITIES**

Fed. R. Evid. 403 ................................................................................................................17

Fed. R. Evid. 702 ................................................................................................... *passim*

## I.   <u>PRELIMINARY STATEMENT</u>

Abbott continues to insist that PASCAL serves no purpose, and patients will be fine absent PASCAL.  Abbott continues to seek a permanent injunction against PASCAL and, in its opening expert reports, Abbott's experts asserted that MitraClip is all patients need.  But a wealth of evidence shows that Abbott is wrong and that, because PASCAL is a differentiated product with different features, its availability benefits patients.  Abbott's motion seeks to curtail Edwards' ability to refute Abbott's false narrative and should be denied.

Mitral regurgitation ("MR") is a grave disease afflicting millions, with many patients going untreated.  One reason for the under-treatment is that the mitral valve can vary greatly from patient to patient, and some anatomies are more difficult to treat successfully than others.  (*See generally* Abbott Ex. 5 at ¶¶ 18, 27-28, 34-40.)  PASCAL is a new option for these patients, including patients that MitraClip could not treat, as Abbott itself has acknowledged outside this litigation. (*See, e.g.*, Davis Ex. 1 at 2; Ex. 2 at 13; Ex. 3.)  The physicians who treat these patients, including with MitraClip, understand that PASCAL's unique features allow for use in ways that MitraClip cannot be used.  And that is not only the opinions of the experts here.  At major conferences and in peer-reviewed publications, physicians have discussed the importance of PASCAL to patients. (*See* Abbott Ex. 2 at ¶¶ 90-96; Ex. 5 at ¶¶ 62, 104-105.)  All of this is relevant to issues in the case.

Yet despite the relevance of this evidence, Abbott now seeks to prevent Edwards from offering testimony about the benefits of PASCAL from witnesses who are particularly qualified to tackle that subject:  physicians who have spent their careers treating patients suffering from MR. Doctors, Abbott argues, are not qualified to discuss the way in which the medical devices that they implant in patients affect patient outcomes.  Abbott also believes that any opinions based on experience, or that are not in numerical form with an error rate, should be excluded.

Abbott is wrong, on both the facts and the law.  Understanding which treatment is best suited to each patient is a critical part of a physician's job.  Abbott has tacitly conceded as much, relying on physicians to offer the same types of opinions it challenges here.  It is simply not the case that only a bioengineer will do.  The opinions are not junk science—they are based on experience, which is considered useful and reliable evidence in this field.  Nor did the challenged physicians fail to consider any needed evidence.  Abbott's case law also does not support the exclusion of physician testimony addressing patient outcomes, as the opinions here are not the equivalent of a witness trying to use his knowledge that dented appliances sell for less in order to value land before and after a gas pipeline was built.  *UGI Sunbury LLC* v. *Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834-35 (3d Cir. 2020).  Abbott also cursorily seeks to strike some of the opinions of Edwards' invalidity expert and to prevent Edwards' damages expert from criticizing another expert, based on purported errors of law.  Abbott is wrong on the law.  Its motion should be denied.

## II.    <u>SUMMARY OF ARGUMENT</u>

1.    The challenged physician testimony is admissible.  Each physician is qualified to discuss the treatment of patients suffering from MR, and their opinions about the ways in which PASCAL benefits those patients fall squarely within that expertise, are reliable and scientifically sound, and are relevant and responsive to issues raised by Abbott in its opening reports.

2.    The Court also should not exclude Dr. Jensen's opinions on written description, enablement, and obviousness-type double patenting ("OTDP"), as Dr. Jensen applied the correct legal standards in analyzing all three issues.  The Court should also permit Dr. Sullivan to criticize Mr. Chang for failing to consider evidence relevant to commercial success.

## III.    STATEMENT OF FACTS

### A.    The Challenged Physician Opinions

Abbott mischaracterizes the challenged opinions and ignores the reports to which they are responsive.  As the record shows, it is Abbott that has put at issue in this case whether PASCAL has features that benefit patients.  The challenged opinions show that it does.

In its opening reports, Abbott claimed that it was entitled to both lost profits and a permanent injunction.  Abbott's expert, Ms. Stamm, opined that every sale of PASCAL is a lost sale of MitraClip—such that lost profits should be awarded to Abbott— ████████████ ████████████████████████████████████████████████ ████████████████████ (Davis Ex. 4 at ¶¶ 107, 113.)  And Dr. Vellturo claimed that ████████████████████████████████████████ (Davis Ex. 5 at ¶¶ 146-147.)  Abbott also served reports from three physicians:  Drs. Makar, Sorajja, and Little.  (Abbott Ex. 13; Davis Exs. 6-7.)  All three opine about the treatment of patients suffering from MR and about patients who have been treated with MitraClip, including in the following form:  Here is a patient with a particular characteristic that was successfully treated by MitraClip.  (*See* Abbott Ex. 13 at ¶¶ 6.2-6.40, Davis Ex. 6 at ¶ 92, Ex. 7 at ¶ 77.)  Dr. Makar opines, for example, about "a 45 year old female who was a single mother" with "bileaflet prolapse" who his team treated with 2 MitraClip XTRs.  (Abbott Ex. 13 at ¶ 6.17.)  Dr. Makar also criticized PASCAL (*id.* at ¶¶ 6.41-6.68), although Abbott now is of the view that he should not have done so (Br. at 15 n.16).

In the responsive expert reports at issue, Drs. Kipperman, Feldman, Armstrong, Chakravarty, Kaneko, and Deuschl each disagreed with Abbott's analysis of how MR patients are treated and disagreed that there is no evidence that PASCAL has benefits to patients as compared to MitraClip.  As these physicians and the literature confirms, there are mitral valve morphologies known to make the use of MitraClip more difficult or even impossible.  (*See, e.g.*, Abbott Ex. 5 at

¶¶ 28, 35-40.)  Doctors sometimes use MitraClip even on patients predicted to have unsuccessful outcomes because of the awfulness of the disease; within these groups of patients, physicians have both succeeded and failed with MitraClip, and have turned away other patients without even making the attempt.  (*See id.*)  Additionally, patients cannot in fact be neatly divided into categories like "large coaptation gap patients."  Rather, the patient population is heterogeneous, and patients often have more than one unfavorable feature, which affects the treatment calculus.  (*Id.* at ¶¶ 38, 43; Abbott Ex. 7 at ¶ 148.)  Thus, as the challenged physicians explain, pointing to one patient with a large coaptation gap who was successfully treated with MitraClip does not guarantee that all similar patients are treated, or treated with a successful outcome.

As each physician also explains, PASCAL is a different device, not subject to the same limitations as MitraClip, and its differentiated features allow for different results in these hard-to-treat patients.  (*See* Abbott Ex. 5 at § III. C; Ex. 2 at § IV; Ex. 3 at § III; Ex. 4 at § II; Ex. 6 at § II; Ex. 7 at §§ V-VI.)  The physicians did not opine, as Abbott insists, that PASCAL is "superior" to MitraClip as FDA uses that term.  Rather, they explain in detail why the difficult or impossible anatomies are hard to treat, and how PASCAL benefits those patients.  (*See id.*)  For example, Dr. Kipperman explains how PASCAL's independent grasping allows the physician to grasp more tissue and hold the leaflet better, such that PASCAL's independent grasping provides a benefit. (Abbott Ex. 7 at ¶¶ 86-89.)  As another example, Dr. Feldman explains why using MitraClip in an area where the chordae are dense can be a problem (Abbott Ex. 5 at ¶ 52), and why PASCAL's elongated shape has an advantage over MitraClip's inverted position when entanglement is a concern (*id.* at ¶ 64).

### B.   Dr. Jensen's Challenged Opinions and Dr. Sullivan's Challenged Criticism

Dr. Jensen opined that the claims of the '267, '388, and '493 patents are invalid under § 112 if they cover devices with ventricular elements that can both open and close based on the

ability of the material from which they are constructed.  (*See, e.g.*, Abbott Ex. 8 at ¶ 617.)  In his OTDP analysis, he opined that claims of the '267 and '388 patents are invalid in view of individual claims of the '493 patent and, alternatively, in view of a combination of claims from the '493 patent.  (*See, e.g. id.* at ¶ 1028.)  Dr. Sullivan also criticized Mr. Chang's failure to consider MitraClip's profitability in his commercial success analysis, not because it was required, but because profitability is relevant evidence in that analysis.  (Abbott Ex. 11 at ¶¶ 55-56.)

## IV.   ARGUMENT

The requirements of Rule 702—qualification, reliability, and fit—apply here.  Rule 702 "has a liberal policy of admissibility," as the rules "embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact."  *Kannankeril* v. *Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997).  Contrary to Abbott's suggestion, there are no strict tests for each of Rule 702's three requirements.  *Schneider* v. *Fried*, 320 F.3d 396, 406 (3d Cir. 2003).  The opinions challenged by Abbott meet all three requirements.

### A.   Testimony from the Challenged Physicians Regarding the Benefits of PASCAL to Patients Is Admissible

#### 1.   The Challenged Physicians Are Qualified

Abbott asks this Court to conclude that physicians who have spent their careers treating MR patients are not qualified to testify about the ways PASCAL benefits those same patients because they do not hold bioengineering degrees.  (Br. at 7-8.)  But bioengineering expertise is not required, as the evidence confirms, including Abbott's own reliance on physician testimony.  The physicians here possess some of the "broad range of knowledge, skills, and training" that will "qualify an expert as such."  *In re Paoli R.R. Yard PCB Litig.* ("*Paoli II*"), 35 F.3d 717, 741 (3d Cir. 1994).  And even assuming that bioengineering expertise could be useful, that still would not result in exclusion.  Rule 702's "liberal policy of admissibility" extends to the qualification prong,

and the Third Circuit has "eschewed imposing overly rigorous requirements of expertise." *Id.*

**The physicians possess relevant expertise treating MR patients:**  Abbott spends little time on the physicians' qualifications.  A review reveals that all are qualified to offer the opinions contained in their reports (resumes are attached as Davis Exs. 8-13):

Dr. Robert Kipperman is an interventional cardiologist at Morristown Medical Center in New Jersey and the Co-Director of the center's Structural Heart Disease Program.  He has served as a Principal Investigator on clinical trials of both MitraClip and PASCAL, and has significant experience implanting both devices, having performed about 300 MitraClip and 30 PASCAL procedures as of his report date.  (Abbott Ex. 7 at ¶¶ 6-13.)  He recently testified in related UK proceedings on the patient benefits of PASCAL.  (Davis Ex. 14 at 1370-73.)

Dr. Ted Feldman is one of the most experienced interventional cardiologists in the nation. He stopped treating patients in 2019 when he joined Edwards, and prior to that spent decades treating patients with mitral valve disease.  He performed the second-ever MitraClip implantation in 2003 and continued to implant MitraClip through 2018; led the first two MitraClip trials; and published and edited seminal books and articles on MitraClip.  (*See, e.g.*, Davis Ex. 15.)  Dr. Feldman has implanted PASCAL, and led the effort to publish data from PASCAL compassionate-use cases in the *Lancet*, all before joining Edwards.  (Abbott Ex. 5 at ¶¶ 1-2, 4, 8-14.)  Dr. Makar acknowledged Dr. Feldman's expertise.  (Davis Ex. 16 at 43-44.)

Dr. Ehrin Armstrong is an interventional cardiologist, the Director of Interventional Cardiology at the Rocky Mountain VA Medical Center, and a Professor at the University of Colorado School of Medicine.  At the VA center, Dr. Armstrong is a part of the "heart team" that weekly recommends whether patients receive surgery, transcatheter treatment (currently MitraClip), or medical management.  He has performed approximately 30 MitraClip cases, and

has authored publications about MitraClip, including on MitraClip patient selection. (Abbott Ex. 2 at ¶¶ 4-21, 51-55; Davis Ex. 15 at Ch. 12.) Dr. Armstrong also holds master's degrees in Biotechnology and Clinical Research. (Davis Ex. 8.)

Dr. Tarun Chakravarty is an interventional cardiologist at Cedars-Sinai Medical Center, where Abbott's expert Dr. Makar is an echocardiographer. He published extensively on the treatment of valvular heart disease, and has performed 250–300 MitraClip procedures and 10 PASCAL procedures. (Abbott Ex. 3 at ¶¶ 4-16.) When Dr. Makar speaks about patients treated at Cedars-Sinai with MitraClip or PASCAL, some of those are patients treated by Dr. Chakravarty with Dr. Makar's assistance. (Davis Ex. 17 at 34-35, 47-50, 65-67.)

Dr. Tsuyoshi Kaneko is a cardiac surgeon also trained in interventional cardiology and is the Surgical Director of the Structural Heart Program at Brigham & Women's Hospital. He treats MR patients with open-heart surgery, with MitraClip, and has also begun using PASCAL as part of the CLASP IID/IIF clinical trial. Dr. Kaneko supervises fellows learning these procedures, and he has lectured on how to perform the MitraClip procedure. (Abbott Ex. 6 at ¶¶ 1-2, 5-10.)

Dr. Florian Deuschl is a visiting Physician Proctor at Edwards who previously practiced as a cardiologist in Germany, where he focused on intraprocedural echocardiography ("echo") for transcatheter mitral- and tricuspid-valve interventions. In Germany, Dr. Deuschl provided echo support for many MitraClip cases, and for two PASCAL compassionate-use cases that are included in the *Lancet* article on PASCAL, of which he is a co-author. (Abbott Ex. 4 at ¶¶ 1-2, 5-9.) He currently proctors tricuspid valve procedures, including PASCAL procedures.

In sum, all six challenged physicians are highly qualified experts in relevant fields.

**It is within the physicians' expertise to explain how device features impact patient selection and outcomes:** In interventional cardiology, treating physicians daily make the kind of

expert judgments Abbott now challenges.  Making patient selection decisions is a part of their job.

Outside of this litigation, treating physicians regularly publish and present on these issues.  The

*Lancet* article on PASCAL is one place where doctors, including Drs. Deuschl, Makar, and

Feldman, explained the benefit of device features.  (*See* Abbott Ex. 21 at 774, 779.)  Following

PASCAL's approval for use in Europe, a group of German cardiologists published an article

itemizing a number of ways in which PASCAL's differentiated features helped optimize the repair.

(Abbott Ex. 22.)  One member of that group, Dr. Nef, also presented on PASCAL's features at the

2019 PCR London Valves conference.  (Abbott Ex. 25.)  Another group of German physicians

recently published on their successful use of PASCAL to treat a patient who suffered a leaflet

laceration during an attempted MitraClip XTR procedure; they, too, discussed the benefits of

PASCAL's unique features to patients who are difficult to treat with MitraClip.  (Davis Ex. 18.)

During another PASCAL presentation at London Valves (Abbott Ex. 27), Dr. Ng elaborated on

features of PASCAL that enhance safety over MitraClip.  (Abbott Ex. 5 at ¶ 104.)  And the FDA

considers physicians qualified to opine on these issues in the compassionate-use process, where it

is the treating physician who explains why a commercial device cannot be used and why an

unapproved device is a better option for that patient.  (*See, e.g.*, Davis Exs. 19-21.)

Away from its motion, Abbott agrees.  Each of Abbott's physician experts discussed device

features and patient outcomes in their reports.  (*See, e.g.*, Abbott Ex. 13 at §§ 6, 10-11; Davis Ex. 6

at § IV(E), (G)-(H); Ex. 7 at § IV(D)-(F).)  They did so in the same ways that Abbott now says are

outside the expertise of physicians.  For example, while Abbott now argues that physicians are not

qualified to say that PASCAL's long, wide paddles provide a benefit (Abbott Ex. 7 at ¶ 84), it

previously offered physician testimony that the length and width of MitraClip XTR's arms do offer

a benefit.  (Abbott Ex. 13 at ¶ 6.6.)  Abbott also submitted a report from a bioengineer, Dr. Dasi,

on infringement and other technical issues:  he purports to rely on the opinions of Drs. Makar, Sorajja, and Little about the importance of MitraClip features to patient outcomes.  (Davis Ex. 22 at § VIII(f).)  There is no mismatch between the experts' credentials and their opinions.

**The physicians do not need additional bioengineering expertise to be qualified:**  The jury should not be deprived of helpful evidence from experienced physicians based on Abbott's conjecture that some other expert might be even more qualified.  Had Edwards relied on bioengineers instead of physicians, no doubt Abbott would have objected that engineers are not qualified to opine about how devices work in patients as opposed to in the laboratory.  And the record evidence discussed above shows that these physicians possess the necessary expertise.  Dr. Armstrong's and Dr. Kaneko's acknowledgements that there are specific details that are outside their areas of expertise (Br. at 7-8) shows only that neither should testify as to those narrow items.  They are not doing so, and Abbott points to no evidence for its sweeping conclusion that all six physicians are entirely unqualified to offer the challenged opinions.  Dr. Armstrong also has the degree Abbott says is needed.  (Davis Ex. 8.)  And even if, contrary to the evidence, a biomechanical engineer were a better option, that would not lead to exclusion.  "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."  *TQ Delta, LLC* v. *ADTRAN, Inc.*, 2019 WL 5677539, at *4 (D. Del. Oct. 31, 2019) (quotation omitted).  And as shown above, the challenged physicians indeed do possess the appropriate specialization.  This is not a close case.

**Personal experience using PASCAL in every type of anatomy is not a prerequisite:**  No expert has opined, and no legal authority holds, that a physician must have treated every possible type of patient to be qualified as an expert.  *See Paoli II*, 35 F.3d at 754 ("If the liberal

standard of Rule 702 allows an engineer who teaches auto mechanics to testify in a products liability action about tractors, it surely allows a trained internist who has spent significant time reviewing the literature on PCBs to testify as to whether PCBs caused illness in plaintiffs."). The qualification prong prevents experts from testifying entirely outside their expertise. Thus, the expert in *Sport Dimension* was prevented from testifying about personal flotation devices because he was instead an expert in designing boats, scuba equipment, buoys, and bulletproof vests. *Sport Dimension, Inc.* v. *Coleman Co.*, 2015 WL 12732710, at \*3 n.1 (C.D. Cal. Jan. 29, 2015), *aff'd*, 820 F.3d 1316 (Fed. Cir. 2016). That is not the situation here. And, Abbott's physicians also discuss patient anatomies that they have not treated. (*See, e.g.*, Abbott Ex. 13 at ¶ 6.36; Davis Ex. 6 at ¶ 92(e)); Ex. 7 at ¶ 77(e).) Personal experience, or lack thereof, goes only, if at all, to weight.[1]

### 2.    The Challenged Opinions Are Reliable

The challenged opinions are also reliable. "Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known," but the inquiry is "a flexible one." *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, 594 (1993).

### a)    Experience provides a proper foundation here

Abbott assumes its own conclusion in claiming that the physicians used no "methodology." But "methodology" is not a synonym for "calculation," and it is not the case that only "testable" methodologies qualify. *Integra Lifesciences Corp.* v. *HyperBranch Med. Tech., Inc.*, 2018 WL 1785033, at \*4 (D. Del. Apr. 4, 2018). The application of medical experience and training is a "methodology" and a "procedure of science" for purposes of Rule 702. *See id.* at \*2-4; Fed. R.

---

[1] Abbott's suggestion that Drs. Feldman and Deuschl are somehow less qualified because each had a PASCAL patient who died is inappropriate, as was Abbott's omission of the context of those unfortunate deaths. Dr. Feldman's patient passed away due to a complication related to a blood pressure monitoring device, not PASCAL. (Davis Ex. 23 at 19-20.) The death of Dr. Deuschl's patient was due to the extreme ill-health of the patient. (Davis Ex. 24 at 73-77.) Abbott should not sensationalize patient deaths, either in this motion or at the upcoming trial.

Evid. 702, Advisory Comm. Notes (2000 Amendments) (explaining "that experience alone—or experience in conjunction with other knowledge, skill, training or education"—can be sufficient support for an expert's opinion). It is common for physicians to testify based on experience and training. *See, e.g.*, *Schneider*, 320 F.3d at 406. All of Abbott's arguments aimed at showing that the physicians' opinions are not quantifiable or testable thus fail. The challenged opinions are properly rooted in the physicians' experience and training, and not the result of "no methodology."

In attacking opinions on how PASCAL's unique features are beneficial in treating these complex anatomies, Abbott sets up a straw-man in calling the opinions "superiority opinions." As Abbott notes, "superiority" is one possible end-point in a head-to-head clinical trial. (*See* Br. at 13.) But it is not the case that in order to talk about whether an accused device offers advantages to patients, a defendant must run a clinical trial with "superiority" as an end-point (and obtain the results in time for litigation). Abbott bears the burden to prove its claims for lost profits and an injunction, and evidence that PASCAL benefits patients (and the reasons treating physicians believe this) is relevant to both questions, whether or not PASCAL is eventually shown to be superior in a head-to-head trial. And the challenged physicians did not opine on "superiority" as FDA uses the term, but instead opined about the benefits of PASCAL to patients. To give a few examples, they opined that:

- for patients with a short posterior leaflet, "the broad, long paddles of PASCAL (and the ability to grasp leaflets independently) are likely to assist in obtaining a secure hold on the posterior leaflet in these patients." (Abbott Ex. 7 at ¶ 117.)

- for patients with prolapse in the commissure, "[b]ecause the chordae are more dense at the commissures and PASCAL's elongated configuration allows it to avoid becoming entangled in and/or more easily disentangle itself from the chordae than can MitraClip, PASCAL would be a better option for patients with this anatomy." (*Id.* at ¶ 132.)

- PASCAL's wide paddles "help in treating patients with clefts: 'the increased width of the implant might allow coverage of a cleft via grasping of the tissue rims at each border and deeper leaflet insertion.'" (Abbott Ex. 5 at ¶ 60 (quoting *Lancet* article).)

These opinions about patient selection and how PASCAL's unique features are advantageous in treating complex anatomies are appropriately based on experience and training. Judgements of this type are regularly made by physicians in this field based on experience and training, as well as case reports and presentations. For confirmation on this point, one need look no further than Abbott's experts. In claiming that *MitraClip* can treat certain anatomies, each of Drs. Makar, Sorajja, and Little relies repeatedly on their own personal experience and a variety of presentations and publications, including single-case presentations. (*See, e.g.*, Abbott Ex. 13 at ¶¶ 6.1-6.40, Davis Ex. 6 at ¶ 92, Ex. 7 at ¶ 77; *see also* Ex. 25 at 50-51.) Their opinions about MitraClip NTR, XTR, and G4 necessarily are not based on clinical trial data, as those devices were launched without clinical trials. (Abbott Ex. 5 at ¶ 85; Davis Ex. 26 at 85.) Yet Drs. Makar, Sorajja, and Little repeatedly discuss how those devices behave in patients. (*See, e.g.*, Abbott Ex. 13 at § 6, Davis Ex. 27 at ¶¶ 13-15; Ex. 28 at ¶¶ 15-17).) Dr. Makar also opined that PASCAL was less likely to be suitable for patients with some anatomies (Abbott Ex. 13 at ¶ 6.21), which he acknowledged was an opinion based on his own judgment, not clinical evidence (Davis Ex. 16 at 84-85). He also agreed that physicians in the field "would have opinions . . . about what a particular device is good for and maybe not so good for." (*Id.*) These opinions disprove Abbott's assertion that only randomized trial data can be used to discuss whether a device offers advantages to patients, and which device should be used for which patient. Physician judgment is what is used.

Similarly, although Abbott criticizes the challenged physicians for talking about individual features of PASCAL in the absence of feature-specific testing (*see* Br. at 12), Drs. Makar, Sorajja, and Little do the same thing. Dr. Makar, for example, opines that when MitraClip is in operation, "the concave shape increases the surface area of the arms and lets the cardiologist cup the leaflets, leading to a more secure, gentle grasp on the leaflets." (Abbott Ex. 13 at ¶ 11.4; *see also id.* at ¶¶

12

11.1-11.10; Ex. 6 at § IV(H); Ex. 7 at ¶¶ 91-97.)[2]  Again, Abbott's evidence shows that the physicians who use these devices can talk about them based on their experience.  As Dr. Feldman explained, physicians do not run clinical trials to test features.  (Abbott Ex. 5 at ¶ 67.)

Publications and presentations further confirm that physicians use their experience and training to make decisions about patient selection and whether a device is beneficial.  One example is the "Percutaneous Mitral Leaflet Repair" book cited by Abbott during the PI, edited by Dr. Feldman and Evalve founder Dr. St Goar.  (Davis Ex. 15 (D.I. 15-4).)  Among other relevant chapters are two by Dr. Armstrong on patient selection, one of which explains why some anatomies are hard to treat with MitraClip.  (*Id.* at Ch. 12; *see also id.* at Ch. 11.)  The *Lancet* article is another example of physicians making patient-selection decisions.  (Abbott Ex. 21.)  Abbott notes that some publications about the benefits of PASCAL are cautious in their predictions about how many patients will benefit from PASCAL in the future. (*See* Br. at 12.)  But, importantly, those publications, like Abbott's expert reports, confirm that physicians in this field rely on their own experience to assess which device would be better for which anatomy.  (*See, e.g.*, Abbott Exs. 21-27; Ex. 2 at ¶¶ 90-96; Ex. 5 at ¶¶ 62, 104-105.)  It is not the case that feature-specific testing or a clinical trial is required for a physician to offer reliable testimony on that subject.  And in the far-more developed field of transcatheter aortic valve replacement, where there have been multiple devices available to physicians for years, physicians regularly choose between devices without head-to-head data, which largely does not exist.  (*See* Davis Ex. 26 at 13-14; Ex. 29 at 201-205.)

Nor did the physicians say that they have no external evidence for the opinions offered.  Dr. Kaneko, for example, was clear that there **is** evidence, in the form of the *Lancet* article, that

---

[2] Edwards moved to preclude Drs. Makar, Sorajja, and Little from opining that particular features of MitraClip drive economic demand, but is not seeking to prevent those physicians from testifying about how certain features contribute to achieving particular medical results.  (D.I. 352.)

PASCAL will be able to overcome some of the limitations of MitraClip. (Davis Ex. 29 at 165; *see also, e.g.*, Ex. 30 at 52-56, 105-107; Ex. 17 at 89-91; Ex. 23 at 38; Ex. 24 at 75-79.) And in any event, "Plaintiffs' concerns regarding the lack of data may be explored on cross-examination." *Integra Lifesciences*, 2018 WL 1785033, at *6.

Abbott's objections to a number of challenged opinions, including on the difficulties of using MitraClip, are also unclear. For example, Abbott seeks to strike Dr. Kipperman's reference to a physician steering-committee's note that "XTR is not recommended" in certain patient anatomies. (Abbott Ex. 7 at ¶ 110.) And Abbott seeks to strike Dr. Deuschl's explanation that simultaneous grasping can result in sub-optimal leaflet insertion. (Abbott Ex. 4 at ¶ 30.) Abbott's failure to explain why these criticisms should be excluded is reason enough to deny the motion on those and similar paragraphs. Abbott's motion also fails on the merits. It is accepted that there are anatomies that are difficult or impossible to treat with MitraClip, and Dr. Feldman's report discusses several relevant publications. (Abbott Ex. 5 at ¶¶ 30-40.) The people who categorize these patient anatomies are treating physicians. (*See, e.g.*, Davis Ex. 31 at 870.) Opinions about difficulties using MitraClip, based on physician experience and training, are reliable.

*       *       *

As explained above, each of Drs. Kipperman, Feldman, Armstrong, Chakravarty, Kaneko, and Deuschl has experience treating patients suffering from MR. They are experienced in patient selection. They all have experience with MitraClip, and five of the six have experience with PASCAL. As a review of their opinions reveals, it is that experience (and training, and the literature) that they applied when reaching their opinions, just as Abbott's experts did and just as other physicians did when publishing. Their opinions are thus based on reliable science and meet the test of Rule 702. They are not rendered unreliable because there are as of yet no clinical trial

14

results that definitively prove PASCAL's superiority under FDA standards for superiority.  To require more—such as a showing that FDA would accept the opinions as establishing superiority— would run contrary to Rule 702's liberal policy of admissibility.  *See Paoli II*, 35 F.3d at 744.

### b)   Other indicia of reliability support admissibility

Rule 702 is satisfied if the challenged opinions are properly supported by the physicians' experience.  *See, e.g.*, *Comcast Cable Commc'ns, LLC* v. *Sprint Commc'ns Co.*, 203 F. Supp. 3d 499, 545 (E.D. Pa. 2016) (expert "based his testimony on his review of the relevant evidence and his expertise.  This is sufficient foundation for reliability.").  "[E]xpert testimony does not have to obtain general acceptance or be subject to peer review to be admitted under Rule 702," *Schneider*, 320 F.3d at 406, though here there is evidence of both.  There are many publications on patient selection in this field (*see, e.g.*, Davis Ex. 31; Ex. 15 at Ch.12; Ex. 32), including publications relied on by the physicians here addressing PASCAL's patient benefits (*see, e.g.*, Abbott Ex. 21).  And it is generally accepted that physicians will apply their experience to decide which devices will benefit which patients, as those publications also confirm.  Edwards was not required to show, for example, that the physicians' use of their expertise has an error rate.  *See Integra Lifesciences*, 2018 WL 1785033, at *4.  Abbott's cases are not to the contrary.  The opinions in *UGI Sunbury* were excluded as both not testable ***and*** not based on relevant experience. 949 F.3d at 834.  In *Oddi* v. *Ford Motor Co.*, the Third Circuit again recognized that training and experience can suffice. 234 F.3d 136, 158 (3d Cir. 2000).  Nor has Abbott explained why the challenged physicians need to offer quantitative evidence.  There is no indication in the record that interventional cardiology works that way, nor is that the standard for either lost profits or an injunction.

### c)   The physicians were not required to provide patient records

All three of Abbott's physician-experts discussed individual patients that they had treated (or helped to treat) with MitraClip, with no patient records.  (*See* Abbott Ex. 13 at ¶¶ 6.13, 6.17,

15

Davis Ex. 6 at ¶ 92(g), Ex. 7 at ¶ 77(b).)  It is not the law that physicians can only rely on experience to testify if they must produce patient records.  None of Abbott's cases say that.

> **d)    The physicians did not ignore alternative causes or other relevant evidence**

Abbott criticizes the physicians for failing to control for differences in patient populations. But the physicians were not conducting statistical analyses, and, as shown above, were not required to do so.  Grounds for expert opinions "merely have to be good, they do not have to be perfect," and exclusion is not warranted even if "there are better grounds for some alternative conclusion" or flaws in methodology.  *Paoli II*, 35 F.3d at 744.  For thicker anterior leaflets in particular, there is no evidence that it is even possible to control for that difference.

Abbott also criticizes four of the physicians for not relying on non-public data.[3]  But physicians in private practice typically do not have access to a manufacturer's non-public data when they form opinions about what devices they should use.  Abbott's only evidence that the data would be useful is testimony from Dr. Kipperman that it would be useful ***to compare to the EXPAND*** data.  (Abbott Ex. 20 at 1411-1412.)  It is simply not true that physicians needed to consider this data to be able to offer their opinions.  The overwhelming majority of MitraClip cases have not been reported in the literature (*see* Davis Ex. 23 at 140-142), and, not surprisingly, such unreported commercial data was not considered by any of Abbott's expert physicians.  This is not like the situation in *Paoli II*, where a doctor gave a medical diagnosis based solely on reading answers to a questionnaire while ignoring other possible explanations for the plaintiffs' illnesses. 35 F.3d at 763.  Had the physicians here relied on the commercial data, then the criticism would

---

[3] Abbott misstates the record with respect to Dr. Feldman, who did reference aggregate commercial data in his report.  (*See* Abbott Ex. 5 at ¶ 61.)  The testimony that Abbott points to is about individual commercial cases; Dr. Feldman discussed in his report only one individual commercial case.  (Abbott Ex. 12 at 108-110.)

presumably have been that they relied on data that is not available to other physicians, such that their opinions were not reliable evidence on, for example, whether each PASCAL sale is a lost MitraClip sale. And "the rejection of expert testimony is the exception and not the rule." *Comcast Cable*, 203 F. Supp. 3d at 543 (quotation omitted).

### 3. The Challenged Opinions Meet the "Fit" Requirement.

The challenged opinions are relevant to issues in this case. Abbott cannot credibly contend that the opinions are a bad "fit" on the public interest factor. Physician testimony about the benefits of PASCAL shows that the public would be harmed by an injunction. Similar evidence was considered by the Court in Abbott's preliminary injunction request. (*See* D.I. 164 at 56-59.) Given the seriousness of the issue, Abbott's objection to hearing from six physicians rings hollow. It is relevant that many physicians share the view that patients will be harmed if PASCAL is unavailable. Had Edwards relied on a single physician, surely Abbott would allege that Edwards selected an outlier. This evidence is also relevant to Abbott's claim for lost profits damages.

In the jury trial, Edwards does not expect to call six physicians to the stand. Who will testify depends upon future developments in the case and patient scheduling issues. Those physicians who testify will be offering relevant testimony responsive to Abbott's arguments. Abbott may not use "cumulativeness" to try to exclude *all* of the six physicians. Abbott also lists Rule 403 and utters the word "prejudice," but needed to do far more to validly raise that objection. Nor was Edwards was required to tell Abbott in June what opinions might be included in *responsive* expert reports due in December. And, even in that June response, Edwards asserted that Abbott would not be entitled to lost profits damages because ███████████████████ ███████████████████████████████ (Abbott Ex. 34 at 22.) Abbott also omits another interrogatory response that shows Abbott has long known that physicians' opinions about PASCAL would be relevant. (Davis Ex. 33 at 24-27.) The "fit" requirement is satisfied.

17

**B.     Edwards' Invalidity Expert Did Not Apply the Wrong Legal Standards**

In opining that certain claims are invalid under 35 U.S.C. § 112 and for OTDP, Dr. Jensen did not misapply the law.  His opinions should not be struck.

**Section 112:**  Abbott mischaracterizes Dr. Jensen's § 112 analyses as improperly focusing on PASCAL.  What he did instead was properly use Abbott's infringement accusation to show how far the asserted claims' functional language is being stretched.  (*E.g.*, Abbott Ex. 8 at ¶¶ 617-630.)  For example, although the claims require a device's fixation elements are "moveable" between certain positions, that movement is not tied to any structural feature, and it is Abbott's position, in its infringement allegations, that movement based on the flexibility of a device's manufacturing material suffices.  (*Id.*)  Dr. Jensen can use that point to illustrate the apparent breadth of the claims and their lack of support, and indeed, the Federal Circuit has repeatedly affirmed the use of an accused product as a proxy to demonstrate breadth.  In *Plant Genetic Systems*, the court concluded that claims to plant cells were invalid under § 112 because they were broad enough to cover "monocot cells," which patentee conceded were covered as they were the type of accused cells.  *See Plant Genetic Sys., NV* v. *DeKalb Genetics Corp.*, 315 F.3d 1335, 1341 (Fed. Cir. 2003); *see also Rivera* v. *ITC*, 857 F.3d 1315, 1319-21 (Fed. Cir. 2017) (claims invalid under § 112 where element (coffee "receptacle") was read broadly to cover feature of accused product ("integrated filter cartridge")).  Moreover, as in *Amgen*, it would be error to preclude testimony showing that the devices disclosed in Abbott's patents are "not representative of the entire genus" covered by its functional claim language, and this is true even where Dr. Jensen uses the accused product itself "to support the unrepresentativeness argument" and non-enablement. *See Amgen Inc.* v. *Sanofi*, 872 F.3d 1367, 1373-75 (Fed. Cir. 2017); *MorphSys, Inc.* v. *Janssen Biotech, Inc.*, 358 F. Supp. 3d 354, 365 (D. Del. 2019) (holding "post-priority-date evidence can be considered where . . . it is used to evaluate whether the disclosed species sufficiently represent

18

the claimed genera"). And there is also no reason to preclude Dr. Jensen's related opinions regarding the inventors' testimony about the limits of their research (*see, e.g.*, Abbott Ex. 8 at ¶¶ 631-642), which "illuminates the absence of critical description in this case." *Nuvo Pharm. (Ireland) Desig. Activity Co.* v. *Dr. Reddy's Labs., Inc.*, 923 F.3d 1368, 1381 (Fed. Cir. 2019).

Abbott's cases are inapposite. They each concern experts who improperly focused on § 112 support for **unclaimed** features found in the accused products. *See Inline Connect. Corp.* v. *AOL Time Warner Inc.*, 2007 WL 275928, *4 (D. Del. Jan. 29, 2007) (accused product's "ADSL service"); *In re ChanBond, LLC Patent Litig.*, 2019 WL 6910284, *5-6 (D. Del. Dec. 19, 2019) (accused product's use of "cable network and DOCSIS devices").

**Double-Patenting:** Abbott says Dr. Jensen applied the wrong law by combining claims, but the law does not prohibit combining claims. In *Perricone* v. *Medicis Pharm. Corp*, the District Court **combined claims 4 and 7** to invalidate claim 19 under OTDP. 267 F. Supp. 2d 229, 241-42 (D. Conn. 2003), *aff'd in part, vacated in part, rev'd in part*, 432 F.3d 1368 (Fed. Cir. 2005). The Federal Circuit, in affirming, expressly acknowledged that the district court's conclusion that claim 19 of the challenged patent was invalid under OTDP was based on the combination of claims 4 and 7 of the reference patent. *Perricone*, 432 F.3d at 1374, 1380. And the Federal Circuit also used unrelated claims in an OTDP analysis in *Georgia-Pacific Corp.* v. *U.S. Gypsum Co.*: "The dependent claims of the '989 patent . . . are likewise invalid . . . in light of the claims of the '569 and '496 patents." 195 F.3d 1322, 1328 (Fed. Cir. 1999). As for Abbott's cases, *In re Goodman,* decided 12 years before *Perricone*, does not prohibit "combining claim elements" in an OTDP analysis. 11 F.3d 1046, 1052 (Fed. Cir. 1993). The *Goodman* court did not even need to consider obviousness because the rejected claims were generic to, and anticipated by, a single species claim from the reference patent. *Id.* at 1053. And the *Magna* decision is in conflict with *Perricone* and

rests upon a misinterpretation of *Georgia-Pacific*'s analysis.  *Magna Elecs., Inc.* v. *TRW Auto. Holdings Corp.*, 2016 WL 4239187, at *3-5 (W.D. Mich. Jan. 8, 2016).  Dr. Jensen did not use the wrong law, and his testimony should be permitted.

### C.    Edwards' Damages Expert Was Permitted To Criticize Abbott's Expert

Abbott seeks to exclude paragraphs 55, 56, and 59 of Dr. Sullivan's reply "because the law does not require consideration of a profitability for commercial success."  (Br. at 20.)  But paragraph 59 is about market growth, not profitability, which Abbott fails entirely to address in its motion.  Testimony on paragraph 59 should thus not be excluded.  As for paragraphs 55 and 56, Dr. Sullivan does not opine that profitability is ***required*** evidence to show commercial success.  Rather, he opines that profitability is ***relevant*** evidence that Abbott's expert Mr. Chang did not consider.  (Abbott Ex. 11 at ¶¶ 55-56.)  Dr. Sullivan's discussion of profitability was criticizing Mr. Chang for citing sales figures without doing any analysis to determine what those figures mean in the context of this product and market, including whether they are "significant sales in a relevant market."  (Abbott Ex. 37 at ¶¶ 1188-1191; Abbott Ex. 11 at ¶¶ 55-56.)  That is a valid criticism, as Delaware courts often cite profitability as evidence relevant to commercial success.  *See, e.g.*, *Noven Pharm., Inc.* v. *Actavis Labs. UT, Inc.*, 2017 WL 6619330, at *33 (D. Del. Dec. 22, 2017) (using profitability as measure of commercial success); *Avanir Pharm., Inc.* v. *Actavis S. Atl. LLC*, 36 F. Supp. 3d 475, 508-09 (D. Del. 2014), *aff'd*, 612 F. App'x 613 (Fed. Cir. 2015); *ViiV Healthcare UK Ltd.* v. *Lupin Ltd.*, 6 F. Supp. 3d 461, 502 (D. Del. 2013), *aff'd*, 594 F. App'x 686 (Fed. Cir. 2015).  Abbott cites no authority stating otherwise.  Abbott's only case confirms that Dr. Sullivan is allowed to offer rebuttal evidence.  *Ecolochem, Inc.* v. *S. Cal. Edison Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000).  The complained of opinions are not "legally incorrect."

## V.    <u>CONCLUSION</u>

For these reasons, the Court should deny Abbott's motion to exclude in full.

<table>
<tr><td></td><td>/s/ Kelly E. Farnan</td></tr>
</table>

|  |  |
|---|---|
|  | */s/ Kelly E. Farnan*<br>Jeffrey L. Moyer (#3309)<br>Kelly E. Farnan (#4395)<br>Christine D. Haynes (#4697)<br>Richards, Layton & Finger, P.A.<br>920 N. King Street<br>One Rodney Square<br>Wilmington, DE 19801<br>(302) 651-7700<br>Moyer@rlf.com<br>Farnan@rlf.com<br>Haynes@rlf.com |
| OF COUNSEL:<br>Nicholas Groombridge<br>Catherine Nyarady<br>Kripa Raman<br>Kira A. Davis<br>Michael F. Milea<br>Allison C. Penfield<br>Ayelet Evrony<br>Joshua Reich<br>PAUL, WEISS, RIFKIND, WHARTON &<br>GARRISON LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>(212) 373-3000<br>ngroombridge@paulweiss.com<br>cnyarady@paulweiss.com<br>kraman@paulweiss.com<br>kdavis@paulweiss.com<br>mmilea@paulweiss.com<br>apenfield@paulweiss.com<br>aevrony@paulweiss.com<br>jreich@paulweiss.com |  |

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Kira A. Davis
Michael F. Milea
Allison C. Penfield
Ayelet Evrony
Joshua Reich
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
ngroombridge@paulweiss.com
cnyarady@paulweiss.com
kraman@paulweiss.com
kdavis@paulweiss.com
mmilea@paulweiss.com
apenfield@paulweiss.com
aevrony@paulweiss.com
jreich@paulweiss.com

David E. Cole
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
dcole@paulweiss.com

Dated:  March 6, 2020

*/s/ Kelly E. Farnan*
Jeffrey L. Moyer (#3309)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Moyer@rlf.com
Farnan@rlf.com
Haynes@rlf.com

*Attorneys for Defendants Edwards
Lifesciences Corp. and Edwards Lifesciences
LLC*

21

## CERTIFICATE OF SERVICE

I, hereby certify that on March 6, 2020, true and correct copies of the foregoing were caused

to be served on the following counsel of record as indicated

**BY E-MAIL**

Karen E. Keller
David M. Fry
Nathan R. Hoeschen
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801

**BY E-MAIL**

James F. Hurst
Amanda J. Hollis
Gregory B. Sanford
Rebecca Fitzpatrick
Kirkland & Ellis LLP
300 North La Salle
Chicago, IL 60654

Benjamin A. Lasky
Aaron D. Resetarits
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Erin C. Johnston
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Farnan@rlf.com

22

RLF1 23047637v.1